CLERK'S OFFICE U.S. DIST. COURT
AT CHARLOTTESVILE, VA
FILED

SEP 16 2019

JULIA C. DUDLEY CLERK
BY:
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT

## FOR THE WESTERN DISTRICT OF VIRGINIA

## CHARLOTTESVILLE DIVISION

| | |
|---|---|
| Kieran Ravi Bhattacharya,<br><br>**Plaintiff,**<br><br>v.<br><br>Rector and Visitors of the University of Virginia,<br><br>**Defendant** | **Case No.:** 3:19 CV 00054<br><br>**JURY TRIAL DEMANDED** |

## PLAINTIFF'S COMPLAINT

COMES NOW, Plaintiff Kieran Bhattacharya, for his Complaint, and states as follows:

1. Plaintiff Kieran Bhattacharya (hereinafter "Plaintiff"), is a United States Citizen and a resident of the State of Hawai'i. He matriculated as a medical student at the University of Virginia School of Medicine (hereinafter "SOM") in the Class lass of 2020 (hereinafter "SOM2020") on 4 August, 2016 and took a voluntary leave of absence on 7 February, 2017. Plaintiff joined the Class of 2021 (hereinafter "SOM2021") on 3 January, 2018 and was enrolled at SOM until he received a 1-year suspension for "unprofessionalism" from Academic Standards and Achievement Committee (hereinafter "ASAC") chairman Jim Tucker, MD (hereinafter "Dr. Tucker") on 29 November, 2018. Plaintiff is currently unemployed. Plaintiff is filing this Complaint as a pro se litigant.

2. The University of Virginia, an institution of higher education, was incorporated and created as a body politic to be known by the name "Rector and Visitors of the University of Virginia" (hereinafter "University").

3.    Defendant University is a citizen of Virginia for purposes of diversity jurisdiction in that
      it has the power to sue and be sued, complain, and defend in all courts; it exercises
      autonomy over its operations; it does not perform traditional government functions; and
      any judgment against it would not be paid from the state treasury.

4.    Original federal question jurisdiction of this Court is proper pursuant to Article III, § 2 of
      the United States Constitution and 28 U.S.C. § 1332 which provides that federal courts
      shall have jurisdiction where there is diversity of citizenship and the amount in
      controversy is greater than $75,000.

5.    Plaintiff matriculated to SOM and began the Fall 2016 Semester as a member of
      SOM2020 on 4 August, 2016.

6.    During the Fall 2016 semester, Plaintiff participated in the SOM's mandated Social
      Issues in Medicine (hereinafter "SIM") course through shadowing and direct client
      contact at the Albemarle County Department of Social Services, Foster Care Unit. In the
      Agency Evaluation of Student (Exhibit 1.), Supervisor Beckie Aderholz reported that
      Plaintiff attended all scheduled sessions, conformed to expectations with respect to
      different metrics, and received no negative responses.

7.    During the Fall 2016 semester, Plaintiff participated in Team-Based Learning (hereinafter
      "TBL") exercises and received five Student Performance Evaluations (hereinafter "SPE")
      from five medical students in Plaintiff's six-person TBL team for that semester. Three of
      five medical students rated Plaintiff's TBL performance as "Frequently exceeds
      expectations"; one medical student rated Plaintiff's TBL performance as "Meets and
      sometimes exceeds expectations"; and one medical student rated Plaintiff's TBL
      performance as "Meets expectations." All five of Plaintiff's SPEs from TBLs in the Fall

2

2016 Semester are included (Exhibit 2.) with this Complaint with redactions of any and all personal identifiers of each of the other five medical students in Plaintiff's TBL group.

8.     During the Fall 2016 semester, Plaintiff participated in Clinical Performance Development (hereinafter "CPD") 1A and received one SPE (Exhibit 3.) from his CPD mentor, Andrew Wolf, MD (hereinafter "Dr. Wolf"). In this SPE, Dr. Wolf marked "Strongly Agree" with respect to the following assertions: "The student participates in and contributes to small group discussion"; "The student is willing to help others in the group"; "The student exhibits humanism, compassion, and empathy during small group discussion"; "The student demonstrates engagement in the SIM community service experience"; "The student demonstrates awareness of the political and economic forces that impact the delivery of health care"; and "The student demonstrates awareness of the socio-cultural forces that impact the delivery of health care."

9.     On 18 December, 2016, Plaintiff completed the Fall 2016 semester in good academic standing while as a member of SOM2020.

10.     Plaintiff began the Spring 2017 semester at SOM on 2 January, 2017 while as a member of SOM2020.

11.     On 7 February, 2017, Plaintiff took a 1-year leave of absence (hereinafter "LOA") from SOM. On the University of Virginia Official Withdrawal Form (Exhibit 4.), Plaintiff cited his reason for withdrawal as "Personal."

12.     During Plaintiff's LOA from SOM throughout the year 2017, Plaintiff authored and presented, in conjunction with one former SOM classmate, an abstract at the 4th Annual Symposium on Academic Interventional Radiology on 30 September, 2017 in Washington DC.

3

13. During Plaintiff's LOA from SOM throughout the year 2017, Plaintiff authored and presented, in conjunction with one former SOM classmate, a poster entitled "Characterization of trends in medical student indebtedness with current and potentially new repayment options for young physicians" at the Sixteenth Annual Medical Student Research Symposium at the University of Virginia School of Medicine on 7 November, 2017.

14. During Plaintiff's LOA from SOM throughout the year 2017, Plaintiff authored, in conjunction with one former classmate, "Endovascular Management of Acute Mesenteric Ischemia" and orally presented findings at the 43rd Annual Scientific Meeting of Society of Interventional Radiology on 19 March, 2018 in Los Angeles, California.

15. During Plaintiff's LOA from SOM throughout the year 2017, Plaintiff authored a textbook chapter entitled "Special Considerations: Revision Anterior Cruciate Ligament," for which he received first authorship in the first edition of the textbook, "ACL Injuries in Female Athletes" in the year 2018. This textbook was published in the year 2018.

16. During Plaintiff's LOA from SOM throughout the year 2017, Plaintiff authored a textbook chapter entitled "Head and Spine Diagnosis and Decision Making," for which he received first authorship in the Fifth Edition of "Delee, Drez, and Miller's Orthopaedic Sports Medicine" in the year 2018. The textbook was published in the year 2019.

17. During Plaintiff's LOA from SOM throughout the year 2017, Plaintiff edited and contributed to the manuscript "Endovascular Management of Acute Mesenteric Ischemia," for which he received second authorship after it was accepted for publication in "Annals of Gastroenterology" on 13 August, 2019.

4

18. Plaintiff returned to SOM on 3 January, 2018 to begin the Spring 2018 semester as a member of SOM2021.

19. During the Spring 2018 semester, Plaintiff participated in TBL exercises and received five SPEs from five medical students in Plaintiff's six-person TBL. Three of the five medical students rated Plaintiff's TBL performance as "Frequently exceeds expectations"; and two medical students rated Plaintiff's TBL performance as "Meets and sometimes exceeds expectations." All five complete SPEs from the Spring 2018 Semester are included (Exhibit 5.) with this Complaint with redactions of any and all personal identifiers each of the other five medical students in the TBL group.

20. During the Spring 2018 semester, Plaintiff participated in CPD 1B and received one SPE (Exhibit 6.) from his CPD mentor, James Moak, MD (hereinafter "Dr. Moak").

21. A "Professionalism Concern Card" at SOM is punitive administrative action taken against medical students for a variety of forms of misconduct, including but not limited to unexcused absences and violations in professionalism. According to SOM's Policy on Academic and Professional Enhancement (Exhibit 7.), "Any breach of professionalism resulting in a recorded observation, e.g., Professionalism Concern Card, letter, written report, etc., must be addressed with the student by their college dean and documentation of the discussion must be recorded."

22. At 10:52 AM on 4 May, 2018, during the Spring 2018 semester, Plaintiff received a Professionalism Concern Card (Exhibit 8.) from an Attendance Monitor, who commented that "Student did not attend the required Patient Presentation on May 2, 2018."

23. In the Professionalism Concern Card issued against Plaintiff by Attendance Monitor on 4 May, 2018, Attendance Monitor reports that he or she did not notify Plaintiff of this

5

concern card; that he or she did not feel uncomfortable in reporting this concern card to Plaintiff; and that he or she did request to be contacted about the action taken. Plaintiff was not made aware of having received this Professionalism Concern Card until after receiving his medical student file more than six and a half months later on 20 December, 2018.

24. Plaintiff reports that he did attend the 2 May, 2018 patient presentation, but that he was not tallied as present due to a lapse in Plaintiff's subscription of SOM's attendance technology.

25. Attendance at SOM is monitored using a "Turning Point Login," the subscription service for which had expired at the time for the Plaintiff due to his LOA during the year 2017. Plaintiff was notified by Dr. Mary Kate Warden (hereinafter "Dr. Warden"), a "system leader" for the area of study for which the Patient Presentation was focused, and Plaintiff promptly resolved the issue with SOM's technical support.

26. Despite resolving the issue and communicating the resolution with Dr. Warden, Plaintiff reports that the Attendance Monitor did not rescind the Professionalism Concern Card against Plaintiff.

27. Plaintiff reports having no recollection of discussion or notification of the aforementioned Professionalism Concern Card with his then college dean, John J. Densmore, MD, PhD (hereinafter "Dr. Densmore") or any other faculty or staff member. Furthermore, there is no evidence of notification to or discussion of this Professionalism Concern Card to Plaintiff in his student file.

28. On 27 May, 2018, Plaintiff completed the Spring 2018 semester at SOM in good academic standing while as a member of SOM2021.

