UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Charlottesville Division

| | | |
|---|---|---|
| KIERAN RAVI BHATTACHARYA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 3:19-CV-00054-NRM-JCH |
| | ) | |
| RECTOR AND VISITORS OF THE | ) | |
| UNIVERSITY OF VIRGINIA, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**PLAINTIFF'S OPPOSITION TO
THE UNIVERSITY'S RULE 12(b)(1) AND 12(b)(6)
MOTION TO DISMISS THE ORIGINAL COMPLAINT**

Michael J. Lockerby (VSB No. 24003)
Jack G. Haake (VSB No. 87590)
FOLEY & LARDNER LLP
Washington Harbour
3000 K Street, N.W., Suite 600
Washington, D.C. 20007
Telephone: (202) 672-5300
Fax: (202) 672-5399
Email: mlockerby@foley.com
Email: jhaake@foley.com

*Counsel for Plaintiff, Kieran Ravi Bhattacharya*

4848-1718-5712.6

# TABLE OF CONTENTS

**Page**

I.     PRELIMINARY STATEMENT ....................................................1

II.    ALLEGATIONS OF THE ORIGINAL COMPLAINT ...............................4

III.   PROCEDURAL STANDARDS ...............................................................10

      A.     Rule 12(b)(1) Requires the Complaint's Factual Allegations to Be Taken As True For Purposes of the University's Facial Challenge to Subject Matter Jurisdiction. ................................................................10

      B.     Rule 12(b)(6) Requires the Complaint's Factual Allegations to Be Taken As True For Purposes of the University's Motion to Dismiss for Failure to State a Claim. ....................................................................11

IV.   ARGUMENT .........................................................................................11

      A.     Mr. Bhattacharya's Original Complaint Alleges Sufficient Facts to State Plausible Claims for Violation of His Constitutional Rights to Free Speech and Due Process. ...............................................................11

      B.     The University's Motion to Dismiss Should be Denied Because Plaintiff's Claims for Prospective Relief Are Not Barred By Eleventh Amendment Sovereign Immunity .........................................................13

      C.     By the University's Own Admission, Mr. Bhattacharya Was Removed From UVA Med School Based on Speech That Is Protected by the First Amendment. ........................................................................13

           1.     Plaintiff's statements at the AMWA Microaggression Seminar did not substantially and materially disrupt UVA Med School's operation. ...........................................................................16

           2.     The Original Complaint alleges all three elements of the *Huang* test for retaliatory discharge in violation of 42 U.S.C. § 1983. .................17

      D.     The Original Complaint Plausibly Alleges the Essential Elements of a Claim for Violation of Mr. Bhattacharya's Fourteenth Amendment Right to Due Process ....................................................................19

           1.     Mr. Bhattacharya has both a liberty interest in free speech and a property interest in continuing his UVA Med School education. ...........19

           2.     By preventing Plaintiff from attending medical school, the University deprived him of liberty and property interests. .......................20

i

3.  The procedures followed by ASAC at the November 28
    Suspension Hearing did not comply constitutional requirements of
    due process...........................................................................................20

4.  The University cannot evade due process requirements by
    characterizing the suspension as an "academic" decision. .......................23

V.  CONCLUSION...............................................................................................25

4848-1718-5712.6

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Ashcroft v. Free Speech Coalition*,
535 U.S. 234 (2002)..................................................................................................13, 14

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)..........................................................................................................12

*Barnes v. Zaccari*,
669 F.3d 1295 (11th Cir. 2012) .......................................................................................24

*Bd. of Curators of Univ. of Missouri v. Horowitz*,
435 U.S. 78 (1978)......................................................................................................19, 24

*Bd. of Regents of State Colleges v. Roth*,
408 U.S. 564 (1972)..........................................................................................................19

*Bethel School District No. 403 v. Fraser*,
478 U.S. 675 (1986)....................................................................................................14, 15

*Buchanan v. Consol. Stores Corp.*,
125 F. Supp. 2d 730 (D. Md. 2001) .................................................................................10

*Byrnes v. Johnson Cnty. Cmty. Coll.*,
No. CIV.A. 10-2690-EFM, 2011 WL 166715 (D. Kan. Jan. 19, 2011) .....................23, 24

*Clear Channel Outdoor, Inc. v. Mayor & City Council of Baltimore*,
22 F. Supp. 3d 519 (D. Md. 2014) ...................................................................................10

*Davis v. Mann*,
882 F.2d 967 (5th Cir. 1989) ...........................................................................................20

*Dawson-Murdock v. Nat'l Counseling Grp., Inc.*,
931 F.3d 269 (4th Cir. 2019) ...........................................................................................11

*DeJohn v. Temple Univ.*,
537 F.3d 301 (3d Cir. 2008)...............................................................................................1

*Demetres v. East West Const., Inc.*,
776 F.3d 271 (4th Cir. 2015) ...........................................................................................10

*Doe v. Alger*,
228 F. Supp. 3d 713 (W.D. Va. 2016) .............................................................................19

4848-1718-5712.6

*Doe v. Rector & Visitors of George Mason Univ.*,
132 F. Supp. 3d 712 (E.D. Va. 2015) ............................................................19, 20

*Doe v. Virginia Polytechnic Institute & State University*,
400 F. Supp. 3d 479 (W.D. Va. 2019) ...................................................................13

*Escobar v. State Univ. of N.Y.*,
427 F. Supp. 850 (E.D.N.Y. 1977) ........................................................................21

*Evans v. B.F. Perkins Co.*,
166 F.3d 642 (4th Cir. 1999) .................................................................................10

*Flaim v. Med. Coll. of Ohio*
418 F.3d 629 (6th Cir. 2005) .................................................................................21

*Gay Lib v. Univ. of Mo.*,
558 F.2d 848 (8th Cir. 1977) .................................................................................14

*Givhan v. W. Line Consol. Sch. Dist.*,
439 U.S. 410 (1979).................................................................................................15

*Goss v. Lopez*,
419 U.S. 565 (1975).................................................................................................19

*Hardy v. Lewis Gale Med. Ctr., LLC*,
377 F. Supp. 3d 596 (W.D. Va. 2019) ...................................................................11

*Hazelwood Sch. Dist. v. Kuhlmeier*,
484 U.S. 260 (1988)...........................................................................................14, 15

*Huang v. Board of Governors of Univ. of N.C.*,
902 F.2d 1134 (4th Cir. 1990) ...................................................................15, 17, 18

*Incumaa v. Stirling*,
791 F.3d 517 (4th Cir. 2015) .................................................................................22

*Iota XI Chapter of Sigma Chi Fraternity v. Patterson*,
566 F.3d 138 (4th Cir. 2009) .................................................................................19

*Kerns v. United States*,
585 F.3d 187 (4th Cir. 2009) ...........................................................................10, 11

*Keyishian v. Bd. of Regents of Univ. of N.Y.*,
385 U.S. 589 (1967)...................................................................................................1

*Lightsey v. King*,
567 F. Supp. 645 (E.D.N.Y. 1983) ........................................................................21

iv

*Mathews v. Eldridge,*
    424 U.S. 319 (1976) ................................................................................................20, 21

*Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,*
    429 U.S. 274 (1977) ....................................................................................................15

*Papish v. Bd. of Curators of Univ. of Mo.,*
    410 U.S. 667 (1973) ....................................................................................................14

*Perry v. Sindermann,*
    408 U.S. 593 (1972) ....................................................................................................19

*Saleh v. Upadhyay,*
    11 F. App'x 241 (4th Cir. 2001) ................................................................................17

