CLERK'S OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED

02/19/2020

JULIA C. DUDLEY, CLERK
BY: H. Wheeler
DEPUTY CLERK

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Charlottesville Division**

| | |
|---|---|
| KIERAN RAVI BHATTACHARYA, | ) |
| | ) |
| Plaintiff, | ) |
| v. | ) |
| | ) |
| JAMES B. MURRAY JR., in his official capacity | ) |
| as Rector of the Board of Visitors of the | ) |
| University of Virginia; WHITTINGTON W. | ) |
| CLEMENT, in his official capacity as Vice Rector | ) |
| of the Board of Visitors of the University of | ) |
| Virginia; ROBERT M. BLUE; MARK T. | ) |
| BOWLES; L.D. BRITT, M.D., M.P.H.; FRANK | ) |
| M. CONNER III; ELIZABETH M. | ) |
| CRANWELL; THOMAS A. DEPASQUALE; | ) |
| BARBARA J. FRIED; JOHN A. GRIFFIN; | ) Civil Action No. |
| LOUIS S. HADDAD; ROBERT D. HARDIE; | ) 3:19-CV-00054-NRM-JCH |
| MAURICE A. JONES; BABUR B. LATEEF, | ) |
| M.D.; ANGELA HUCLES MANGANO; C. | ) |
| EVANS POSTON JR.; JAMES V. REYES; and | ) **JURY TRIAL DEMANDED** |
| PETER C. BRUNJES, in their respective official | ) |
| capacities as Members of the Board of Visitors of | ) |
| the University of Virginia; TIMOTHY LONGO | ) |
| SR., in his official capacity as Chief of Police of | ) |
| the University of Virginia; MELISSA | ) |
| FIELDING, in her official capacity as Deputy | ) |
| Chief of Police of the University of Virginia; | ) |
| JOHN J. DENSMORE, M.D., Ph.D., in his | ) |
| official capacity as Associate Dean for Admissions | ) |
| and Student Affairs of the University of Virginia | ) |
| School of Medicine; and JIM B. TUCKER, M.D., | ) |
| in his official capacity as Chair of the Academic | ) |
| Standards and Achievement Committee of the | ) |
| University of Virginia School of Medicine; and | ) |
| CHRISTINE PETERSON, M.D., Assistant Dean | ) |
| for Medical Education of the University of | ) |
| Virginia School of Medicine; NORA KERN, | ) |
| M.D.; and SARA K. RASMUSSEN, M.D., Ph.D., | ) |
| each in her official and individual capacity, | ) |
| | ) |
| Defendants. | ) |

**FIRST AMENDED COMPLAINT**

Plaintiff Kieran Ravi Bhattacharya ("Mr. Bhattacharya"), by counsel, respectfully states as for his First Amended Complaint against the following Defendants:  (1) the Rector, Vice Rector, and Members of the Board of Visitors of the University of Virginia, all of whom are named in their respective official capacities (collectively, the "Board of Visitors Defendants"), along with Timothy Longo, Sr., Interim Chief of Police of the University of Virginia, who is named in his official capacity ("Mr. Longo"), and Melissa Fielding, Deputy Chief of Police of the University of Virginia, who is named in her official capacity ("Ms. Fielding") (collectively, the "University Defendants"); (2) John J. Densmore, M.D., Ph.D., Associate Dean for Admissions and Student Affairs, University of Virginia School of Medicine ("Dean Densmore"), and Jim B. Tucker, M.D., Chair of the Academic Standards and Achievement Committee, University of Virginia School of Medicine ("Dr. Tucker"), each of whom is named in his official capacity (collectively, the "UVA Med School Defendants"); and (3) Christine Peterson, M.D., Assistant Dean for Medical Education, University of Virginia School of Medicine ("Dean Peterson"), Nora Kern, M.D., Assistant Professor of Urology, University of Virginia School of Medicine ("Professor Kern"), and Sara K. Rasmussen, M.D., Ph.D., Associate Professor, University of Virginia School of Medicine ("Professor Rasmussen"), each of whom is named in both her official and individual capacity (collectively, the "Individual Co-Conspirators").

## NATURE OF THE ACTION

1.       This Complaint seeks redress for the violation of Plaintiff's constitutional rights by the University of Virginia, which was founded more than 200 years ago by Thomas Jefferson. Before founding the University of Virginia—during the time that ratification of the Constitution was being debated—Mr. Jefferson wrote a December 20, 1787 letter to James Madison expressing the view that "a bill of rights is what the people are entitled to against every government on earth, general

1

or particular, and what no just government should refuse." Of the various provisions of the Bill of Rights that later became part of the Constitution of the United States, the First Amendment's guarantee of free speech is of paramount importance to the mission of any public university, including the University of Virginia. Ever since enactment of the Fourteenth Amendment in 1868, the guarantees of free speech and due process have applied with equal force to the several States—including the Commonwealth of Virginia and state agencies such as the University of Virginia.

2.      If its treatment of Mr. Bhattacharya is any indication, however, the University that Mr. Jefferson founded now seems to think that it is above the law of the land, including the Bill of Rights. The UVA Med School Defendants—acting in concert, combination, and conspiracy with the Individual Co-Conspirators—have acted to deprive and have in fact deprived Mr. Bhattacharya of his right to free speech protected by the First Amendment and his right to due process protected by the Fourteenth Amendment.

3.      Before the UVA Med School Defendants and the Individual Co-Conspirators violated and conspired to violate his civil rights, Mr. Bhattacharya was a student enrolled in the University of Virginia School of Medicine ("UVA Med School"). All that changed, however, as a result of Mr. Bhattacharya's questions and comments during an October 25, 2018 panel discussion on "microaggression" (the "AWMA Microaggression Panel Discussion") sponsored by the newly formed UVA Med School chapter of the American Medical Women's Association ("AMWA").[1] At the time of the October 25, 2018 AWMA Microaggression Panel Discussion, Mr. Bhattacharya was a second-year medical student in good standing at UVA Med School. Nevertheless—in retaliation for his questions and comments at the AWMA Microaggression Panel Discussion to which the

---

[1] Since October 25, 2018, the AMWA has posted on its website a description of the AMWA Microaggression Panel Discussion proclaiming it to have been a "success." A printout of the website posting under the heading "New AMWA Chapter at the University of Virginia — First Event a Success!" (https://www.amwa-doc.org/news/new-amwa-chapter-at-the-university-of-virginia) is attached as **Exhibit 1**.

2

Individual Co-Conspirators objected—Mr. Bhattacharya was disciplined, suspended, and ultimately banished altogether from UVA Med School.  As a result, Mr. Bhattacharya is now unable to pursue his chosen career in medicine.

4.        The organizers of the AWMA Microaggression Panel Discussion included two of the Individual Co-Conspirators, Professors Kern and Rasmussen, both of whom were also panelists at the October 25, 2018 event.  Following a presentation by a Professor of Psychology at the University of Virginia—Beverly Colwell Adams, Ph.D. ("Professor Adams")—Mr. Bhattacharya asked questions and made comments that organizers of the AWMA Microaggression Panel Discussion later characterized as "antagonistic."  The audio recording of the AMWA Microaggression Panel Discussion (attached as **Exhibit 2)** demonstrates that this characterization is neither fair nor accurate. The audio recording establishes that Mr. Bhattacharya and the speaker, Professor Adams, had a rational and calm discussion about the theory of microaggression.  The only person whose behavior was questionable was one of the two AMWA members on the panel, Individual Co-Conspirator Professor Rasmussen.  Professor Rasmussen interrupted the dialogue between Mr. Bhattacharya and Professor Adams, launched into a diatribe about microaggressions that she personally had experienced as a native of West Virginia, and raised her voice in anger at Mr. Bhattacharya before cutting him off altogether.  Ultimately, however, it is immaterial whether UVA Med School's characterization of Mr. Bhattacharya's questions and comments as "antagonistic" is a fair one.  The First Amendment does not permit the government to censor speech that it considers to be antagonistic.

5.        Unfortunately for Mr. Bhattacharya, Professor Rasmussen's angry outburst at the AMWA Microaggression Panel Discussion was just the beginning rather than the end of UVA Med School's efforts—so far successful—to silence and punish anyone who dared to even question the

3

theories being espoused that day. Beginning immediately after the event, UVA Med School responded to Mr. Bhattacharya's dissident speech in a way that would make the rulers of the former Soviet Union proud. That same day, one of Professor Rasmussen's colleagues at UVA Med School who was also a member of the AMWA Microaggression Panel Discussion—Individual Co-Conspirator Professor Kern—surreptitiously lodged a "professionalism concern" complaint against Mr. Bhattacharya, citing him for asking a "series of questions that were quite antagonistic toward the panel." Meanwhile—without ever disclosing that his record now included a "professionalism concern" citation as required by UVA Med School's own policies and procedures— Individual Co-Conspirator Dean Peterson "invited" Mr. Bhattacharya to a meeting for the stated purpose of "help[ing] you understand and be able to cope with unintended consequences of conversations." Although Dean Peterson never disclosed this during their subsequent meeting on October 31, 2018, one of the "unintended consequences" to which she was referring included the formal discipline that Mr. Bhattacharya was soon to receive. This discipline was the result of two later meetings of UVA Med School's Academic Standards and Achievement Committee ("ASAC" or the "Committee") in which Dean Peterson participated even though she is not now and was not at the time a member of the Committee.

6. The first such Committee meeting, which took place on November 14, 2018, was a secret meeting to consider the "professionalism concern" complaint lodged by Professor Kern, who also happened to be a member of the Committee and—along with Dean Peterson—was present for its deliberations. During this meeting, of which Mr. Bhattacharya had no notice, the Committee did not bother to listen to the actual audio recording of the AMWA Microaggression Panel Discussion. Instead, the Committee relied upon Professor Kern's characterization of Mr. Bhattacharya's questions and comments as the basis for its decision to reprimand Mr. Bhattacharya.

4

7.      The reprimand took the form of a letter the following day signed by Committee Chair Dr. Tucker.  By correspondence dated November 15, 2018, UVA Med School admonished Mr. Bhattacharya to "show mutual respect to all" and "express [his opinions] in appropriate ways" and advised him to "consider getting counseling" to improve his communication skills.  By the end of Thanksgiving break, however, UVA Med School's advice to "consider getting counseling" had become a prerequisite for Mr. Bhattacharya to continue his medical school education.  On November 26, 2018, Mr. Bhattacharya was notified by email that he needed to be evaluated by a counselor or psychiatrist before he could return to his classes at UVA Med School.  The following day, November 27, 2018, Mr. Bhattacharya was notified that he could not resume his studies until he had undergone psychological evaluation and received "medical clearance."

8.      Two days later—following a hastily convened "emergency" meeting of the Academic Standards Committee—Mr. Bhattacharya received correspondence dated November 29, 2018 notifying him that he had been suspended from UVA Med School until August 2019 because "your aggressive and inappropriate interactions in multiple situations, including in public settings, during a speaker's lecture, with your Dean, and during the committee meeting yesterday, constitute a violation of the School of Medicine's Technical Standards."  Thereafter, Mr. Bhattacharya was denied the opportunity to appeal the one-year suspension or apply for readmission because the University of Virginia issued a no trespass warning to Mr. Bhattacharya for a four-year period.  In short, Mr. Bhattacharya's comments and questions during the AMWA Microaggression Panel Discussion—"antagonistic" or not—resulted in his permanent exile to the UVA Med School equivalent of Siberia.

4841-6080-5040.8

## PARTIES

### (Plaintiff)

9.      Kieran Ravi Bhattacharya ("Mr. Bhattacharya") is an individual who resides at 70 Hale Pili Way, Haiku, Hawaii 96708.  Mr. Bhattacharya was a student at the University of Virginia School of Medicine before his suspension and dismissal as alleged in this Complaint.

