**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**Charlottesville Division**

| | | |
|---|---|---|
| **KIERAN RAVI BHATTACHARYA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 3:19-CV-54-NKM-JCH** |
| | ) | |
| | ) | |
| **JAMES B. MURRAY, JR., et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

**MEMORANDUM IN SUPPORT OF DEFENDANTS' RULE 12(B)(6)**
**MOTION TO DISMISS FIRST AMENDED COMPLAINT**

**TABLE OF CONTENTS**

TABLE OF CONTENTS ........................................................................................................i

TABLE OF AUTHORITIES ...............................................................................................iii

INTRODUCTION .................................................................................................................1

PROCEDURAL HISTORY ...................................................................................................1

FACTUAL ALLEGATIONS AND CLAIMS ........................................................................2

    I.     Professionalism standards ...............................................................................2

    II.    Plaintiff's inappropriate statements at a school event....................................3

    III.   School of Medicine's response..........................................................................5

    IV.   Emergency ASAC meeting and suspension ......................................................6

    V.    No trespass warning .........................................................................................9

    VI.   Claims ............................................................................................................10

LEGAL STANDARD ...........................................................................................................11

ARGUMENT .......................................................................................................................11

    VII.  Plaintiff fails to state a claim under the First Amendment.........................13

        A.    Plaintiff's speech was not protected. ............................................13

        B.    Drs. Kern, Rasmussen, and Peterson are entitled to Qualified
             Immunity. .......................................................................................17

    II.    This action should be dismissed because plaintiff fails to state a due process
        claim................................................................................................................19

        A.    Plaintiff has not alleged a protected liberty or property interest. .................19

        B.    Defendants satisfied procedural due process requirements.........................23

C.    Drs. Kern, Rasmussen, and Peterson are entitled to Qualified Immunity. ........................................................................................26

III.    Plaintiff fails to state a civil rights conspiracy claim under 42 U.S.C. § 1985(3).............................................................................................26

A.    Plaintiff fails to state a claim...........................................................26

B.    Drs. Kern, Rasmussen, and Peterson are entitled to Qualified Immunity. ........................................................................................28

IV.    Plaintiff fails to state a claim for conspiracy to harm a trade, business, or profession under Va. Code §§ 8.01-499 and -500. ...................................29

A.    Plaintiff has no right of action........................................................29

B.    The Intracorporate Conspiracy Doctrine precludes this Claim. ...................30

CONCLUSION ....................................................................................................30

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Al-Dabagh v. Case W. Reserve Univ.*,
    777 F.3d 355 (6th Cir. 2015) ................................................................23

*Albright v. Oliver*,
    510 U.S. 266 (1994)........................................................................21

*Anderson v. Creighton*,
    483 U.S. 635 (1987)........................................................................18

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)........................................................................11

*Bd. of Curators of Univ. of Mo. v. Horowitz*,
    435 U.S. 78 (1978)................................................................23, 24, 25

*Bd. of Regents v. Roth*,
    408 U.S. 564 (1972)....................................................................20, 22

*Bethel Sch. Dist. v. Fraser*,
    478 U.S. 675 (1986)....................................................................14, 16

*Buschi v. Kirven*,
    775 F.2d 1240 (4th Cir. 1985) ......................................................27, 28

*Byerly v. Va. Polytechnic Inst. & State Univ.*,
    No. 7:18-cv-16, 2019 U.S. Dist. LEXIS 49952 (W.D. Va. Mar. 21, 2019) ..........................20

*Clemmons v. Guilford Tech. Cmt. Coll.*,
    No. 1:16CV482, 2017 U.S. Dist. LEXIS 113587 (M.D.N.C. Jul. 21, 2017)..........................15

*Deegan v. Moore*,
    No. 7:16cv260, 2017 U.S. Dist. LEXIS 47335 (W.D. Va. Mar. 30, 2017) ......................14, 18

*Doe v. Alger*,
    175 F. Supp. 3d 646 (W.D. Va. 2016) ......................................11, 19, 21

*Doe v. Rector & Visitors of George Mason Univ.*,
    132 F. Supp. 3d 712 (E.D. Va. 2015) ...............................................20

*Feminist Majority Found. v. Hurley*,
    911 F.3d 674 (4th Cir. 2018) ...........................................................18

*Fenje v. Feld*,
    398 F.3d 620 (7th Cir. 2005) ....................................................................................23

*Graham v. City of Manassas Sch. Bd.*,
    390 F. Supp. 3d 702 (E.D. Va. 2019) .....................................................................11

*Guthrie v. McClasky*,
    No. 1:11-cv-61, 2012 U.S. Dist. LEXIS 51753 (W.D. Va. Apr. 12, 2012)...........22

*Hately v. Watts*,
    917 F.3d 770 (4th Cir. 2019) ..................................................................................11

*Healy v. James*, 408 U.S. 169 (1972) ..........................................................................14

*Herron v. Va. Commonwealth Univ.*,
    366 F. Supp. 2d 355 (E.D. Va. 2004) ................................................................24, 26

*Hewitt v. Helms*,
    459 U.S. 460 (1983).............................................................................................20, 21

*Hunt v. Board of Regents*,
    792 Fed. App'x 595 (10th Cir. Nov. 14, 2019)..................................................15, 18

*Inman v. Klockner-Pentaplast of Am. Inc.*,
    467 F. Supp. 2d 642 (W.D. Va. 2006) ....................................................................29

*Keefe v. Adams*,
    840 F.3d 523 (8th Cir. 2016) ......................................................................15, 16, 18

*Ku v. Tennessee*,
    322 F.3d 431 (6th Cir. 2003) ..................................................................................24

*Langadinos v. Appalachian Sch. of Law*,
    No. 1:05CV39, 2005 U.S. Dist. LEXIS 20958 (W.D. Va. Sept. 25, 2005)...........28

*Lewin v. Med. Coll.*,
    910 F. Supp. 1161 (E.D. Va. 1996) ........................................................................24

*Maciariello v. Sumner*,
    73 F.2d 295 (4th Cir. 1992) ....................................................................................18

*Mansfield v. Anesthesia Assocs.*,
    No. 1:07cv941, 2008 U.S. Dist. LEXIS 34732 (E.D. Va. Apr. 28, 2008).............29

*Newsom v. Albemarle Cty. Sch. Bd.*,
    354 F.3d 249 (4th Cir. 2003) ..................................................................................14

*Nofsinger v. Va. Commonwealth Univ.*,
  No. 3:12-cv-236, 2012 U.S. Dist. LEXIS 97857 (E.D. Va. Jul. 13, 2012),
  *aff'd*, 2013 U.S. App. LEXIS 6579 (4th Cir. Apr. 2, 2013)...............................20, 24

*Papish v. Bd. of Curators of Univ. of Mo.*,
  410 U.S. 667 (1973)..................................................................................14

*Pearson v. Callahan*,
  555 U.S. 223 (2009)..................................................................................18

*Perkins v. United States*,
  55 F.3d 910 (4th Cir. 1995) ........................................................................26

*Sciolino v. City of Newport News*,
  480 F.3d 642 (4th Cir. 2007) ................................................................21, 22

*Shaboon v. Duncan*,
  252 F.3d 722 (5th Cir. 2001) ......................................................................24

*Siu v. Johnson*,
  748 F.2d 238 (4th Cir. 1984) ......................................................................23

*Suarez Corp. Indus. v. McGraw*,
  202 F.3d 676 (4th Cir. 2000) ......................................................................13

*Sword v. Fox*,
  446 F.2d 1091 (4th Cir. 1971) ....................................................................14

*Tinker v. Des Moines Indep. Cty. Sch. Dist.*,
  393 U.S. 503 (1969)........................................................................14, 15, 16

*Virginia v. Black*,
  538 U.S. 343 (2003).................................................................................17

*Warner v. Buck Creek Nursery, Inc.*,
  149 F. Supp. 2d 246 (W.D. Va. 2001) ..........................................................29

*Wood v. Moss*,
  134 S. Ct. 2056 (2014) ..............................................................................14