6

29. On 30 July, 2018, Plaintiff began the Fall 2018 semester at SOM while as a member of SOM2021.

30. At noon on 25 October, 2018, Plaintiff attended a SIM discussion entitled "Microaggressions: Why are "They" So Sensitive?" led by Beverly Colwell Adams, PhD (hereinafter "Dr. Adams") and hosted by the SOM chapter of the American Medical Women's Association (hereinafter "AMWA"). Plaintiff participated in a 5 minute and 20 second discussion with two panel speakers, Dr. Adams and Sarah K. Rasmussen, MD, PhD (hereinafter "Dr. Rasmussen"), during a designated question and answer session.

31. The entire 1-hour SIM discussion is included in this complaint (Exhibit 9.). Plaintiff participates in discussion with two panel speakers, Dr. Adams and Dr. Rasmussen, between 28:40 and 34:00 of the one-hour session.

32. At 2:59 PM on 25 October, 2018, Christine M Peterson, MD (hereinafter "Dr. Peterson"), a gynecologist and one of four "college deans" at SOM, sent Plaintiff the following email (Exhibit 10.): "Kieran, I was at the noontime "Microaggressions" panel today and observed your discomfort with the speaker's perspective on the topic. Would you like to come share your thoughts with me? I think I can provide some perspective that will reassure you about what you are and are not responsible for in interactions that could be uncomfortable even when that's not intended. If you'd prefer to talk with your own college dean, that's fine too. I simply want to help you understand and be able to cope with unintended consequences of conversations. Dr. Peterson"

33. Plaintiff agreed to meet with Dr. Peterson at her office at 4 PM on 31 October, 2018.

34. At 9:04 PM on 25 October, 2018, Nora Kern, MD (hereinafter "Dr. Kern"), a Urologist at SOM, issued a Professionalism Concern Card (Exhibit 11.) against Plaintiff. Dr. Kern

7

was the third member on the speaking panel of the SIM discussion and called on Plaintiff

to ask questions during the discussion; and at no time during the 5 minutes and 20 second

discussion involving Plaintiff, Dr. Adams, and Dr. Rasmussen did Dr. Kern directly

address the Plaintiff or his line of questioning as inappropriate.

35. In support of the Professionalism Concern card against Plaintiff, Dr. Kern cites relevance

in the following two areas: "Respect for Others" and "Respect for Differences."

36. Dr. Kern refers to Plaintiff as "this student" and "med student" in the following

description in support of the Professionalism Concern Card: "For a AMWA session, we

held a panel on micro aggression. Myself and 2 other faculty members were invited

guests. This student asked a series of questions that were quite antagonistic toward the

panel. He pressed on and stated one faculty member was being contradictory. His level of

frustration/anger seemed to escalate until another faculty member defused the situation

by calling on another student for questions. I am shocked that a med student would show

so little respect toward faculty members. It worries me how he will do on wards."

37. The supporting commentary from Dr. Kern in her Professionalism Concern Card against

Plaintiff does not directly quote Plaintiff, Dr. Rasmussen, or Dr. Adams from the 5

minutes and 20 seconds of available audio discussion amongst these three individuals.

38. Dr. Kern reports in the Professionalism Concern Card at 9:04 PM on 25 October, 2018

that she has not discussed her concerns with Plaintiff and further discloses that she does

not feel uncomfortable discussing her concerns with Plaintiff. Moreover, Dr. Kern makes

no indication that she has reported her issuance of a Professionalism Concern Card

against Plaintiff with anyone other than Katherine Yates (hereinafter "Ms. Yates"), the

registrar at SOM and standard recipient of the concern card notifications through som-

8

studentaffairs@virgina.edu. This Professionalism Concern Card was not made available to Plaintiff until after receiving his medical student file approximately 56 days later on 20 December, 2018.

39. Plaintiff reports no recollection of ever having being notified in person by Dr. Kern of the Professionalism Concern Card issued solely by Dr. Kern against Plaintiff. Furthermore, Plaintiff reports no recollection of ever speaking directly to or having been spoken directly to in person by Dr. Kern at any time during his enrollment at SOM. Finally, Plaintiff reports no recollection of contacting directly or having been contacted directly by Dr. Kern for any reason during his enrollment at SOM. Dr. Kern does not name Plaintiff directly by first or last name in the supporting commentary of the Professionalism Concern Card.

40. At 1:12 PM on 26 October, 2018, Dr. Densmore sent the following e-mail (Exhibit 12.) to Plaintiff: "Hi Kieran, I just wanted to check in and see how you are doing. I hope the semester is going well. I'd like to meet next week if you have some time. JJD"

41. Plaintiff agreed to meet with Dr. Densmore at noon on 1 November, 2018.

42. As had been previously agreed upon, Plaintiff met with Dr. Peterson in Dr. Peterson's office at 4 PM on 31 October, 2018 for approximately 1 hour. Plaintiff reports recollection of having discussed a variety of social and political topics with Dr. Peterson, including but not limited to the topic of microaggressions.

43. Plaintiff reports no recollection of ever having been told by Dr. Peterson during this hour-long interaction that Dr. Kern had issued a Professionalism Concern Card against Plaintiff at 9:04 PM on 25 October, 2018 as a result of the Plaintiff's participation in the SIM discussion on microaggressions between noon and 1 PM on 25 October, 2018.

9

Moreover, there is no documented report in Plaintiff's student file of Dr. Peterson's communicating to Plaintiff that he had received a Professional Concern Card from Dr. Kern as a result of Plaintiff's participation in the 25 October, 2018 SIM discussion on microaggressions.

44. As had been previously agreed upon, Plaintiff met with Dr. Densmore in Dr. Densmore's personal office at noon on 1 November, 2018 for approximately 10 minutes. Plaintiff reports having a brief discussion with Dr. Densmore about study strategies for SOM's "summative exams" and the United States Medical Licensing Exam (hereinafter "USMLE") Step 1, which Plaintiff was scheduled to take on 1 February, 2019.

45. Plaintiff reports no recollection of having being informed by Dr. Densmore during this 1 November, 2018 meeting that Dr. Kern had issued a Professionalism Concern Card against Plaintiff at 9:04 PM on 25 October, 2018 as a result of the Plaintiff's participation in the 25 October, 2018 SIM discussion on microaggressions. Furthermore, there is no documented report in Plaintiff's medical student file that Dr. Densmore had communicated to Plaintiff that Dr. Kern had issued a Professionalism Concern Card against Plaintiff as a result of Plaintiff's participation in the 25 October, 2018 SIM discussion on microaggressions.

46. After meeting with Dr. Densmore in Dr. Densmore's personal office at noon on 1 November, 2018, Plaintiff reports having been under the impression that there were no Professionalism Concern Cards in his student file. However, two Professionalism Concern Cards had been placed in Plaintiff's student file at the time of the 1 November, 2018 meeting with Dr. Densmore, and no faculty member or employee of SOM is documented to have informed Plaintiff of and/or discussed with Plaintiff these two

10

serious, punitive administrative decisions. As previously mentioned, in the Professionalism Concern Card (Exhibit 8.) issued against Plaintiff by an "Attendance Monitor" at 10:52 AM on 4 May, 2018 and in the Professionalism Concern Card (Exhibit 11.) issued by Dr. Kern at 9:04 PM on 25 October, 2018, neither the Attendance Monitor nor Dr. Kern report feeling uncomfortable discussing their concerns with Plaintiff. Nonetheless, there is no evidence in Plaintiff's student file that that either the Attendance Monitor or Dr. Kern ever explicitly reported either or both punitive administrative actions to Plaintiff. Moreover, there is no evidence in Plaintiff's student file that either the Attendance Monitor or Dr. Kern made any effort to delegate the task of explicitly reporting either or both of these Professionalism Concern Cards to Plaintiff at any time during Plaintiff's enrollment at SOM.

47. In room "MR 5 3005" at 4:03 PM on 14 November, 2018, a meeting of the University of Virginia School of Medicine Academic Standards and Achievement Committee (hereinafter "SOM ASAC") was called to order. The meeting was adjourned at 5:18 PM on 14 November, 2018. Minutes of the 14 November, 2018 SOM ASAC meeting were respectfully submitted by Ms. Yates on 27 November, 2018 (Exhibit 13.).

48. At the 14 November, 2018 SOM ASAC meeting, Ms. Yates tallied twelve voting committee members as "present." In this Complaint, each of these twelve committee members will be listed numerically in the order that each individual was listed by Ms. Yates with each committee member's name; each committee member's position at SOM on or around 14 November, 2018 to the best of Plaintiff's knowledge; and whatever the Plaintiff feels necessary to include about each committee member's position to provide this Court with what Plaintiff believes to be a sensitive and specific representation of the

11

SOM ASAC's published "Academic Standards and Achievement Committee Operating Procedures." (Exhibit 14.)

49.    Committee member #1 tallied by Ms. Yates as present at the 14 November, 2018 SOM ASAC meeting was Jim B. Tucker, MD. Dr. Tucker's publicly available biography (Exhibit 15.) discloses that he received Board Certification in General Psychiatry and Child and Adolescent Psychiatry by the American Board of Psychiatry and Neurology (hereinafter "ABPN") in 1992 and that he is currently a Professor of Psychiatry at SOM.

50.    The SOM Office of Student Affairs discloses in its publicly available list of ASAC committee members (Exhibit 16.) that Dr. Tucker is the Chair of the SOM ASAC and that he has held this position since on or before the year 2017 and will retain this position until on or after the year 2020. In accordance with Section II of the operating procedures of SOM ASAC, Dr. Tucker was qualified as a voting member of SOM ASAC during the 14 November, 2018 SOM ASAC meeting. At the time of this pleading, Plaintiff reports having had no recollection of any direct contact with Dr. Tucker on or before 14 November, 2018.