*Simon & Schuster, Inc. v, Members of the New York State Crime Victims Board,*
    502 U.S. 105 (1991) ....................................................................................................13

*Smith v. Rector & Visitors of Univ. of Virginia,*
    78 F. Supp. 2d 533 (W.D. Va. 1999) ........................................................................13

*Suarez Corp. Industries v. McGraw,*
    202 F.3d 676 (4th Cir. 2000) ......................................................................................15

*Sweezy v. New Hampshire,*
    354 U.S. 234 (1957) ......................................................................................................1

*Tall v. Maryland Dep't of Health & Mental Hygiene,*
    No. CV ELH-15-3811, 2016 WL 7491621 (D. Md. Dec. 29, 2016), *aff'd sub*
    *nom. Tall v. Maryland Developmental Disabilities Admin.*, 690 F. App'x 841
    (4th Cir. 2017) ............................................................................................................11

*Tigrett v. Rector & Visitors of Univ. of Virginia,*
    97 F. Supp. 2d 752 (W.D. Va. 2000) ........................................................................13

*Tinker v. Des Moines Independent Community School Dist.,*
    393 U.S. 503 (1969) ........................................................................................14, 15, 16

*United States v. North Carolina,*
    180 F.3d 574 (4th Cir. 1999) ......................................................................................11

*United States v. Playboy Entertainment Group, Inc.,*
    529 U.S. 803 (2000) ....................................................................................................14

*Velasco v. Gov't of Indonesia,*
    370 F.3d 392 (4th Cir. 2004) ......................................................................................11

v

*United States ex rel. Vuyyuru v. Jadhav*,
  555 F.3d 337 (4th Cir.), *cert. denied*, 558 U.S. 875 (2009).....................................11

*Wagner v. Wheeler*,
  13 F.3d 86 (4th Cir. 1993) ...............................................................................15

*Wilkinson v. Austin*,
  545 U.S. 209 (2005)..........................................................................................22

*Wisconsin v. Constantineau*,
  400 U.S. 433 (1971)..........................................................................................20

*Ex Parte Young*,
  209 U.S. 123 (1908)....................................................................................12, 13

*Zhao v. Virginia Polytechnic and State University*,
  Case No. 7:18cv00189, 2018 WL 5018487 (W.D. Va. Oct. 16, 2018) ...................19

**State Cases**

*Abbariao v. Hamline Univ. Sch. of Law*,
  258 N.W.2d 108 (Minn. 1977)............................................................................23

**Federal Statutes**

42 U.S.C. § 1983.................................................................................10, 13, 15, 17

Fed. R. Civ. P. 12(b)(1).......................................................................................10

Fed. R. Civ. P. 12(b)(6).......................................................................................11

vi

Plaintiff Kieran Ravi Bhattacharya ("Mr. Bhattacharya"), by counsel, respectfully states as follows in opposition to the Rule 12(b)(1) and (6) Motion to Dismiss (Dkt. #18) and accompanying Memorandum in Support (Dkt. #19) filed by Defendant Rector and Visitors of the University of Virginia (the "University"). The University's Motion to Dismiss is directed at the complaint that Mr. Bhattacharya filed as a *pro se* plaintiff (Dkt. #1) (the "Original Complaint"). Now that Mr. Bhattacharya is represented by counsel, he will be seeking leave to file an amended complaint that will moot the University's sovereign immunity defense. On the merits, the Original Complaint plausibly states claims for violation of Mr. Bhattacharya First and Fourteenth Amendment rights.

## I.     PRELIMINARY STATEMENT

In a December 20, 1787 letter to James Madison, Thomas Jefferson—founder of the University of Virginia—wrote that "a bill of rights is what the people are entitled to against every government on earth, general or particular, and what no just government should refuse." Of the various provisions of the Bill of Rights that later became part of the Constitution of the United States, the First Amendment's guarantee of free speech is of paramount importance to the mission of any public university.[1]   And ever since enactment of the Fourteenth Amendment in 1868, the guarantees of free speech and due process have applied with equal force to the several States—obviously including the Commonwealth of Virginia.

The University of Virginia, however, seems to think that is above the law of the land. By way of its Motion to Dismiss, the University that Mr. Jefferson founded now seeks to have this Court effectively nullify the Bill of Rights. The right of free speech protected by the First

---

[1] *See, e.g., Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957) ("[t]he essentiality of freedom in the community of American universities is almost self-evident"); *Keyishian v. Bd. of Regents of Univ. of N.Y.*, 385 U.S. 589, 603 (1967) ("[n]ation's future depends upon leaders trained through wide exposure to that robust exchange of ideas which discovers truth out of a multitude of tongues, rather than through any kind of authoritative selection") (internal quotation omitted), ("[S]tudents must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die."); *DeJohn v. Temple Univ.*, 537 F.3d 301, 314 (3d Cir. 2008) ("free speech is of critical importance because it is the lifeblood of academic freedom").

1

4848-1718-5712.6

Amendment means nothing if there is no remedy for its violation as the University now claims. The Fourteenth Amendment's guarantee of due process is similarly meaningless if the University can violate it with impunity. In this case, if the allegations of the Original Complaint are true—as the Court is required to assume for purposes of the University's Motion to Dismiss—the University has run roughshod over Mr. Bhattacharya's rights of free speech and due process alike.

Mr. Bhattacharya was suspended and ultimately dismissed from the University of Virginia School of Medicine ("UVA Med School")—and is now unable to pursue his chosen career in medicine—because of his questions and comments during an October 25, 2018 seminar on "microaggression"[2] sponsored by the newly organized UVA Med School chapter of the American Medical Women's Association ("AMWA")[3] (the "AWMA Microaggression Seminar"). Following a presentation by the first speaker, a professor of psychology, Mr. Bhattacharya asked questions and made comments that one of the organizers of the AWMA Microaggression Seminar characterized as "antagonistic." The Court need only listen to the audio recording[4] to determine whether that is a fair characterization. Mr. Bhattacharya and the speaker had a rational and calm discussion about the theory of microaggression. The only person whose behavior was questionable was one of the two AMWA members on the panel, UVA Med School Professor Sara Rasmussen. Professor Rasmussen interrupted the dialogue between Mr. Bhattacharya and the speaker, launched into a diatribe about microaggressions that she personally had experienced as a native of West Virginia, and raised her voice in anger at Mr. Bhattacharya before cutting him off altogether. Ultimately, however, it is immaterial whether UVA Med School's characterization of Mr.

---

[2] "Microaggression" is defined as "a comment or action that subtly and often unconsciously or unintentionally expresses a prejudiced attitude toward a member of a marginalized group (such as a racial minority)." Merriam Webster.com
[3] *See* https://www.amwa-doc.org/news/new-amwa-chapter-at-the-university-of-virginia.
[4] *See* Compl., Ex. 9. A recording of the exchange is available at 28:40-34:00 via the following hyperlink: https://bigleaguepolitics.com/college-student-suspended-for-antagonizing-sjw-microaggression-lecture/.

2

Bhattacharya's questions and comments as "antagonistic" is a fair one. The First Amendment does not permit the government to censor speech that it considers to be "antagonistic."