### (The University Defendants)

10.      The University of Virginia is a public university owned and operated by the government of the Commonwealth of Virginia.

11.      The Rector, Vice Rector, and Members of the Board of Visitors of the University of Virginia (collectively, the "Board of Visitors Defendants") are, and were at all times relevant to this Complaint, officials of the University of Virginia responsible for the adoption and enforcement of policies applicable to students attending the University of Virginia—including policies to ensure that students' rights of free speech and due process are protected.

12.      Timothy Longo, Sr., Interim Chief of Police of the University of Virginia ("Mr. Longo"), is responsible for overseeing safety and security functions of the University of Virginia and enforcing no trespass orders.

13.      Melissa Fielding, Deputy Chief of Police of the University of Virginia ("Ms. Fielding"), was at all times relevant to this Complaint a member of the police force at the University of Virginia with responsibility for overseeing safety and security functions of the University of Virginia.

14.      Each of the Board of Visitors Defendants, Mr. Longo, and Ms. Fielding (collectively, the "University Defendants") is sued in his or her official capacity for injunctive and declaratory relief and for damages resulting from the acts and omissions alleged in this Complaint.

**(The UVA Med School Defendants)**

15.     John J. Densmore, M.D., Ph.D. ("Dean Densmore") is Associate Dean for Admissions and Student Affairs, University of Virginia School of Medicine.

16.     Jim B. Tucker, M.D. ("Dr. Tucker") is Chair of the Academic Standards and Achievement Committee of the University of Virginia School of Medicine.

17.     The University of Virginia School of Medicine ("UVA Med School") is a public medical college that is part of the University of Virginia.

18.     Dean Densmore and Dr. Tucker (collectively, the "UVA Med School Defendants") are both members of the faculty and administration of UVA Med School responsible for the adoption and enforcement of policies applicable to students attending UVA Med School—specifically including UVA Med School's Policy on Academic and Professional Enhancement and, more generally, policies to ensure that medical students' rights of free speech and due process are protected.

19.     Each of the UVA Med School Defendants is sued in his official capacity for injunctive and declaratory relief and for damages resulting from the acts and omissions alleged in this Complaint.

**(The Individual Co-Conspirators)**

20.     Christine Peterson, M.D. is Assistant Dean for Medical Education, University of Virginia School of Medicine ("Dean Peterson").

21.     Nora Kern, M.D. ("Professor Kern") is Assistant Professor of Urology at the University of Virginia School of Medicine and former member of the Academic Standards and Achievement Committee of the University of Virginia School of Medicine.

22.     Sara K. Rasmussen, M.D., Ph.D. ("Professor Rasmussen") is an Associate Professor at the University of Virginia School of Medicine.

7

23.     Professor Kern and Professor Rasmussen (collectively, the "Individual Co-Conspirators") are both members of AMWA who helped organize and participated in the AMWA Microaggression Panel Discussion.

24.     As members of the faculty of UVA Med School, the Individual Co-Conspirators are required to comply with policies applicable to students attending UVA Med School—specifically including UVA Med School's Policy on Academic and Professional Enhancement and, more generally, policies to ensure that medical students' rights of free speech and due process are protected.

25.     With respect to Mr. Bhattacharya, however, the Individual Co-Conspirators subordinated their responsibilities to UVA Med School—including students and faculty alike—to their personal ideologies and prejudices and their loyalty to AMWA.  Professor Kern and Professor Rasmussen acted in combination and conspiracy with other UVA Med School Defendants—including Dean Peterson—to deprive Mr. Bhattacharya of his constitutional rights of free speech and due process and to cause injury to Mr. Bhattacharya in his chosen profession.  Dean Peterson also acted in combination and conspiracy with third parties to subvert and corrupt the activities of the Academic Standards and Achievement Committee and abuse its processes for improper purposes.

26.     Dean Peterson, Professor Kern, and Professor Rasmussen each had an independent personal stake in the foregoing conspiracy.

27.     Each of the Individual Co-Conspirators is sued in her official capacity for injunctive and declaratory relief and for damages resulting from the acts and omissions alleged in this Complaint.

28.     Each of the Individual Co-Conspirators is also sued in her individual capacity for damages resulting from the acts and omissions alleged in this Complaint.

## JURISDICTION AND VENUE

29.     This civil rights action raises federal questions under the United States Constitution, particularly the First and Fourteenth Amendments, and the Civil Rights Act of 1871, 42 U.S.C. §§ 1983 and 1985(3).

30.     This Court has original jurisdiction over these federal claims pursuant to 28 U.S.C. §§ 1331 and 1343.

31.     This Court has authority to award the requested damages pursuant to 28 U.S.C. §§ 1343 and 42 U.S.C. §§ 1983 and 1985(3); the requested declaratory relief pursuant to 28 U.S.C. §§ 2201-02; the requested injunctive relief pursuant to 28 U.S.C. § 1343, 42 U.S.C. § 1983, and Fed. R. Civ. P. 65; and costs and attorneys' fees pursuant to 42 U.S.C. § 1988(b).

32.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because the acts conduct described in this Complaint occurred in this district.

## FACTS COMMON TO ALL COUNTS

**(Before His Attendance at the AMWA Microaggression Panel Discussion,
Mr. Bhattacharya Was a Medical Student in Good Standing at UVA Med School)**

33.     Mr. Bhattacharya enrolled in UVA Med School and began the fall 2016 semester as a member of the Class of 2020 on August 4, 2016.

34.     During the fall 2016 semester, Mr. Bhattacharya participated in UVA Med School's mandatory Social Issues in Medicine ("SIM") course through shadowing and direct client contact at the Albemarle County Department of Social Services, Foster Care Unit.  In the Agency Evaluation of Student attached as **Exhibit 3**, Supervisor Beckie Aderholz reported that Mr. Bhattacharya

attended all scheduled sessions, conformed to expectations with respect to different metrics, and received no negative responses.

35.     During the fall 2016 semester, Mr. Bhattacharya participated in Team-Based Learning ("TBL") exercises and received five Student Performance Evaluations (hereinafter "SPE") from five medical students in Mr. Bhattacharya's six-person TBL team for that semester.  Three of the five medical students rated Mr. Bhattacharya's TBL performance as "Frequently exceeds expectations;" one medical student rated Mr. Bhattacharya's TBL performance as "Meets and sometimes exceeds expectations;" and one medical student rated Mr. Bhattacharya's TBL performance as "Meets expectations."  All five of Mr. Bhattacharya's SPEs from TBLs in the fall 2016 Semester are attached as **Exhibit 4**, which has been redacted to remove personal identifiers of each of the other five medical students in Mr. Bhattacharya's TBL group.

36.     During the fall 2016 semester, Mr. Bhattacharya participated in Clinical Performance Development ("CPD") 1A and received one SPE from his CPD mentor, Andrew Wolf, MD ("Dr. Wolf").  In this SPE, attached as **Exhibit 5**, Dr. Wolf marked "Strongly Agree" with respect to the following assertions:

        a.     "The student participates in and contributes to small group discussion"

        b.     "The student is willing to help others in the group"

        c.     "The student exhibits humanism, compassion, and empathy during small group"

        d.     "The student demonstrates engagement in the SIM community service experience"

        e.     "The student demonstrates awareness of the political and economic forces that impact the delivery of health care"

10

  f. "The student demonstrates awareness of the socio-cultural forces that impact the delivery of health care."

37. On December 18, 2016, Mr. Bhattacharya completed the fall 2016 semester at UVA Med School in good academic standing as a member of the Class of 2020.

38. Mr. Bhattacharya began the spring 2017 semester at UVA Med School on January 2, 2017 as a member of the Class of 2020.

39. On February 7, 2017, Mr. Bhattacharya took a one-year leave of absence (the "LOA") from UVA Med School.  On the University of Virginia Official Withdrawal Form, attached as **Exhibit 6**, Plaintiff cited his reason for withdrawal as "Personal."

40. During Mr. Bhattacharya's LOA from UVA Med School in 2017, he engaged in a number of activities related to his career objective of becoming a medical doctor.  These include the following:

  a. On September 30, 2017, Mr. Bhattacharya presented—in conjunction with a former UVA Med School classmate—an abstract that the two of them had co-authored at the Fourth Annual Symposium on Academic Interventional Radiology in Washington, D.C.

  b. On November 7, 2017, Mr. Bhattacharya presented—in conjunction with a former UVA Med School classmate—a poster that the two of them had co-authored entitled "Characterization of trends in medical student indebtedness with current and potentially new repayment options for young physicians" at the Sixteenth Annual Medical Student Research Symposium at UVA Med School.

  c. Throughout 2017, Mr. Bhattacharya authored—in conjunction with a former UVA Med School classmate—a paper entitled "Endovascular Management of Acute Mesenteric Ischemia," the findings of which the two of them presented orally at the 43rd

Annual Scientific Meeting of Society of Interventional Radiology on March 19, 2018 in Los Angeles.

d.      Throughout 2017, Mr. Bhattacharya authored a textbook chapter entitled "Special Considerations:  Revision Anterior Cruciate Ligament" that was published in 2018 in the first edition of the textbook entitled *ACL Injuries in Female Athletes*.

e.      Throughout 2017, Mr. Bhattacharya authored a textbook chapter entitled "Head and Spine Diagnosis and Decision Making" that was published in the fifth edition of *Delee, Drez, and Miller's Orthopaedic Sports Medicine* in 2019.

f.      Throughout 2017, Mr. Bhattacharya edited and contributed to a manuscript entitled "Endovascular Management of Acute Mesenteric Ischemia" that was accepted for publication in the *Annals of Gastroenterology* on August 13, 2019 and published online on September 26, 2019 (https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6826075).

41.      Mr. Bhattacharya returned to UVA Med School on January 3, 2018 to begin the spring 2018 semester as a member of the Class of 2021.

42.      During the spring 2018 semester, Mr. Bhattacharya participated in TBL exercises and received five SPEs from five medical students in Mr. Bhattacharya's six-person TBL.  Three of the five medical students rated Mr. Bhattacharya's TBL performance as "Frequently exceeds expectations;" and two medical students rated Mr. Bhattacharya's TBL performance as "Meets and sometimes exceeds expectations."  All five complete SPEs from the spring 2018 Semester are attached as **Exhibit 7**, which has been redacted to remove personal identifiers of each of the other five medical students in the TBL group.

12

43.     During the spring 2018 semester, Mr. Bhattacharya participated in CPD 1B and received one SPE (attached as **Exhibit 8**) from his CPD mentor, James Moak, MD (hereinafter "Dr. Moak").

44.     A "Professionalism Concern Card" ("PCC") at UVA Med School is punitive administrative action taken against medical students for a variety of forms of misconduct, including unexcused absences and violations of professionalism.  According to UVA Med School's Policy on Academic and Professional Enhancement (**Exhibit 9**), "Any breach of professionalism resulting in a recorded observation, e.g., Professionalism Concern Card, letter, written report, etc., must be addressed with the student by their college dean and documentation of the discussion must be recorded."

45.     During the spring 2018 semester, at 10:52 a.m. on May 4, 2018, an attendance monitor submitted the Professionalism Concern Card attached as **Exhibit 10** (the "First Professionalism Concern Card") to Mr. Bhattacharya's medical student file.   The First Professionalism Concern Card stated as follows with respect to Mr. Bhattacharya: "Student did not attend the required Patient Presentation on May 2, 2018."  In the First Professionalism Concern Card, the attendance monitor reported that he or she did not notify Mr. Bhattacharya of this concern card; that he or she did not feel uncomfortable in reporting this concern card to Mr. Bhattacharya; and that he or she did not request to be contacted about the action taken.