**Statutes**

42 U.S.C. § 1983 ......................................................................................10

42 U.S.C. § 1985 ................................................................................12, 13

42 U.S.C. § 1985(3) .......................................................................11, 26, 27

Va. Code § 8.01-499 ....................................................................11, 12, 29

Va. Code § 8.01-500 ...................................................................................................11, 12, 29

**Rules**

Fed. R. Civ. P. 8 ...................................................................................................................17

Fed. R. Civ. P. 12(b)(1)..........................................................................................................1

Fed. R. Civ. P. 12(b)(6)......................................................................................................1, 11

**Other Authorities**

U. S. Const. amend. I ................................................................................. *passim*

U. S. Const. amend. XIV ................................................................................. *passim*

## INTRODUCTION

Plaintiff Kieran Bhattacharya ("Plaintiff") has sued the entire Board of Visitors, five faculty members, and two law enforcement officers at the University of Virginia (collectively, "Defendants") because he believes that he was wrongfully suspended from the School of Medicine and banned from the University. Asserting due process, free speech, and state and federal conspiracy claims, Plaintiff alleges that he fell victim to a faculty-led conspiracy to punish and expel him for questioning whether microaggressions are a valid social issue. Although that far-fetched theory is at the core of Plaintiff's First Amended Complaint ("Amended Complaint"), he also attempts to weave in additional baseless free speech and due process claims. Ultimately, Plaintiff blames the School of Medicine for ruining his chance to practice medicine and demands immediate re-admission, money damages, and expungement of his student records.

Plaintiff's claims are unfounded. The First Amended Complaint ("Amended Complaint") and dozens of attached exhibits establish that Plaintiff was suspended on professionalism grounds after demonstrating a pattern of combative, disruptive, and threatening behavior that was entirely inappropriate for a doctor-in-training. Plaintiff was subsequently banned from the entire University after he made threatening statements about the University over the Internet. The School of Medicine and the University took adverse action because Plaintiff was unfit to remain in the medical program and because he posed a legitimate security threat to the University community. In all respects, the Amended Complaint shows that Defendants' actions were lawful and appropriate.

## PROCEDURAL HISTORY

Plaintiff filed his original complaint *pro se* against the Rector and Visitors of the University of Virginia ("University"). (Dkt. no. 1.) The University timely responded by filing a motion to dismiss under Federal Rule 12(b)(1) and (6). (Dkt. no. 18.) In the meantime, Plaintiff obtained

counsel and filed an opposition expressing intention to amend the original complaint. (Dkt. no. 25.) Thereafter, this Court suspended briefing on the pending motion to dismiss, (dkt. no. 27,) and granted Plaintiff leave to file his Amended Complaint, (dkt. nos. 32, 33).

## FACTUAL ALLEGATIONS AND CLAIMS

### I.   Professionalism standards

In the fall of 2018, Plaintiff was a second-year medical student at the University of Virginia School of Medicine. (FAC  ¶ 3.)  As a medical student, Plaintiff was charged with maintaining standards of professionalism, which are a critical component of the School's medical training codified generally in the School's Policy on Academic and Professional Advancement (Policy), (FAC Ex. 9,) and more specifically in the School's Technical Standards, (*see* FAC ¶ 117). Emphasizing the importance of professionalism to success in medical school, the Policy states that "[p]rofessional attitudes and behaviors are components of the 12 Competences required of the Contemporary Physician that enable the independent performance of the responsibilities of a physician and therefore are a requirement for the successful award of the degree of Doctor of Medicine." (*Id*.) As a result, [e]valuation of professional attitudes and behaviors is an integral part of a student's assessment and generally is accomplished through observation and narrative recording." (*Id*.) One way that the School encourages these professionalism evaluations is through issuance of Praise and Concern Cards, which are used to record observations of attitudes and behaviors (*Id*.)

The body charged with reviewing students' academic deficiencies and professionalism violations is the Academic Standards and Achievement Committee ("ASAC" or "committee"). (*Id*. ("All . . . patterns of unprofessional behavior and egregious violations of professionalism will be presented to the Academic Standards and Achievement Committee (ASAC) that acts on behalf of

the faculty of the School of Medicine.") Under its operating procedures, the committee is charged with "review[ing] evidence of unprofessional, unethical, or illegal activities or behaviors by students" and taking remedial action against those who do not meet the School's standards. (FAC Ex. 45.)   The committee's voting membership is comprised entirely of faculty members who are M.D. medical doctors or Ph.D. clinical researchers, and medical students. (*See* Compl. ¶¶ 49–59, 112–115.)

## II.   Plaintiff's inappropriate statements at a school event

On October 25, 2018, Plaintiff attended a school-sponsored panel discussion on the topic of microaggressions that was hosted by UVA's chapter of the American Medical Women's Association ("AMWA"). (FAC ¶¶ 3, 4, 54; Ex. 1.) Drs. Kern and Rasmussen, who are faculty members and members of the AMWA, (FAC ¶23; Ex. 1,) served as panel members and helped organize the event, (FAC ¶ 4, 23). Dr. Adams, a P.h.D. psychology professor from UVA's College of Arts and Sciences who had studied microaggression professionally for several years, served as a third panel member. (FAC ¶ 4; Exs. 1, 2.) A recording of the presentation is attached as an exhibit to the Complaint. (FAC ¶ 55; Ex. 2.)

During the presentation, Dr. Adams described four decades' worth of research in the field, cited numerous specific examples of microaggressions from her own research, and provided a personal anecdote to illustrate how unintentional microaggressions can be. (FAC Ex. 2.) Following Dr. Adams's presentation, the panelists invited questions from the audience and Plaintiff was the first to be called on. (*Id*.) For his first question, Plaintiff asked whether it was necessary to be "a member of a marginalized group" in order to experience a microaggression. (*Id*.) Dr. Adams attempted to  answer but before she could say more than "no," Plaintiff cut her off, declaring that her answer was "contradictory" to her presentation. (*Id*.) Dr. Adams provided a thoughtful response,

noting that the definition of a microaggression in fact expanded beyond comments directed at marginalized groups. (*Id*.) Without acknowledging her answer, Plaintiff pressed on that the term "marginalized group" was "extremely non-specific." (*Id*..) Dr. Adam again thoughtfully replied that the term was intentionally broad. Plaintiff once again did not acknowledge her answer. (*Id*..)

Next, Plaintiff criticized the field of study, stating that "a microaggression is entirely dependent on how the person who is receiving it is reacting." (*Id*..) Plaintiff also referred to the sum total of Dr. Adams's "years" of research as amounting to "just one anecdotal case. I mean do you have—have you studied anything else about microaggression that you know in the last few years?" (*Id*..) Dr. Adams provided clarification on both accounts. (*Id*..) Dissatisfied, Plaintiff argued that "[it]'s not really my problem or fault" if someone feels offended by unintentional slights and then demanded "again, what is the basis for what you are going to tell someone that they have committed a microaggression?"  I mean, where are you getting this basis from? How are you studying this? And collecting evidence on this and making presentations from it?" (*Id*.)

At this point, Professor Rasmussen intercepted the question and discussed a personal anecdote, attempting to convey to Plaintiff the importance of showing sensitivity to others. (*Id*.) Professor Rasmussen also stated specifically that it was time to open the floor to other students who might have questions. (*Id*.) Ignoring her plea for consideration of other audience members, Plaintiff continued to hold the floor. He replied defensively about his own interpersonal sensitivity and then stated for the third time that anecdotal research was inadequate. (*Id*.) To end the exchange, Dr. Rasmussen had to cut Plaintiff off mid-sentence and call on someone else. (*Id*.) Throughout the recording, Plaintiff sounded frustrated and angry.

### III.    School of Medicine's response

The incident drew attention from multiple faculty members. Dr. Peterson, one of the four college deans at the School of Medicine, sent Plaintiff an email right after the panel discussion inviting him to meet with her because of Plaintiff's apparent "discomfort with the speaker's perspective on the topic." (FAC ¶ 63.) In response to the email, Plaintiff denied any discomfort but agreed to meet. (FAC ¶ 65.) The meeting lasted approximately one hour and involved discussions about various political and social topics. (FAC ¶ 73.)