51.    Committee member #2 tallied by Ms. Yates as present at the 14 November, 2018 SOM ASAC meeting was Brian Behm, MD (hereinafter "Dr. Behm"). Dr. Behm's publicly available biography (Exhibit 17.) discloses that he received Board Certification in Internal Medicine and Gastroenterology by the American Board of Medical Specialties (hereinafter "ABMS"), retains a title of Associate Professor at SOM, and is described as a gastroenterologist. The SOM Office of Student Affairs discloses in its publicly available list of ASAC committee members that Dr. Behm has been an SOM ASAC committee member since on or before the year 2017 and will retain this position until on or after the

12

year 2020; however, Dr. Behm is currently listed as "On Leave" from the SOM ASAC for reasons unbeknownst to Plaintiff. In accordance with Section II of operating procedures of the SOM ASAC, Dr. Behm was qualified as a voting member of SOM ASAC during the 14 November, 2018 SOM ASAC meeting. At the time of this pleading, Plaintiff reports having had no recollection of any direct contact with Dr. Behm on or before 14 November, 2018.

52.     Committee member #3 tallied by Ms. Yates as present at the 14 November, 2018 SOM ASAC meeting was Donna Chen, MD, MPH (hereinafter "Dr. Chen"). Dr. Chen's publicly available biography (Exhibit 18.) discloses that she received Board Certification in Psychiatry by ABPN in 2001 and retains the following titles at SOM: Associate Professor in Psychiatry and Associate Professor in Health Evaluation Sciences. The SOM Office of Student Affairs discloses in its publicly available list of ASAC committee members that Dr. Chen has been an SOM ASAC member since on or before the year 2017 and will retain this position until on or after the year 2020. In accordance with Section II of operating procedures of the SOM ASAC, Dr. Chen was qualified as a voting member of SOM ASAC during the 14 November, 2018 SOM ASAC meeting. At the time of this pleading, Plaintiff reports having had recollection of numerous instances of direct contact with Dr. Chen in the context of medical ethics lectures while Plaintiff was enrolled at SOM.

53.     Committee member #4 tallied by Ms. Yates as present at the 14 November, 2018 SOM ASAC meeting was Stephen Culp, MD, PhD (hereinafter "Dr. Culp"). Dr. Culp's publicly available biography (Exhibit 19.) discloses that he received Board Certification in Urology by ABMS and retains the title of Associate Professor of Urology at SOM. The

13

SOM Office of Student Affairs does not currently disclose Dr. Culp as a SOM ASAC member in its publicly available list of ASAC committee members. Nonetheless, Dr. Culp was designated as a qualified voting member of SOM ASAC by Ms. Yates during the 14 November, 2018 SOM ASAC meeting. At the time of this pleading, Plaintiff reports having had no recollection of any direct contact with Dr. Culp on or before 14 November, 2018.

54. Committee member #5 tallied by Ms. Yates as present at the 14 November, 2018 SOM ASAC meeting was Pamila Herrington, MD (hereinafter "Dr. Herrington"). Dr. Herrington's publicly available biography (Exhibit 20.) discloses that she received Board Certification in Psychiatry and Neurology-Psychiatry by ABPN in 1998 and that she retains the title of Assistant Professor of Psychiatric Medicine at SOM. The SOM Office of Student Affairs discloses in its publicly available list of ASAC committee members that Dr. Herrington has been an SOM ASAC member since on or before the year 2019 and will retain this position until on or after the year 2022. In accordance with Section II of operating procedures of the SOM ASAC, Dr. Herrington was designated as a qualified voting member of SOM ASAC by Ms. Yates during the 14 November, 2018 SOM ASAC meeting. At the time of this pleading, Plaintiff reports having had recollection of multiple instances of direct contact with Dr. Herrington.

55. Committee member #6 tallied by Ms. Yates as present at the 14 November, 2018 SOM ASAC meeting was Nicholas Intagliata, MD (hereinafter "Dr. Intagliata"). Dr. Intagliata's publicly available biography (Exhibit 21.) discloses that he has received Board Certification in Internal Medicine, Gastroenterology, and Transplant Hepatology by ABMS. The SOM Office of Student Affairs discloses in its publicly available list of

14

ASAC committee members that Dr. Intagliata has been an ASAC committee member since on or before the year 2018 and will retain this position until on or after the year 2021. In accordance with Section II of operating procedures of the SOM ASAC, Dr. Intagliata was designated as a qualified voting member of SOM ASAC by Ms. Yates during the 14 November, 2018 SOM ASAC meeting. At the time of this pleading, Plaintiff reports having had no recollection of direct contact with Dr. Intagliata on or before 14 November, 2018.

56. Committee member #7 tallied by Ms. Yates as present at the 14 November, 2018 SOM ASAC meeting was Nora Kern, MD. Dr. Kern's publicly available biography (Exhibit 22.) discloses that she received Board Certification in Urology by the American Board of Urology (hereinafter "ABU") and retains the title of Assistant Professor of Urology at SOM. The SOM Office of Student Affairs does not currently list Dr. Kern in its publicly available list of ASAC committee members. Nonetheless, Dr. Kern was designated as a qualified voting member of SOM ASAC by Ms. Yates during the 14 November, 2018 SOM ASAC meeting. As mentioned previously, at the time of this pleading, Plaintiff reports having had no recollection of direct contact with Dr. Kern; however, Dr. Kern was present at the SIM discussion on microaggressions and did issue a Professionalism Concern Card against Plaintiff at 9:04 PM on 25 October, 2018.

57. Committee member #8 tallied by Ms. Yates as present at the 14 November, 2018 SOM ASAC meeting was Wilson Miller, PhD. Dr. Miller's publicly available biography (Exhibit 23.) discloses that he holds the title of Assistant Professor of Radiology and Medical Imaging at SOM. The SOM Office of Student Affairs discloses in its publicly available list of ASAC committee members that Dr. Miller has been an ASAC committee

15

member since on or before the year 2018 and will retain this position until on or after the year 2021. In accordance with Section II of operating procedures of the SOM ASAC, Dr. Miller was designated as a qualified voting member of SOM ASAC by Ms. Yates during the 14 November, 2018 SOM ASAC meeting. At the time of this pleading, Plaintiff reports having had no recollection of any direct contact with Dr. Miller on or before 14 November, 2018.

58. Committee member #9 tallied by Ms. Yates as present at the 14 November, 2018 SOM ASAC meeting was Barnett R Nathan, MD (hereinafter "Dr. Nathan"). Dr. Nathan's publicly available biography (Exhibit 24.) discloses that he received Board Certification in Neurology, Vascular Neurology, and Neurocritical Care by ABMS. The SOM Office of Student Affairs does not currently list Dr. Nathan in its publicly available list of ASAC committee members. Nonetheless, Dr. Nathan was designated as a qualified voting member of SOM ASAC by Ms. Yates during the 14 November, 2018 SOM ASAC meeting. At the time of this pleading, Plaintiff reports having had no recollection of direct contact with Dr. Nathan on or before 14 November, 2018.

59. Committee member #10 tallied by Ms. Yates as present at the 14 November, 2018 SOM ASAC meeting was Catherine Shaffrey, MD. Dr. Shaffrey's publicly available biography (Exhibit 25.) discloses that she received Board Certification in Anesthesiology by ABMS in 1996 and currently holds the title of Assistant Professor of Anesthesiology at SOM. The SOM Office of Student Affairs discloses in its publicly available list of ASAC committee members that Dr. Shaffrey has been an ASAC committee member since on or before the year 2018 and will retain this position until on or after the year 2021. In accordance with Section II of operating procedures of the SOM ASAC, Dr. Shaffrey was

16

designated as a qualified voting member of SOM ASAC by Ms. Yates during the 14 November, 2018 SOM ASAC meeting. At the time of this pleading, Plaintiff reports having had no recollection of direct contact with Dr. Shaffrey on or before 14 November, 2018.

60. Committee members #11 and #12 tallied by Ms. Yates as present at the 14 November, 2018 SOM AASC meeting were medical students at SOM. Under Section II of ASAC operating procedures, two fourth year medical students serve 1-year terms as ex-officio voting members of SOM ASAC. Plaintiff reports having had no recollection of direct contact with either of these two medical students on or before 14 November, 2018.

61. At the 14 November, 2018 SOM ASAC meeting, Ms. Yates tallied 4 individuals, including herself, as "Non-voting members." In this Complaint, each of these 4 non-voting members will be listed numerically in the order each individual was listed by Ms. Yates with each member's name; each individual's position at SOM on or around 14 November, 2018 to the best of Plaintiff's knowledge; and whatever the Plaintiff feels necessary to include about each member's position to provide this Court with what the Plaintiff believes to be a sensitive and specific representation of the SOM ASAC's published "Academic Standards and Achievement Committee Operating Procedures."

62. Non-voting member #1 tallied by Ms. Yates as present at the 14 November, 2018 SOM ASAC meeting was Megan Bray, MD (hereinafter "Dr. Bray"). Dr. Bray's publicly available biography (Exhibit 26.) discloses that she received Board Certification in Obstetrics and Gynecology by ABMS and holds the title of Associate Professor. Pursuant to Section II of operating procedures of SOM ASAC, Dr. Bray was not a qualified voting

17

member during the 14 November, 2018 SOM ASAC meeting. Plaintiff reports having had no recollection of direct contact with Dr. Bray on or before 14 November, 2018.

63. Non-voting member #2 tallied by Ms. Yates as present at the 14 November, 2018 SOM ASAC meeting was Lesley Thomas (hereinafter "Ms. Thomas"). Ms. Thomas holds the title of Assistant Dean for Medical Education, and based on publicly available information from SOM's webpage on "Medical Student Advocacy," (Exhibit 27.) serves as a vocational vector for what can include ex parte, anonymous, and unverifiable reports involving "sexism, racism, harassment, discrimination, verbal abuse, and other types of unprofessional behavior directed at students." Plaintiff reports having had no recollection of any direct contact with Ms. Thomas on or before 14 November, 2018.