Unfortunately for Mr. Bhattacharya, Professor Rasmussen's angry outburst at the AMWA Microaggression Seminar was just the beginning rather than the end of UVA Med School's efforts—so far successful—to silence and punish anyone who dared to even question the theories being espoused that day. Beginning immediately after the seminar, UVA Med School responded to Mr. Bhattacharya's dissident speech in a way that would make the rulers of the former Soviet Union proud. That same day, one of Professor Rasmussen's colleagues at UVA Med School who was also a member of the microaggression panel—AMWA member Professor Nora Kern—surreptitiously lodged a "professionalism concern" complaint against Mr. Bhattacharya, citing him for asking a "series of questions that were quite antagonistic toward the panel." (Compl. ¶ 36). Meanwhile—without ever disclosing that his record now included a "professionalism concern" citation as required by UVA Med School's own policies and procedures—Assistant Dean for Medical Education Christine Peterson "invited" Mr. Bhattacharya to a meeting for the stated purpose of "help[ing] you understand and be able to cope with unintended consequences of conversations." (Compl., Ex. 10). Although Dean Peterson never disclosed this during their subsequent meeting (Compl. ¶¶ 33-34), one of the "unintended consequences" to which she was referring included the formal discipline that Mr. Bhattacharya was soon to receive.

By correspondence dated November 15, 2018, UVA Med School admonished Mr. Bhattacharya to "show mutual respect to all" and "express [his opinions] in appropriate ways" and advised him to "consider getting counseling" to improve his communication skills. (Compl. ¶ 80, Ex. 35, 35.B). By the end of Thanksgiving break, UVA Med School's advice to "consider getting counseling" had become a prerequisite for continuing his studies. On November 26, 2018, Mr.

3

4848-1718-5712.6

Bhattacharya was notified by email that he needed to be evaluated by a counselor before he could return to his classes at UVA Med School. (Compl. ¶ 85, Ex. 36). The following day, November 27, 2018, Mr. Bhattacharya was notified that he could not resume his studies until he had undergone psychological evaluation and received "medical clearance." (*Id*. ¶ 91).

Two days later—following a hastily convened perfunctory meeting on November 28, 2019—Mr. Bhattacharya received correspondence dated November 29, 2018 notifying him that he had been suspended from UVA Med School until August 2019 because "your aggressive and inappropriate interactions in multiple situations, including in public settings, during a speaker's lecture, with your Dean, and during the committee meeting yesterday, constitute a violation of the School of Medicine's Technical Standards." (Compl., Exs. 51, 51.B). Thereafter, Mr. Bhattacharya was denied the opportunity to appeal the one-year suspension or apply for readmission because the University of Virginia issued a no trespass warning to Mr. Bhattacharya for a four-year period. (Compl. ¶¶ 139-45). In short, Mr. Bhattacharya's comments and questions during the AMWA Microaggression Seminar—"antagonistic" or not—resulted in his permanent exile to the UVA Med School equivalent of Siberia.

## II.    ALLEGATIONS OF THE ORIGINAL COMPLAINT

Mr. Bhattacharya enrolled in UVA Med School in the fall of 2016 and was a member of the Class of 2020. (Compl. ¶¶ 1, 5, 21). Mr. Bhattacharya completed his first two semesters at UVA Med School in good standing. (*Id.* ¶¶ 9, 28). The only incident recorded during this period—unbeknownst to Mr. Bhattacharya at the time—was the issuance of a "Professionalism Concern Card"[5] because Mr. Bhattacharya had been marked absent from a patient presentation that he in

---

[5] A professionalism concern card ("PCC") is a punitive administrative action taken against medical students for a variety of forms of misconduct. (Compl. ¶ 21). Any recorded observation must be addressed with the student by the college dean, and documentation of the discussion must be recorded, according to UVA Med School's Policy on Academic and Professional Enhancement. (*Id.* ¶ 21, Ex. 7).

4

4848-1718-5712.6

fact attended. He was marked absent because he did not have the required attendance technology software. (*Id*. ¶ 24). Other than this incident, Mr. Bhattacharya was consistently evaluated as meeting or exceeding expectations. (*Id*. ¶¶ 7, 19).

On October 25, 2018, Mr. Bhattacharya attended a faculty-led panel discussion on microaggression (the "AMWA Microaggression Seminar) that concluded with time for questions from the audience. (*Id*. ¶ 30). Mr. Bhattacharya was the first person selected and proceeded to ask clarifying questions regarding the remarks of a psychology professor who was the featured speaker. (*Id*., Ex. 9 at 28:40-34:00). Specifically, he (1) asked about a discrepancy between a statement in the slides and the speaker's oral response to his question; (2) disagreed with an element of the discussion; and (3) inquired as to the foundation for the speaker's conclusions. (*Id*.). During this colloquy, which lasted approximately five minutes, Mr. Bhattacharya listened in silence to the speaker's responses and ultimately disagreed with at least some of her conclusions. (*Id*.). Another panelist, UVA Med School Professor Rasmussen, interrupted the exchange and cut off any follow-up discussion by Mr. Bhattacharya. (*Id*.). Thereafter, Mr. Bhattacharya did not ask any further questions or interrupt further questions and comments by others. (*Id*.).

Shortly after the AMWA Microaggression Seminar, Dr. Peterson, one of the four college deans at UVA Med School, sent Mr. Bhattacharya an email noting that she had "observed [his] discomfort with the speaker's perspective" on the panel topic. (Compl. ¶ 32, Ex. 10). Dr. Peterson claimed to want "to help [Mr. Bhattacharya] understand and be able to cope with unintended consequences of conversations." (*Id.*, Ex. 10). Mr. Bhattacharya responded: "I simply wanted to give them some basic challenges regarding the topic" and "I understand that there is a wide range of acceptable interpretations on this." Dr. Peterson responded: "I don't know you at all so I may have misinterpreted your challenges to the speaker." (*Id.*, Ex. 10).

Unbeknownst to Mr. Bhattacharya, that same day, Dr. Nora Kern—a UVA Med School professor who was also a member of the panel—had submitted a "Professionalism Concern Card" about Mr. Bhattacharya's questions and comments at the AMWA Microaggression Seminar. Professor Kern's PCC identified "respect for others" and "respect for differences" as areas of concern and stated that Mr. Bhattacharya asked a "series of questions that were quite antagonistic toward the panel." (*Id*. ¶¶ 34-38, Ex. 11). Ignoring UVA Med School's requirement that such concerns must be addressed with the student in a documented discussion, neither Dean Peterson, Professor Kern, nor any other member of the faculty or administration notified Mr. Bhattacharya of the PCC; nor did they address it with him at that time. (*Id*. ¶¶ 21, 39).

UVA Med School's Academic Standards and Achievement Committee ("ASAC" or the "Committee") is charged with "review[ing] evidence of unprofessional, unethical, or illegal activities or behaviors by students" and taking remedial action against those who do not meet UVA Med School's standards. (*Id*. ¶ 97, Ex. 14). The Committee's voting membership consists entirely of faculty members who are medical doctors or Ph.D. clinical researchers, along with medical students. (*Id*. ¶¶ 21, 49-59, 112-15). On November 14, 2018, the Committee—including Professor Kern—met to consider the "Professionalism Concern Card" submitted by Professor Kern. The November 14, 2018 meeting resulted in November 15, 2018 correspondence—signed by Committee chair Dr. Tucker—informing Mr. Bhattacharya that the Committee "has received notice of a concern about your behavior at a recent AMWA panel" that "was thought to be unnecessarily antagonistic and disrespectful," reminding him to "show mutual respect to all" and to "express [his opinions] in appropriate ways," and suggesting that he "consider getting counseling" to improve his communication skills. (*Id*. ¶¶ 72, 74, 80, Exs. 35, 35B). Consistent with the minutes of the November 14, 2018 Committee meeting, the November 15, 2018 correspondence did not

6

4848-1718-5712.6

address what Mr. Bhattacharya actually said at the AMWA Microaggression Seminar—only Professor Kern's characterization of it. (*Id.*, Exs. 13, 35).