46.     Mr. Bhattacharya did not become aware of the First Professionalism Concern Card until after receiving his medical student file more than seven and a half months later on December 20, 2018.

47.     Contrary to the report contained in the First Professionalism Concern Card, Mr. Bhattacharya in fact attended the May 2, 2018 patient presentation but was not recorded as present due to a lapse in Mr. Bhattacharya's subscription to UVA Med School's attendance technology.

48.     By way of background, attendance at UVA Med School is monitored using technology known as "Turning Point Login."  As of the May 2, 2018 patient presentation, Mr. Bhattacharya's subscription to Turning Point Login had expired during his LOA in calendar year 2017.  At that time, Mr. Bhattacharya was notified of the lapse in his subscription by Dr. Mary Kate Warden ("Dr. Warden")—a "system leader" for the area of study for which the May 2, 2018 patient presentation was focused—and Mr. Bhattacharya promptly resolved the issue with UVA Med School's technical support.

49.     Notwithstanding Mr. Bhattacharya's resolution of the subscription issue and communication of the resolution to Dr. Warden, the attendance monitor did not rescind the First Professionalism Concern Card.  Again, Mr. Bhattacharya had no knowledge at the time that the First Professionalism Concern Card had even been recorded in his medical student file.

50.     Mr. Bhattacharya was unaware of the existence of the First Professionalism Concern Card because neither Dean Densmore nor any other faculty or staff member of UVA Med School ever notified him of its existence or discussed it with him as required by UVA Med School's Policy on Academic and Professional Enhancement.

51.     On May 27, 2018, Mr. Bhattacharya completed the spring 2018 semester at UVA Med School in good academic standing as a member of the Class of 2021.

52.     On July 30, 2018, Mr. Bhattacharya began the fall 2018 semester at UVA Med School as a member of the Class of 2021.

53.     Mr. Bhattacharya was in good standing at UVA Med School as of October 25, 2018,

when he attended the AMWA Microaggression Panel Discussion.

**(During the Question and Answer Period at the AMWA Microaggression Panel Discussion,
Mr. Bhattacharya Politely Challenged Certain Statements by a Professor of Psychology
Before Professor Rasmussen Interrupted the Exchange in Anger)**

54.     The official title of the AMWA Microaggression Seminar was "Microaggressions:

Why are 'They' So Sensitive?"  The AMWA website description of the event (https://www.amwa-

doc.org/news/new-amwa-chapter-at-the-university-of-virginia), entitled "New AMWA Chapter at

the University of Virginia — First Event a Success!" (**Exhibit 1**), conflates "microaggression" with

"gender harassment" and "gender inequity," describing it as follows:

> One of the goals for University of Virginia AMWA Chapter's first
> semester as a chapter was to highlight the micro-aggressions female
> medical students and providers can face in the workplace, and
> subsequently equip our classmates with tools to both handle these
> issues in the moment as well as report them. We approached this in
> two ways. First, we collected anonymous stories of micro-
> aggressions/gender harassment from medical students at UVA, and
> got an amazing, yet terribly sad, volume of responses. We collected
> all the stories and put up a display in our student lounge so that our
> classmates could read the responses and reflect on them. Second, we
> arranged a panel of three incredible female faculty to speak on micro-
> aggressions and how they handle them in the workplace. Dr. Beverly
> Adams, a psychology professor from the College of Arts and Sciences
> opened up our lecture by discussing the history, definitions, and her
> personal research on micro-aggressions. This was followed by Dr.
> Nora Kern and Dr. Sara Rasmussen, two powerhouse female surgeons
> at UVA discussing their personal experiences with gender inequity as
> healthcare providers. Our event was attended by members of all
> classes, and caught the attention of our college deans and directors of
> education, prompting discussion within our administration about
> harassment and how we can handle it better as an institution. The
> UVA chapter hopes that publicizing this event will help other chapters
> hold similar events and prompt discussion nation-wide!

55.     If the reaction of Professors Kern and Rasmussen is any indication, however, the

"discussion nation-wide" that AMWA's UVA Med School chapter hoped to prompt was not

intended to include any questions or comments perceived as critical of the theory of

15

microaggression—even though it is in fact controversial.[2]  Following Professor Adams' remarks, Individual Co-Conspirator opened the floor to questions and called upon Mr. Bhattacharya.  His questions and comments had nothing to do with "gender harassment" or "gender inequity."  Nor were the content and tone of Mr. Bhattacharya's questions and comments inappropriate as Professor Kern later claimed.  The audio link of the exchange establishes that Mr. Bhattacharya's questions and comments were logical and not something that should have prompted any concern—let alone retaliation or discipline—from either UVA Med School as an institution or the Individual Co-Conspirators.

56.     Mr. Bhattacharya asked four questions, as follows:

a.      Question #1：  "Hello, thank you for your presentation.  I had a few questions just to clarify your definition of microaggressions.  Is it a requirement to be a victim of microaggression that you are a member of a marginalized group?  In the definition it just said you had to be a member of a marginalized group—in the definition you just provided it in the last slide.  So that's contradictory."

b.      Question #2：  "Follow up question.  Exactly how do you define marginalized and who is a marginalized group.  Where does that go?  I mean it seems extremely non-specific."

c.      Question #3：  "Third component about your definition of microaggression and how you said 'oh ha' it is distinguished from rude statements you clarified that is because the person who is receiving the microaggressions somehow knows the intention of the person who made it.  Somehow knows whether or not the person is educated, whether that person actually is intentionally harming them or whether or not they are unintentionally harming

---

[2] *See, e.g.,* Althea Nagai, "The Pseudo-Science of Microaggressions," Academic Questions (Spring 2017) (www.nas.org/academic-questions/30/1/the_pseudo_science_of_microaggressions), attached as **Exhibit 11**.

them (1), (2) the distinguishing factor that we should also make between what a rude statement is and what you are now defining as a microaggression is that a microaggression is entirely dependent on how the person who is receiving it is reacting.  It could be dependent upon a previous relationship and it is not exactly what the person is saying.  So the evidence that you provided, and you said you studied this for years, which is just one anecdotal case, I mean do you have—have you studied anything else about microaggression that you know in the last few years."

   d. Question #4**:** **"**Yeah but isn't it really out of my control what hurts somebody?  I can't control what offends. I can punch the air, and if that makes someone mad, that's really not my problem or fault.  If I punch someone in the face, and it directly hurts them, I incited at them, that is completely different.  So, again, what is the basis for what you are going to tell someone that they have committed a microaggression?  You hear a story from someone but how do you know that their interpretation is not subject to bias, that they do not have a prejudice towards the person that they're saying made it.  I mean, where are you getting this basis from?  How are you studying this? And collecting evidence on this and making presentations from it?"

  57. In response to Mr. Bhattacharya's first three questions, Professor Adams took them in stride, providing answers that were logical and complete regardless of whether the entire audience found them to be persuasive.  Individual Co-Conspirator Professor Rasmussen would not allow Professor Adams to answer Question #4.  Instead, Professor Rasmussen interrupted, provided lengthy anecdotes about microaggressions that she had allegedly suffered as a native of West Virginia, and then—when Mr. Bhattacharya attempted to respond—raised her voice in anger and cut him off.

17

58.   Rather than answer Question #4 or permit Professor Adams to do so, Professor Rasmussen provided the following anecdote(s) based on her personal experience:

> I am from West Virginia and on my father's side was sort of transplanted to West Virginia but my mother's side has been from West Virginia since the 1700s.  And growing up, I was privileged enough to be able to go out of state to attend summer camps, and a rejoining refrain I heard all the time was oh you don't sound like you're from West Virginia.  Or immediately lots of harmless jokes like oh but you are wearing shoes, oh but you are here at this math camp, oh but you're a girl, why are you bothering to get a …. These were all. You could argue it was said in good fun by people who don't know what they are saying.  I grew up innocent to that and never pushed back on it but I tell you when I got to residency and I saw how people started thinking less of me because I was from a rural state.  I began to understand the impact of these microaggressions.  It doesn't matter.  You have to learn to uncouple the intent of what you are saying and the impact it has on the audience.  And you have to have a responsibility on the impact of your actions.  And if you make a statement that someone considers insensitive, the first thing you can say is oh my gosh that it wasn't my intent.  But don't get frustrated with that person for bringing it to your attention.

59.   In response to Professor Rasmussen, Mr. Bhattacharya stated: "I have to respond to that because I never talked about getting frustrated at a person for making the statement. I never would condone any statements that you are making like that.  What I'm saying is that what you are providing is anecdotal evidence. That's what you provided.  That's what she provided."

60.   At that point, Professor Rasmussen raised her voice in anger, stated as follows: "No, I think she provided a lot of citations and the literature and I'm sorry…I was just reading your body language," and then cut off Mr. Bhattacharya altogether, asking another student "Would you like to ask a question?"

**(Immediately After the AMWA Microaggression Panel Discussion,
the Two AMWA Members Who Participated in the Panel Discussion Conspired With
Dean Peterson to Retaliate Against Mr. Bhattacharya for His Questions and Comments)**

61.   Beginning shortly after the October 25, 2018 Microaggression Panel Discussion— and continuing through the November 14, 2018 and November 28, 2018 ASAC meetings that

18

resulted in official communications from UVA Med School censuring and later suspending Mr. Bhattacharya—the Individual Co-Conspirators collaborated with one another, with the UVA Med School Defendants, and with other UVA Med School faculty members and students who shared their personal ideology. The objective of the foregoing conspiracy was to punish Mr. Bhattacharya for his questions and comments during the AMWA Microaggression Panel Discussion and to deter others from questioning or challenging the ideology of the Individual Co-Conspirators. Dean Peterson also injected herself into the functions of ASAC for the improper purpose of abusing its disciplinary powers for personal reasons.

62.     The conduct in furtherance of this conspiracy included:

a.      emails from Dean Peterson to Mr. Bhattacharya that resulted in an October 31, 2018 meeting between her and Mr. Bhattacharya;

b.      inappropriate and unprofessional communications among Professor Kern, Professor Rasmussen, and Dean Peterson with one another and third parties before and after the October 31, 2018 meeting between Mr. Bhattacharya and Dean Peterson, and before and after the November 14, 2018 and November 28, 2018 ASAC meetings in which Professor Kern participated and which Dean Peterson attended as a "guest" even though she was not a member of the Committee;

c.      the surreptitious submission by Professor Kern of a "Professionalism Concern Card" to Mr. Bhattacharya's UVA Med School student file and the wrongful concealment of that submission by Professor Kern, Dean Peterson, and other UVA Med School Defendants—including Dean Densmore—who had a duty to disclose it to Mr. Bhattacharya; and

d.      orchestrating the November 14, 2018 and November 28, 2018 ASAC

meetings described herein and the discipline against Mr. Bhattacharya that resulted from

these meetings.

The evidence of this conspiracy includes email and text message traffic to and from Professor

Rasmussen, Professor Kern, Dean Peterson, the UVA Med School Defendants, and others within

UVA Med School to which Mr. Bhattacharya does not have access.  The Individual Co-Conspirators,

the UVA Med School Defendants, and UVA Med School had a duty to preserve and hopefully have

preserved such evidence.  To the extent that the Individual Co-Conspirators, the UVA Med School

Defendants, and UVA Med School destroyed rather than preserved such evidence, Mr. Bhattacharya

is entitled to adverse inferences with respect to the conspiracy.