Dr. Kern submitted a 'professionalism concern card' regarding Plaintiff's behavior specifically in the areas of "respect for others" and "respect for differences." (FAC ¶¶ 62, 67.) In the card, Dr. Kern described Plaintiff's behavior as "antagonistic toward the panel" and noted that Plaintiff called one of the speakers "contradictory." (FAC ¶67.) Dr. Kern also noted that Plaintiff's "level of frustration/anger seemed to escalate until another faculty member defused the situation" and expressed "shock[ ] that a med [sic] student would show so little respect toward faculty members." (*Id*.) In conclusion, Dr. Kern stated that the incident  "worries me how [Plaintiff] will do on wards." (*Id*.) (FAC ¶ 69.)

Around the same time, Dr. Densmore, who was Plaintiff's dean, contacted Plaintiff to schedule a meeting but the purpose of the meeting was to discuss study strategies. (FAC ¶¶ 71, 72, 74.)

On November 14, 2018, the ASAC convened and considered the concern card submitted by Dr. Kern. Dr. Tucker, who was the chair of the committee, presided. (FAC ¶ 78.) As a voting member of the committee, Dr. Kern was present (FAC ¶ 79,) as was Dr. Peterson, who appeared as a non-voting "guest," (FAC ¶ 84). Neither Dr. Densmore nor Dr. Rasmussen was present at the meeting, nor were they members of the committee. (*See* FAC ¶¶ 77–84.) By a unanimous vote of all

twelve voting members , the committee resolved to send Plaintiff a letter "reminding him of the importance in medicine to show respect to all: colleagues, other staff, and patients and families." (FAC ¶ 88; Ex. 36.)

The next day, Dr. Tucker sent Plaintiff a letter by email stating that the committee had received notice that Plaintiff's behavior at the panel discussion was "unnecessarily antagonistic and disrespectful." (FAC ¶ 91, Ex. 36.) The letter also stated that "[c]ertainly, people may have different opinions on various issues, but they need to express them in appropriate was." (*Id*.) Finally, the letter reminded Plaintiff to "show mutual respect to all" and suggested that Plaintiff "consider getting counseling" to improve his communication skills. (*Id*.)  Neither the letter nor the minutes from the November 14 ASAC meeting mention the topic of microaggressions at all or Plaintiff's particular viewpoint on the subject. (FAC Exs. 35, 36.)

## IV.    Emergency ASAC meeting and suspension

On November 26, 2018, Dr. Densmore emailed Plaintiff. (FAC ¶ 96; Ex. 37.) Based on an alert from the Dean of Students Office that Plaintiff was "heading back to Charlottesville," Dr. Densmore told Plaintiff that he had to be "seen by CAPS" before resuming classes. (*Id*.) CAPS is an acronym for the Counseling and Psychological Services center at the University. (FAC ¶ 97.) Plaintiff fired back an email objecting on constitutional grounds but did not question why the School was suddenly imposing a counseling requirement on him. (FAC ¶ 98.) The next day, Plaintiff received a follow-up email from Dr. Canterbury, the Senior Associate Dean for Education at the School. (FAC ¶ 99; Exs. 40, 41.) In his email, Dr. Canterbury emphasized that Plaintiff "[was] not cleared to return to class until [he] ha[d] been evaluated by CAPS" and reiterated that Plaintiff must "initiate the medical clearance process" in order to resume classes. *Id*. Plaintiff never explains why he was absent from the School or where he was, nor does he dispute his absence. *See generally*

FAC. Plaintiff also fails to address why the Dean of Students Office and Dr. Densmore were monitoring Plaintiff's whereabouts and travel schedule. *Id.*

The following day on November 28, Plaintiff received written notice from an administrator at 1:00 pm stating that the ASAC would be meeting at 5:00 pm to discuss Plaintiff's "enrollment status." (FAC ¶ 101.)  The email provided the address and room number for the meeting and invited Plaintiff to attend and "share [his] insights with the committee."  (*Id.*)  At the time, Plaintiff knew that dismissal was a possible consequence of the meeting, (FAC ¶ 102,) and learned in advance that his comments at the microaggression panel discussion were related to the purpose of the meeting, (FAC ¶ 109). Plaintiff also had access to all of the policies and procedures that governed the ASAC's procedures because a) they are publicly available and b) he received them by email. (FAC ¶ 103.)

Plaintiff attended the November 28 meeting and alleges that a complete audio recording of the meeting is attached to the Complaint. (*See* FAC ¶ 110; Ex. 48.) Presiding as chair, Dr. Tucker informed Plaintiff of the committee's behavioral concerns and offered Plaintiff numerous opportunities to ask and answer questions. (FAC Ex.48.) When Plaintiff asked if the meeting had been called because of Plaintiff's comments at the panel discussion, Dr. Tucker answered, "No. That was addressed last month . . . What we're concerned about is some of the behavior that you've shown since then." (*Id.*) Dr. Tucker also emphasized the recency of Plaintiff's concerning behavior. (*Id.* ("[T]here's concern about your interactions and behaviors most recently.").) On multiple ocasions, Dr. Tucker attempted to discuss the precise instances of concern, at one point informing Plaintiff that "people are expressing concerns with your interactions" including Plaintiff's dean, Dr. Densmore, "as well as other students and other administrators." (*Id.*) Although Plaintiff demanded to know specifics, Plaintiff interjected when Dr. Densmore tried to provide them. (*Id.*)

7

Plaintiff's behavior at the meeting was erratic and emotionally charged. Plaintiff continually professed ignorance about the reason for the meeting and pivoted to subjects unrelated to the fundamental concerns about Plaintiff's behavior. (*See generally id*). He spent much of the meeting railing against the notice he received and obsessing over whether he had received an email containing Dr. Tucker's November 15 admonition letter (which Plaintiff now concedes that he did receive). (*Id*.) He read emails from faculty members aloud in a mocking tone and called the proceeding "laughable." (*Id*.) In addition, Plaintiff accused the committee of violating his free speech rights and mentioned consulting with several lawyers whom he might hire. (*Id*.) He also recorded the entire meeting and photographed the committee members. (FAC ¶ 110; Exs. 47, 48.)

Multiple committee members pointed out that Plaintiff was exhibiting the very behavior that concerned them. For example, Dr. Nathan stated that Plaintiff was being "extremely defensive," "aggressive," and "threatening." (*Id*.). Plaintiff flatly denied the characterizations, accusing Dr. Nathan of "just projecting." (*Id*.)  When Dr. Nathan stated that the committee needed Plaintiff to "change [his] behavior"—whether or not he attended counseling—Plaintiff refused to acknowledge that his behavior was a problem and did not agree to change it. (*Id*.)

The committee was explicit that their concerns were rooted in Plaintiff's lack of professionalism. Committee member Dr. Nathan stressed that "we are concerned about your professionalism and your professional behavior in medical school," including "the behavior you are exhibiting right now." (*Id*.)  Dr. Nathan also explained that "any patient that you walked into a room with would be scared. We are all physicians; we know what patients feel." (*Id*.)  Plaintiff dismissed the concerns as unfounded and argued that he had to be defensive "because I have to defend myself." (*Id*.)

8

The day after the meeting, the committee notified Plaintiff by letter that it was suspending him from the School until August of 2019. (FAC ¶ 117.)  The suspension letter stated that Plaintiff's "aggressive and inappropriate interactions in multiple situations, including in public settings, during a speaker's lecture, with your Dean, and during the committee meeting yesterday, constitute a violation of the School's Technical Standards."  (*Id.*)  The letter also contained a list of the Technical Standards that Plaintiff had violated:

> Demonstrating self-awareness and self-analysis of one's emotional state and reactions; Modulating affect under adverse and stressful conditions and fatigue; Establishing effective working relationships with faculty, other professionals and students in a variety of environments; and Communicating in a non-judgmental way with persons whose beliefs and understandings differ from one's own.

(*Id.*)

As with the November 14 meeting, Dr. Peterson was present at this emergency meeting as a non-voting "guest." (FAC ¶ 114.) Dr.. Kern was a voting member of the committee at the time but the meeting minutes state that she did not vote. (FAC Ex. 49.)