64. Non-voting member #3 tallied by Ms. Yates as present at the 14 November, 2018 SOM ASAC meeting was Selina Noramly, PhD (hereinafter "Dr. Noramly"). Dr. Noramly's publicly available biography (Exhibit 28.) discloses that she holds the title of Director of Academic Enhancement at SOM. Plaintiff reports having had recollection of direct contact with Dr. Noramly on one occasion before 14 November, 2018 in October 2016 to discuss study strategies for medical school exams.

65. Non-voting member #4 tallied by Ms. Yates as present at the 14 November, 2018 SOM ASAC meeting was Katherine Yates herself. The SOM Office of Student Affairs contact list (Exhibit 29.) discloses that Ms. Yates is the SOM registrar and should be contacted for "Clerkship Scheduling, Enrollment, Leaving and Returning from the University." Plaintiff recalls having had direct contact with Ms. Yates before 14 November, 2018 when Plaintiff withdrew from SOM at Defendant University on 7 February, 2017.

18

66. At the 14 November, 2018 SOM ASAC meeting, Ms. Yates tallied 4 individuals as "Guests." In this complaint, each of these 4 Guests will be listed numerically in the order each individual was listed by Ms. Yates with each member's name; each individual's position at SOM on or around 14 November, 2018 to the best of Plaintiff's knowledge; and whatever the Plaintiff feels necessary to include about each member's position to provide this Court with what the Plaintiff believes to be a sensitive and specific representation of the SOM ASAC's published "Academic Standards and Achievement Committee Operating Procedures."

67. Guest #1 tallied by Ms. Yates as present at the 14 November, 2018 SOM ASAC meeting was David Charles Lewis, who is referred to by a "UVA PUBLIC PEOPLE SEARCH" (Exhibit 30.) as Business Intelligence Lead. Plaintiff reports having had no recollection of any direct contact with David Charles Lewis on or before 14 November, 2018.

68. Guest #2 tallied by Ms. Yates as present at the 14 November, 2018 SOM ASAC meeting was Lynne Fleming (hereinafter "Ms. Fleming"). Publicly available biography (Exhibit 31.) discloses Ms. Fleming as Associate University Counsel at The Office of the University Counsel at Defendant University. Ms. Fleming has been a member of University Counsel's Office since 2001.

69. Guest #3 tallied by Ms. Yates as present at the 14 November, 2018 SOM ASAC meeting was Dr. Peterson. Publicly available biography (Exhibit 32.) discloses that Dr. Peterson received Board Certification in Obstetrics and Gynecology by ABMS in 1982 and holds the titles of Assistant Dean for Medical Education and Associate Professor of Obstetrics and Gynecology at SOM. As mentioned previously, Plaintiff had first met in person with Dr. Peterson in her personal office at 4 PM on 31 October, 2018 per Dr. Peterson's

19

request. Plaintiff reports having had no recollection of any other interactions with Dr. Peterson between on or after 5 PM on 31 October, 2018 and on or before 4 PM on 14 November, 2018.

70. Guest #4 tallied by Ms. Yates as present at the 14 November, 2018 SOM ASAC meeting was Sean Reed, MD (hereinafter Dr. Reed). Publicly available biography (Exhibit 33.) discloses that Dr. Reed received Board Certification in Family Medicine by the American Board of Family Medicine and holds the title of Associate Professor at SOM. Plaintiff reports having had no recollection of any direct contact with Dr. Reed on or before 14 November, 2018.

71. During the 14 November, 2018 SOM ASAC meeting, Ms. Yates tallied a total twelve voting committee members; four non-voting committee members, and four guests as present. Plaintiff reports having had no recollection of any direct contact on or before 14 November, 2018 with ten of the twelve voting committee members present at the 14 November, 2018 SOM ASAC meeting; no recollection of any direct contact on or before 14 November, 2018 with two of the four non-voting committee members present at the 14 November, 2018 SOM ASAC meeting; and no recollection of any direct contact on or before 14 November, 2018 with three of the four guests present at the 14 November, 2018 SOM ASAC meeting.

72. During the 14 November, 2018 SOM ASAC meeting, Ms. Yates reports the following as a "Professionalism Issue" (Exhibit 34.): "Kieran Bhattacharya (Densmore) concern card for professionalism – From the reporter: 'For a AMWA session, we held a panel on micro aggression. I and 2 other faculty members were invited guests. This student asked a series of questions that were quite antagonistic toward the panel. He pressed on and stated one

20

faculty member was being contradictory. His level of frustration/anger seemed to escalate until another faculty member defused the situation by calling on another student for questions. I am shocked that a med student would show so little respect toward faculty members. It worries me how he will do on wards. – One prior concern card (attendance of a mandatory activity).'"

73. The punitive action against Plaintiff recorded by Ms. Yates at the 14 November, 2018 SOM ASAC occurred approximately three weeks prior. There is no evidence from minutes by Ms. Yates that there was any amount of deliberation or discussion regarding the topic of microaggressions during the meeting itself. Moreover, the Professionalism Issue reported to SOM ASAC by Dr. Kern, who herself was an SOM ASAC committee member, reads in exact verbatim as to what Dr. Kern had placed in the supporting commentary for the Professionalism Concern Card that she and only she had written in support of her furtive, punitive utilization of administrative action against Plaintiff.

74. During the 14 November, 2018 SOM ASAC meeting, Ms. Yates records the following (Exhibit 13.): "Professionalism Issues – The committee voted unanimously to send Kieran Bhattacharya (Densmore) a letter reminding him of the importance in medicine to show respect to all: colleagues, other staff, and patients and families."

75. In accordance with Section II of the operating procedures of SOM ASAC and the aforementioned tallies by Ms. Yates, a unanimous vote by the SOM ASAC committee on 14 November, 2018 includes votes by the following individuals: Drs. Jim Tucker, Brian Behm, Donna Chen, Stephen Culp, Pamila Herrington, Nicholas Intagliata, Nora Kern, Wilson Miller, Barnett Nathan, Catherine Shaffrey, and two fourth year medical students.

21

76. The unanimous vote by SOM ASAC was intended to send an e-mail reminder to Plaintiff, who at the time was a medical student as SOM, to remind Plaintiff of the importance in medicine to show respect to all. The four entities listed under "all" in the joint statement voted unanimously on by SOM ASAC include the following: colleagues, other staff, and patients and families. This declarative list does not include a reminder to show respect to medical students. Furthermore, at no point during Plaintiff's participation with two SOM faculty members in a 5 minute and 20 seconds discussion of microaggressions did Plaintiff interact with patients, families, or other staff not generally considered to be faculty members.

77. There exists no documentation in Plaintiff's student file of Plaintiff's showing disrespect to patients, families, or staff not generally considered to be faculty members.

78. There was no documented effort by any of the 20 individuals present at the 14 November, 2018 ASAC meeting to listen to the available audio of the 25 October, 2018 SIM discussion on microaggressions.

79. There was no documented effort by any of the 20 individuals present at the 14 November, 2018 ASAC meeting to explicitly notify Plaintiff by any means that Dr. Kern had issued a Professionalism Concern Card against Plaintiff at 9:04 PM on 25 October, 2018.

80. At 10:36 AM on 15 November, 2018, Dr. Tucker attached the following letter, dated on 15 November, 2018 (Exhibit 35.) in an email (Exhibit 35.B.): "Dear Mr. Bhattacharya: The Academic Standards and Achievement Committee has received notice of a concern about your behavior at a recent AMWA panel. It was thought to be unnecessarily antagonistic and disrespectful. Certainly, people may have different opinions on various issues, but they need to express them in appropriate ways. It is always important in

22

medicine to show respect to all: colleagues, other staff, and patients and their families. We would suggest that you consider getting counseling in order to work on your skills of being able to express yourself appropriately. Sincerely, Jim B Tucker, MD."

81. Dr. Tucker's recommendation of counseling to Plaintiff in the 15 November, 2018 letter on behalf on SOM ASAC was not included in the reminder that was unanimously voted upon by the SOM ASAC committee members on 14 November, 2018 according to minutes taken by Ms. Yates.

82. In Dr. Tucker's recommendation of counseling to Plaintiff on 15 November, 2018, Dr. Tucker fails to report to Plaintiff that "it" was specifically Dr. Kern and Dr. Kern only who viewed Plaintiff's conduct as "antagonistic."

83. In Dr. Tucker's recommendation of counseling to Plaintiff on 15 November, 2018, Dr. Tucker fails to report to Plaintiff that Dr. Kern issued a Professionalism Concern Card against Plaintiff at 9:04 PM on 25 October, 2018.

84. To the best of Plaintiff's knowledge, Dr. Kern was the only individual who was percipient witness of the SIM discussion on 25 October, 2018 and also a percipient witness of and voting member at the SOM ASAC meeting on 14 November, 2018.

85. At 5:45 PM on 26 November, 2018, Dr. Densmore sent the following email (Exhibit 36.) to Plaintiff: "Hi Kieran, I hope you're doing well. We were notified by the Dean of Students Office that you were heading back to Charlottesville. You will need to be seen by CAPS before you can return to classes. Let me know if you have questions. Best regards, JJD."

86. The acronym "CAPS" referenced by Dr. Densmore was understood at the time by Plaintiff to be "Counseling and Psychological Services" at the Elson Student Health

23

Center of Defendant University. Furthermore, it was understood by the Plaintiff at the time that any individual receiving treatment from Counseling and Psychological Services (hereinafter "CAPS") at Defendant university would be required to provide CAPS with expressed written consent to treatment.