Less than two weeks later, the first day after the Thanksgiving break, Mr. Bhattacharya received an email from Dr. Densmore, who is currently UVA Med School's Associate Dean for Admissions and Student Affairs. Dean Densmore's November 26, 2018 email notified Mr. Bhattacharya that he needed to be evaluated by "CAPS" (an acronym for Counseling and Psychological Services) before he could return to class. (*Id.* ¶ 85, Ex. 36). Mr. Bhattacharya responded with an email asking how it could "be legal to mandate psychiatric evaluation to continue [his] education." (*Id.* ¶ 88, Ex. 36). Thereafter, Mr. Bhattacharya made calls expressing his desire to return to classes and disagreement with being required to undergo psychiatric evaluation to do so. (*Id.* ¶¶ 88, 91, Ex. 40). On November 27, 2018, Mr. Bhattacharya received a follow-up email from Dr. Canterbury, UVA Med School's Senior Associate Dean for Education, stating that Mr. Bhattacharya could not resume his studies until he had been "evaluated by CAPS at the Student Health Service" and received "medical clearance." (*Id.* ¶ 91).

On November 28, 2018, a school administrator sent Mr. Bhattacharya an email at 1:00 p.m. with the cryptic message that the Committee would be meeting at 5:00 p.m. that day to discuss Mr. Bhattacharya's "enrollment status." (*Id.* ¶ 94). The email provided the address and room number for the meeting and invited Mr. Bhattacharya to attend and "share [his] insights with the committee." (*Id.*, Ex. 42). Given the ambiguous nature of the email, Mr. Bhattacharya sought to confirm whether his continued enrollment was in jeopardy and to ascertain the reason for the meeting by emailing and calling faculty. (*Id.* ¶¶ 95, 107). Mr. Bhattacharya's direct request to learn the nature of the meeting was ignored. The only response was an email containing links to policies and procedures without any additional pertinent information about the purpose of the

4848-1718-5712.6

meeting. (*Id*. ¶ 96). Later that day, Mr. Bhattacharya learned that his participation in the microaggression discussion would be among the topics to be addressed at 5:00 p.m. This information was conveyed in a telephone call that he received at 2:12 p.m. from Dr. Sean Reed, an Associate Professor of Medicine who was at the time one of four "college deans" of UVA Med School. (*Id*. ¶ 108). During that call, less than three hours before the scheduled meeting, Mr. Bhattacharya learned for the very first time of the existence of the "Professionalism Concern Card" that had been submitted by Professor Kern based on his questions and comments at the AMWA Microaggression Seminar.

Mr. Bhattacharya attended the November 28, 2018 meeting (the "November 28 Suspension Hearing"), which lasted approximately 28 minutes. (*Id*. ¶ 109). During the November 28 Suspension Hearing, Dr. Tucker spoke for the Committee and stated that the purpose of the meeting was to afford Mr. Bhattacharya with "an opportunity to express [his] side of things." (*Id*., Ex. 46). Dr. Tucker stated that the Committee had sent a letter on November 15, 2018 regarding Mr. Bhattacharya's participation in the microaggression panel discussion and that the Committee had received other interactions that were concerning people. (*Id*.). Dr. Tucker did not provide any specific example of or reference what the "other interactions that were concerning people" may have been, despite repeated requests by Mr. Bhattacharya. (*Id*.).

The Committee never provided an explanation of what would be evaluated. (*Id*.). Mr. Bhattacharya spent the time he was afforded asking questions and attempting to understand the claims that were being brought against him. (*Id*.). The only explanatory statement from the Committee was that Mr. Bhattacharya was aggressive and that patients would be scared of him. (*Id*.). The only example provided by the Committee was Mr. Bhattacharya's "defensive" and "aggressive" behavior at the November 28 Suspension Hearing itself. (*Id*.). Mr. Bhattacharya

8

disagreed with this characterization and asked that the Committee consider this characterization in the context that Mr. Bhattacharya had been summoned for the express purpose of defending himself. (*Id.*). He also disagreed that he had exhibited aggressive behavior and stated that he had never received any complaints that he had exhibited aggressive behavior. (*Id.*). The Committee did not provide any documentation or otherwise rebut Mr. Bhattacharya's denial. (*Id.*).

During the November 28 Suspension Hearing, Mr. Bhattacharya also objected to the process by which the decision-making process was being implemented and expressed concern that the outcome was a foregone conclusion. (*Id.*). Mr. Bhattacharya disagreed that UVA Med School could require a psychiatric evaluation for him to attend classes where there were no specific complaints and expressed his concern that his mental health was a private matter and he could only respond to specific incidents and not a general sentiment. (*Id.*). Ignoring this argument, the Committee concluded the November 28 Suspension Hearing expressly barring Mr. Bhattacharya from attending classes in the absence of a psychiatric evaluation. (*Id.*).

On November 29, 2018, the Committee notified Mr. Bhattacharya by letter that it was suspending him from UVA Med School until August 2019 (the "Suspension Letter"). (*Id.*, Exs. 51, 51.B). The Suspension Letter stated that Mr. Bhattacharya's "aggressive and inappropriate interactions in multiple situations, including in public settings, during a speaker's lecture, with your Dean, and during the committee meeting yesterday, constitute a violation of the School of Medicine's Technical Standards." (*Id.*). The Suspension Letter does not identify any specific interactions that were "aggressive or inappropriate" or describe how they were "aggressive and inappropriate" but appears to refer to the microaggression lecture and the November 28 Suspension Hearing. (*Id.*).

Mr. Bhattacharya attempted to initiate a timely appeal of the Decision on December 4, 2018. (*Id.* ¶ 136). Dr. Densmore acknowledged Mr. Bhattacharya's initiation of the appeals process on

9

December 4, 2018. (*Id*.). However, ASAC did not conclude the appeal process, instead informing Mr. Bhattacharya on January 3, 2019 that it would not complete the appeal process because the University of Virginia had issued a no trespass warning to Mr. Bhattacharya for a four-year period. (*Id*. ¶¶ 139-42, Ex. 54). Mr. Bhattacharya sought to obtain readmission in July 2019 but was denied the opportunity to do so because of the no trespass warning. (*Id*. ¶¶ 143-45).

The Original Complaint asserts claims under 42 U.S.C. § 1983 that the University violated Mr. Bhattacharya's First Amendment right to free speech by retaliating against him for his questions and comments during the AMWA Microaggression Seminar and violated his Fourteenth Amendment right to due process by suspending him from UVA Med School without proper notice or an effective opportunity to be heard.

### III.    PROCEDURAL STANDARDS

#### A.    Rule 12(b)(1) Requires the Complaint's Factual Allegations to Be Taken As True For Purposes of the University's Facial Challenge to Subject Matter Jurisdiction.

Plaintiff has the burden under Rule 12(b)(1) of proving subject matter jurisdiction. *Demetres v. East West Const., Inc.*, 776 F.3d 271, 272 (4th Cir. 2015); *Evans v. B.F. Perkins Co.*, 166 F.3d 642, 647 (4th Cir. 1999). The University could have challenged subject matter jurisdiction "in one of two ways"—either a facial challenge, asserting that the allegations pleaded in the Original Complaint are insufficient to establish subject matter jurisdiction, or a factual challenge, asserting " 'that the jurisdictional allegations of the complaint [are] not true.' " *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009) (citation omitted) (alteration in original); *see also Buchanan v. Consol. Stores Corp.*, 125 F. Supp. 2d 730, 736 (D. Md. 2001).