63.      In furtherance of the conspiracy to violate Mr. Bhattacharya's civil rights described

herein, at 2:59 p.m. on October 25, 2018, Dean Peterson sent Mr. Bhattacharya the email attached

as **Exhibit 12** stating:

> Kieran, I was at the noontime "Microaggressions" panel today and
> observed your discomfort with the speaker's perspective on the
> topic. Would you like to come share your thoughts with me? I think
> I can provide some perspective that will reassure you about what
> you are and are not responsible for in interactions that could be
> uncomfortable even when that's not intended.  If you'd prefer to talk
> with your own college dean, that's fine too.  I simply want to help
> you understand and be able to cope with unintended consequences
> of conversations.  Dr. Peterson

64.      Before receiving Dean Peterson's October 25, 2018 email, Mr. Bhattacharya had

never met or hand any other direct contact with Dean Peterson.  The reference to "your own college

dean" was to Dean Densmore, who—pursuant to UVA Med School's Policy on Academic and

Professional Advancement—was responsible for addressing Professor Kern's Professionalism

Concern Card with Mr. Bhattacharya and documenting that discussion.  Although Mr. Bhattacharya

20

never had any prior communications with Dean Peterson, she had—unbeknownst to Mr. Bhattacharya at the time—been in contact with Professors Kern and Rasmussen and others about Mr. Bhattacharya's questions and comments at the AMWA Microaggression Panel Discussion.

65.     By email that same day, October 25, 2018 at 4:30 p.m. (**Exhibit 12**), Mr. Bhattacharya responded to Dean Peterson's October 25, 2018 as follows:

> Your observed discomfort of me from wherever you sat was not at all how I felt.  I was quite happy that the panel gave me so much time to engage with them about the semantics regarding the comparison of microaggressions and barbs.  I have no problems with anyone on the panel; I simply wanted to give them some basic challenges regarding the topic.  And I understand that there is a wide range of acceptable interpretations on this.  I would be happy to meet with you at your convenience to discuss this further.

Dean Peterson's response later that day stated in pertinent part: "Kieran, I understand.  I don't know you at all so I may have misinterpreted your challenges to the speaker." The exchange closed with an agreement for the two of them to meet in Dean Peterson's Student Health office at 4 p.m. on October 31, 2018.

66.     Once the meeting with Dean Peterson had been set, at 9:04 p.m. on October 25, 2018, Professor Kern issued the Professionalism Concern Card against Mr. Bhattacharya attached as **Exhibit 13** (the "Second Professionalism Concern Card").  Professor Kern was a speaker at the AMWA Microaggression Panel Discussion who called on Mr. Bhattacharya to ask questions after the presentation but did not respond to any of his questions or comments—at least not to his face.

67.     The Second Professionalism Concern Card against Mr. Bhattacharya identified relevant areas of concern as "Respect for Others" and "Respect for Differences," referred to Mr. Bhattacharya as "this student" and "med student," and described the basis for it as follows:

> For a AMWA session, we held a panel on microaggression.  Myself [sic] and 2 other faculty members were invited guests.  This student asked a series of questions that were quite antagonistic toward the

> panel.  He pressed on and stated one faculty member was being
> contradictory.  His level of frustration/anger seemed to escalate until
> another faculty member defused the situation by calling on another
> student for questions.  I am shocked that a med student would show
> so little respect toward faculty members.  It worries me how he will
> do on wards.

68.     The supporting commentary from Professor Kern in the Second Professionalism

Concern Card against Mr. Bhattacharya does not directly quote Mr. Bhattacharya, Professor

Rasmussen, or Professor Adams from the 5 minutes and 20 seconds of available audio discussion

among these three individuals.

69.     The Second Professionalism Concern Card stated that Professor Kern had not

discussed her concerns with Plaintiff and that she did not feel uncomfortable discussing her concerns

with Mr. Bhattacharya.  When she issued the Professional Concern Card on October 25, 2018,

Professor Kern did not disclose that she had reported its issuance to anyone other than the registrar

at UVA Medical School who was the standard recipient of such concern card notifications at the

email address som-studentaffairs@virgina.edu.   In fact, however, Professor Kern disclosed her

submission of the Professionalism Concern Card to others—including the other Individual Co-

Conspirators—who used this information to punish Mr. Bhattacharya for his questions and

comments at the AMWA Microaggression Panel Discussion with which they took issue.  This

Professionalism Concern Card was not made available to Mr. Bhattacharya until 56 days after its

issuance as part of his medical student file that he received on December 20, 2018 following his

suspension from UVA Med School on November 29, 2018.

70.     Professor Kern never notified Mr. Bhattacharya of the issuance of the Second

Professionalism Concern Card and never spoke with him about it.  In fact, Mr. Bhattacharya has no

recollection of ever having spoken to Professor Kern at any time during his enrollment at UVA

22

Medical School.  Nor has Professor Kern ever contacted Mr. Bhattacharya or been contacted by Mr. Bhattacharya for any reason during his enrollment at UVA Medical School.

71.     The day after Professor Kern submitted the Professionalism Concern Card to Mr. Bhattacharya's medical student file, Mr. Bhattacharya received an email from Dean Densmore—the member of the UVA Med School faculty and administration who, under UVA Med School's policies and procedures, was required to discuss the Professionalism Concern Card with Mr. Bhattacharya and document the discussion.  In fact, he never did so that day or at any other time.  On October 26, 2018 at 1:12 p.m., Dean Densmore sent Mr. Bhattacharya the e-mail attached as **Exhibit 14** stating: "Hi Kieran, I just wanted to check in and see how you are doing.  I hope the semester is going well. I'd like to meet next week if you have some time.  JJD."

72.     In response, Mr. Bhattacharya agreed to meet with Dean Densmore at noon on November 1, 2018.

73.     The day before his scheduled meeting with Dean Densmore, Mr. Bhattacharya met with Dean Peterson as previously agreed.  The meeting between Mr. Bhattacharya and Dean Peterson took place on October 31, 2018 beginning at 4 p.m. and lasted for approximately one hour. In addition to prying into Mr. Bhattacharya's personal life, Dean Peterson spent much of their time together trying to ascertain Mr. Bhattacharya's views on various social and political issues— including sexual assault, affirmative action, and the election of President Trump.  Dean Peterson barely mentioned the ostensible purpose of the meeting, *i.e.,* to discuss Mr. Bhattacharya's questions and comments at the AMWA Microaggression Panel Discussion.   At no time during Mr. Bhattacharya's hour-long meeting with Dean Peterson on October 31, 2018 did she tell him about the Professionalism Concern Card against him that had been issued by Professor Kern.

74.     The following day, November 1, 2018, Mr. Bhattacharya met with Dean Densmore as previously agreed.  The meeting took place in Dean Densmore's personal office starting at noon on November 1, 2018 and lasted approximately ten minutes.  The scope of the discussion with Dean Densmore was limited to study strategies for UVA Med School's "summative exams" and the United States Medical Licensing Exam ("USMLE") Step 1, which Mr. Bhattacharya was scheduled to take on February 1, 2019.

75.     At no time during this November 1, 2018 meeting—or at any other time—did Dean Densmore inform Mr. Bhattacharya that Professor Kern had issued a Professionalism Concern Card against him.  In fact, Dean Densmore did not even raise the issue of Mr. Bhattacharya's questions and comments at the AMWA Microaggression Panel Discussion during the November 1, 2018 meeting.  Toward the end of the meeting, Mr. Bhattacharya himself brought up the fact that he had been called to meet with Dean Peterson the preceding day.  At that point, Dean Densmore informed Mr. Bhattacharya that he was aware of the discussions with Dean Peterson.  Dean Densmore did not inform Mr. Bhattacharya that he had anything to be concerned about.  Again, he did not let Mr. Bhattacharya know about Professor Kern's Professionalism Concern Card.

76.     After meeting with Dean Densmore on November 1, 2018, Mr. Bhattacharya had no reason to know, believe, or even suspect that there were any Professionalism Concern Cards in his medical student file.  In fact, however, two Professionalism Concern Cards had been placed in Mr. Bhattacharya's medical student file at the time of the November 1, 2018 meeting with Dean Densmore.  Dean Densmore knew of the two Professionalism Concern Cards but affirmatively concealed their existence from Mr. Bhattacharya.  By doing so, Dean Densmore violated UVA Med School's Policy on Academic and Professional Advancement.  No member of the faculty or administration of UVA Medical School ever informed Mr. Bhattacharya of and/or discussed with

24

Mr. Bhattacharya these two serious, punitive administrative decisions.   In both the First Professionalism Concern Card (**Exhibit 10**) issued by an attendance monitor and the Second Professionalism Concern Card issued by Professor Kern (**Exhibit 13**), the attendance monitor and Professor Kern did not report feeling uncomfortable discussing their concerns with Mr. Bhattacharya.  Nevertheless, neither the attendance monitor nor Professor Kern ever reported these punitive administrative actions to Mr. Bhattacharya.  Nor did they arrange to have anyone else report either or both of these Professionalism Concern Cards to Mr. Bhattacharya at any time during Mr. Bhattacharya's enrollment at UVA Med School.

### (Based Upon the "Professionalism Concerns" Raised by Professor Kern, UVA Med School's Academic Standards and Achievement Committee Cited and Ultimately Suspended Mr. Bhattacharya for Being "Antagonistic")

77.    Unbeknownst to Mr. Bhattacharya at the time, UVA Med School's Academic Standards and Achievement Committee ("ASAC" or the "Committee") met on November 14, 2018 from 4:03 p.m. until 5:18 p.m. to discuss the Second Professionalism Concern Card that had been issued by Professor Kern, according to the meeting minutes attached as **Exhibit 15**.

78.    The November 14, 2018 Committee was presided over by UVA Med School Defendant Dr. Tucker, whose publicly available biography is attached as **Exhibit 16**.  Dr. Tucker serves as the Chair of the Committee according to the UVA Med School Office of Student Affairs publication attached as **Exhibit 17.**

79.    Individual Co-Conspirator Professor Kern, whose publicly available biography is attached as **Exhibit 18**, was also present at the November 14, 2018 Committee meeting.  The November 14, 2018 meeting minutes listed Professor Kern as a voting member of the Committee even though the Committee was voting upon Professor Kern's Professionalism Concern Card that day.

80.     In addition to Dr. Tucker and Professor Kern, the voting members of the Committee present for the November 14, 2018 meeting, according to the minutes, were as follows:

a.     Brian Behm, M.D., whose publicly available biography is attached as **Exhibit 19**;

b.     Donna Chen, M.D., M.P.H., whose publicly available biography is attached as **Exhibit 20**;

c.     Stephen Culp, M.D., Ph.D., whose publicly available biography is attached as **Exhibit 21**;

d.     Pamila Herrington, M.D., whose publicly available biography is attached as **Exhibit 22**;

e.     Nicolas Intagliata, M.D. whose publicly available biography is attached as **Exhibit 23**;

f.     Wilson Miller, Ph.D., whose publicly available biography is attached as **Exhibit 24**;

g.     Barnett R Nathan, M.D., whose publicly available biography is attached as **Exhibit 25**;

h.     Catherine Shaffrey, M.D., whose publicly available biography is attached as **Exhibit 26**; and

i.     two students at UVA Medical School.

81.     Of the twelve voting members present for the November 14, 2018 ASAC meeting, Mr. Bhattacharya had previously had no contact with ten of them—including Dr. Tucker, who presided over the November 14, 2018 Committee meeting, and Professor Kern, whose "Professionalism Concern Card" was the subject of the meeting.