## V.    No trespass warning

Plaintiff had an opportunity to appeal the committee's decision within 14 days of the decision, (FAC ¶ 122,) but action taken by the University Police Department (UPD) superseded the appeal process, (FAC ¶¶ 128, 129,) and also prevented the School from considering Plaintiff's readmission the following school year, (FAC ¶ 132). On December 30, 2018, Plaintiff learned from then-Captain Fielding ("Deputy Chief Fielding") of the University of Virginia Police Department ("UPD"), that the UPD would be issuing a "no trespass" warning banning Plaintiff from UVA grounds for four years ("Trespass Warning"). (FAC ¶ 127.)  Plaintiff spoke with Deputy Chief Fielding by phone on December 30 and again four days later but claims that she would not explain the basis for the Trespass Warning either time. (FAC ¶¶ 127, 130.) The Trespass Warning, which

Plaintiff received on January 2, 2019, (FAC ¶ 128,) provided a right of appeal within ten days, (FAC Ex. 58,) but Plaintiff failed to follow the proper procedure, (FAC ¶ 130). When Plaintiff finally did submit a proper written appeal more than six months later, the UPD considered and denied it. (FAC ¶¶ 137; Exs. 65, 66.)

Plaintiff alleges that he did not learn the grounds for the Trespass Warning until July 2019, when Deputy Chief Fielding explained by email that it was due to "comments on a chat room that were perceived as threats." (FAC ¶ 135; Ex. 63.) The written denial of Plaintiff's appeal stated that "[t]he conduct you directed at members of the university community compromised safety and security and caused fear." (FAC ¶ 137; Ex. 66.) Plaintiff does not deny the accuracy of these characterizations. (FAC ¶ 137.) Although Plaintiff does not describe the comments in any detail, Plaintiff identifies them in Count I as attempts "to obtain press coverage of his wrongful suspension." (FAC ¶ 140.)

## VI.   Claims

Plaintiff brings this lawsuit primarily under 42 U.S.C. § 1983 and the First and Fourteenth Amendments. Specifically, Plaintiff alleges that Defendants deprived Plaintiff of procedural due process by suspending him without proper notice or an effective hearing. Plaintiff also alleges that Defendants abridged his right to free speech by disciplining him, mandating psychological counseling, suspending him, and banning him from campus because of, variously, comments that he made during the microaggression panel discussion, at the ASAC emergency meeting, and in online forums following his suspension. Plaintiff also asserts a civil rights conspiracy to deprive him of equal protection of the law under 42 U.S.C. § 1985(3) as well as a conspiracy to deprive him of his business or profession under §§ 8.01-499 and -500 of the Virginia Code.

## LEGAL STANDARD

A complaint should be dismissed under Rule 12(b)(6)  if it "fail[s] to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss pursuant to Rule 12(b)(6), [a plaintiff's] factual allegations must be enough to raise a right to relief above the speculative level, thereby nudging [the] claims across the line from conceivable to plausible." *Hately v. Watts*, 917 F.3d 770, 781 (4th Cir. 2019) (quoting *Aziz v. Alcolac, Inc.*, 658 F.3d 388, 391 (4th Cir. 2011)). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

In deciding whether the plaintiff has met this plausibility standard, "[t]he Court must 'assume the facts alleged in the complaint are true and draw all reasonable factual inferences in [the plaintiff's] favor,' . . . but only to the extent those allegations pertain to facts rather than legal conclusions." *Graham v. City of Manassas School Bd.*, 390 F. Supp. 3d 702, 708–09 (E.D. Va. 2019) (quoting *Burbach Broad. Co. of Del. v. Elkins Radio Corp.*, 278 F.3d 401, 406 (4th Cir. 2002)). "And if there is a conflict between the bare allegations of the complaint and any attached or incorporated document, then the document prevails."  *Doe v. Alger*, 175 F. Supp. 3d 646, 656 (W.D. Va. 2016) (Dillon, J.) (citing *Fayetteville Inv'rs v. Comm. Builders, Inc.*, 936 F.2d 1462, 1465 (4th Cir. 1991)).

## ARGUMENT

The Amended Complaint compels dismissal because it fails to state a valid claim to relief. First, Plaintiff cannot state a claim under the First Amendment because the speech at issue was not protected. The Supreme Court and Fourth Circuit have long recognized that schools may discipline students for disruptive and offensive speech without offending free speech interests. Because

11

Plaintiff's in-school comments were disruptive to the School's educational mission as well as highly disrespectful, the School had a right to discipline him. Building on these First Amendment principles, other federal circuits have recognized a public university's right to discipline unprofessional speech, particularly in a healthcare setting. As Plaintiff was disciplined for a lack of professionalism, the School's actions were constitutional.

Plaintiff also alleges that he was banned from Grounds for Internet statements made after his suspension but the claim is not substantive enough for this Court or Defendants to decipher what the statements actually were. Thus, Plaintiff fails to state a claim on the basis of these statements, too.

Second, Plaintiff cannot state a due process claim. For one, the School had no constitutional obligation to offer prior notice or a hearing before dismissing Plaintiff on professionalism grounds because the decision did not require any kind of fact-finding for which a hearing would be useful. It was a subjective, medicine-specific judgment about Plaintiff's fitness to continue on in the program. Courts in the Fourth Circuit have consistently recognized a university's autonomy to make these types of decisions without judicial or administrative interference. In addition, Plaintiff has not alleged a protected liberty or property interest that would trigger due process protections in the first place.

Third, Plaintiff also cannot satisfy a single element of a conspiracy claim under either 42 U.S.C § 1985 or Virginia Code §§ 8.01-499 and -500. As to the first, Plaintiff has not alleged that he belonged to a protected class or that Defendants conspired against him. As to the second, Plaintiff has not alleged harm to his theoretical future medical practice or an actual conspiracy. Moreover, the intracorporate conspiracy doctrine bars both claims.

Finally, the three individually named faculty members—Drs. Kern, Rasmussen, and Peterson—are entitled to qualified immunity from the constitutional and § 1985 conspiracy claims because the law does not clearly establish that these Defendants violated Plaintiff's rights.

These pleading infirmities are fatal to all claims and this motion should be granted in full.

## I.   PLAINTIFF FAILS TO STATE A CLAIM UNDER THE FIRST AMENDMENT.

Plaintiff alleges that Defendants retaliated against him in violation of the First Amendment because of his statements on three separate occasions: 1) during the microaggression panel discussion; 2) during the emergency ASAC meeting; and 3) in Internet chat forums. Plaintiff alleges that Defendants retaliated against him by issuing a professionalism concern card, issuing the resulting written admonition, requiring Plaintiff to obtain medical clearance in order to return to classes, suspending Plaintiff, and issuing the Trespass Warning.

### A.   Plaintiff's Speech Was Not Protected.

The First Amendment provides that "Congress shall make no law . . . abridging freedom of speech." U.S. Const. amend. I. Through the Fourteenth Amendment, this prohibition also applies to the States. U.S. Const. amend. XIV, § 1. The First Amendment "creates both an affirmative right to speak and 'the right to be free from retaliation by a public official for the exercise of that right.'" *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 685 (4th Cir. 2000). In order to state a claim for retaliation, "Plaintiff must show: (1) that [his] speech was protected, (2) that the alleged retaliatory action adversely affected [his] protected speech, and (3) a causal relationship between [his] speech and the retaliatory action." *Deegan v. Moore*, No. 7:16cv260, 2017 U.S. Dist. LEXIS 47335, at *12 (W.D. Va. Mar. 30, 2017) (Dillon, J.) (citing *Raub v. Campbell*, 785 F.3d 876, 885 (4th Cir. 2015).