87. Dr. Densmore's publicly available biography (Exhibit 37.) discloses that he has Board Certification in Internal Medicine; Hematology; and Medical Oncology by ABMS and holds the following two titles at SOM of Defendant University: Associate Professor of Internal Medicine and Associate Dean for Admissions and Student Affairs. Moreover, Dr. Densmore serves as a one of the four college deans for "Hunter College," of which Plaintiff was a member of while enrolled at SOM.

88. In response to Dr. Densmore's email (Exhibit 36.) to Plaintiff at 5:45 PM PM on November 26, 2018, Plaintiff sent the following email (Exhibit 36.) to Dr. Densmore qt 5:00 AM on 27 November, 2018: "How can it be legal to mandate psychiatric evaluations to continue my education? 'Public colleges responding to clearly protected expressions by prescribing mandatory counseling or psychological evaluation violates both students' rights to free speech and private conscience.' – Kelly Sarabyn, FIRE (Foundation for Individual Rights in Education)"

89. The Foundation for Individual Rights in Education (hereinafter "FIRE") was founded in 1999 and describes its mission (Exhibit 38.) as to "defend and sustain individual rights of students and faculty members at America's colleges and universities. These rights include freedom of speech, freedom of association, due process, legal equality, religious liberty, and sanctity of conscience."

24

90. Kelly Sarabyn, an author for and contributor to FIRE, from her 31 December, 2007 article (Exhibit 39.) entitled "Colleges, Mandatory Counseling, and the Right of Private Conscience," penned the following excerpt: "Public colleges responding to clearly protected expressions by prescribing mandatory counseling or psychological evaluation violates both students' rights to free speech and private conscience. Unlike a suspension from school, which offends a student's right to free speech, ordering psychological counseling for protected speech compounds the offense to the Constitution by violating both a student's right to free speech and his right to private conscience."

91. At 11:48 AM on 27 November, 2018, Randolph J. Canterbury, MD (hereinafter "Dr. Canterbury") sent the following email (Exhibit 40.) entitled "Required process to attend class" to Plaintiff: "Dear Kieran, I have heard from Dr. Densmore that you have been calling him about your desire to return to classes today. You are not cleared to return to class until you have been evaluated by CAPS at the Student Health Service. Do not attend your CPD group today. Make an appointment with CAPS to initiate the medical clearance process. Best regards, R. J. Canterbury, M.D."

92. Dr. Canterbury's publicly available biographies (Exhibit 41.) disclose that he received Board Certification in Internal Medicine in 1983 by ABMS and Board Certification in Psychiatry in 1985 and Addiction medicine in 1991 by ABPN. Dr. Canterbury holds the titles of Professor of Psychiatric Medicine and Internal Medicine as well as Senior Associate Dean for Education at SOM of Defendant University.

93. At the time of this Complaint and at the time of receiving the aforementioned email from Dr. Canterbury at 11:48 AM on 27 November, 2018, Plaintiff does not and did not have

25

any understanding or awareness as to what "medical clearance process" was referenced by Dr. Canterbury in Dr. Canterbury's email to Plaintiff.

94. At 1:00 PM on 28 November, 2018, Ms. Yates sent the following email (Exhibit 42.) to Plaintiff, "Hello Kieran, The Academic Standards and Achievement Committee will be meeting today to discuss your current enrollment status. You are invited to attend to share your insights with the committee. The meeting will take place at 5:00 in the Claude Moore Medical Education Building, in room G 165. Please arrive at 5:00. The meeting has some business to attend to before they have questions for you, so we will have someone waiting to let you know when they are ready for you. Please reply and let us know if you will be in attendance. Thank you, Katherine M. Yates"

95. At 1:28 PM on 28 November, 2018, Plaintiff sent the following email (Exhibit 43.) to Ms. Yates: "Who exactly will be present? Do you normally just give students 3 hours to prepare after indirectly threatening to kick them from medical school? Why exactly is my enrollment status up for discussion?"

96. At 1:37 PM, on 28 November, 2018, 203 minutes before 5:00 PM, 28 November, 2018, Ms. Yates sent the following email (Exhibit 44.) to Plaintiff: "Hello, Here is the information about the committee's make up policies, and procedures: https://med.virginia.edu/student-affairs/policies/academic-standards-and-achievement-committee-operating-procedures/ https://med.virginia.edu/student-affairs/policies/academic-standards-achievement-policy/ https://med.virginia.edu/school-administration/standing-committees/academic-standards-and-achievement-committee/ Regards, Katherine"

26

97. Per the concluding portion of the introductory paragraph of the Academic Standards and Achievement Committee Operating Procedures (Exhibit 14.), "Comprised of faculty in the school of medicine who do not assign final grades to students as well as student representatives, the role of ASAC is to promote students who meet these required standards, to recommend remedial action for those who do not meet the standards, and to suspend or recommend dismissal of those students who are incapable or who choose not to meet the required standards of achievement within the time frame allotted for completion of the M.D. degree." This introduction of this document goes on to declare: "It is the policy of the School of Medicine to give every qualified and committed student the opportunity to graduate; however, the School reserves the right, in its sole and absolute discretion, to make judgments about who has or has not demonstrated the necessary qualification to earn a degree and to practice medicine competently."

98. Section III.A. of the Academic Standards and Achievement Committee Operating Procedures (Exhibit 14.) states as follows: "Official votes may be taken when a quorum (greater than 50% of the voting members) is present. All motions, except for a motion of dismissal, shall pass by a majority of voting members present. A motion for dismissal requires a two-thirds majority of voting members. Voting members will be recused from participating and shall not be counted in the quorum is they have (or have had) a personal, mentoring, or advising relationship with the student beyond that of usual student-faculty contact in class or clinical environment. This restriction includes faculty mentors on research projects, family members, anyone with a physician-patient relationship with the student or other personal relationship."

27

99. Section III.D. of the Academic Standards and Achievement Committee Operating Procedures (Exhibit 14.) states as follows: "When there are severe professional transgressions or the Committee is to consider serious actions such as suspension or dismissal of a student, a final vote should be taken only after the student has been offered an opportunity to address the Committee in person, and to respond to questions from members of the Committee. Also, the student should be notified by the Committee in writing as to what the major concerns of the Committee are likely to be during the coming meeting. Assistant Deans for Student Affairs (College Deans) as well as relevant teaching faculty may also be invited to attend committee meetings to provide information."

100. The beginning portion of Section III.H. of the Academic Standards and Achievement Committee Operating Procedures (Exhibit 14.) states as follows: "When a student addresses the Committee, the student will act as his or her own advocate."

101. Section III.J. of the Academic Standards and Achievement Committee Operating Procedures (Exhibit 14.) states as follows "Guidelines and policies written in advance cannot cover all possible scenarios. When in doubt, the Committee should be guided by several important general principles, including: fairness to students; following due process; promptness of action and notification; maintaining confidentiality when possible; and, balancing the best interests of each student with its obligations to the Faculty, patients and to society to train graduates who demonstrate the highest standards or academic performance and conduct."

102. Paragraph 3 of the "Professionalism" subsection of SOM's Policy on Academic and Professional Advancement (Exhibit 7.) states as follows: "Any breach of professionalism

28

resulting in a recorded observation, e.g., Professionalism Concern Card, letter, written report, etc., must be addressed with the student by their college dean and documentation of the discussion must be recorded."

103. When Plaintiff had received an email from Ms. Yates at 1:00 PM on 28 November, 2018, Plaintiff had received no specific written notice or documented address from his college dean or anyone else that he had received either or both of the Professionalism Concern Cards that were in his student file at the time.

104. Although Section III.D. of ASAC operating procedures states that in instances in which the Committee is to consider serious actions such as suspension or dismissal of the student, "the student should be notified by the Committee in writing as to what the major concerns of the Committee are likely to be during the coming meeting," Plaintiff received no written notification of specific allegations in which Plaintiff was expected to explain and/or defend against in advocating for Plaintiff's enrollment status at SOM of Defendant University.

105. Although Plaintiff responded to Ms. Yates within 28 minutes and asked as to what specifically was the reasoning behind the ASAC disciplinary hearing, neither Ms. Yates nor any other employee of SOM at Defendant University was able to provide Plaintiff with any written statement of the allegations against him during the remaining 3 hours and 32 minutes that Plaintiff had to prepare to advocate for his enrollment status at SOM of Defendant University.

106. Plaintiff initially received only one e-mail from Ms. Yates and no other notifications by phone or in person from anyone else of the ASAC disciplinary hearing.

107.    Between 1:23 PM and 2:06 PM on 28 November, 2018, Plaintiff made 9 phone calls
        (Exhibit 45.) to a variety of faculty members in Charlottesville in an attempt to garner
        more information about what to expect and as to what exact consequences could arise
        from the scheduled, upcoming ASAC disciplinary hearing against Plaintiff at 5:00 PM on
        28 November, 2018.

108.    At 2:12 PM on 28 November, 2018, Plaintiff received an incoming call (Exhibit 45.)
        from Dr. Reed. While Plaintiff did not record the 2:12 PM phone call from Dr. Reed,
        Plaintiff reports recollection that Dr. Reed then informed him that he had received a
        Professionalism Concern Card from as a result of Plaintiff's participation in the
        aforementioned SIM discussion on microaggressions. Moreover, Plaintiff reports that he
        had informed Dr. Reed that he was unaware that Plaintiff had received any
        Professionalism Concern Cards. Finally, Plaintiff reports recollection that Dr. Reed had
        expressed doubtfulness that Plaintiff had not received any notification of the
        aforementioned Professionalism Concern Card. Dr. Reed did not by any means send
        Plaintiff a written copy of the Professionalism Concern Card issued against Plaintiff
        before his disciplinary hearing scheduled to take place within 2 hours and 48 minutes of
        the beginning of the incoming call from Dr. Reed.