In a facial challenge, "the facts alleged in the complaint are taken as true, and the motion must be denied if the complaint alleges sufficient facts to invoke subject matter jurisdiction." *Kerns*, 585 F.3d at 192; *accord Clear Channel Outdoor, Inc. v. Mayor & City Council of*

4848-1718-5712.6

*Baltimore*, 22 F. Supp. 3d 519, 524 (D. Md. 2014).[6]  In this case, because the University challenges subject matter jurisdiction on the basis of sovereign immunity, its challenge is facial—requiring the Court to assume the truth of the allegations of the Original Complaint.  *Tall v. Maryland Dep't of Health & Mental Hygiene*, No. CV ELH-15-3811, 2016 WL 7491621, at *3 (D. Md. Dec. 29, 2016), *aff'd sub nom. Tall v. Maryland Developmental Disabilities Admin*., 690 F. App'x 841 (4th Cir. 2017).

**B.      Rule 12(b)(6) Requires the Complaint's Factual Allegations to Be Taken As True For Purposes of the University's Motion to Dismiss for Failure to State a Claim.**

To defeat the University's Rule 12(b)(6) motion, Plaintiff must simply provide "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Dawson-Murdock v. Nat'l Counseling Grp., Inc*., 931 F.3d 269, 275 (4th Cir. 2019) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)).  Rule 12(b)(6) requires the Court "to accept all factual allegations in the complaint as true" and "draw all reasonable inferences in favor of the plaintiff."  *Hardy v. Lewis Gale Med. Ctr., LLC*, 377 F. Supp. 3d 596, 604 (W.D. Va. 2019).

## IV.      ARGUMENT

**A.      Mr. Bhattacharya's Original Complaint Alleges Sufficient Facts to State Plausible Claims for Violation of His Constitutional Rights to Free Speech and Due Process.**

The Original Complaint—consisting of more than 47 pages and 168 numbered paragraphs, along with 56 exhibits—contains "sufficient factual matter, accepted as true, to 'state a claim to

---

[6] In a factual challenge to subject matter jurisdiction, "the plaintiff bears the burden of proving" that subject matter jurisdiction is satisfied "by a preponderance of the evidence" (*United States ex rel. Vuyyuru v. Jadhav*, 555 F.3d 337, 347 (4th Cir.), *cert. denied*, 558 U.S. 875 (2009)), and the court "may regard the pleadings as mere evidence on the issue and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." *Velasco v. Gov't of Indonesia*, 370 F.3d 392, 398 (4th Cir. 2004).  "[T]he district court is entitled to decide disputed issues of fact with respect to subject matter jurisdiction" (*Kerns*, 585 F.3d at 192) "[u]nless 'the jurisdictional facts are intertwined with the facts central to the merits of the dispute.'"  *U.S. ex rel. Vuyyuru*, 555 F.3d at 348 (citation omitted).  In particular, "the district court may ... resolve the jurisdictional facts in dispute by considering evidence ... such as affidavits" (*id.*) and may also "hold an evidentiary hearing to determine whether the facts support the jurisdictional allegations."  *United States v. North Carolina*, 180 F.3d 574, 580 (4th Cir. 1999); *accord Kerns*, 585 F.3d at 192.

11

relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). The factual allegations of the Original Complaint, accepted as true and with all reasonable inferences drawn in favor of Plaintiff, demonstrate that the University suppressed Mr. Bhattacharya's free speech, retaliating against him for expressing his views at a school event. Mr. Bhattacharya's expression does not fall within a constitutionally unprotected class of speech. It is therefore protected by the First Amendment. The Original Complaint pleads facts sufficient to support the conclusion that the University violated the First Amendment by suppressing Mr. Bhattacharya's free speech and retaliating against him for expressing his views.

In support of Mr. Bhattacharya's Fourteenth Amendment claim against the University, the Original Complaint alleges facts sufficient to show a violation of due process in at least three respects. First, ASAC did not provide him with any meaningful notice and opportunity to be heard when he was alerted of the November 28 Suspension Hearing only hours before it took place and was not informed of the nature of the claims against him or their basis. Second, ASAC did not provide anything beyond a perfunctory explanation supporting its decision. Third, ASAC did not follow its own internal policies and process in suspending Mr. Bhattacharya. By preventing him from completing his studies at UVA Med School, the University has prevented Mr. Bhattacharya from entering the medical profession altogether.

Finally, Mr. Bhattacharya's claims are not barred by sovereign immunity to the extent that he seeks prospective relief. After the filing of this Opposition, Mr. Bhattacharya will be seeking leave to amend the Original Complaint to name specific individuals at the University (including UVA Med School) acting in their official capacities—thereby eliminating any doubt that Plaintiff's allegations are within the *Ex Parte Young* exception to sovereign immunity.

12

**B.    The University's Motion to Dismiss Should be Denied Because Plaintiff's Claims for Prospective Relief Are Not Barred By Eleventh Amendment Sovereign Immunity.**

State actors are frequently held accountable for violations of constitutional rights under Section 1983 notwithstanding the Eleventh Amendment's grant of sovereign immunity.  Under the doctrine of *Ex Parte Young*, 209 U.S. 123 (1908)*,* Mr. Bhattacharya can seek prospective injunctive relief against officials acting on behalf of the State named in their official capacity.  If amended to name individuals at the University in their official capacity, the Original Complaint would fit squarely within the doctrine of *Ex Parte Young* under the very authority cited by the University, *Tigrett v. Rector & Visitors of Univ. of Virginia*, 97 F. Supp. 2d 752 (W.D. Va. 2000). In *Tigrett*, the Court held:  "the 11th Amendment neither bars [plaintiff's] suit against the individual defendants in their official capacities to the extent that he seeks prospective injunctive relief … nor for monetary damages."  *Id.* at 756; *see also Smith v. Rector & Visitors of Univ. of Virginia*, 78 F. Supp. 2d 533, 537 (W.D. Va. 1999).  If amended to seek prospective injunctive relief— including expunged and amended academic records and reinstatement as a medical student in good standing at UVA Med School—Plaintiff's Complaint would be well within the doctrine of *Ex Parte Young*, as this Court has previously held.  *See Doe v. Virginia Polytechnic Institute & State University*, 400 F. Supp. 3d 479, 488-89 (W.D. Va. 2019) ("plaintiffs are seeking to expunge and clear their academic records, among other injunctive relief, which numerous courts have noted is a request for prospective relief and not barred by the Eleventh Amendment").

**C.    By the University's Own Admission, Mr. Bhattacharya Was Removed From UVA Med School Based on Speech That Is Protected by the First Amendment.**

The First Amendment protects most expression from content-based government regulation unless the restriction in question can withstand strict scrutiny.  *Simon & Schuster, Inc. v, Members of the New York State Crime Victims Board*, 502 U.S. 105, 118 (1991).  The presumption is that all expression is protected by the First Amendment.  *See, e.g., Ashcroft v. Free Speech Coalition*,

13

535 U.S. 234, 251 (2002); *United States v. Playboy Entertainment Group, Inc.*, 529 U.S. 803, 817 (2000). This presumption means that the University has the burden of showing that Mr. Bhattacharya's speech falls within a constitutionally **unprotected** class of expression. *Playboy Entertainment Group*, 529 U.S. at 816. If the expression at issue falls on the protected side of the constitutional line—even by just a bit—it remains fully protected on the same terms and by the same constitutional standards as even the most clearly protected expression. *Free Speech Coalition*, 535 U.S. at 240, 251.