82.     In addition to the voting members present for the November 14, 2018 ASAC meeting, the minutes reflect that the following four "non-voting members" were also present:

a.      Megan Bray, M.D. ("Dr. Bray"), whose publicly available biography is attached as **Exhibit 27**;

b.      Lesley Thomas, Assistant Dean for Medical Education ("Dean Thomas"), who—according to publicly available information from UVA Med School's webpage on "Medical Student Advocacy" attached as **Exhibit 28**—is "available to hear reports of mistreatment," including "reports involv[ing] sexism, racism, harassment, discrimination, verbal abuse, and other types of unprofessional behavior directed at students;"

c.      Selina Noramly, Ph.D., Director of Academic Enhancement at UVA Med School ("Dr. Noramly"), whose publicly available biography is attached as **Exhibit 29**; and

d.      Katherine Yates ("Ms. Yates"), who—according to the UVA Med School Office of Student Affairs contact list attached as **Exhibit 30**—is the registrar and should be contacted for "Clerkship Scheduling, Enrollment, Leaving and Returning from the University."

83.     Of the four non-voting members present for the November 14, 2018 ASAC meeting, Mr. Bhattacharya had previously had contact with only two of them—one of whom was the registrar, Ms. Yates, who kept the meeting minutes.

84.     In addition to the voting and non-voting members present for the November 14, 2018 ASAC meeting, the minutes reflect that the following four "guests" were also present:

a.      David Charles Lewis, who is identified as "Business Intelligence Lead" on the excerpt from UVA Med School's website attached as **Exhibit 31**;

27

b.      Lynne Fleming, Esq., whose available publicly available biography (**Exhibit 32**) identifies her as Associate University Counsel at the Office of the University Counsel at the University of Virginia;

c.      Dean Peterson, whose publicly available biography is attached as **Exhibit 33**: and

d.      Sean Reed, M.D. ("Dr. Reed"), whose publicly available biography is attached as **Exhibit 34.**

85.      At no time on or before November 14, 2018 UVA Med School ASAC meeting did Mr. Bhattacharya have any direct contact or communication with any of the "guests" who were present except for Dean Peterson.  Mr. Bhattacharya's communications with Dean Peterson had been limited to the October 31, 2018 meeting described herein and the email exchanges preceding that meeting.

86.      The minutes of the November 14, 2018 UVA Med School ASAC meeting (**Exhibit 35**), under the heading "Professionalism Issue," state as follows:

Kieran Bhattacharya (Densmore) concern card for professionalism

– From the reporter: "For a AMWA session, we held a panel on micro aggression. I and 2 other faculty members were invited guests. This student asked a series of questions that were quite antagonistic toward the panel. He pressed on and stated one faculty member was being contradictory. His level of frustration/anger seemed to escalate until another faculty member defused the situation by calling on another student for questions. I am shocked that a med student would show so little respect toward faculty members. It worries me how he will do on wards."

– One prior concern card (attendance of a mandatory activity).

87.      Except for the reference to the prior concern card, the November 14, 2018 meeting minutes track—verbatim—the language of the October 25, 2018 Professional Concern Card submitted by Professor Kern.

88.     According to the minutes of the November 14, 2018 UVA Med School ASAC meeting: "The committee voted unanimously to send Kieran Bhattacharya (Densmore) a letter reminding him of the importance in medicine to show respect to all: colleagues, other staff, and patients and families."  The minutes do not reflect that Professor Kern abstained from voting as she was required to do.

89.     At no time during the November 14, 2018 meeting of the UVA Med School ASAC meeting did those present listen to any portion of the audio of the October 25, 2018 AMWA Microaggression Panel Discussion.

90.     At no time before or immediately after the November 14, 2018 ASAC meeting did anyone present inform Mr. Bhattacharya that Dr. Kern had issued a Professionalism Concern Card against him on October 25, 2018.

91.     On November 15, 2018, Dr. Tucker sent Mr. Bhattacharya correspondence by email (**Exhibit 36**) stating as follows:

> Dear Mr. Bhattacharya:
>
> The Academic Standards and Achievement Committee has received notice of a concern about your behavior at a recent AMWA panel. It was thought to be unnecessarily antagonistic and disrespectful. Certainly, people may have different opinions on various issues, but they need to express them in appropriate ways.
>
> It is always important in medicine to show respect to all:  colleagues, other staff, and patients and their families.  We would suggest that you consider getting counseling in order to work on your skills of being able to express yourself appropriately.
>
> Sincerely,
>
> Jim B. Tucker, M.D.

92.     Dr. Tucker's recommendation that Mr. Bhattacharya "consider getting counseling" set forth in the November 15, 2018 letter on behalf on UVA Med School ASAC was not included in

the reminder that was unanimously voted upon by the Committee members on November 14, 2018 according to the minutes taken by Ms. Yates.

93.    Dr. Tucker's November 15, 2018 correspondence failed to disclose to Mr. Bhattacharya that it was Professor Kern who viewed Mr. Bhattacharya's conduct as "antagonistic."

94.    Dr. Tucker's November 15, 2018 correspondence failed to disclose to Mr. Bhattacharya that Professor Kern had issued a Professionalism Concern Card against him on October 25, 2018.

95.    Professor Kern was the only individual who was witness to the AMWA Microaggression Panel Discussion on October 25, 2018 and also present and voting at the UVA Med School ASAC meeting on November 14, 2018.

96.    At 5:45 p.m. on November 26, 2018, Dean Densmore sent Mr. Bhattacharya an email (**Exhibit 37)** stating:  "Hi Kieran, I hope you're doing well.  We were notified by the Dean of Students Office that you were heading back to Charlottesville.  You will need to be seen by CAPS before you can return to classes.  Let me know if you have questions.  Best regards, JJD."

97.    "CAPS" is an acronym for "Counseling and Psychological Services" at the Elson Student Health Center of the University of Virginia.  To receive treatment from CAPS, Mr. Bhattacharya would have to provide express written consent.

98.    In response to Dean Densmore's email, Mr. Bhattacharya sent Dean Densmore an email (**Exhibit 37)** at 5:00 a.m. on November 27, 2018 stating as follows:

> How can it be legal to mandate psychiatric evaluations to continue my education?   "Public colleges responding to clearly protected expressions by prescribing mandatory counseling or psychological evaluation violates both students' rights to free speech and private conscience." – Kelly Sarabyn, FIRE (Foundation for Individual Rights in Education).

The Foundation for Individual Rights in Education ("FIRE") was founded in 1999 and describes its mission (**Exhibit 38)** as being to "defend and sustain individual rights of students and faculty members at America's colleges and universities.  These rights include freedom of speech, freedom of association, due process, legal equality, religious liberty, and sanctity of conscience."   The quotation in Mr. Bhattacharya's November 27, 2018 email came from a December 31, 2007 article (**Exhibit 39**) by Kelly Sarabyn, an author for and contributor to FIRE, which stated in part:

> Public colleges responding to clearly protected expressions by prescribing mandatory counseling or psychological evaluation violates both students' rights to free speech and private conscience. Unlike a suspension from school, which offends a student's right to free speech, ordering psychological counseling for protected speech compounds the offense to the Constitution by violating both a student's right to free speech and his right to private conscience.

99.     UVA Med School apparently was not persuaded by the foregoing constitutional arguments.  Instead, at 11:48 a.m. on November 27, 2018, Randolph J. Canterbury, M.D. ("Dr. Canterbury") sent Mr. Bhattacharya an email (**Exhibit 40**) stating:

> Dear Kieran, I have heard from Dr. Densmore that you have been calling him about your desire to return to classes today.  You are not cleared to return to class until you have been evaluated by CAPS at the Student Health Service.  Do not attend your CPD group today. Make an appointment with CAPS to initiate the medical clearance process.  Best regards, R.J. Canterbury, M.D.

According to his publicly available biography (**Exhibit 41**), Dr. Canterbury is Professor of Psychiatric Medicine and Internal Medicine as well as Senior Associate Dean for Education at UVA Med School.

100.     At the time of Dr. Canterbury's November 27, 2018 email and even to this day, Mr. Bhattacharya did not and still does not have any understanding or awareness as to the "medical clearance process" to which Dr. Canterbury's email referred.

101.    The following day, November 28, 2018, at 1:00 p.m., UVA Med School Registrar

Ms. Yates sent Mr. Bhattacharya an email (**Exhibit 42**) stating as follows:

> Hello Kieran, The Academic Standards and Achievement Committee
> will be meeting today to discuss your current enrollment status.  You
> are invited to attend to share your insights with the committee.  The
> meeting will take place at 5:00 in the Claude Moore Medical
> Education Building, in room G 165.  Please arrive at 5:00.  The
> meeting has some business to attend to before they have questions for
> you, so we will have someone waiting to let you know when they are
> ready for you.  Please reply and let us know if you will be in
> attendance.  Thank you, Katherine M. Yates.

102.    Within less than half an hour, at 1:28 p.m. on November 28, 2018, Mr. Bhattacharya

responded to Ms. Yates with an email (**Exhibit 43**) stating: "Who exactly will be present? Do you

normally just give students 3 hours to prepare after indirectly threatening to kick them from medical

school?  Why exactly is my enrollment status up for discussion?"  Mr. Bhattacharya also asked

whether he could have a lawyer present.  Thereafter, Mr. Bhattacharya attempted to retain counsel

but did not have sufficient time to obtain legal advice before the disciplinary hearing that afternoon

or have a lawyer present.

103.    The only written response from Ms. Yates or anyone else at UVA Med School in

advance of the ASAC meeting scheduled for 5:00 p.m. that day took the form of an email from Ms.

Yates sent at 1:37 p.m. on November 28, 2018 (**Exhibit 44**) stating as follows:

> Hello, Here is the information about the committee's make up
> policies, and procedures:
>
> https://med.virginia.edu/student-affairs/policies/academic-standards-
> and-achievement-committee-operating-procedures/
>
> https://med.virginia.edu/student-affairs/policies/academic-standards-
> achievement-policy/
>
> https://med.virginia.edu/school-administration/standing-
> committees/academic-standards-and-achievement-committee/
>
> Regards,

Katherine

104.     The materials linked to Ms. Yates' email sent at 1:37 p.m. on November 28, 2018 included the following provisions of the Academic Standards and Achievement Committee Operating Procedures (**Exhibit 45**) (the "Operating Procedures") that the Committee violated that day:

a.     The introductory paragraph of the Operating Procedures concludes with the following statement:

> Comprised of faculty in the school of medicine who do not assign final grades to students as well as student representatives, the role of ASAC is to promote students who meet these required standards, to recommend remedial action for those who do not meet the standards, and to suspend or recommend dismissal of those students who are incapable or who choose not to meet the required standards of achievement within the time frame allotted for completion of the M.D. degree.

It also declares:

> It is the policy of the School of Medicine to give every qualified and committed student the opportunity to graduate; however, the School reserves the right, in its sole and absolute discretion, to make judgments about who has or has not demonstrated the necessary qualification to earn a degree and to practice medicine competently.

b.     Section III.A. of the Operating Procedures states as follows:

> Official votes may be taken when a quorum (greater than 50% of the voting members) is present. All motions, except for a motion of dismissal, shall pass by a majority of voting members present. A motion for dismissal requires a two-thirds majority of voting members. Voting members will be recused from participating and shall not be counted in the quorum if they have (or have had) a personal, mentoring, or advising relationship with the student beyond that of usual student-faculty contact in class or clinical environment. This restriction includes faculty mentors on research projects, family members, anyone with a physician-patient relationship with the student or other personal relationship.

33

c.      Section III.D. of the Operating Procedures states as follows:

> When there are severe professional transgressions or the Committee is to consider serious actions such as suspension or dismissal of a student, a final vote should be taken by the Committee only after the student has been offered an opportunity to address the Committee in person, and to respond to questions from members of the Committee. Also, the student should be notified by the Committee in writing as to what the major concerns of the Committee are likely to be during the coming meeting. Assistant Deans for Student Affairs (College Deans) as well as relevant teaching faculty may also be invited to attend committee meetings to provide information.

d.      The beginning portion of Section III.H. of the Operating Procedures states as follows: "When a student addresses the Committee, the student will act as his or her own advocate."

e.      Section III.J. of the Operating Procedures states as follows:

> Guidelines and policies written in advance cannot cover all possible scenarios. When in doubt, the Committee should be guided by several important general principles, including: fairness to students; following due process; promptness of action and notification; maintaining confidentiality when possible; and, balancing the best interests of each student with its obligations to the Faculty, patients and to society to train graduates who demonstrate the highest standards or academic performance and conduct.