1.   The panel discussion and emergency ASAC meeting statements were not protected speech.

"[T]he fundamental right to speak secured by the First Amendment does not leave people at liberty to publicize their views 'whenever and however and wherever they please.'" *Wood v. Moss*, 134 S. Ct. 2056, 2066 (2014) (quoting *United States v. Grace*, 461 U.S. 171, 177–78 (1983)). In the educational context, the Supreme Court and Fourth Circuit have consistently held that public universities have "legitimate authority to enforce reasonable regulations as to the time, place, and manner of speech" as well as an "undoubted prerogative to enforce reasonable rules governing student conduct." *Papish v. Bd. of Curators of Univ. of Mo.*, 410 U.S. 667, 669–70 (1973); *see Healy v. James*, 408 U.S. 169, 192 (1972) (stating that a university may "expect that its students adhere to generally accepted standards of conduct"); *see also Sword v. Fox*, 446 F.2d 1091, 1096 (4th Cir. 1971) ("[T]he regulation of student conduct is ordinarily the prerogative of the college authorities."). These regulations may be enforced in order to maintain "order and decorum within the educational system" and to preserve a university's "function to impart learning and to advance the boundaries of knowledge." *Id.* at 1097; *see Tinker v. Des Moines Indep. Cty. Sch. Dist.*, 393 U.S. 503, 513 (1969) (holding that schools may regulate conduct that "materially disrupts classwork or involves substantial disorder or invasion of the rights of others"). Even without proof of material disruption, schools are also authorized to restrict speech that is "indecent" or "plainly offensive" as long as the restriction is content- and viewpoint-neutral and aimed at teaching "the shared values of a civilized social order." *Bethel Sch. Dist. v. Fraser*, 478 U.S. 675, 683 (1986); *see Newsom v. Albemarle Cty. Sch. Bd.*, 354 F.3d 249, 256 (4th Cir. 2003) (holding that *Fraser* presents an exception to "*Tinker*'s disruption requirement").

Based on these principles, courts have permitted universities to regulate speech in order to enforce standards of professionalism in the healthcare field. In *Keefe v. Adams*, the Eight Circuit upheld a student's removal from a graduate nursing program due to a series of disrespectful and

14

threatening Facebook postings, stating that "the First Amendment did not bar [an administrator] from making the determination that Keefe was unable to meet the professional demands of being a nurse." 840 F.3d 523, 532 (8th Cir. 2016), *cert. denied*, 2017 U.S. LEXIS 2226 (Apr. 3, 2017). Important to the court's holding was the fact that the student was training to be a healthcare provider. *Id*. at 530, n. 5. Citing *Keefe*, a federal district court within the Fourth Circuit has upheld the suspension of a student who was training to be a dental assistant because she violated her college's code of conduct. *Clemmons v. Guilford Tech. Cmt. Coll.*, No. 1:16CV482, 2017 U.S. Dist. LEXIS 113587, at *14, *15 (M.D.N.C. Jul. 21, 2017) ("[A] school can properly regulate speech that has a negative effect on the school's mission" especially when the school is "preparing students for careers in medicine."). Also citing *Keefe*, the Tenth Circuit recently affirmed qualified immunity for school administrators who dismissed a medical student for unprofessional off-campus political statements. *Hunt v. Board of Regents*, 792 Fed. App'x 595, 606 (10th Cir. Nov. 14, 2019) (stating that the right to regulate off-campus speech was not clearly established but the right to regulate on-campus speech was).

Here, the allegations show that Plaintiff was admonished and ultimately suspended for violating standards of professionalism. (*See* FAC Exs. 36 (admonishing Plaintiff for unprofessional behavior at the panel discussion), 48 (requiring Plaintiff to either seek counseling or otherwise change his unprofessional behavior), 53 (suspending Plaintiff for numerous instances of unprofessionalism and reciting a list of standards that Plaintiff breachecd including "demonstrating self-awareness and self-analysis").) As enforcement of professionalism standards is essential to the School of Medicine's educational mission, this Court should align itself with the Eighth and Tenth Circuits and find that the School's actions were constitutional.

The School's actions were constitutional for two additional reasons: Plaintiff's speech was "offensive" under *Bethel Sch. Dist. v. Fraser*, 478 U.S. 675, 683 (1986), and "materially disruptive" under *Tinker v. Des Moines Indep. Cty. Sch. Dist.*, 393 U.S. 503 (1969). As the purpose of the panel discussion was to teach students about a social issue in medicine, it was not the time or place for Plaintiff to dispute the validity of the subject matter, argue with faculty, or disparage a professor's substantial research in the field. Plaintiff's behavior was offensive to the faculty because it was insulting, disrespectful, and uncivil. (FAC Ex. 2.) His behavior also materially disrupted to the learning environment. (*Id.*) *See Keefe*, 840 F.3d at 532 ("[S]peech reflecting non-compliance with [a behavioral] Code that is related to academic activities *materially disrupts* the Program's legitimate pedagogical concerns.") (punctuation omitted) (emphasis added).

Plaintiff's comments at the emergency ASAC meeting were similarly offensive and disruptive. While the purpose of the meeting was to engage in reflective discourse about Plaintiff's fitness to remain at the School, Plaintiff instead was evasive, aggressive, and combative toward the committee members, who were almost all faculty members. He played dumb about why he was in the meeting and demanded detailed answers, but then refused to listen when Dr. Tucker attempted to provide them. He bitterly mocked the ASAC proceeding, implicitly threatened the committee with a lawsuit, and dismissed out of hand the committee's fundamental concerns about his behavior. At bottom, Plaintiff's behavior was materially disruptive to the meeting as well as to the sanctity of the student-faculty relationship. Plaintiff's condescending, rude, and threatening remarks to the committee members were also offensive under *Fraser*.

Combined, these interactions were a manic display of disruptive, offensive, and altogether unprofessional display of behavior that the School was compelled to sanction to preserve its

educational mission of training competent physicians. Thus, the retaliation claim should be dismissed as to the panel discussion and emergency ASAC meeting statements.

2.   The social media statements were not protected speech.

Plaintiff alleges too few facts about his social media statements for this Court to reasonably infer that they were protected speech or to put Defendants on notice of their true nature. On the one hand, Plaintiff describes the statements as a mere attempt to obtain press coverage, but on the other hand, Plaintiff alleges that the UPD found the statements threatening to the security of the entire University and does not deny that characterization. Based on the pleading, it is impossible to determine the true nature of the statements. Moreover, threatening statements are categorically unprotected by the First Amendment. *See Virginia v. Black*, 538 U.S. 343, 359 (2003) (holding that "true threats" receive no First Amendment protection).

Based on the scant pleading, this Court should dismiss the free speech claim as to the online comments. Fed. R. Civ. P. 8 (requiring a "plain statement" of Plaintiff's claim).

**B.    Drs. Kern, Rasmussen, And Peterson Are Entitled To Qualified Immunity.**

Drs. Kern, Rasmussen, and Peterson ("Female Faculty Defendants"), who are the only Defendants named in their individual capacity, are entitled to qualified immunity from Plaintiff's retaliation claim even if Plaintiff could establish a constitutional violation, which he cannot.[1]

---

[1] In addition to failing to establish that his speech was protected, Plaintiff also fails to satisfy the causation element as to any of the Female Faculty Defendants because none took action that directly penalized Plaintiff because of his speech. The closest case is Dr. Kern, who issued the concern card due to Plaintiff's panel discussion comments. But Plaintiff was not actually admonished until the 12-member committee voted unanimously to do so. That intervening act breaks the causal connection for Dr. Kern. In addition, none of these Defendants had a hand in Plaintiff's suspension or the Trespass Warning, and Drs. Rasmussen and Peterson took no action *at all* to discipline Plaintiff. (*See generally* FAC.)

17

"The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (citations omitted). "The qualified immunity analysis involves two questions: first, whether the defendants' actions as alleged violate a constitutional right; and second, whether the right at issue was clearly established at the time of the alleged misconduct." *Deegan* at * 23 (citing *Pearson*, 555 U.S. at 232). To be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). "Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." *Maciariello v. Sumner*, 73 F.2d 295, 298 (4th Cir. 1992).