109.    At 5:00 PM on 28 November, 2018, Plaintiff attended the ASAC hearing to discuss his
        enrollment status. Plaintiff documented the hearing via a photograph (Exhibit 46.) of the
        attendees and an audio recording (Exhibit 46.B.) of the entire disciplinary hearing. The
        duration of the ASAC hearing was approximately 28 minutes.

110.    During the 28 November, 2018 ASAC disciplinary hearing against Plaintiff, the only
        document or interaction explicitly and accurately referenced by Dr. Tucker to Plaintiff

30

was Dr. Tucker's letter on behalf of ASAC to Plaintiff regarding Plaintiff's participation in the SIM discussion on microaggressions. Plaintiff claimed to have never read the aforementioned document including Dr. Tucker's recommendation for counseling at the time of the ASAC disciplinary hearing. Plaintiff requested that Dr. Tucker produce the referenced document, and Dr. Tucker refused to do so until after the conclusion of the disciplinary hearing.

111. During the 28 November, 2018 ASAC disciplinary hearing against Plaintiff, Dr. Tucker erroneously refers to the explicit order by Dr. Densmore in the email referenced in Paragraph 85 of this Complaint as a recommendation to be evaluated by CAPS. Dr. Tucker refuses to acknowledge this error when Plaintiff finds and reads the contents of the email in person to Dr. Tucker during the ASAC disciplinary hearing.

112. From minutes (Exhibit 47.) of the 28 November, 2018 ASAC disciplinary hearing against Plaintiff, Ms. Yates tallies twelve voting committee members as "present." Nine of these twelve ASAC committee members present at the 28 November, 2018 ASAC disciplinary hearing against Plaintiff were also present at the 14 November, 2018 ASAC meeting. These nine members were Drs. Jim Tucker, Brian Behm, Donna Chen, Nicholas Intagliata, Nora Kern, Wilson Miller, Barnett Nathan, Catherine Shaffrey, and one fourth year medical student. Each of the remaining three "Disciplinary" Committee Members will be listed numerically in the order that each individual was listed by Ms. Yates with each committee member's name; each committee member's position at SOM on or around 28 November, 2018 to the best of Plaintiff's knowledge; and whatever the Plaintiff feels necessary to include about each committee member's position to provide this Court with what Plaintiff believes to be a sensitive and specific representation of

31

SOM ASAC's published "Academic Standards and Achievement Committee Operating Procedures." (Exhibit 14.)

113.    "Disciplinary" committee member #1 tallied by Ms. Yates as present at the 28 November, 2018 SOM ASAC disciplinary hearing was Roger Abounader, MD, PhD (hereinafter "Dr. Abounader"). Dr. Abounader's publicly available biography (Exhibit 48.) discloses that he holds the title of Professor of Microbiology, Immunology, and Cancer Biology at SOM. The SOM office of Student Affairs discloses in its publicly available list of ASAC committee members that Dr. Abounader has been an ASAC committee member since on or before the year 2017 and will retain this position until on or after the year 2020. In accordance with Section II of operating procedures of the SOM ASAC, Dr. Abounader was designated as a qualified voting member of SOM ASAC by Ms. Yates during the 28 November, 2018 SOM ASAC disciplinary hearing against Plaintiff. At the time of this pleading, Plaintiff reports having had no recollection of direct contact with Dr. Abounader on or before 5 PM on 28 November, 2018.

114.    "Disciplinary" committee member #2 tallied by Ms. Yates as present at the 28 November, 2018 SOM ASAC disciplinary hearing was Robert Bloodgood, PhD (hereinafter "Dr. Bloodgood"). Dr. Bloodgood's publicly available biography (Exhibit 49.) discloses that he holds the title of Professor of Cell Biology at SOM. The SOM office of Student Affairs does not currently list Dr. Bloodgood in its publicly available list of ASAC committee members. Nonetheless, Dr. Bloodgood was designated as a qualified voting member of SOM ASAC by Ms. Yates during the 28 November, 2018 SOM ASAC disciplinary hearing against Plaintiff. At the time of this pleading, Plaintiff

32

reports having had no recollection of direct contact with Dr. Bloodgood on or before 5 PM on 28 November, 2018.

115. "Disciplinary" Committee member #3 tallied by Ms. Yates as present at the 28 November, 2018 SOM ASAC disciplinary hearing was Sharon Diamond-Myrsten, MD (hereinafter Dr. Diamond-Myrsten). Dr. Diamond-Myrsten's publicly available biography (Exhibit 50.) discloses that she received Board Certification in Family Medicine by ABMS and retains the title of Assistant Professor of Family Medicine at SOM. The SOM office of Student Affairs discloses in its publicly available list of ASAC committee members that Dr. Diamond-Myrsten has been an ASAC committee member since on or before the year 2018 and will retain this position until on or after the year 2021. In accordance with Section II of operating procedures of the SOM ASAC, Dr. Diamond-Myrsten was designated as a qualified voting member of SOM ASAC by Ms. Yates during the 28 November, 2018 SOM ASAC disciplinary hearing against Plaintiff. At the time of this pleading, Plaintiff reports having had no recollection of direct contact with Dr. Diamond-Myrsten on or before 5 PM on 28 November, 2018.

116. From minutes (Exhibit 47.) of the 28 November, 2018 ASAC disciplinary hearing against Plaintiff, Ms. Yates tallies four non-voting committee members as "present." All four non-voting committee members tallied as present during the 28 November, 2018 disciplinary hearing against Plaintiff have been previously mentioned in this complaint and are listed as follows: John J Densmore, MD, PhD; Megan Bray, MD; Lesley Thomas; and Katherine Yates.

117. From minutes (Exhibit 47.) of the 28 November, 2018 ASAC disciplinary hearing against Plaintiff, Ms. Yates tallies three "Guests" as "present." All three Guests tallied as present

during the 28 November, 2018 disciplinary hearing against Plaintiff have been previously mentioned in this Complaint and are listed as follows: Kieran Bhattacharya (Plaintiff), Lynne Fleming, and Christine Peterson, MD.

118. Paragraph 1 of 5 from minutes (Exhibit 47.) of the 28 November, 2018 ASAC disciplinary hearing against Plaintiff states as follows: "The committee convened to discuss concerning behaviors exhibited by Kieran Bhattacharya (Densmore) over the past weeks after members of the Technical Standards Committee determined that the concerns were best addressed by the ASAC. The ASAC convened an emergency meeting on Wednesday November 28. Kieran Bhattacharya was invited to attend the meeting to discuss his enrollment status and did attend the meeting.."

119. Paragraph 2 of 5 from minutes (Exhibit 47.) of the 28 November, 2018 ASAC disciplinary hearing against Plaintiff states as follows: "The student was given the opportunity to address concerns about his behavior. He asked questions of members of the Committee and responded to questions asked by the Committee."

120. Paragraph 3 of 5 from minutes (Exhibit 47.) of the 28 November, 2018 ASAC disciplinary hearing against Plaintiff states as follows: "The Committee reviewed the list of technical standards that are acknowledged annually by the students especially the Emotional, Attitudinal and Behavioral Skills."

121. Paragraph 4 of 5 from minutes (Exhibit 47.) of the 28 November, 2018 ASAC disciplinary hearing against Plaintiff states as follows: "Because the student's behavior demonstrated his inability to meet several of those standards. Dr. Nathan made a motion to suspend Kieran Bhattacharya (Densmore) from the School of Medicine, effective immediately, with the option to petition to return in August of 2019. Dr. Behm seconded

34

this motion. The committee voted unanimously to accept the motion. Nora Kern did not vote on the matter, as personal business required her to leave before the vote was executed."

122. Paragraph 5 of 5 from minutes (Exhibit 47.) of the 28 November, 2018 ASAC disciplinary hearing against Plaintiff states as follows: "A letter will be sent to Kieran Bhattacharya's email, informing him of the decision and explaining the appeals process."

123. At 5:30 PM on 29 November, 2018, Dr. Tucker sent Plaintiff the following message (Exhibit 51.) by email: "Dear Mr. Bhattacharya, See the attached letter from the Academic Standards and Achievement Committee. Please know that Drs. Densmore, Reed, and Keeley are available for support. Also, in response to your question about ID access, suspension involves a deactivation of your ID per standard university procedure, but you can make an appointment should you need to meet with your college dean." Attached (Exhibit 51.B.) to this email was notification to Plaintiff of a 1-year suspension from SOM of Defendant University.

124. Paragraph 1 of 4 of Plaintiff's 1-year suspension letter states as follows: "The Academic Standards and Achievement Committee ("ASAC") convened on November 28, 2018 to review concerns that your recent behavior in various settings demonstrated a failure to comply with the School of Medicine's Technical Standards. Members of the Technical Standards Committee determined that the concerns about your recent behavior should be addressed by the Academic Standards and Achievement Committee. The ASAC decided that the nature of the concerns called for an emergency meeting. You were notified of that meeting on November 28, 2018 and provided an opportunity to be heard and to

respond to the concerns about your recent behavior. You attended the meeting, asked and answered questions and presented information."

125. Paragraph 2 of 4 of Plaintiff's 1-year suspension letter states as follows: "The Academic Standards and Achievement Committee has determined that your aggressive and inappropriate interactions in multiple situations, including in public settings, during a speaker's lecture, with your Dean, and during the committee meeting yesterday, constitute a violation of the School of Medicine's Technical Standards that are found at: https://med.virginia.edu/student-affairs/policies/technical-standards/"

126. Paragraph 3 of 4 of Plaintiff's 1-year suspension letter states as follows: "Those Standards, in relevant and as part of professionalism, state that each student is responsible for: Demonstrating self-awareness and self-analysis of one's emotional state and reactions; Modulating affect under adverse and stressful conditions and fatigue; Establishing effective working relationships with faculty, other professionals and students in a variety of environments; and Communicating in a non-judgmental way with persons whose beliefs and understandings differ from one's own."