It is well established that "state colleges and universities are not enclaves immune from the sweep of the First Amendment,"[7] and students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines Independent Community School Dist.*, 393 U.S. 503, 506 (1969). The extent to which the University can regulate speech depends upon which of three categories it falls.

The first type of student speech—which the University has considerable discretion to regulate—is speech that, while perhaps not obscene, is nevertheless vulgar, lewd, indecent, or plainly offensive. *Bethel School District No. 403 v. Fraser*, 478 U.S. 675, 683-85 (1986); *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 272 n. 4 (1988). Mr. Bhattacharya's questions and comments at the microaggression seminar were clearly not within this first category.[8] The second type of student speech—speech that is "school-sponsored"—can be regulated if the

---

[7] *Papish v. Bd. of Curators of Univ. of Mo.*, 410 U.S. 667, 670 (1973) (quotation marks and citation omitted); *see also Gay Lib v. Univ. of Mo.*, 558 F.2d 848, 857 (8th Cir. 1977) ("[T]he First Amendment must flourish as much in the academic setting as anywhere else.... To invoke censorship in an academic environment is hardly the recognition of a healthy democratic society.").

[8] The University's characterization of Mr. Bhattacharya's speech as "offensive public discourse" (Dkt. #19) (p. 26 of 32) does not square with the facts alleged in the Original Complaint, including the recording of the exchange filed with the Court. (Compl., Ex. 9). Unlike the speaker in *Fraser*, Mr. Bhattacharya did not engage in speech that was sexually explicit and did not advocate for drug use. The University's characterization of Mr. Bhattacharya's speech as "antagonistic" does not change the nature of his speech to "offensive public discourse." To allow such an end-run around First Amendment protections flies in the face of established law and would permit state universities to censor speech with which they disagree by the simple expedient of characterizing it as "antagonistic" and therefore offensive.

4848-1718-5712.6

regulation is "reasonably related to legitimate pedagogical concerns." *Hazelwood*, 484 U.S. at 273. The speech at issue in this case does not fall within this second category either. The third type of student speech—speech that is neither vulgar, lewd, indecent or plainly offensive under *Fraser* nor school-sponsored under *Hazelwood*—is subject to the rule of *Tinker*, which prohibits regulation of student speech unless it would materially and substantially disrupt classwork and discipline in the school. *See Tinker*, 393 U.S. at 513.

The First Amendment right of free speech "includes not only the affirmative right to speak, but also the right to be free from retaliation by a public official for the exercise of that right." *Suarez Corp. Industries v. McGraw*, 202 F.3d 676, 685 (4th Cir. 2000). Retaliation "place[s] informal restraints on speech 'allow[ing] the government "to produce a result which it could not command directly. Such interference with constitutional rights is impermissible." *Id.* (quoting *Perry v. Sindermann*, 408 U.S. 593, 597 (1972) (citations omitted)). To establish a First Amendment retaliatory discharge claim pursuant to 42 U.S.C. § 1983, Mr. Bhattacharya must prove three elements:

1.  "that the expressions which are alleged to have provoked the retaliatory action relate to matters of public concern" (*Huang v. Board of Governors of Univ. of N.C.*, 902 F.2d 1134, 1140 (4th Cir. 1990));

2.  "that the alleged retaliatory action deprived him of some valuable benefit" (*id.* at 1140); and

3.  that there was a causal relationship between the protected expression and the retaliatory action. *Id.*; *Wagner v. Wheeler*, 13 F.3d 86, 90 (4th Cir. 1993); *see also Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977); *Givhan v. W. Line Consol. Sch. Dist.*, 439 U.S. 410, 416–17 (1979).

4848-1718-5712.6

The speech at issue in this case—questioning the controversial theory of microaggression—was not vulgar, lewd, indecent, plainly offensive, or school-sponsored. Accordingly, Mr. Bhattacharya's speech could be prohibited only if it caused a substantial and material disruption of UVA Med School's operation under the doctrine of *Tinker*. Clearly, it did not.

### 1. Plaintiff's statements at the AMWA Microaggression Seminar did not substantially and materially disrupt UVA Med School's operation.

Mr. Bhattacharya's questions and comments during the AMWA Microaggression Seminar occurred during a period expressly reserved for this purpose. His questions and comments followed logically from the presentation that he had just heard and did not disrupt the program in any way. He did not cause a substantial and material disruption of the school's operation or adversely affect school discipline. His only transgression during the October 25, 2018 political reeducation camp was not to take at face value the indoctrination being served up by UVA Med School Professors Rasmussen and Kern and the advocacy group to which they belong, AMWA.

Mr. Bhattacharya's interactions with school officials following the panel discussion also did not cause a substantial and material disruption. The stated grounds for Mr. Bhattacharya's suspension did not specify which interactions with his dean were supposedly "inappropriate." The facts alleged in the Original Complaint—which the Court must accept as true for purposes of the University's Motion to Dismiss—do not support a finding of disruptive behavior. Mr. Bhattacharya was invited to speak with Dr. Peterson and did so, without any issues being reported or raised regarding that interaction. (Compl. ¶¶ 32, 34, 43, Ex. 10). Mr. Bhattacharya did disagree with the demand by Dr. Densmore that he undergo a mandatory psychological evaluation before he could return to class. Mr. Bhattacharya expressed his disagreement in the form of a private email (*Id.* ¶ 88, Ex. 36) that did not disrupt the operation of UVA Med School in any way. These and other factual allegations of the Original Complaint (including exhibits) demonstrate that Mr.

16

Bhattacharya's interactions with UVA Med School were not disruptive and were appropriate within their context. For example, the Committee characterized Mr. Bhattacharya as "defensive" during the November 28 Suspension Hearing. Yet he had been invited for the express purpose of defending his ability to remain a student in UVA Med School. The University's retaliation against Mr. Bhattacharya for doing so violated his rights of free speech and due process alike—establishing each of the three elements of his claim for violation of 42 U.S.C. § 1983.

2. **The Original Complaint alleges all three elements of the *Huang* test for retaliatory discharge in violation of 42 U.S.C. § 1983.**

The first element of the *Huang* test is satisfied because Mr. Bhattacharya's expression of his views at the microaggression seminar addressed a matter of public concern, a determination that "rests on whether the public or the community is likely to be concerned with or interested in the particular expression, or whether it is more properly viewed as a private matter." *Saleh v. Upadhyay*, 11 F. App'x 241, 255 (4th Cir. 2001) (internal quotations and citation omitted). The second element of the *Huang* test is also satisfied because his discharge deprived him of valuable benefits—including the exercise of his constitutional right to free speech and the ability to complete his medical studies and pursue a career in medicine.

Last but not least, the third element of the *Huang* test—"a causal relation between the protected expression and the retaliatory action" (902 F.2d at 1140)—is also satisfied. We know this because the University has so stated in writing. The November 29, 2018 letter from ASAC (Compl., Exs. 51, 51.B) specifically cites Mr. Bhattacharya's interactions with the microaggression panel (in other words, his expression of his views) as a reason for his suspension. Similarly, ASAC's November 15, 2018 letter (Compl., Exs. 35, 35.B) states that Mr. Bhattacharya's expressions were "unnecessarily antagonistic and disrespectful." Again, the University has never explained the basis for its characterization, and the audio recording is

17

inconsistent with its characterization. Mr. Bhattacharya asked questions and expressed his views during the period allotted for this very purpose. Unlike Professor Rasmussen, he did not raise his voice, and he did not insult the panelists. Once Professor Rasmussen cut him off, Mr. Bhattacharya did not attempt to continue the discussion and sat back down in silence. All he did was question or perhaps disagree with certain statements of one speaker. According to the University, however, expressing a different point of view on the sacrosanct topic of microaggression is "unnecessarily antagonistic and disrespectful."