105.    At no time before its November 28, 2018 meeting did the Committee comply with Paragraph 3 of the "Professionalism" subsection of UVA Med School's Policy on Academic and Professional Advancement (**Exhibit 9**). Paragraph 3 states as follows: "Any breach of professionalism resulting in a recorded observation, e.g., Professionalism Concern Card, letter, written report, etc., must be addressed with the student by their [sic] college dean and documentation of the discussion must be recorded." At the time that Mr. Bhattacharya received an email from Ms. Yates at 1:00 p.m. on November 28, 2018 notifying him of the ASAC disciplinary hearing that

34

afternoon, Mr. Bhattacharya had received no specific written notice or documentation from his college dean or anyone else at UVA Med School regarding either or both of the Professionalism Concern Cards that were in his student file at the time.

106.    Although Section III.D. of the Operating Procedures states that in instances in which the Committee is to consider serious actions such as suspension or dismissal of the student, "the student should be notified by the Committee in writing as to what the major concerns of the Committee are likely to be during the coming meeting," Mr. Bhattacharya received no written notification of specific allegations in which he was expected to explain and/or defend against in advocating for his continued enrollment status at UVA Med School.  As a result, Mr. Bhattacharya was effectively denied the opportunity to advocate for himself at the November 28, 2018 disciplinary hearing as contemplated by Section III.H. of the Operating Procedures.  Moreover, the Committee cited Mr. Bhattacharya's effort to advocate for himself as a basis for his suspension from UVA Med School.

107.    Although Mr. Bhattacharya responded to Ms. Yates within 28 minutes of receiving notice of the ASAC disciplinary hearing scheduled for later that day (November 28, 2018) and asked specifically what its rationale was, neither Ms. Yates nor any other member of the faculty or administration at UVA Med School provided Mr. Bhattacharya with any written statement of the allegations against him during the remaining 3 hours and 32 minutes that he had to prepare to advocate for his continued enrollment status at UVA Med School.

108.    In addition to his efforts to obtain additional information from Ms. Yates about the ASAC disciplinary hearing scheduled for the afternoon of November 28, 2018, Mr. Bhattacharya made nine telephone phone calls between 1:23 p.m. and 2:06 p.m. that day (**Exhibit 46**) to various members of the UVA Med School faculty and administration attempting to obtain more information

about what to expect and the potential consequences of the upcoming ASAC disciplinary hearing. During this time, Mr. Bhattacharya also attempted to contact an attorney in Charlottesville with whom he had previously spoken but was unable to obtain any advice before the ASAC disciplinary hearing or arrange for her presence on such short notice.

109.     In response to one of these calls, Mr. Bhattacharya received a telephone call at 2:12 p.m. on November 28, 2018 (**Exhibit 46**) from Sean Reed, M.D. ("Dr. Reed").  During the call, Dr. Reed informed Mr. Bhattacharya of a Professionalism Concern Card resulting from Mr. Bhattacharya's participation in the AMWA Microaggression Panel Discussion.  In response to Mr. Bhattacharya's statement that he was unaware of having received any Professionalism Concern Cards, Dr. Reed expressed doubt that Mr. Bhattacharya had not received such notice.  In fact, at no time before or at the November 28, 2018 ASAC disciplinary hearing did Dr. Reed or any other member of the faculty or administration of UVA Med School provide Mr. Bhattacharya with a copy of the Professionalism Concern Card that had been issued against him or a description of its contents. During his November 28, 2018 telephone call with Dr. Reed, Mr. Bhattacharya informed Dr. Reed that he intended to record the meeting.  Dr. Reed thanked Mr. Bhattacharya for providing this information.

110.     At 5:00 p.m. on November 28, 2018, Mr. Bhattacharya attended the ASAC disciplinary hearing to discuss his enrollment status.  Mr. Bhattacharya documented the hearing via a photograph of the attendees (**Exhibit 47**) and an audio recording of the entire disciplinary hearing (**Exhibit 48**).  The hearing lasted approximately 28 minutes.

111.     During the November 28, 2018 ASAC disciplinary hearing against Mr. Bhattacharya, Dr. Tucker referred—erroneously—to the statement in Dean Densmore's November 26, 2018 email (**Exhibit 37**) that "[y]ou will need to be seen by CAPS" as merely a "recommendation" to be

evaluated by CAPS.  Dr. Tucker refused to acknowledge his error even after Mr. Bhattacharya read the contents of the email out loud during the ASAC disciplinary hearing.

112.    According to the minutes of the November 28, 2018 ASAC disciplinary hearing (**Exhibit 49**), twelve voting members of the Committee were present. Nine of the twelve ASAC members present at the November 28, 2018 ASAC disciplinary hearing had also been present at the November 14, 2018 ASAC meeting.  According to the minutes, these nine members were—in addition to UVA Med School Defendant Dr. Tucker and Individual Co-Conspirator Professor Kern—Dr. Behm, Dr. Chen, Dr. Intagliata, Dr. Miller, Dr. Nathan, Dr. Shaffrey, and one fourth year medical student.  However, Professor Kern is not in the photograph of attendees that Mr. Bhattacharya took on November 28, 2018 (**Exhibit 47**).

113.    The other three voting members of the Committee present at the November 28, 2018 ASAC disciplinary hearing were:

    a.    Roger Abounader, MD, PhD ("Dr. Abounader"), whose publicly available biography is attached as **Exhibit 50**;

    b.    Robert Bloodgood, PhD ("Dr. Bloodgood"), whose publicly available biography is attached as **Exhibit 51**; and

    c.    Sharon Diamond-Myrsten, M.D. ("Dr. Diamond-Myrsten"), whose publicly available biography is attached as **Exhibit 52**.

Before the November 28, 2018 ASAC disciplinary hearing, Mr. Bhattacharya had no prior direct contact with Dr. Abounader, Dr. Bloodgood, or Dr. Diamond-Myrsten.

114.    According to the minutes of the November 28, 2018 ASAC disciplinary hearing (**Exhibit 49**), four non-voting members of the Committee members who had been present for the November 15, 2018 ASAC meeting were also present during the November 28, 2018 disciplinary

hearing, along with three "guests," as follows:   Plaintiff Mr. Bhattacharya, Individual Co-Conspirator Dean Peterson, and University Counsel Ms. Fleming.

115.    The minutes of the November 28, 2018 ASAC disciplinary hearing (**Exhibit 49**) contain five paragraphs under the heading "Professionalism Issues," as follows.

a.      The first paragraph states:

The committee convened to discuss concerning behaviors exhibited by Kieran Bhattacharya (Densmore) over the past weeks after members of the Technical Standards Committee determined that the concerns were best addressed by the ASAC. The ASAC convened an emergency meeting on Wednesday November 28. Kieran Bhattacharya was invited to attend the meeting to discuss his enrollment status and did attend the meeting.

b.      The second paragraph states: "The student was given the opportunity to address concerns about his behavior. He asked questions of members of the Committee and responded to questions asked by the Committee."

c.      The third paragraph states: "The Committee reviewed the list of technical standards that are acknowledged annually by the students especially the Emotional, Attitudinal and Behavioral Skills."

d.      The fourth paragraph states:

Because the student's behavior demonstrated his inability to meet several of those standards. Dr. Nathan made a motion to suspend Kieran Bhattacharya (Densmore) from the School of Medicine, effective immediately, with the option to petition to return in August of 2019. Dr. Behm seconded this motion. The committee voted unanimously to accept the motion. Nora Kern did not vote on the matter, as personal business required her to leave before the vote was executed.[3]

---

[3] Although the minutes do not reflect this, Professor Kern was not present for any portion of the November 28, 2018 meeting that Mr. Bhattacharya attended.

e.   The fifth paragraph states: "A letter will be sent to Kieran Bhattacharya's email, informing him of the decision and explaining the appeals process."

116.   On November 29, 2018 at 5:30 p.m., Dr. Tucker sent Mr. Bhattacharya an email (**Exhibit 53**) stating as follows:

> Dear Mr. Bhattacharya, See the attached letter from the Academic Standards and Achievement Committee. Please know that Drs. Densmore, Reed, and Keeley are available for support. Also, in response to your question about ID access, suspension involves a deactivation of your ID per standard university procedure, but you can make an appointment should you need to meet with your college dean.

The attachment to the November 29, 2018 email was correspondence notifying Mr. Bhattacharya that he was being suspended from UVA Med School for a period of one year (the "November 29, 2018 Suspension Letter").

117.   The November 29, 2018 Suspension Letter consisted of four paragraphs.

a.   The first paragraph stated:

> The Academic Standards and Achievement Committee ("ASAC") convened on November 28, 2018 to review concerns that your recent behavior in various settings demonstrated a failure to comply with the School of Medicine's Technical Standards. Members of the Technical Standards Committee determined that the concerns about your recent behavior should be addressed by the Academic Standards and Achievement Committee. The ASAC decided that the nature of the concerns necessitated the calling of an emergency meeting. You were notified of that meeting on November 28, 2018 and provided an opportunity to be heard and to respond to the concerns about your recent behavior. You attended the meeting, asked and answered questions and presented information.

b.   The second paragraph stated:

> The Academic Standards and Achievement Committee has determined that your aggressive and inappropriate interactions in multiple situations, including in public settings, during a speaker's lecture, with your Dean, and during the committee meeting yesterday, constitute a violation of the School of

39

            Medicine's Technical Standards that are found at: https://med.virginia.edu/student-affairs/policies/technical-standards/

    c.    The third paragraph stated:

        Those Standards, in relevant and as part of professionalism, state that each student is responsible for: Demonstrating self-awareness and self-analysis of one's emotional state and reactions; Modulating affect under adverse and stressful conditions and fatigue; Establishing effective working relationships with faculty, other professionals and students in a variety of environments; and Communicating in a non-judgmental way with persons whose beliefs and understandings differ from one's own.

    d.    The fourth paragraph stated:

        The committee has voted to suspend you from school, effective immediately. You may apply for readmission to return to class no earlier than August, 2019. A student suspended for academic, professionalism, or administrative reasons or a student who has academic or Technical Standards/professionalism deficiencies at the time of suspension must be reviewed and approved to return by ASAC. The committee would only approve your return if you are able to provide evidence that further violations of the Technical Standards are unlikely to occur. You may appeal your suspension, in accordance with the SOM's appeal procedures.

118.    Other than the November 29, 2018 Suspension Letter, the only documentation that Mr. Bhattacharya ever received from UVA Med School about "aggressive and inappropriate interactions" that allegedly occurred in "public settings" was the November 15, 2018 correspondence attached as **Exhibit 36** regarding his questions and comments during the October 25, 2018 AWMA Microaggression Panel Discussion.  The November 29, 2018 Suspension Letter provided no details as to the nature, timing, location, severity, and/or identity of individuals reporting the "multiple aggressive and inappropriate interactions" that Mr. Bhattacharya had allegedly exhibited in "public settings."

119.     During the November 28, 2018 ASAC disciplinary hearing, no member of the Committee made any specific reference to or allegation of Mr. Bhattacharya's alleged "multiple aggressive and inappropriate interactions" in multiple "public settings."  Nor did the Committee listen to the audio recording of what had transpired at the October 25, 2018 AMWA Microaggression Panel Discussion.  Instead, the Committee relied upon the inaccurate and ideologically motivated characterization of Mr. Bhattacharya's October 25, 2018 questions and comments by Individual Co-Conspirator Professor Kern—who also happened to be a member of the Committee.  Professor Kern was, along with Individual Co-Conspirator Dean Peterson, present for the Committee meetings on November 14, 2018 and November 28, 2018.