These Defendants are entitled to qualified immunity because it was not clearly established that the First Amendment forbid disciplining, suspending, or banning Plaintiff from campus under the circumstances alleged. First, the Fourth Circuit has not ruled on whether the First Amendment prohibits public universities from enforcing codes of professionalism. Second, other federal circuits have ruled that universities can. *See Hunt*,792 Fed. App'x at 606; *Keefe*, 840 F.3d at 532.  Third, Supreme Court and Fourth Circuit case law indicates that this type of action is permitted under the First Amendment. *See supra*, Part I.A; *see also Feminist Majority Found. v. Hurley*, 911 F.3d 674, 691, n. 7 (4th Cir. 2018) (suggesting that a public university may be able to punish students for harassing speech). Because there is no controlling case where a university administrator acting under similar circumstances violated the First Amendment, the law was not clearly established and the Female Faculty Defendants are entitled to qualified immunity.

## II.   THIS ACTION SHOULD BE DISMISSED BECAUSE PLAINTIFF FAILS TO STATE A DUE PROCESS CLAIM.

Plaintiff brings a procedural due process claim alleging that he was unconstitutionally deprived of enrollment at the School of Medicine, the ability to pursue a medical career, and the freedom of expression "without notice or an opportunity to be heard." (FAC ¶ 152.) To begin with, the claim fails because Plaintiff has not alleged a valid liberty or property interest that would trigger any   protection under the Fourteenth Amendment. In addition, even if Plaintiff could establish a protected interest, he still was not entitled to notice or a hearing because his suspension was based on a subjective evaluation that only required the School to exercise professional judgment, which it did. As to the Trespass Warning, the facts alleged establish that Plaintiff had a right to appeal the decision but did not timely exercise it.

### A.   Plaintiff Has Not Alleged A Protected Liberty Or Property Interest.

Under the Fourteenth Amendment, "no state shall make or enforce any law which shall deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. Evaluation of a claim for violation of the right to due process is a two-step inquiry:

> [T]he reviewing court must first determine if a property or liberty interest has been  sufficiently alleged to determine whether constitutionally protected process is due. If one or both has been sufficiently alleged, then the court must determine whether the plaintiff has sufficiently alleged that the process he received was constitutionally inadequate.

*Alger*, 175 F. Supp. 3d at 656 (Dillon, J.) (citing *Bd. of Regents v. Roth*, 408 U.S. 564, 569 (1972)). As Plaintiff has not alleged a protected property or liberty interest, the claim fails outright.

### 1.   Plaintiff has not alleged a protected property interest.

Plaintiff alleges two  property interests: 1) "continuing his medical studies at UVA Med School," and 2) "pursuing the practice of medicine." (FAC ¶ 149.) Neither is valid.

Under the Due Process Clause, property interests are finite and do not exist merely because of a person's "unilateral expectation" or "abstract need or desire." *Roth*, 408 U.S. at 577. "Rather, they are created and their dimensions are defined by an independent source such as state law—rules or understandings that secure certain benefits." *Id.* To survive a motion to dismiss, Plaintiff must allege concrete facts to establish a property interest. *Byerly v. Va. Polytechnic Inst. & State Univ.*, No. 7:18-cv-16, 2019 U.S. Dist. LEXIS 49952, at *21 (W.D. Va. Mar. 21, 2019) (Ballou, M.J.) (holding that conclusory allegations were insufficient to establish a protected property interest); *Nofsinger v. Va. Commonwealth Univ.*, No. 3:12-cv-236, 2012 U.S. Dist. LEXIS 97857, at *18–19 (E.D. Va. Jul. 13, 2012), *aff'd*, 2013 U.S. App. LEXIS 6579 (4th Cir. Apr. 2, 2013) (same).

Here, Plaintiff has alleged no facts to support the existence of a protected property interest in his continued medical education or in a future medical practice and merely assumes they exist. (*See* FAC, Count II.)  Plaintiff's conclusory pleading is insufficient to survive a motion to dismiss. *See Byerly*, 2019 U.S. Dist. LEXIS 49952, at *21.  In addition, "[n]either the Supreme Court nor the Fourth Circuit has held that such a property interest exists in connection with higher education, either categorically or specifically with regard to Virginia law." *Doe v. Rector & Visitors of George Mason Univ.*, 132 F. Supp. 3d 712, 720–21 (E.D. Va. 2015).  There is also no statutory right to practice medicine, just as there is no right to practice law or any other profession.

2.    Plaintiff has not alleged a protected liberty interest.

 "Liberty interests protected by the Fourteenth Amendment may arise from two sources— the Due Process Clause itself and the laws of the States." *Hewitt v. Helms*, 459 U.S. 460, 466 (1983) (citation omitted). "[I]t is well-settled that only a limited range of interest fall within this provision." *Id*. Plaintiff alleges three liberty interests: 1) "continuing his studies at UVA Med School," 2)

20

"pursuing the practice of medicine," (FAC ¶ 149,) and 3) "Protected Free Speech," (FAC ¶ 148). None is constitutionally valid.

First, free speech is not a liberty interest that triggers due process protections. If it were, States could suppress protected speech as long as they provided notice and a hearing first. *See* U.S. Const. amend. XIV, §1, which would upend more than a century of First Amendment jurisprudence. By claiming free speech as a Fourteenth Amendment liberty interest, Plaintiff unduly expands the meaning of "liberty," which is limited to only certain rights that are intrinsic to the Due Process Clause. *See, e.g.*,  *Albright v. Oliver*, 510 U.S. 266, 294 (1994) (Stevens, J. and Blackmun, J. dissenting) (reciting liberty interests rooted in the Due Process Clause). As free speech is not a liberty interest, it cannot form the basis of a due process claim.

Second, continued enrollment in a university is not a protected liberty interest either and Plaintiff has stated no legal or factual basis to support this allege entitlement. Neither the Fourth Circuit nor the United States Supreme Court has recognized a liberty interest in university enrollment and this Court has expressly declined to do so. *Alger*, 175 F. Supp. 3d at 660 (Dillon, J.) (stating that there is no current precedent to support "borrow[ing] from public employment cases to find a liberty interest in cases of suspension or expulsion from public colleges and universities"). As there is no basis to locate a liberty interest in enrollment, this Court should reject the claim.

Third, Plaintiff has no liberty interest in pursuing a future medical career. Although the Fourteenth Amendment secures a right "to engage in any of the common occupations of life," courts have only recognized that right for individuals who have been employed or who are eligible for employment. *See, e.g.*, *Sciolino v. City of Newport News*, 480 F.3d 642, 645 (4th Cir. 2007) (liberty interest ensures the "freedom to take advantage of other employment opportunities") (citation omitted); *Roth*, 408 U.S. at 573 (noting possible liberty interest in former employee's

reemployment). The Due Process Clause does not protect against speculative employment deprivations. *See Sciolino*, 480 F.3d at 645 (dismissing due process claim because fired employee failed to allege a likely deprivation); *see also Guthrie v. McClasky*, No. 1:11-cv-61, 2012 U.S. Dist. LEXIS 51753, at *16 (W.D. Va. Apr. 12, 2012) (dismissing employee discharge claim as implausible because it "lack[ed] any allegation that Guthrie ha[d] sought employment in her chosen field and that such employment opportunities were foreclosed to her as a result of defendants' conduct") (Urbanksi, J.).

At this time, Plaintiff lacks a vested interest in a medical career because the prospect is purely speculative. Plaintiff was suspended before he was even halfway through medical school. Even if he had not been suspended, he still would have faced numerous hurdles before he could ever practice medicine including passing numerous exams, earning a medical degree, and completing a residency. Plaintiff has not alleged that he would have successfully completed these future challenges and the Amended Complaint indicates that the conclusion is not foregone. (*See, e.g.*, FAC Ex. 48 (referencing Plaintiff's recent failing grade on a hematology exam).) Plaintiff also has not alleged how his suspension has prevented him from continuing his medical training at another institution. As Plaintiff's liberty interest in a medical career is a mere hypothetical, this Court should reject it.

Because Plaintiff fails to allege a liberty or property interest, the due process claim is fatally infirm and should be dismissed. *See Guthrie*, 2012 U.S. LEXIS 51753, at *16 ("Only if we find a protected interest do we examine whether the deprivation of the protected interest was done in accordance with due process.")

22

### B.     Defendants Satisfied Procedural Due Process Requirements.

Even if the Court finds that Plaintiff had a protected liberty or property interest, the claim still fails because the procedures used to suspend Plaintiff were constitutional.