127. Paragraph 4 of 4 of Plaintiff's 1-year suspension letter states as follows: "The committee has voted to suspend you from school, effective immediately. You may apply for readmission to return to class no earlier than August, 2019. A student suspended for academic, professionalism, or administrative reasons or a student who has academic or Technical Standards/professionalism deficiencies at the time of suspension must be reviewed and approved to return by ASAC. The committee would only approve your return if you are able to provide evidence that further violations of the Technical

36

Standards are unlikely to occur. You may appeal your suspension, in accordance with the SOM's appeal procedures."

128. In Plaintiff's 1-year suspension letter, Dr. Tucker asserts on behalf of ASAC that "The Academic Standards and Achievement Committee has determined that your aggressive and inappropriate interactions in multiple situations, including in public settings, during a speaker's lecture, with your Dean, and during the committee meeting yesterday."

129. Prior to Plaintiff's disciplinary hearing at 5:00 PM on 28 November, 2018, Plaintiff was never provided with written documentation from any employee of SOM as to what "aggressive and inappropriate interactions" Plaintiff had committed in "public settings." Moreover, no member of SOM ASAC made any specific reference to or allegation of Plaintiff's activity in public settings during the disciplinary hearing. The 1-year suspension letter itself provides Plaintiff with no details as to the nature, timing, location, severity, and/or reporting actor(s) of these multiple "public settings" in which Plaintiff is described by Dr. Tucker on behalf of SOM ASAC to have exhibited "multiple aggressive and inappropriate interactions."

130. Prior to Plaintiff's disciplinary hearing at 5:00 PM on 28 November, 2018, Plaintiff was never provided with written documentation from any employee of SOM as to what "aggressive and inappropriate interactions" Plaintiff had committed in "a speaker's lecture." If this excerpt from Dr. Tucker's 1-year suspension letter on behalf of SOM ASAC to Plaintiff was referencing the SIM discussion on microaggressions, this Court should take note from available audio of the SIM discussion that Plaintiff was called on to ask questions by Dr. Kern and spoke only during a designated period of questions and answers following Dr. Adams' lecture at the 25 October, 2018 SIM discussion on

microaggressions. Plaintiff did not speak during Dr. Adams' lecture itself, and Plaintiff attempted to detail this by presenting the 5 minute and 20 second audio excerpt to SOM ASAC during Plaintiff's disciplinary hearing but was restrained from doing so by Dr. Tucker. Also, there is no existing documentation available to Plaintiff that any ASAC committee member had listened to the available audio before incorporating this interaction and voting unanimously as a committee to issue a 1-year suspension against Plaintiff from SOM at Defendant University.

131.  Prior to Plaintiff's ASAC Disciplinary hearing on 28 November, 2018, Plaintiff was not provided with written documentation from any employee of SOM as to what "aggressive and inappropriate interactions" Plaintiff had committed "with [his] dean."

132.  Dr. Tucker asserts in the 1-year suspension letter on behalf on ASAC to Plaintiff that Plaintiff's conduct at the ASAC disciplinary hearing itself qualified as "aggressive and inappropriate," but makes no effort to provide further details on this allegation, and no characterization about Plaintiff's conduct during the disciplinary hearing is explicitly described as aggressive and inappropriate in the minutes documented by Ms. Yates of the 28 November, 2018 disciplinary hearing against Plaintiff.

133.  To the best of Plaintiff's recollection, Plaintiff reports that within 72 hours of his receiving a 1-year suspension letter from Dr. Tucker at 5 PM on 29 November, 2018, Plaintiff's UVA health system email account was deleted. Plaintiff was able to archive several emails before this email account was deleted, including but not limited to explicit orders for psychiatric evaluations by Dr. Densmore in Paragraph 85 and by Dr. Canterbury in Paragraph 91 of this Complaint that were erroneously characterized by Dr. Tucker as recommendations during the ASAC disciplinary hearing against Plaintiff.

134. Bullet point #3 of the Academic appeals process listed in the concluding portion of the 1-year suspension letter from Dr. Tucker on behalf of SOM ASAC to Plaintiff declares the following: "The student is permitted to inspect their entire medical school file, including any material upon which the decision of ASAC was based." Emails from Dr. Densmore and Dr. Canterbury obtained by Plaintiff and included as exhibits Paragraphs 85 and 91 of this Complaint were only made available through the process of forwarding and archiving what the Plaintiff believed to be pertinent emails on the morning of 29 November, 2018 and were never made available to Plaintiff in his student file or by any other means from SOM at Defendant University.

135. Bullet point #5 of the Academic appeals process listed in the concluding portion of the 1-year suspension letter from Dr. Tucker to Plaintiff declares the following: "The Appeals Committee is to conduct a hearing as soon as possible (ordinarily within 14 days) and will uphold, modify, or reverse the decision(s) of ASAC."

136. At 11:15 AM on 4 December, 2018, Plaintiff sent an email from a personal email account (Exhibit 52.) to Dr. Densmore to initiate the appeals process. At 8:02 PM on 4 December, 2018, Plaintiff received a response by email (Exhibit 52.B.) from Dr. Densmore declaring that the appeals process had been initiated.

137. On 7 December, 2018, during the course of the scheduled appeals process, Plaintiff received notification by email (Exhibit 53.) from the National Board of Medical Examiners (hereinafter "NBME") that his registration for the United States Medical Licensing Exam Step 1 (hereinafter "USMLE Step 1") was cancelled upon notification by SOM that Plaintiff was not currently enrolled at SOM. Plaintiff was previously scheduled to take the USMLE Step 1 on 1 February, 2019.

39

138. On 20 December, 2018, approximately 16 days after initiating the appeals process, Plaintiff received his medical student file. It was at this time, more than three weeks after receiving his 1-year suspension, that Plaintiff was able to view the two Professional Concerns Cards placed against him by Attendance Monitor and Dr. Kern, respectively.

139. On 3 January, 2019, Dr. Densmore sent an email with the following message: "Dear Kieran, I received from the University Police Department a copy of a "no trespass warning" issued to you (attached). We will not be able to proceed with an appeal to your suspension at this time. Best regards, John Densmore."

140. Attached in the aforementioned email from Support Services Captain Melissa Fielding with the following message (Exhibit 54.): "Dear Mr. Bhattacharya: As a follow up to my phone conversation with you on Sunday, December 30, 2018, please find attached to this letter a no trespass warning which has been issued to you by the University of Virginia Police Department at the University of Virginia."

141. No specific reasoning as to why the no trespass warning (Exhibit 54.) was issued to Plaintiff was provided to Plaintiff in writing.

142. No specific reasoning as to why the no trespass warning (Exhibit 54.) was in issued to Plaintiff and no specific notice that a no trespass warning would be issued to Plaintiff was provided to Plaintiff during the referenced phone call in the message attached to the no trespass warning issued against Plaintiff by then Support Services Captain Melissa Fielding of the University of Virginia Police Department (hereinafter "UPD") at Defendant University.

143. On 7 July, 2019, Plaintiff emailed Dr. Tucker and Dr. Densmore inquiring about the possibility of readmission to SOM. On 12 July, 2019, Dr. Densmore responded in an

40

email (Exhibit 55.) with the following message: "Dear Kieran, Thank you for your email. The School of Medicine is aware that a no trespass order was issued by the University Police Department (UPD) on January 2, 2019 prohibiting you from University Grounds for four years. We cannot address your request for readmission while a no trespass order is in effect. Should you have questions about that order, you will need to contact UPD directly. Best regards, John Densmore."

144. The no trespass warning against Plaintiff from the police department of Defendant University is set to expire on 3 January, 2023.

145. According to SOM's Policy on Academic and Professional Advancement, "All requirements for graduation, including passing Step 1, Step 2 CK and Step 2 CS of the USMLE, must be completed within six years from the date the student matriculated in the School of Medicine." Plaintiff would not be able to comply with this requirement if he were to graduate from SOM after 3 August, 2022.

## COUNT I – FIRST AMENDMENT VIOLATION (42 U.S.C. § 1983)

For count I of his Complaint, for First Amendment Violation of Freedom of Speech and Expression against Defendant University, Plaintiff Kieran Bhattacharya, states as follows:

146. Plaintiff herein incorporates by reference the allegations contained in Paragraphs 1 through 145 of his Complaint.

147. The First Amendment prohibits State officials at public universities from adopting regulations that outlaw certain student conduct when the regulation "is so broad as to chill the exercise of free speech and expression." *Dambrot v. Cent. Michigan University*, 55 F.3d 1177, 1182 (6th Cir. 1995)

148. The government may not prohibit speech "based solely on the emotive impact that its offensive content may have on a listener." *Saxe v. State College Area School dist.*, 240 F.3d 200, 209 (3d Cir. 2001) (Alito, J).

149. Moreover, "regulations that prohibit speech on the basis of listener reaction alone are unconstitutional both in public high school and university settings." *Bair v. Shippensburg Univ.*, 280 F. Supp. 2d 357, 369 (M.D. Pa. 2003).

150. A regulation is unconstitutionally overbroad if "a substantial number of instances exist in which the [regulation] cannot be applied constitutionally." *Speet v. Schuette*, 726 F .3d 867, 872 (6th Cir. 2013). This Court must find a regulation as facially unconstitutional because "the threat of enforcement of an overbroad [regulation] may deter or 'chill' constitutionally protected speech," as "[m]any persons, rather than undertake the considerable burden (and sometimes risk) of vindicating their rights through case-by-base litigation, will chose simply to abstain from protected speech, harming not only themselves but society as a whole, which is deprived of an uninhibited market of ideas." *Virginia v. Hicks*, 539 U.S. 113, 119 (2003).