Subsequent communications from UVA Med School faculty and administrators confirm that the content of Mr. Bhattacharya's speech was the real issue. For example, the October 25, 2018 email from Dean Peterson "inviting" him to come in for a meeting identified the issue as Mr. Bhattacharya's perceived discomfort with the "speaker's perspective" and warned him of "unintended consequences of conversations." (Compl., Ex. 10). Mr. Bhattacharya responded politely that he "simply wanted to provide some basic challenges regarding the topic," that he "understood that here were a wide range of acceptable interpretations," and that Dr. Peterson "may have misinterpreted [his] challenges to the speaker" (*id.*)—again confirming that the issue was what he said, not how he said it. But for his questions and comments at the AMWA Microaggression Seminar, Mr. Bhattacharya would not have been called in to speak with Dean Peterson, would not have been required to undergo psychological evaluation, and would not have been suspended from UVA Med School. The University's insistence that there was no "causal relation between the protected expression and the retaliatory action" (*Huang*, 902 F.2d at 1140) is contrary to the Original Complaint's allegations and exhibits—including documents originating with the University itself.

18

4848-1718-5712.6

**D.**     **The Original Complaint Plausibly Alleges the Essential Elements of a Claim for Violation of Mr. Bhattacharya's Fourteenth Amendment Right to Due Process.**

To establish a claim for violation of the Due Process Clause, Mr. Bhattacharya must show "(1) a cognizable liberty or property interest; (2) the deprivation of that interest by some form of state action; and (3) that the procedures employed were constitutionally inadequate." *Iota XI Chapter of Sigma Chi Fraternity v. Patterson*, 566 F.3d 138, 145 (4th Cir. 2009). Here, Mr. Bhattacharya had a liberty interest in free speech and a property and liberty interest in continuing his education at UVA Med School, the University deprived him of his liberty and property interests, and the procedures upon which the University based its suspension of Mr. Bhattacharya were constitutionally inadequate.

**1.     Mr. Bhattacharya has both a liberty interest in free speech and a property interest in continuing his UVA Med School education.**

The Constitution, the source of Mr. Bhattacharya's liberty interest in free speech, does not create protected property interests. *Doe v. Rector & Visitors of George Mason Univ.*, 132 F. Supp. 3d 712, 721 (E.D. Va. 2015) (quoting *Equity in Athletics, Inc. v. Dep't of Educ.*, 639 F.3d 91, 109 (4th Cir. 2011)). A protected property interest must have some other source, such as state law or rules entitling citizens to certain benefits. *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972). It can include public school attendance (*Goss v. Lopez*, 419 U.S. 565, 573–74 (1975)) and—under the doctrine established by the Supreme Court in *Sindermann*—continued enrollment in a state university. *Doe v. Alger*, 228 F. Supp. 3d 713, 725-29 (W.D. Va. 2016); *Zhao v. Virginia Polytechnic and State University*, Case No. 7:18cv00189, 2018 WL 5018487, at *7 (W.D. Va. Oct. 16, 2018). Here, UVA Med School admits only a certain number of students each year. Mr. Bhattacharya paid tuition to reserve his space and accordingly has a property interest in continuing his medical education at UVA Med School. *See, e.g., Bd. of Curators of Univ. of Missouri v. Horowitz*, 435 U.S. 78, 84 (1978) (assuming the existence of a liberty or property interest in

19

4848-1718-5712.6

continued education at medical school); *Davis v. Mann*, 882 F.2d 967, 971 (5th Cir. 1989) (contract between university and dental resident created a property interest).

### 2. By preventing Plaintiff from attending medical school, the University deprived him of liberty and property interests.

The Supreme Court has held that a liberty interest is implicated "[w]here a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him." *See Wisconsin v. Constantineau*, 400 U.S. 433, 437 (1971). A reputational liberty interest has also been successfully invoked in school discipline cases. *Doe*, 132 F. Supp. 3d at 724 (citing *Goss v. Lopez*, 419 U.S. 565 (1975)). A Virginia court has specifically held that "expulsion from a public university on charges of misconduct implicates a protected liberty interest under the Fourteenth Amendment." *Doe*, 132 F. Supp. 3d at 724. Under these precedents, UVA Med School's suspension of Mr. Bhattacharya and denial of readmission deprived him of interests protected by the Fourteenth Amendment.

### 3. The procedures followed by ASAC at the November 28 Suspension Hearing did not comply constitutional requirements of due process.

The adequacy of the procedures followed by the University at the November 28 Suspension Hearing depends upon three factors: (1) "the private interest . . . affected," (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards," and (3) "the Government's interest including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). Here, all three factors weigh decidedly in Mr. Bhattacharya's favor.

The first *Mathews* factor—the private interest affected, *i.e.*, continued enrollment at UVA Med School—is substantial. In the words of the Sixth Circuit, the private interest in avoiding wrongful expulsion is "significant," "extends beyond [the student's] immediate standing at [the

20

present institution] and could interfere with later opportunities for higher education and employment." *Flaim v. Med. Coll. of Ohio* 418 F.3d 629, 638 (6th Cir. 2005). The other two *Mathews* factors—the risk of an erroneous result created by the use of the flawed procedures and the burden that correcting the procedures would place on UVA Med School—also weigh in favor of Mr. Bhattacharya for three reasons.

First, the November 28 Suspension Hearing—which lasted all of twenty-eight minutes, following little or no notice of its purpose and the nature and basis of the "charges" against Mr. Bhattacharya—deprived him of "[t]he fundamental requirement of due process," *i.e.*, "the opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews*, 424 U.S. at 902 (internal quotation marks omitted). Like the "Sentence first–verdict afterward" trial convened by the Queen of Hearts in *Alice's Adventures in Wonderland*, the November 28 Suspension Hearing was a "mere sham." *Lightsey v. King*, 567 F. Supp. 645, 649-650 (E.D.N.Y. 1983). The University "simply brushed aside" its own policies and procedures. *Escobar v. State Univ. of N.Y.*, 427 F. Supp. 850, 858 (E.D.N.Y. 1977). Mr. Bhattacharya was alerted to the November 28 Suspension Hearing the very day that it was convened and was not notified as to its purpose or subject matter of the meeting, finally ascertaining less than three hours before it began that it had something to do with his statements at the AMWA Microaggression Seminar. He was not provided with the ability to prepare for the discussion or present evidence in his defense. As is evident from the recording, the Committee simply opened the floor to Mr. Bhattacharya without establishing the grounds for it or the basis on which the Committee would be basing its decision. The only reason that the November 28 Suspension Hearing lasted as long as it did (approximately twenty-eight minutes) is that Mr. Bhattacharya persisted in pointedly seeking information about the basis for the claims against him so that he could defend himself. Rather than providing specific

21

information or evidence, one member of the Committee repeatedly asked why Mr. Bhattacharya thought he was there. The November 28 Suspension Hearing was perfunctory and its outcome was preordained.