120.     Before the November 28, 2018 ASAC disciplinary hearing, Mr. Bhattacharya was not provided with written documentation from UVA Med School of the "aggressive and inappropriate interactions" that Mr. Bhattacharya allegedly had "with [his] dean" (or the identity of the dean with whom he allegedly had such interaction).

121.     The November 29, 2018 Suspension Letter asserted that Mr. Bhattacharya's conduct at the November 28, 2018 ASAC disciplinary hearing itself qualified as "aggressive and inappropriate" but provided no details to support this allegation.  The minutes of the November 28, 2018 ASAC disciplinary hearing provide no support for the characterization in the November 29, 2018 Suspension Letter that Mr. Bhattacharya's efforts to defend his continuing enrollment in UVA Med School had violated the Technical Standards by being "aggressive and inappropriate."

**(Mr. Bhattacharya Was Prevented From Appealing His Suspension
and Applying for Readmission to UVA Med School
Because the University Issued a Four-Year "No Trespass" Order Against Him)**

122.     The November 29, 2018 Suspension Letter advised Mr. Bhattacharya that he had the option of appealing the suspension if he filed his appeal within 14 days.  As a practical matter,

however, UVA Med School denied Mr. Bhattacharya the right to appeal his suspension and to apply for readmission based on a series of subterfuges, as described in the paragraphs that follow.

123.    Mr. Bhattacharya timely filed an appeal of his suspension by sending an email to Dr. Densmore on December 4, 2018 (**Exhibit 54**) to initiate the appeals process.   Dr. Densmore responded by email later that day (**Exhibit 55**) acknowledging that the appeal process had been initiated and that additional information would be provided to Mr. Bhattacharya relating to the appeal.

124.    University Counsel, Ms. Fleming, did not acknowledge Mr. Bhattacharya's interest in completing the appeals process until after he sent information about what had happened to him to a website known as Secure Drop.  The SecureDrop website (https://securedrop.org) describes itself as "an open source whistleblower submission system that media organizations and NGOs can install to securely accept documents from anonymous sources. It was originally created by the late Aaron Swartz and is now managed by Freedom of the Press Foundation."  The website goes on to state that SecureDrop "is used at over 50 news organizations worldwide, including The New York Times, The Washington Post, ProPublica, The New Yorker, and The Intercept."

125.    Had UVA Med School complied with its own appeal procedures (**Exhibit 56**), UVA Med School have conducted a hearing "as soon as possible (ordinarily within 14 days)" to review the suspension decision made on November 28, 2018.  In this case, however, Mr. Bhattacharya did not receive his medical student file to prosecute his appeal until December 20, 2018—16 days after he initiated the appeals process.  It was at this time, more than three weeks after his one-year suspension, that Mr. Bhattacharya was able to review for the very first time the Professional Concerns Card(s) in his medical student file.  Mr. Bhattacharya did not receive his medical student file until several days after sending information about his situation to SecureDrop.

126.     Meanwhile, on December 7, 2018—three days after Mr. Bhattacharya had initiated an appeal of his suspension—he received notice (**Exhibit 57**) from the National Board of Medical Examiners ("NBME") that his registration for the United States Medical Licensing Exam Step 1 ("USMLE Step 1") had been cancelled because he was no longer enrolled at UVA Med School. Previously, Mr. Bhattacharya had been scheduled to take the USMLE Step 1 on February 1, 2019.

127.     On December 30, 2018, University Defendant Ms. Fielding—who was at the time a Police Captain with the University of Virginia Police Department (the "UVA Police Department")— called Mr. Bhattacharya and advised him that the UVA Police Department was issuing him a "no trespass" warning.  Mr. Bhattacharya requested additional information regarding the reason that he would no longer be welcome on the grounds of the University of Virginia, including UVA Med School.  Ms. Fielding was unable or unwilling to provide any additional information regarding the reason for the "no trespass" warning.

128.     On January 2, 2019, Ms. Fielding sent a letter to Mr. Bhattacharya attaching a no trespass warning (the "No Trespass Order") issued by the UVA Police Department (**Exhibit 58**). The No Trespass Order did not state the basis for its directive that "You are not to come on **any** property or facility on the Grounds of the University of Virginia **except** as a patient at the University of Virginia Medical Center."  (*Id.*) (emphasis in original).

129.     On January 3, 2019, Dr. Densmore sent Mr. Bhattacharya an email (**Exhibit 59**) stating that UVA Med School would "not be able to proceed with an appeal to your suspension at this time" because of the No Trespass Order.

130.     Thereafter, Mr. Bhattacharya contacted Ms. Fielding and requested that the No Trespass Order be rescinded.  Ms. Fielding was unable or unwilling to do so and—once again— provided no information about the basis for the No Trespass Order.  Ms. Fielding asserted that there

was no possibility of appeal at that time. At that point Mr. Bhattacharya said "thank you very much."

Ms. Fielding said "what?"  In response, Mr. Bhattacharya again said "thank you very much" and

ended the phone call.

131.    Following the telephone call, Ms. Fielding sent Mr. Bhattacharya an email (**Exhibit**

**60**) stating in part as follows:

> I am writing as a follow up to my call to you at 4:10 p.m. (EST), today.
> You hung up on me before I could relay all of the information that I
> was calling to discuss with you.  As I stated on the phone, **the trespass**
> **notice issued to you is active and will remain active for the period**
> **of time indicated on the form.**  If you violate it, you will be arrested.

(emphasis in original).

132.    On July 7, 2019, Mr. Bhattacharya sent an email to UVA Med School Defendants

Dr. Tucker and Dean Densmore inquiring about the possibility of readmission to the UVA Med

School 2019.  By email dated July 12, 2019 (**Exhibit 61**), Dean Densmore responded as follows:

> Dear Kieran, Thank you for your email. The School of Medicine is
> aware that a no trespass order was issued by the University Police
> Department (UPD) on January 2, 2019 prohibiting you from
> University Grounds for four years. We cannot address your request
> for readmission while a no trespass order is in effect. Should you have
> questions about that order, you will need to contact UPD directly. Best
> regards, John Densmore.

133.    Therefore, Mr. Bhattacharya sought to have the UVA Police Department rescind the

No Trespass Order and sought additional information from the UVA Police Department about the

rationale for it.

134.    Following a telephone conversation with Ms. Fielding, Mr. Bhattacharya sent Ms.

Fielding an email on July 13, 2019 at 6:16 a.m. (**Exhibit 62**).  The email, on which Dean Densmore

was shown as a cc: recipient, stated as follows:

> During your time as Support Services Captain between December
> 2018-January 2019, you issued an NTO in my name (Kieran Ravi
> Bhattacharya) and failed to provide me with any specific reasons for

this order in your initial phone call before issuing it; failed to provide me with any specific reason in the PDF that was forwarded to me by John Densmore; failed to provide me with any specific reasons in the physical document sent to the Haiku Post post office addressed 70 Hale Pili Way, failed to me [sic] with provide me with any specific reasons during the attached e-mail follow up phone call that is mentioned below, failed to provide any specific reasons during the phone call mentioned in this e-mail, and finally:  you failed to mention in this e-mail that I ended this phone call after twice providing you a curt parting gesture of "Thank you very much" after you in a rather emotionally charged tone announced to me that there was no possibility for appeal…and unsurprisingly failed again to provide me with specific details as to what exactly I was appealing in this NTO.  I had already for this more than than [sic] 6 months ago.  I again ask that you provide me with specific reasons in painstaking detail, dissolve the order immediately, or do both to avoid the costly risk of taking this matter, should it be found to be applicable under Diversity Jurisdiction (28 U.S.C. ss 1332) to the United States District Court for the Western District of Virginia at the earliest convenience of any and all parties involved.

Sincerely,
Kieran Ravi Bhattacharya

135.    On July 18, 2019, Mr. Bhattacharya received an email from Ms. Fielding, who had subsequently been promoted to Deputy Chief of the UVA Police Department.  The July 18, 2019 letter (**Exhibit 63**) stated that the No Trespass Order was issued "after concerns were raised about comments on a chat room that were perceived as threats."  The UVA Police Department did not identify who made the "comments," the identity of the "chat room" on which the comments had been posted, the substance of the comments, and why they were "perceived as threats."  Mr. Bhattacharya was provided this scanty information seven months after receiving the No Trespass Order.

136.    By email that same day (**Exhibit 64**), Mr. Bhattacharya asked Ms. Fielding the following questions, to which she never responded:

-What comments specifically?
-Who threatened who exactly?

-What chat room are you referring to and how does this at all relate to my or anyone else's safety at UVA?
-What community are you referring to?
-Who exactly, if not you, told you to issue this NTO?
-Why was none of this mentioned on the NTO issued more than 6 months ago?
-Was UPD able to make any arrests towards any of these perceived threats?
-What exactly do you mean when you affirm that the NTO was not a result of the suspension?

137.    On July 21, 2019, Mr. Bhattacharya submitted an appeal of the No Trespass Order to the UVA Police Department (**Exhibit 65**).  By way of a letter from the UVA Police Department dated August 7, 2019 (**Exhibit 66**), the University upheld the No Trespass Order, stating:

> The conduct you directed at members of the university community compromised safety and security and caused fear.  You are not permitted to be on University property throughout the duration of this trespass warning, which is currently effective until January 2, 2023. This decision is final.

To this day, Mr. Bhattacharya has not been told what conduct on his part supposedly "compromised safety and security and caused fear."  Absent this information, no neutral third party—such as this Court—can decide whether the University had any objectively reasonable basis for the No Trespass Order or whether it was part of the continuing effort by UVA Med School—at the behest of the Individual Co-Conspirators and others—to punish Mr. Bhattacharya for questions and comments during the October 25, 2018 AMWA Microaggression Panel Discussion with which certain individuals took issue.

138.    The No Trespass Order from the UVA Police Department does not expire until January 3, 2023.  By the time that the No Trespass Order is scheduled to expire, Mr. Bhattacharya would be unable to complete his medical education even if his appeal were granted.  UVA Med School's Policy on Academic and Professional Advancement states: "All requirements for

graduation, including passing Step 1, Step 2 CK and Step 2 CS of the USMLE, must be completed within six years from the date the student matriculated in the School of Medicine."

## COUNT I

### DEPRIVATION OF FIRST AMENDENT RIGHT OF FREE SPEECH
### IN VIOLATION OF 42 U.S.C. § 1983

### (Against the University Defendants, the UVA Med School Defendants,
### and the Individual Co-Conspirators)

139.    Mr. Bhattacharya hereby incorporates by reference the allegations of Paragraphs 1 through 138 of this Complaint.

140.    By asking questions and making comments at the October 25, 2018 AMWA Microaggression Panel Discussion, attempting to defend himself at the November 28, 2018 ASAC disciplinary hearing, and seeking to obtain press coverage of his wrongful suspension as described in the foregoing Paragraph 139, Mr. Bhattacharya engaged in speech that is protected by the First Amendment to the U.S. Constitution (the "Protected Free Speech").

141.    By virtue of the Fourteenth Amendment to the U.S. Constitution, the University of Virginia—including UVA Med School—is subject to the First Amendment because it is an agency of the Commonwealth of Virginia.