When analyzing a procedural due process claim in the context of university dismissals, the Supreme Court has recognized a "significant difference between the failure of a student to meet academic standards and the violation by a student of valid rules of conduct. This difference calls for far less stringent procedural requirements in the case of an academic dismissal." *Bd. of Curators of Univ. of Missouri v. Horowitz*, 435 U.S. 78, 86 (1978). Central to determining whether a dismissal is academic or disciplinary is the nature of the decision-making process. *Horowitz*, 435 U.S. at 90. If "subjective and evaluative," requiring "an expert evaluation of cumulative information," then the dismissal is academic and "not readily adapted to the procedural tools of judicial or administrative decisionmaking." *Id*. Consequently, the Due Process Clause only requires "the exercise of professional judgment by those empowered to make the final decision in a way not so manifestly arbitrary and capricious that a reviewing court could confidently say of it that it did not in the end involve the exercise of professional judgment." *Siu v. Johnson*, 748 F.2d 238, 245 (4th Cir. 1984). A dismissal satisfies this standard as long as the school's decision is "careful and deliberate," *Horowitz*, 435 U.S. at 85, and made "on the basis of factors clearly related to legitimate institutional interests," i*d*. at 246.

The Supreme Court and courts in the Fourth Circuit have repeatedly held that dismissals based on a lack of professionalism are academic, especially in the healthcare context.[2] *See*

---

[2] Courts in other federal circuits have, too. *See e.g.*, *Al-Dabagh v. Case W. Reserve Univ.*, 777 F.3d 355, 358–59 (6th Cir. 2015) (decision to dismiss medical student for lack of professionalism was academic); *Fenje v. Feld*, 398 F.3d 620, 625 (7th Cir. 2005) (decision to dismiss doctor-in-training for lack of candor was "an academic judgment by school officials, expert in the subjective evaluation of medical doctors, that Dr. Fenje did not possess the attributes necessary" for a medical resident); *Ku v. Tennessee*, 322 F.3d 431, 435 (6th Cir. 2003) (decision to place medical student on leave of

*Horowitz*, 435 U.S. at 90 (medical resident's dismissal based on "the academic judgment of school officials that she did not have the necessary clinical ability to perform adequately as a medical doctor" was academic); *Noffsinger v. Va. Commonwealth Univ.*, No. 3:12-CV-236, 2012 U.S. Dist. LEXIS 97857, at *7 (E.D. Va. Jul. 13, 2012), *aff'd*, 2013 U.S. app. LEXIS 6579 (4th Cir., Apr. 2, 2013) (student dismissal from graduate physical therapy program based on in part on "professional behavior" was academic); *Herron v. Va. Commonwealth Univ.*, 366 F. Supp. 2d 355, 359 (E.D. Va. 2004) (dismissal from graduate nursing program was academic because it was based on clinical performance including student's "combativeness" and inability to accept criticism); *Lewin v. Med. College*, 910 F. Supp. 1161, 1165–67 (E.D. Va. 1996) (decision to deny readmission to medical school was academic despite evidence of misconduct because the reasons for dismissal involved academic, clinical, and professional factors).

In the instant case, the Amended Complaint establishes that Plaintiff's suspension was based on a subjective professionalism inquiry involving the exercise of professional judgment. Professionalism is a fundamental part of the School's educational mission and is evaluated as rigorously as technical skills and medical knowledge. (*See* FAC Ex. 9 ("Professional attitudes and behaviors" are a "requirement for the successful award of the degree of Doctor of Medicine.").) At the School of Medicine, evaluating professionalism is a technical and medicine-specific inquiry focused on a student's fitness to complete program requirements. (*See id.* (requiring faculty and ASAC to "interpret and apply" professionalism objectives to specific student behaviors).) This is why the twelve voting members of the ASAC, who make professionalism determinations, are almost all medical professionals with at least one advanced degree in the field. (*See* FAC Exs. 19–

---

absence based on "inability to interact with others in a basic professional manner" was an academic judgment); *Shaboon v. Duncan*, 252 F.3d 722,731 (5th Cir. 2001) (medical resident's "intransigence" and "refusal to acknowledge and deal with her problem furnished a sound academic basis for her dismissal").

26; 50–52 (naming ASAC voting members and their professional credentials).)  In addition, there can be no doubt from the audio recordings of the panel discussion and emergency ASAC meeting, as well as the admonition and suspension letters and meeting minutes, that the committee exercised professional judgment by disciplining Plaintiff in accordance with the School's professionalism standards because of legitimate behavioral concerns. (*See* FAC Exs. 2, 35, 36, 48, 49, 53.) Thus under *Horowitz* and its progeny within and outside of the Fourth Circuit, the School's decisions to discipline and suspend Plaintiff were academic-based decisions and satisfied due process requirements.

In addition to satisfying the requirements of due process, Defendants provided Plaintiff additional procedural safeguards. For one, the committee invited Plaintiff to their emergency meeting and gave Plaintiff time to ask and answer questions about the issues of concern. (FAC Ex. 48.)  Plaintiff also received advance notice that the committee called the meeting to discuss his enrollment status. (FAC  ¶ 101.) Even before the meeting, Defendant gave Plaintiff plenty of notice that behavioral issues were jeopardizing his enrollment. For one, the professionalism standards are publicly available to all medical students and Plaintiff was charged with knowing and adhering to them. (*See e.g,.* FAC Ex. 9 ("Evaluation of professional attitudes and behaviors is an integral part of a student's assessment").) In addition, Plaintiff was alerted to one of his behavioral incidents in an admonition letter from the committee two weeks before the meeting. (FAC Ex. 36.)  The letter reprimanded Plaintiff for a specific instance of unprofessional behavior. (*Id.*)

Assuming a protected liberty or property interest, the School provided Plaintiff at least as much process as he was due under the Fourteenth Amendment. For this additional reason, the due process claim should be dismissed. Moreover, because the Complaint extensively documents both the academic nature of the dismissal and the professional judgment supporting it, the claim should

be dismissed without leave to amend because any attempt to amend would be futile. *See Perkins v. United States*, 55 F.3d 910, 917 (4th Cir. 1995) (articulating futility standard); *Herron v. Va. Commonwealth Univ.*, 366 F. Supp. 2d 355, 359–60 (E.D. Va. 2004) *(*denying leave to amend to add a due process claim because school met due process requirements).

###### C.      Drs. Kern, Rasmussen, And Peterson Are Entitled To Qualified Immunity.

The Female Faculty Defendants are entitled to qualified immunity under the standard set forth in Part I.B because the law does not clearly establish that Plaintiff had a protected liberty or property interest, *see supra*, Part II.A, or that Plaintiff was entitled to more process than the exercise of professional judgment, *see supra*, Part II.B. On these grounds alone, the due process claim should be dismissed as to these Defendants.

### III.    PLAINTIFF FAILS TO STATE A CIVIL RIGHTS CONSPIRACY CLAIM UNDER 42 U.S.C. § 1985(3).

Plaintiff attempts to bring a civil rights conspiracy claim against the Female Faculty Defendants, alleging that they deliberately deprived Plaintiff of his "equal enjoyment of rights" because Plaintiff belonged to a class of individuals "who disagree[ ] with the[ir] ideological views." (FAC ¶ 156.)  The claim fails for numerous reasons.

###### A.      Plaintiff Fails To State A Claim.

To state a claim under § 1985(3), Plaintiff must plead facts sufficient to establish five elements:

> (1) A conspiracy of two or more persons, (2) who are motivated by a specific class-based, invidiously discriminatory animus, to (3) deprive the plaintiff of the equal enjoyment of rights secured by the law to all,   (4) and which results in injury to the plaintiff as (5) a consequence of an overt act committed by the defendants in connection with the conspiracy.

*Buschi v. Kirven*, 775 F.2d 1240, 1258 (4th Cir. 1985).