151. Dr. Densmore, who was acting at the time in the capacity of a public employee at SOM of Defendant University, issued a mandatory psychiatric evaluation by Defendant University's Counseling and Psychological Services via email at 5:30 PM on 26 November, 2018 as a necessary condition for Plaintiff's returning to classes at SOM. This mandatory psychiatric evaluation constitutes a violation of Plaintiff's First Amendment protections of freedom of speech and expression. Furthermore, Dr. Densmore's issuance of a mandatory psychiatric evaluation violates Plaintiff's private conscience.

152. To Plaintiff's knowledge, no established protocol or policy of SOM at Defendant University allows a faculty to member to, without explicit reason, order that a medical student receive an indefinite amount of psychiatric evaluations for an indefinite period of time by an unspecified individual or individuals to maintain enrollment at SOM at Defendant University, a public institution. Moreover, no established protocol or policy by SOM of Defendant University was communicated to Plaintiff with the email by Dr. Densmore referenced in Paragraph 85 of this Complaint.

153. Beyond the lack of clear legal and institutional bases in Dr. Densmore's mandated psychiatric evaluation by email to Plaintiff, it isn't explicitly clear to Plaintiff as to how Dr. Densmore would be able to verify that Plaintiff had been evaluated by CAPS at the Elson Student Health of Defendant University. The Department of Student Health at Defendant University's statement (Exhibit 56.) of student confidentiality states as follows: "Your medical records will be kept confidential and access to information about you will be limited to those legitimately involved in your care. Your medical records will be released only in cases of medical emergencies, in response to court-ordered subpoenas or to persons you specify with your written consent." Moreover, Plaintiff's receiving treatment from CAPS would in itself have required written consent, and even if Plaintiff did decide on his own volition to request treatment from CAPS, there would be ample reasons for Plaintiff to do so while maintaining strict confidentiality.

154. Thus, even if Dr. Densmore had the legal and institutional authority to order psychiatric evaluations of medical students at SOM without any explicitly written reason, there would and should be no practical way for Dr. Densmore to systematically confirm that such orders were followed by Plaintiff, nor are there any publicly established policies by

43

Defendant University to the best of Plaintiff's knowledge that specify exactly what Plaintiff must have said or done while being evaluated by CAPS. Plaintiff, for example, could have decided on his volition to consent to treatment at CAPS and chose to remain silent in the presence of a psychiatrist or counselor and promptly left immediately after beginning an interaction with a CAPS employee.

155. Dr. Densmore made no attempt to challenge Plaintiff's responses by email or by phone on 27 November, 2018 to clarify what legal and institutional bases Dr. Densmore felt that he had at the time to order a mandatory psychiatric evaluation of Plaintiff as a necessary prerequisite to return to classes at SOM of Defendant University.

156. Dr. Canterbury's follow-up email on 27 November, 2018, detailed in Paragraph 91, reaffirms the mandatory psychiatric evaluation from Dr. Densmore from the previous day. Dr. Canterbury's order lacks the same degree of legal bases, institutional authority, and practical application for the same reasons listed in Paragraphs 146 to 155.

## COUNT II – FIFTH AMMENDMENT VIOLATION (U.S.C. 42 § 1983)

For Count II of his Complaint, for Fifth Amendment Violation of Procedural Due Process against Defendant University, Plaintiff Kieran Bhattacharya, states as follows:

157. Plaintiff hereby re-alleges and repeats paragraphs 1 through 156, and incorporates them herein as fully set forth.

158. The concept of procedural due process "imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment." *Matthews v. Eldridge*, 424 U.S. 319, 332 (1976)

44

159. Moreover, "[D]ue process requires notice and some opportunity for hearing before a student at a tax-supported college is expelled for misconduct." *Dixon v. Ala. State Bd. Of Educ.,* 294 F.2d 150, 158 (5th Cir. 1961).

160. Plaintiff acknowledges that "[a] university is not a court of law, and it is neither a practical or desirable one." (quoting *Flain v. Med. Coll. Of Ohio*, 418 F.3d 629, 635 n.1 (6th Cir. 2005))

161. Applying *Matthews*: "Generally, the amount of process due in university disciplinary proceedings is based on a sliding scale that considers three factors: (a) the student's interests that will be affected; (b) the risk of an erroneous deprivation of such interests through the procedures used and the probable value, if any, of additional or substitute procedural safeguards; and (c) the university's interests, including the burden that additional procedures would entail." (citing *Matthews*, 424 U.S. at 335). These are also known as the *Matthews* factors.

162. Plaintiff reports that a 1-year suspension for "unprofessionalism" would be catastrophic towards his interests as a prospective medical resident, assuming that SOM had accepted his request for reenrollment or will in the future provide Plaintiff with an opportunity for reenrollment, which Dr. Densmore reports on behalf of SOM that SOM is unable to do so at the time of this Complaint as a result of the 4-year No Trespass Order issued against Plaintiff on 2 January, 2019.

163. Plaintiff received no written explanation as to why exactly his enrollment status was being addresses and only received notice of his disciplinary hearing by email 4 hours prior to the disciplinary hearing. This is in direct discordance with Section III.D. of ASAC operating procedures that "the student should be notified by the Committee in

writing as to what the major concerns of the Committee are likely to be during the coming meeting,"

164. It is inconceivable, particularly with notice by e-mail 4 hours prior to the disciplinary hearing, that Plaintiff would know exactly how to properly defend his enrollment status in SOM at Defendant University without any written descriptions as to what major concerns the Committee are likely to be during the coming meeting.

165. Even after calling nearly 10 SOM faculty members merely hours before he was required to defend his enrollment status, Plaintiff only received verbal notification of a Professionalism Concern Card that had been issued more than one month prior, but he had received no explicit notification of the actual Professionalism Concern Card from Dr. Kern. Beyond the fact that neither Dr. Kern, Dr. Peterson, Dr. Tucker, nor any committee member of SOM ASAC made any effort to explicitly inform Plaintiff in person, by email, or by phone of the Professionalism Concern Card when having ample opportunity to do so, there exists no documentation in Plaintiff's student file that the Professionalism Concern Card was addressed specifically by Dr. Densmore with Plaintiff. This interaction between Plaintiff and Dr. Densmore should have been carried and documented in a timely manner after 25 October, 2018 for the Professionalism Concern Card to have been made in compliance with SOM's Policy on Academic and Professional Advancement. Finally, Dr. Reed made no effort to provide Plaintiff with a written copy of the Professionalism Concern Card hours before the disciplinary hearing was scheduled to commence, and Dr. Tucker made no effort to provide Plaintiff with a written copy of the Professionalism Concern Card during the disciplinary hearing itself. Plaintiff did not obtain a physical copy of the Professionalism Concern Card until receiving a copy of his

46

Student File on 20 December, 2018, 56 days after the Professionalism Concern Card was issued by Dr. Kern and 22 days after Plaintiff received a 1-year suspension for unprofessionalism.

166. Despite multiple attempts to clarify as to what specific allegation he was defending against with Ms. Yates by email, with Dr. Reed by phone, and at least three ASAC committee members during the ASAC Disciplinary hearing on 28 November, 2018, Plaintiff received no notification of any other specific incidents with the exception of a vague and unwritten references to Plaintiff's conduct during his participation in the SIM discussion on microaggressions on 25 October, 2018.

167. Plaintiff brought a copy of the audio recording of the SIM discussion and includes the audio in this Complaint. Dr. Tucker, chairman of ASAC and author of Plaintiff's 1-year suspension letter, not only declined to hear this audio recording during the ASAC disciplinary hearing, but he also did not explicitly demonstrate any effort to listen to the audio recording during the prior 14 November, 2018 ASAC meeting, where Dr. Tucker made the decision to recommend that Plaintiff seek psychological counseling without explicit approval or vote of such language by the other 11 voting committee members according to minutes documented by Ms. Yates during the 14 November, 2018 ASAC meeting and obtained by Plaintiff in his medical student file.

168. Finally, Dr. Tucker erroneously characterized Dr. Densmore's mandatory psychiatric evaluation as a recommendation and refused to correct himself after correction by Plaintiff of this mischaracterization during the course of the 28 November, 2018 ASAC Disciplinary hearing.

47

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Kieran Bhattacharya prays that the Court:

a) order Defendant University to dissolve its existing No Trespass Order from UPD, therefore permitting Plaintiff to coordinate opportunity for re-enrollment at SOM

b) order Defendant University to remove all references from Plaintiff's 1-year suspension from his medical student file

c) order Defendant University to remove all references to Plaintiff's two Professionalism Concern Cards from his medical student file

d) order Defendant University to allow Plaintiff the opportunity for reenrollment at SOM on or around 4 November, 2019 to allow Plaintiff to complete requirements of SOM's Doctor of Medicine program within 6 years of his matriculation date

e) order Defendant University to allow for Plaintiff's registration of the USMLE Step 1 on or before 10 February, 2020 by immediately notifying the NBME of Plaintiff's enrollment status at SOM

f) order Defendant University compensate Plaintiff for lost potential future income, harm to professional reputation, and any and all out-of-pocket incidental expenses in an amount not less than one hundred and forty thousand and 00/100 dollars ($140,000)

g) Order Defendant University to pay court costs; and

h) Enter its Order for such other and further relief as this Court deems just and proper under the circumstances.

## JURY TRIAL DEMAND

Plaintiff demands trial by jury on all issues so triable.

Respectfully Submitted,
Kieran Bhattacharya

/s/ Kieran Bhattacharya
Filing as Pro Se Litigant
70 Hale Pili Way
Haiku, HI, 96708
Cell: (808) 344-9928
E-mail: kieran0696@gmail.com

49