The second deficiency in the Committee's procedure is its failure to provide a statement of reasons for its decision sufficient to provide "a basis for objection before the next decisionmaker or in a subsequent . . . review." *Wilkinson v. Austin*, 545 U.S. 209, 226 (2005); *see also Incumaa v. Stirling*, 791 F.3d 517, 535 (4th Cir. 2015) (prison classification board's failure to provide reasoning for its decision denied prisoner the ability to challenge the decision through the prison's grievance process).

Third, UVA Med School did not even follow its own internal procedures set forth in its Policy on Academic and Professional Advancement (Compl., Ex. 14) (the "Policy"). The Policy requires any breach of professionalism resulting in a PCC to be addressed with the student by the college dean, and documentation of the discussion must be recorded. Professionalism issues are presented to ASAC for review only when there are "three or more" written PCCs unless there are severe professional violations (for example, commission of a felony or threat to a patient). When suspension is being considered, ASAC must notify the student in writing before the meeting as to the major concerns to be addressed. In this case, there were only two PCCs—one for an alleged absence, the other for statements that were supposedly "unnecessarily antagonistic and disrespectful." Neither was violent or otherwise within any exception to the general rule of requiring three PCCs before consideration by the Committee. The dean failed to discuss the two PCCs with Mr. Bhattacharya and record the discussion in his file. In advance of the November 28 Suspension Hearing, the Committee provided no written notice of its concerns. At the November 28 Suspension Hearing Meeting, the Committee did not identify any specific "professionalism"

22

concerns—instead referring to vague, unsupported assertions. The Committee also deprived Mr. Bhattacharya of his right to appeal or reapply—citing a "no trespassing" order issued by the University.

### 4. The University cannot evade due process requirements by characterizing the suspension as an "academic" decision.

After the fact, the University now seeks to justify its disciplinary determination to suspend or expel Mr. Bhattacharya as an "academic removal" in which his due process rights were minimal. Before suspension or expulsion for disciplinary reasons, the student is entitled to due process— including a formal hearing at which the student may call witnesses, present evidence and otherwise fully rebut the accusations against him. "Expulsion for misconduct triggers a panoply of safeguards designed to ensure the fairness of factfinding by the university." *Abbariao v. Hamline Univ. Sch. of Law*, 258 N.W.2d 108, 112 (Minn. 1977) (citing *Dixon v. Alabama State Bd. of Educ.*, 294 F.2d 150 (5th Cir. 1961)).

Other courts have rejected similar efforts by educators to justify violations of the Fourteenth Amendment by the simple expedient of characterizing an "expulsion for misconduct" as an "academic removal." For example, in *Byrnes v. Johnson Cnty. Cmty. Coll.*, No. CIV.A. 10-2690-EFM, 2011 WL 166715 (D. Kan. Jan. 19, 2011), the court rejected a college's attempt to categorize as an "academic" decision its dismissal of four students from a nursing program for unprofessional behavior on Facebook:

> As Defendants correctly note, higher educational institutions are given broad discretion by the courts with respect to their academic decisions. However, Defendants are in error in characterizing this incident as an 'academic' rather than a 'disciplinary' proceeding. To adopt the position of Defendants' witness would be to label any decision that involved an educational institution as therefore 'academic,' and effectively to eliminate the disciplinary category. The law is clear that academic decisions which are given deference are those related to matters such as the academic grade given a student for course work. This matter, involving alleged violations of codes of conduct, is clearly disciplinary, and the broader discretion afforded educational institutions does not apply.

23

*Id*. at 2.

The decision of UVA Med School to suspend Mr. Bhattacharya and ultimately prevent him from continuing his medical education is nothing "[l]ike the decision of an individual professor as to the proper grade for a student in his course." *Bd. of Curators of Univ. of Missouri v. Horowitz*, 435 U.S. 78, 90 (1978). Determining that Mr. Bhattacharya's statements were "unnecessarily antagonistic and disrespectful" does ***not*** "require[] an expert evaluation of cumulative information" and *is*—unlike a grading decision—"readily adapted to the procedural tools of judicial or administrative decisionmaking." *Id.*

Allowing the exception for "academic decisions" to swallow the rule of due process will inevitably result in the suspension and expulsion of students whose views differ from those of the faculty and administration. For example, in *Barnes v. Zaccari*, 669 F.3d 1295 (11th Cir. 2012), Valdosta State University in Georgia summarily expelled—without pre-removal process—a student environmental activist whose blogging and leafleting was annoying to the university president. The Eleventh Circuit found the removal to be a violation of the student's due process rights, notwithstanding the university's insistence that the removal was justified by safety concerns over speech indicating that the student might be violent. *Id*. at 1307.

Here, the Committee did not raise any concerns about Mr. Bhattacharya's academic record. By all accounts—including the facts alleged in the Original Complaint—Mr. Bhattacharya was performing well academically. The decision to suspend Mr. Bhattacharya and deny him any right to appeal was based on his views and how he expressed them. It had nothing to do with "academic" considerations. The University is not entitled to any deference under the pretext that its decision was "academic."

4848-1718-5712.6

## V.     **CONCLUSION**

The UVA Med School professors who organized the microaggression seminar had every right under the First Amendment to express their personal social and political views.  But they had no right to retaliate against Mr. Bhattacharya for asking questions and making comments that they interpreted as a contrary point of view.  At UVA Med School, the penalties for dissident speech have proven to be swift and sure.  Not only was Mr. Bhattacharya suspended for statements that the AMWA members who organized the microaggression seminar characterized as "antagonistic," he is now unable to pursue a career in medicine at all.  The allegations of the Original Complaint establish clear violations of Mr. Bhattacharya's constitutional rights of free speech and due process, and any Eleventh Amendment issues can easily be addressed by amendment.  Accordingly, Mr. Bhattacharya respectfully requests that the University's Motion to Dismiss be denied.

Date:  January 6, 2020

Respectfully submitted,

KIERAN RAVI BHATTACHARYA

By: _____ *s/ Michael J. Lockerby* _____
Counsel

Michael J. Lockerby (VSB No. 24003)
Jack G. Haake (VSB No. 87590)
FOLEY & LARDNER LLP
Washington Harbour
3000 K Street, N.W., Suite 600
Washington, D.C. 20007-5109
Telephone: (202) 672-5300
Facsimile: (202) 672-5399
Email: mlockerby@foley.com
Email: jhaake@foley.com

*Counsel for Plaintiff, Kieran Ravi Bhattacharya*

25

## CERTIFICATE OF SERVICE

I hereby certify that on this 6th day of January, 2020, I electronically filed the foregoing

PLAINTIFF'S OPPOSITION TO THE UNIVERSITY'S RULE 12(b)(1) and 12(b)(6) MOTION

TO DISMISS THE ORIGINAL COMPLAINT with the Clerk of the Court using the CM/ECF

system, and will deliver the foregoing via email to the following counsel of record:

> Madeline M. Gibson, Esq.
> Assistant Attorney General
> Office of the Attorney General
> Commonwealth of Virginia
> 202 North Ninth Street
> Richmond, Virginia 23219

>                    *s/ Michael J. Lockerby*
> Michael J. Lockerby (VSB No. 24003)
> Jack G. Haake (VSB No. 87590)
> FOLEY & LARDNER LLP
> Washington Harbour
> 3000 K Street, N.W., Suite 600
> Washington, D.C. 20007-5109
> Telephone: (202) 672-5300
> Facsimile: (202) 672-5399
>
> *Counsel for Plaintiff, Kieran Ravi Bhattacharya*

4848-1718-5712.6