142.    By engaging in the conduct described in the foregoing Paragraph 139—including retaliating against Mr. Bhattacharya for his Protected Free Speech by, *inter alia*, issuing a Professionalism Concern Card, disciplining Mr. Bhattacharya for his Protected Free Speech, requiring Mr. Bhattacharya to undergo counseling and obtain "medical clearance" as a prerequisite for remaining enrolled at UVA Med School, suspending Mr. Bhattacharya from UVA Med School, and preventing Mr. Bhattacharya from appealing his suspension or applying for readmission to UVA Med School by issuing and refusing to remove the No Trespass Order (collectively, the "Retaliatory

47

Conduct")—the University of Virginia (including University Defendant Ms. Fielding), UVA Med School (including the UVA Med School Defendants), and the Individual Co-Conspirators infringed upon, chilled, and otherwise adversely affected Mr. Bhattacharya's Protected Free Speech.

143.    The Retaliatory Conduct would deter a person of normal resolve from speaking freely at the University of Virginia, including UVA Med School.

144.    The Retaliatory Conduct is causally related to Mr. Bhattacharya's Protected Free Speech.  The UVA Med School Defendants and Individual Co-Conspirators have admitted this causal relationship in writing, *e.g.*, in the following documents:

       a.       Professor Kern's Professionalism Concern Card (**Exhibit 13**);

       b.       the minutes of the November 14, 2018 ASAC meeting (**Exhibit 15**);

       c.       the November 15, 2018 ASAC correspondence (**Exhibit 36**);

       d.       the minutes of the November 28, 2018 ASAC disciplinary hearing (**Exhibit 49**); and

       e.       the November 29, 2018 Suspension Letter (**Exhibit 53**).

145.    But for Mr. Bhattacharya's Protected Free Speech, the University of Virginia (including University Defendant Ms. Fielding), UVA Med School (including the UVA Med School Defendants), and the Individual Co-Conspirators would not have engaged in the Retaliatory Conduct.

146.    By engaging in the Retaliatory Conduct, the University of Virginia (including University Defendant Ms. Fielding), UVA Med School (including the UVA Med School Defendants), and the Individual Co-Conspirators violated 42 U.S.C. § 1983—making the University Defendants, the UVA Med School Defendants, and the Individual Co-Conspirators liable for injunctive relief, damages, and attorneys' fees pursuant to 42 U.S.C. § 1988(b).

## COUNT II

**DEPRIVATION OF FOURTEENTH AMENDMENT RIGHT OF DUE PROCESS
IN VIOLATION OF 42 U.S.C. § 1983**

**(Against the University Defendants, the UVA Med School Defendants,
and the Individual Co-Conspirators)**

147.    Mr. Bhattacharya hereby incorporates by reference the allegations of Paragraphs 1
through 146 of this Complaint.

148.    Mr. Bhattacharya had a liberty interest in the Protected Free Speech.

149.    Mr. Bhattacharya had a liberty and property interest in continuing his medical studies
at UVA Med School and pursuing the practice of medicine.

150.    By engaging in the Retaliatory Conduct, the University of Virginia (including
University Defendant Ms. Fielding), UVA Med School (including the UVA Med School
Defendants), and the Individual Co-Conspirators deprived Mr. Bhattacharya of the liberty and
property interests described in Paragraphs 148 and 149.

151.    By engaging in the Retaliatory Conduct, the University of Virginia (including
University Defendant Ms. Fielding), UVA Med School (including the UVA Med School
Defendants), and the Individual Co-Conspirators violated the policies and procedures of UVA Med
School, including the Academic Standards and Achievement Committee Operating Procedures
(**Exhibit 45**), by, *inter alia*:

   a.    failing to notify Mr. Bhattacharya of the issuance of the Professionalism
Concern Card issued by Professor Kern and affirmatively concealing its existence from him;

   b.    failing to have Mr. Bhattacharya's "college dean" discuss the Professionalism
Concern Card with him and document the discussion;

49

c.      failing to provide Mr. Bhattacharya with the Professionalism Concern Card issued by Professor Kern in advance of the November 28, 2018 ASAC disciplinary hearing or at any other time before his suspension from UVA Med School;

d.      allowing Professor Kern to vote at the November 14, 2018 ASAC meeting;

e.      failing to provide Mr. Bhattacharya with sufficient notice of the November 28, 2018 ASAC disciplinary hearing or its basis for Mr. Bhattacharya to have adequate opportunity to defend himself; and

f.      using Mr. Bhattacharya's defense of himself at the November 28, 2018 ASAC disciplinary hearing as a basis for his suspension as set forth in the November 29, 2019 Suspension Letter.

152.    The conduct described in the foregoing Paragraphs 147 through 151 deprived Mr. Bhattacharya of notice and opportunity to be heard and otherwise deprived Mr. Bhattacharya of due process in violation of the Fourteenth Amendment to the U.S. Constitution and 42 U.S.C. § 1983—making the University Defendants, the UVA Med School Defendants, and the Individual Co-Conspirators liable for injunctive relief, damages, and attorneys' fees pursuant to 42 U.S.C. § 1988(b).

## COUNT III

### CONSPIRACY TO INTERFERE WITH CIVIL RIGHTS
### IN VIOLATIONOF 42 U.S.C.  § 1985(3)

#### (Against the Individual Co-Conspirators)

153.    Mr. Bhattacharya hereby incorporates by reference the allegations of Paragraphs 1 through 152 of this Complaint.

154.    By engaging in the conduct described in Paragraph 153 of this Complaint, the Individual Co-Conspirators conspired with one another and with the University of Virginia

(including University Defendant Ms. Fielding) and UVA Med School (including the UVA Med School Defendants) to deprive Mr. Bhattacharya of the equal enjoyment of rights secured to all by law, including the First and Fourteenth Amendments to the U.S. Constitution (the "Unlawful Conspiracy").

155.    The Individual Co-Conspirators had a meeting of the minds to deprive Mr. Bhattacharya of his First and Fourteenth Amendment rights.

156.    The Unlawful Conspiracy was motivated by a specific class-based, invidiously discriminatory animus against anyone who disagrees with the ideological views of the Individual Co-Conspirators and the sponsors of the AMWA Microaggression Panel Discussion.

157.    The Unlawful Conspiracy resulted in injury to Mr. Bhattacharya—including deprivation of his First and Fourteenth Amendment rights, his suspension from UVA Med School, and his inability to pursue his chosen profession of medicine.

158.    The conduct described in the foregoing Paragraphs 153 through 157 of this Complaint violated 42 U.S.C. § 1985(3), entitling Mr. Bhattacharya to recover damages from the Individual Co-Conspirators.

## COUNT IV

### CONSPIRACY TO INJURE MR. BHATTACHARYA IN HIS TRADE, BUSINESS, AND PROFESSION

#### (Against the Individual Co-Conspirators)

159.    Mr. Bhattacharya hereby incorporates by reference the allegations of Paragraphs 1 through 158 of this Complaint.

160.    With the willful and malicious intention of injuring Mr. Bhattacharya in his trade, business, and profession, the Individual Co-Conspirators conspired with one another and with third parties.  These third parties with whom the Individual Co-Conspirators conspired in violation of

51

Virginia Code § 18.2-499 include the UVA Med School Defendants, Dean Thomas, and other individuals who disagreed with Mr. Bhattacharya's questions and comments at the AMWA Microaggression Panel Discussion.  The unlawful purposes of the foregoing conspiracy included depriving Mr. Bhattacharya of the ability to complete his medical school studies and enter the medical profession.

161.    Although the Individual Co-Conspirators are employees of UVA Med School, they had an independent personal stake in the conspiracy that went beyond—and was actually contrary to—their duties and responsibilities as members of the faculty and administration of UVA Med School.  The Individual Co-Conspirators' independent personal stake included their allegiance to the AMWA chapter for which the AMWA Microaggression Panel Discussion was the first scheduled event, and their ideology.

162.    By engaging in the conduct described in Paragraphs 159 through 161 of this Complaint, the Individual Co-Conspirators acted intentionally, purposefully, and without legal justification to injure Mr. Bhattacharya in his trade, business, and profession.

163.    The damage caused by the combined acts of the Individual Co-Conspirators described in Paragraphs 159 through 161 of this Complaint was committed in pursuance of the foregoing conspiracy.

164.    As a result of the conspiracy described in Paragraphs 159 through 161 of this Complaint, Mr. Bhattacharya is entitled by virtue of Virginia Code § 18.2-500 to three times his actual damages (including tuition and expenses associated with his attendance at UVA Med School and the net present value of his anticipated earnings as a physician), together with prejudgment and post-judgment interest thereon, and reasonable attorneys' fees and costs.

4841-6080-5040.8

165.    Va. Code § 18.2-500 also allows for the issuance of injunctive relief to prevent the continuance of the conspiracy.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Kieran Bhattacharya prays that the Court:

(A)    Order the University Defendants to dissolve the existing No Trespass Order issued by the UVA Police Department;

(B)    Order the UVA Med School Defendants to remove all references to the Professionalism Concern Cards, the AMWA Microaggression Panel Discussion, and his suspension from Mr. Bhattacharya's medical student file;

(C)    Order the UVA Med School Defendants to allow Mr. Bhattacharya to re-enroll in UVA Med School as soon as possible and to deem his matriculation date, for purposes of fulfilling UVA Med School's graduation requirements, to be the date of reenrollment;

(D)    Order the UVA Med School Defendants to allow Mr. Bhattacharya to register for the USMLE Step 1 as soon as possible by immediately notifying the NBME of Mr. Bhattacharya's enrollment status at UVA Med School;

(E)    Award compensatory damages in favor of Mr. Bhattacharya for lost potential future income, harm to professional reputation, and out-of-pocket expenses against the University Defendants, the UVA Med School Defendants, and the Individual Co-Conspirators;

(F)    Award Mr. Bhattacharya treble damages against the Individual Co-Conspirators pursuant to Virginia Code § 18.2-500;

(G)    Award Mr. Bhattacharya costs and attorneys' fees against the University Defendants, the UVA Med School Defendants, and the Individual Co-Conspirators; and

(H)     Award Mr. Bhattacharya such other and further relief as this Court deems just and proper under the circumstances.

## JURY TRIAL DEMANDED

Mr. Bhattacharya hereby demands trial by jury of all issues so triable.

Date:  February 3, 2020

Respectfully submitted,

KIERAN RAVI BHATTACHARYA

By: _____ *s/ Michael J. Lockerby*_____
Counsel

Michael J. Lockerby (VSB No. 24003)
Jack G. Haake (VSB No. 87590)
FOLEY & LARDNER LLP
Washington Harbour
3000 K Street, N.W., Suite 600
Washington, D.C. 20007-5109
Telephone:  (202) 672-5300
Facsimile:  (202) 672-5399
Email:  mlockerby@foley.com
Email:  jhaake@foley.com

*Counsel for Plaintiff, Kieran Ravi Bhattacharya*

4841-6080-5040.8

## CERTIFICATE OF SERVICE

I hereby certify that on this 3rd day of February, 2020, I electronically filed the foregoing

FIRST AMENDED COMPLAINT with the Clerk of the Court using the CM/ECF system and will

send the foregoing FIRST AMENDED COMPLAINT via email to the following counsel of record:

> Madeline M. Gibson, Esq.
> Assistant Attorney General
> Office of the Virginia Attorney General
> Commonwealth of Virginia
> 202 North Ninth Street
> Richmond, Virginia 23219

> *s/ Michael J. Lockerby*
> Michael J. Lockerby (VSB No. 24003)
> Jack G. Haake (VSB No. 87590)
> FOLEY & LARDNER LLP
> Washington Harbour
> 3000 K Street, N.W., Suite 600
> Washington, D.C. 20007-5109
> Telephone:  (202) 672-5300
> Facsimile:  (202) 672-5399

> *Counsel for Plaintiff, Kieran Ravi Bhattacharya*

4841-6080-5040.8