To start, Plaintiff cannot satisfy the second element because he does not allege membership in a protected class. To satisfy this second element, Plaintiff must allege that he belongs to a class possessing "discrete, insular and immutable characteristics comparable to those characterizing classes such as race, national origin and sex." Id. (citation omitted). In Buschi v. Kirven, 775 F.2d at 1258, the Fourth Circuit held that "whistleblowers" are not protected under § 1985(3) and explained that "the class protected can extend no further than to those classes of persons who are, so far as the enforcement of their rights is concerned, in unprotected circumstances similar to those of the victims of Klan violence." *Id*. (citation omitted).

As alleged in the Amended Complaint, Plaintiff was a member of a class composed of medical students who held certain opinions about microaggressions. A class defined by its viewpoint on a field of psychology does not possess "immutable characteristics" like "race, national origin, and sex," and cannot be said to lack protections "similar to those of the victims of Klan violence." As this is fundamentally a free speech claim, it should be treated as one under the First Amendment only. *See id* (treating whistleblower claim as free speech claim).

Plaintiff's claim also lacks merit for other reasons, not least of which because Plaintiff fails to allege a plausible conspiracy. Although Plaintiff alleges repeatedly in conclusory language that the Female Faculty Defendants targeted Plaintiff to punish him for his ideology, he fails to allege supporting facts. The factual allegations merely establish that the Female Faculty Defendants attended a school-sponsored panel discussion, that Drs. Kern and Peterson expressed concerns with or about Plaintiff afterward, and that Drs. Kern and Peterson attended the two ASAC meetings involving Plaintiff. Furthermore, the facts establish that only Dr. Kern was a voting member of the ASAC and that she did not participate in the vote to suspend Plaintiff. While Plaintiff claims that there were nefarious emails exchanged behind the scenes, Plaintiff has not actually laid eyes on

them so can only speculate on their contents and existence. (*See* FAC ¶ 62.) Plaintiff also alleges that Deputy Chief Fielding, Dr. Tucker, Dr. Densmore, and other unnamed individuals were somehow part of the alleged conspiracy, but again does not allege supporting facts and also does not allege that these individuals had the personal animus ascribed to the Female Faculty Defendants. These allegations are not sufficient to satisfy the conspiracy element of this claim. *See Langadinos v. Appalachian Sch. of Law*, No. 1:05CV39, 2005 U.S. Dist. LEXIS 20958, at *39–*40 (W.D. Va. Sept. 25, 2005) (Jones, J.) (rejecting conclusory conspiracy claim and discussing "the high threshold that a plaintiff must meet to establish a prima facie case under section 1985").

Finally, the intracorporate conspiracy doctrine precludes this claim because the Female Faculty Defendants were all employed by the University and engaged in their normal work activities. *See Buschi*, 775 F.2d at 1252 ("Simply joining corporate officers as defendants in their individual capacities is not enough to make them persons separate from the corporation in legal contemplation."); *see also* Langadinos, 2005 U.S. Dist. LEXIS 20958, at *37 (holding that the doctrine barred a § 1985 claim because the defendants worked for the same law school)

### B.     Drs. Kern, Rasmussen, And Peterson Are Entitled To Qualified Immunity.

Applying the standard set forth *supra* in Part I.B, the Female Faculty Defendants are entitled to qualified immunity because it is not clearly established that the intracorporate conspiracy doctrine does not apply here, that Plaintiff has alleged any conspiracy at all, or that Plaintiff is a member of a protected class. *See supra*, Part III.A.

This claim must be dismissed because the allegations do not support it, the intracorporate conspiracy doctrine bars it, and the Female Faculty Defendants are entitled to qualified immunity.

IV.   **PLAINTIFF FAILS TO STATE A CLAIM FOR CONSPIRACY TO HARM A TRADE, BUSINESS, OR PROFESSION UNDER VA. CODE §§ 8.01-499 AND -500.**

Plaintiff alleges that the Female Faculty Defendants also conspired under state law to "deprive[ ] Mr. Bhattacharya of the ability to complete his medical school studies and enter the medical profession." (FAC ¶ 160). Plaintiff does not state a valid claim because he has not suffered the requisite harm, and has not alleged an actionable conspiracy.

A.   **Plaintiff Has No Right Of Action.**

"To recover in an action for conspiracy to harm a business, a plaintiff must prove (1) a combination of two or more persons for the purpose of willfufilly and maliciously injuring the plaintiff in his business; and (2) resulting damage to the plaintiff. " *Mansfield v. Anesthesia Assocs.*, No. 1:07cv941, 2008 U.S. Dist. LEXIS 34732, at * 8 (E.D. Va. 2008). Plaintiff's claim fails for two reasons: First, Plaintiff alleges injury to his employment interests, but  does not allege any injury to his own business, and second, Plaintiff pleads only conclusory allegations about a conspiracy.

Courts in the Fourth Circuit have consistently held that the civil conspiracy statutes only apply to "business interests," which is read narrowly and does not include "employment status." *Inman v. Klockner-Pentaplast of Am. Inc.*, 467 F. Supp. 2d 642, 654 (W.D. Va. 2006) (Moon, J.). The upshot is that these statutes provide no remedy for plaintiffs complaining about injury to "future employment," or the "ability in the future to start [one's] own business." *Warner v. Buck Creek Nursery, Inc.*, 149 F. Supp. 2d 246, 267 (W.D. Va. 2001) (Moon, J.). As Plaintiff's alleged injuries are to an educational interest  and a speculative future medical profession that is equivalent to a future employment or business interest, these statutes do not give Plaintiff a remedy. *Id*.

29

**B.     The Intracorporate Conspiracy Doctrine Bars This Claim.**

For the reasons stated *supra* in Part III.B, Plaintiff's claim is barred because the Female

Faculty Defendants were employed by the same University and engaged in the normal course of

their faculty duties. Although Plaintiff claims they were dominated by personal motives, (FAC ¶¶

161-62,) the allegation is not supported by the factual allegations, nor is it a reasonable inference.

This claim must be dismissed because Plaintiff has no right of action and, in any event,

cannot bring a conspiracy claim against a single corporate entity.

## CONCLUSION

This action should be dismissed for failure to state a claim because Plaintiff has

failed to satisfy critical elements of any of his claims to relief and the Female Faculty Defendants

are entitled to qualified immunity. As Plaintiff still has not cured pleading infirmities in his

Amended Complaint, there is no reason to believe that a second opportunity would amend would

yield a different result. All claims should be dismissed with prejudice.

Respectfully submitted,

JAMES B. MURRAY, JR., WHITTINGTON W.
CLEMENT, ROBERT M. BLUE, MARK T. BOWLES
L.D. BRITT, FRANK M. CONNER III, ELIZAETH M.
CRANWELL, THOMAS A. DEPASQUALE, BARBARA
J. FRIED, JOHN A. GRIFFIN, LOUIS S. HADDAD,
ROBERT D. HARDIE, MAURICE A. JONES, BABUR B.
LATEEF, ANGELA HUCLES MANGANO, C. EVANS
POSTON JR., JAMES V. REYES, PETER C.
BRUNJES, TIMOTHY LONGO SR., MELISSA
FIELDING, JOHN J. DENSMORE, JIM B. TUCKER,
CHRISTINE PETERSON, NORA KERN, and
SARA K. RASMUSSEN

_____ */s/ Madeline M. Gibson* _____
Madeline M. Gibson (VSB No. 87561)
Assistant Attorney General
Office of the Virginia Attorney General
202 North 9th Street

MARK R. HERRING
Attorney General of Virginia

SAMUEL T. TOWELL
Deputy Attorney General

MARSHALL H. ROSS
Senior Assistant Attorney
General

Richmond, Virginia 23219
Telephone:  (804) 692-0551
Facsimile:  (804) 371-2087
mgibson@oag.state.va.us

*Counsel for Defendants*

31

## CERTIFICATE OF SERVICE

I hereby certify that on this 24th day of March, 2020, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, and that a notice of electronic filing will be delivered via the CM/ECF system to all counsel of record.


*/s/ Madeline M. Gibson*
Madeline M. Gibson (VSB No. 87561)
Assistant Attorney General
Office of the Virginia Attorney General
202 North 9th Street
Richmond, Virginia 23219
Telephone:  (804) 692-0551
Facsimile:   (804) 371-2087
mgibson@oag.state.va.us

*Counsel for Defendants*