UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

| | | |
|---|---|---|
| KIERAN RAVI BHATTACHARYA, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | Civil Action No. 3:19-CV-00054-NRM-JCH |
| | ) | |
| RECTOR AND VISITORS OF THE | ) | |
| UNIVERSITY OF VIRGINIA, | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## MR. BHATTACHARYA'S OPPOSITION TO
## DEFENDANTS' RULE 12(b)(6) MOTION TO DISMISS

Michael J. Lockerby (VSB No. 24003)
Jack G. Haake (VSB No. 87590)
FOLEY & LARDNER LLP
Washington Harbour
3000 K Street, N.W., Suite 600
Washington, D.C. 20007
Telephone: (202) 672-5300
Fax: (202) 672-5399
Email: mlockerby@foley.com
Email: jhaake@foley.com

*Counsel for Plaintiff, Kieran Ravi Bhattacharya*

**TABLE OF CONTENTS**

**Page**

I.    PRELIMINARY STATEMENT ........................................................................1

II.   FACTUAL ALLEGATIONS OF THE COMPLAINT ....................................................2

III.  ARGUMENT ........................................................................................8

    A.   Defendants' MTD Should Be Denied Because Mr. Bhattacharya Alleges
        Sufficient Facts to State Plausible Constitutional and Conspiracy Claims.............8

    B.   UVA Med School's Retaliation Against Mr. Bhattacharya Included
        Suspending Him for Speech Protected By the First Amendment...........................8

    C.   The Complaint Plausibly Alleges the Essential Elements of a Claim for
        Violation of Mr. Bhattacharya's Fourteenth Amendment Due Process
        Rights. ...............................................................................14

    D.   The Individual Co-Conspirators Are Not Entitled to Qualified Immunity
        In View of "Clearly Established" Free Speech and Due Process Precedent. ........18

    E.   The Complaint Plausibly Alleges Sufficient Facts to Establish a
        Conspiracy in Violation of Both 42 U.S.C. § 1985(3) and Virginia Code §
        18.2-499 . ............................................................................20

        1.   The Complaint alleges that the Individual Co-Conspirators
            conspired among themselves and with others—including various
            third parties. .....................................................................20

        2.   The intra-enterprise conspiracy doctrine does not bar Counts III
            and IV against Dean Peterson, Professor Kern, and Professor
            Rasmussen............................................................................22

        3.   Count III plausibly alleges the essential elements of Mr.
            Bhattacharya's claim for violation of 42 U.S.C. § 1985(3). .....................23

        4.   Count IV plausibly alleges the essential elements of a claim that
            the Individual Co-Conspirators violated Virginia Code § 18.2-499..........25

IV.   CONCLUSION.......................................................................................25

4829-3382-7768.3

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Ashcroft v. Free Speech Coalition*,
    535 U.S. 234 (2002)....................................................................................................9

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009).....................................................................................................8

*Barnes v. Zaccari*,
    669 F.3d 1295 (11th Cir. 2012) ................................................................................19

*Bd. of Curators of Univ. of Missouri v. Horowitz*,
    435 U.S. 78 (1978)..............................................................................................15, 18

*Bd. of Regents of State Colleges v. Roth*,
    408 U.S. 564 (1972)...................................................................................................15

*Bell v. Fur Breeders Agric. Coop.*,
    348 F.3d 1224 (10th Cir. 2003) ................................................................................24

*Bethel Sch. Dist. No. 403 v. Fraser*,
    478 U.S. 675 (1986).............................................................................................9, 10

*Buschi v. Kirven*,
    775 F.2d 1240 (4th Cir. 1985) ............................................................................24, 26

*Byrnes v. Johnson Cnty. Cmty. Coll.*,
    No. CIV.A. 10-2690-EFM, 2011 WL 166715 (D. Kan. Jan. 19, 2011) ...................18

*Conklin v. Lovely*,
    834 F.2d 543 (6th Cir. 1987) ....................................................................................26

*Copperweld Corp. v. Indep. Tube Corp.*,
    467 U.S. 752 (1984)...................................................................................................24

*Davis v. Mann*,
    882 F.2d 967 (5th Cir. 1989) ....................................................................................15

*Doe v. Alger*,
    228 F. Supp. 3d 713 (W.D. Va. 2016) .....................................................................15

*Doe v. Rector & Visitors of George Mason Univ.*,
    132 F. Supp. 3d 712 (E.D. Va. 2015) .......................................................................15

2

*Escobar v. State Univ. of New York/Coll. at Old Westbury*,
    427 F. Supp. 850 (E.D.N.Y. 1977) ........................................................................17

*Feminist Majority Found. v. Hurley*,
    911 F.3d 674 (4th Cir 2018) .........................................................................19, 20

*Flaim v. Med. Coll. of Ohio*
    418 F.3d 629 (6th Cir. 2005) ..............................................................................16

*Gay Lib v. Univ. of Mo.*,
    558 F.2d 848 (8th Cir. 1977) ...............................................................................9

*Givhan v. W. Line Consol. Sch. Dist.*,
    439 U.S. 410 (1979)............................................................................................11

*Goodreau v. Rector & Visitors of Univ. of Virginia*,
    116 F.Supp.2d 694 (W.D.Va. 2000) ....................................................................21

*Goss v. Lopez*,
    419 U.S. 565 (1975)............................................................................................15

*Hardy v. Lewis Gale Med. Ctr., LLC*,
    377 F. Supp. 3d 596 (W.D. Va. 2019) ...................................................................8

*Hazelwood Sch. Dist. v. Kuhlmeier*,
    484 U.S. 260 (1988).........................................................................................9, 10

*Healy v. James*,
    408 U.S. 169 (1972)............................................................................................11

*Huang v. Bd. of Governors of Univ. of N.C.*,
    902 F.2d 1134 (4th Cir. 1990) ..............................................................11, 13, 14

*Hunt v. Board of Regents of Univ. of New Mexico*,
    792 Fed.App'x. 595 (10th Cir. 2019) ..................................................................20

*Incumaa v. Stirling*,
    791 F.3d 517 (4th Cir. 2015) ..............................................................................17

*Inman v. Klockner-Pentaplast of Am. Inc.*,
    467 F. Supp. 2d 642 (W.D. Va. 2006) .................................................................26

*Iota XI Chapter of Sigma Chi Fraternity v. Patterson*,
    566 F.3d 138 (4th Cir. 2009) ..............................................................................15

*Keefe v. Adams*,
    840 F.3d 523 (8th Cir. 2016) ..............................................................................20

3

*Lightsey v. King*,
    567 F. Supp. 645 (E.D.N.Y. 1983) ........................................................................16

*Mansfield v. Anesthesia Assocs.*,
    No. 1:07cv941, 2008 U.S. Dist. LEXIS 34732 (E.D. Va. 2008) ...........................26

*Matter of Massachusetts Bd. of Registration in Optometry*,
    110 F.T.C. 549 (1988)...........................................................................................24

*Mathews v. Eldridge*,
    424 U.S. 319 (1976)...............................................................................................16

*Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*,
    429 U.S. 274 (1977)...............................................................................................11

*N. Carolina Bd. of Dental Examiners v. F.T.C.*,
    717 F.3d 359 (4th Cir. 2013) .................................................................................24

*Papish v. Bd. of Curators of Univ. of Mo.*,
    410 U.S. 667 (1973)...........................................................................................9, 20

*Patel v. Scot. Mem'l Hosp.*,
    1995 U.S. Dist. LEXIS 5258 (M.D.N.C. 1995), *aff'd*, 91 F.3d 132 (4th Cir.
    1996) ......................................................................................................................24

*Perry v. Sindermann*,
    408 U.S. 593 (1972)...............................................................................................15

*Poindexter v. Am. Bd. of Surgery*,
    911 F. Supp. 1510 (N.D. Ga. 1994), *aff'd mem.*, 56 F.3d 1391 (11th Cir. 1995)...................24

*Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*,
    792 F.2d 210 (D.C. Cir. 1986) ..............................................................................24

*Saleh v. Upadhyay*,
    11 F. App'x 241 (4th Cir. 2001) ............................................................................13

*Simon & Schuster, Inc. v, Members of the New York State Crime Victims Bd.*,
    502 U.S. 105 (1991).................................................................................................8

*Sky Angel U.S., L.L.C. v. Nat'l Cable Satellite Corp.*,
    947 F. Supp. 2d 88 (D.D.C. 2013) .........................................................................24

*St. Joseph's Hosp. v. Hosp. Corp. of Am.*,
    795 F.2d 948 (11th Cir. 1986) ...............................................................................24

*Suarez Corp. Indus. v. McGraw*,
    202 F.3d 676 (4th Cir. 2000) ............................................................................10, 11

4

*Sword v. Fox*,
     446 F.2d 1091 (4th Cir. 1971) ........................................................................11, 21

*Tinker v. Des Moines Indep. Comty. Sch. Dist.*,
     393 U.S. 503 (1969).................................................................................9, 10, 11

*United Bhd. of Carpenters & Joiners, Local 610, AFL-CIO v. Scott*,
     463 U.S. 825 (1983).....................................................................................25, 26

*United States v. Playboy Entm't Grp., Inc.*,
     529 U.S. 803 (2000).............................................................................................9

*Volunteer Medical Clinic, Inc. v. Operation Rescue*,
     948 F.2d 218 (6th Cir. 1991) ............................................................................26

*Wagner v. Wheeler*,
     13 F.3d 86 (4th Cir. 1993) .................................................................................11

*Ward v. Members of the Bd. of Control of E. Michigan University*,
     700 F.Supp.2d 803 (E.D. Mich 2010).................................................................21

*Warner v. Buck Creek Nursery, Inc.*,
     149 F. Supp. 2d 246 (W.D. Va. 2001) ..........................................................24, 26

*Weiss v. York Hosp.*,
     745 F.2d 786 (3d Cir. 1984)...............................................................................24

*Wesley v. Howard Univ.*,
     3 F. Supp. 2d 1 (D.D.C. 1998)...........................................................................24

*Wilkinson v. Austin*,
     545 U.S. 209 (2005)...........................................................................................17

*Williams v. 5300 Columbia Pike Corp.*,
     891 F. Supp. 1169 (E.D. Va. 1995) ...................................................................24

*Wisconsin v. Constantineau*,
     400 U.S. 433 (1971)...........................................................................................15

*Wood v. Moss*,
     572 U.S. 744 (2014)...........................................................................................11

*Zhao v. Virginia Polytechnic Inst. and State Univ.*,
     Case No. 7:18cv00189, 2018 WL 5018487 (W.D. Va. Oct. 16, 2018) ...................15

**State Cases**

*Abbariao v. Hamline Univ. Sch. of Law*,
     258 N.W.2d 108 (Minn. 1977)...........................................................................18

5

*Rohrbaugh v. Kreidler,*
    71 Va. Cir. 298, 2006 Va. Cir. LEXIS 245 (Arlington County 2006)....................................26

**Federal Statutes**

42 U.S.C. § 1983.................................................................................................................1, 11

42 U.S.C. § 1985(3) ......................................................................................... *passim*

**State Statutes**

Virginia Code § 18.2-499 .............................................................................1, 21, 24, 26

**Rules**

Fed. R. Civ. P. 12(b)(6)..................................................................................8, 12, 23

**Other Authorities**

First Amendment ......................................................................................1, 10, 20, 22

Fourteenth Amendment .............................................................................1, 20, 22

## I.    PRELIMINARY STATEMENT

Defendants' Motion to Dismiss ("MTD") should be denied because Mr. Bhattacharya's First Amended Complaint (Dkt. #33) (the "Complaint") plausibly alleges facts sufficient to establish that the University of Virginia ("UVA") violated the First Amendment by suspending him from the University of Virginia School of Medicine ("UVA Med School") for expressing views with which certain faculty members disagreed.  The Complaint also alleges facts sufficient to establish that UVA Med School violated the Fourteenth Amendment by suspending Mr. Bhattacharya without following its own policies and procedures—much less the due process and opportunity to be heard that due process requires.  These allegations establish the essential elements of Mr. Bhattacharya's 42 U.S.C. § 1983 claims set forth in Counts I and II.

Mr. Bhattacharya's Complaint also alleges facts sufficient to establish that three faculty members—Dean Peterson, Professor Kern, and Professor Rasmussen (the "Individual Co-Conspirators")—violated 42 U.S.C. §1985(3) (Count III) and Virginia Code § 18.2-499 (Count IV).  To find these claims barred by the "intra-enterprise conspiracy doctrine," the Court would have to ignore specific factual allegations that these individuals conspired with third parties and had an "independent personal stake" in the conspiracy.  *See, e.g.,* FAC ¶¶ 25, 26, 62.b, 160, 161.

The Individual Co-Conspirators are the only Defendants named in their individual capacities in Mr. Bhattacharya's claims for violation of 42 U.S.C. § 1983.  To find these claims barred by the doctrine of qualified immunity, the Court would have to ignore longstanding authority that no public university can engage in the "viewpoint discrimination" and other violations of free speech and due process that—in this case—are established by UVA's own documents cited in and attached to the Complaint.

Unable to come up with a ***legitimate*** defense, the three Individual Co-Conspirators (who happen to be female) suggest that they were sued in their individual capacities ***because*** they are

1

female.  Defendants' MTD thus refers to them as the "Female Faculty Defendants," a term that is defined to exclude four co-defendants who also happen to be female.  The Complaint alleges that Dean Peterson, Professor Kern, and Professor Rasmussen "subordinated their responsibilities to UVA Med School—including students and faculty alike—to their personal ideologies and prejudices and their loyalty to AMWA."  (FAC ¶ 25).  The suggestion that they were singled out because of their gender has no basis in fact and is an insult to the intelligence of the Court[1]—as are the tortured arguments by which Defendants seek to excuse the clear violations of Mr. Bhattacharya's constitutional rights that, to any neutral observer, are apparent from the factual allegations of the Complaint.

## II.      FACTUAL ALLEGATIONS OF THE COMPLAINT

The Complaint alleges that Mr. Bhattacharya was suspended and ultimately dismissed from UVA Med School and is now unable to pursue his chosen career in medicine because of his questions and comments during an October 25, 2018 seminar on microaggression.  Contrary to the revisionist history of Defendants' MTD, the seminar was *not* "school-sponsored" or a "school event."  According to the website of the American Medical Women's Association (the "AMWA"), AMWA's newly organized UVA Med School chapter sponsored the seminar (the "AMWA Microaggression Seminar").  (FAC ¶ 3, Ex. 1).

Before October 25, 2018, Mr. Bhattacharya was a student in good standing at UVA Med School.  (*Id.* ¶¶ 33, 35, 37, 38, 42, 45-47).  That was soon to change once Mr. Bhattacharya—voluntarily, not as a requirement of his course work—attended the AMWA Microaggression Seminar.  (*Id.* ¶¶ 3-4, 54).  During the question and answer period following the panelists' prepared

---

[1] Consistent with their "identity politics" defense, the Individual Co-Conspirators assert that Mr. Bhattacharya's 42 U.S.C. § 1985(3) claim should be dismissed for failure to allege that their conspiracy to deprive him of his civil rights was motivated by the fact that Mr. Bhattacharya is a member of a racial or ethnic minority.

2

remarks, Mr. Bhattacharya asked clarifying questions about the statements of a psychology professor who was the featured speaker.  (*Id.*, ¶¶ 55-56, Ex. 2 at 28:40-34:00).  Specifically, he asked about a discrepancy between a statement in the slides and the speaker's oral response to his question, asked about and disagreed with her definition of "marginalized," asked for clarification of the difference between microaggressions and rude statements, and inquired as to the foundation for the speaker's conclusions.  (*Id.*).  During this colloquy, which lasted approximately five minutes, Mr. Bhattacharya listened in silence to the speaker's responses and ultimately disagreed with at least some of her conclusions.  (*Id.*).  Another panelist, Individual Co-Conspirator Professor Rasmussen, interrupted the exchange and cut off any follow-up discussion by Mr. Bhattacharya. (*Id.*).  Thereafter, Mr. Bhattacharya did not ask any further questions or interrupt further questions and comments by others.  (*Id.*).

Unbeknownst to Mr. Bhattacharya at the time, the third panelist—Individual Co-Conspirator Professor Kern—considered his questions and comments to be "antagonistic."  The Court need only listen to the audio recording[2] to determine whether that is a fair characterization. Mr. Bhattacharya and the speaker had a rational and calm discussion about the theory of microaggression.  The only person whose behavior was arguably "antagonistic" was Professor Rasmussen.  She interrupted the exchange between Mr. Bhattacharya and the speaker, launched into a diatribe about the microaggressions that she had experienced as a native of West Virginia, and raised her voice in anger at Mr. Bhattacharya before cutting him off altogether.  Unfortunately for Mr. Bhattacharya, Professor Rasmussen's angry outburst at the AMWA Microaggression Seminar was just the beginning rather than the end of UVA Med School's efforts—so far successful—to silence and punish anyone who dared to even question the theories being espoused

---

[2] *See* FAC, Ex. 9.  A recording of the exchange is available at 28:40-34:00 via the following hyperlink: https://bigleaguepolitics.com/college-student-suspended-for-antagonizing-sjw-microaggression-lecture/.

that day.   Beginning immediately after the seminar, UVA Med School responded to Mr. Bhattacharya's dissident speech in a way that would make the rulers of the former Soviet Union proud.  (*Id.* ¶ 5).

That same day, Professor Kern surreptitiously lodged a Professionalism Concern Card ("PCC") against Mr. Bhattacharya.  The PCC, a punitive administrative action taken against medical students for specified forms of misconduct (*id.* ¶ 44), cited Mr. Bhattacharya for asking a "series of questions that were quite antagonistic toward the panel" and identified "respect for others" and "respect for differences" as areas of concern.  (*Id*. ¶¶ 66-70, Ex. 13).  UVA Med School's policies require that such concerns must be addressed with the student in a documented discussion.  (*Id.* ¶ 44, Ex. 9).  Yet neither Dean Peterson, Professor Kern, nor any other member of the faculty or administration notified Mr. Bhattacharya of the PCC or addressed it with him at the time.[3]  (*Id*. ¶¶ 69-70).  Instead, on October 25, 2018, Dean Peterson "invited" Mr. Bhattacharya to meet for the stated purpose of "help[ing] you understand and be able to cope with unintended consequences of conversations."  (*Id*., Ex. 67).[4]  Although Dean Peterson never disclosed this during their subsequent meeting (*id*.  ¶ 73), one of the "unintended consequences" to which she was referring included the formal discipline that—with her "help"—Mr. Bhattacharya was soon to receive from UVA Med School's Academic Standards and Achievement Committee ("ASAC" or the "Committee").

---

[3] The day after Professor Kern submitted the PCC, Defendant Dean Densmore—the administrator responsible for notifying Mr. Bhattacharya about the PCC, discussing it with him, and documenting their discussion—contacted Mr. Bhattacharya to schedule a meeting.  When they met, Dean Densmore (like Dean Peterson) did not address Professor Kern's PCC with Mr. Bhattacharya or even make him aware of its existence.  (FAC ¶¶ 71-72, 74).

[4] Dean Peterson's email stated that she had "observed [his] discomfort with the speaker's perspective."  (FAC ¶ 63, Ex. 12).  Mr. Bhattacharya responded that "I simply wanted to give them some basic challenges regarding the topic" and "I understand that there is a wide range of acceptable interpretations on this,"  prompting Dean Peterson to admit that "I don't know you at all so I may have misinterpreted your challenges to the speaker."  (*Id.*, Ex. 12).

4

On November 14, 2018, ASAC—including Professor Kern, who was a member of the Committtee, and Dean Peterson, who was not—met to consider the PCC that Professor Kern had submitted.  The meeting resulted in November 15, 2018 correspondence informing Mr. Bhattacharya that ASAC "has received notice of a concern about your behavior at a recent AMWA panel" that "was thought to be unnecessarily antagonistic and disrespectful," reminding him to "show mutual respect to all" and to "express [his opinions] in appropriate ways," and suggesting that he "***consider getting counseling***" to improve his communication skills.  (*Id.* ¶¶ 7, 79- 80, 91, Ex. 35, 36) (emphasis added).  Like the minutes of the November 14, 2018 ASAC meeting, the November 15, 2018 correspondence did not address what Mr. Bhattacharya ***actually said*** at the AMWA Microaggression Seminar—only Professor Kern's characterization of it.  (*Id.*, Ex. 35).

By the end of Thanksgiving break, however, heeding UVA Med School's advice that Mr. Bhattacharya "consider getting counseling" had become a prerequisite for continuing his studies. On November 26, 2018, Dean Densmore notified Mr. Bhattacharya that he must be evaluated by "CAPS" (Counseling and Psychological Services) before he could return to class from Thanksgiving break.  (*Id.* ¶¶ 96-97, Ex. 37).  Mr. Bhattacharya responded by asking how it could "be legal to mandate psychiatric evaluation to continue [his] education," expressing his desire to return to classes, and disagreeing with being required to undergo psychiatric evaluation to do so. (*Id.* ¶ 98, Exs. 37, 38, 39).  On November 27, 2018, Defendant Dr. Canterbury notified Mr. Bhattacharya that he could not resume his studies until he had been "evaluated by CAPS at the Student Health Service" and received "medical clearance."  (*Id.* ¶ 99, Ex. 40).

The next day, November 28, 2018, ASAC hastily convened a disciplinary hearing (the "November 28 Suspension Hearing") for the stated purpose of discussing Mr. Bhattacharya's

"enrollment status."[5]  During the 28-minute November 28 Suspension Hearing, ASAC invited Mr.

Bhattacharya to "express [his] side of things" without ever telling him what he had supposedly

done wrong—other than ask questions at the AMWA Microaggression Seminar with which the

Individual Co-Conspirators took issue and try to defend the unspecified charges against him.[6]

On November 29, 2018, ASAC notified Mr. Bhattacharya by letter that it was suspending

him from UVA Med School until August 2019 (the "Suspension Letter").  (*Id.*, Exs. 51, 51.B).

The Suspension Letter stated that Mr. Bhattacharya's "aggressive and inappropriate interactions in

multiple situations,[7] including in public settings, during a speaker's lecture, with your Dean, and during

---

[5] At 1:00 p.m. on November 28, 2018, a UVA Med School administrator sent Mr. Bhattacharya an email with the cryptic message that ASAC would be meeting at 5:00 p.m. that day to discuss Mr. Bhattacharya's "enrollment status." (*Id.* ¶ 101, Ex. 42).  The email provided the address and room number for the meeting and invited Mr. Bhattacharya to attend and "share [his] insights with the committee." (*Id.*, Ex. 42).  Given the ambiguous nature of the email, Mr. Bhattacharya sought to confirm whether his continued enrollment was in jeopardy and to ascertain the reason for the meeting by emailing and calling faculty. (Id. ¶¶ 102, 108).  Rather than respond to Mr. Bhattacharya's request for information about the purpose of the meeting, UVA Med School sent him an email containing links to its policies and procedures. (Id. ¶¶ 103-104, Exs. 44, 45).  Less than three hours before the scheduled meeting, in response to messages that he had left, Mr. Bhattacharya received a telephone call from UVA Med School Associate Professor Sean Reed informing him that the AMWA Microaggression Seminar would be among the topics of discussion. (*Id.* ¶ 109).  During that call, Mr. Bhattacharya learned for the very first time of the existence of the PCC that had been submitted by Individual Co-Conspirator Professor Kern. (*Id.*).

[6] During the November 28 Suspension Hearing, Dr. Tucker stated that the purpose of the meeting was to afford Mr. Bhattacharya with "an opportunity to express [his] side of things," that ASAC had sent a letter on November 15, 2018 regarding Mr. Bhattacharya's participation in the AMWA Microaggression Seminar, and that ASAC had received "other interactions that were concerning people." (*Id.*, Ex. 48).  Dr. Tucker did not identify the "other interactions that were concerning people" despite Mr. Bhattacharya's repeated requests that he do so. (*Id.*).

At no time during the November 28 Suspension Hearing did ASAC ever explain what information it would evaluate to decide his "enrollment status." (*Id.*).  Mr. Bhattacharya asked questions attempting to ascertain the claims against him. (*Id.*).  The Committee's only explanatory statement was that Mr. Bhattacharya was aggressive and that patients would be scared of him. (*Id.*).  The Committee's only example was Mr. Bhattacharya's "defensive" and "aggressive" behavior at the November 28 Suspension Hearing itself. (*Id.*).  Mr. Bhattacharya disagreed with this characterization and asked that the Committee consider this characterization in the context that Mr. Bhattacharya had been summoned for the express purpose of defending himself. (*Id.*).  He also disagreed that he had exhibited aggressive behavior and stated that he had never received any complaints about such behavior. (*Id.*).  The Committee did not provide any documentation or otherwise rebut Mr. Bhattacharya's denial. (*Id.*).

During the November 28 Suspension Hearing, Mr. Bhattacharya also objected to the process by which the decision-making process was being implemented and expressed concern that the outcome was a foregone conclusion. (*Id.*).  Mr. Bhattacharya disagreed that UVA Med School could require a psychiatric evaluation for him to attend classes where there were no specific complaints and expressed his concern that his mental health was a private matter and he could respond to specific incidents and not a general sentiment. (*Id.*).  Ignoring this argument, the Committee concluded the November 28 Suspension Hearing, expressly barring Mr. Bhattacharya from attending classes in the absence of a psychiatric evaluation. (*Id.*).

[7] At no time did ASAC provide any evidence of a pattern of combative, disruptive, and threatening behavior.  The only behavior identified in the PCC and the November 15, 2018 correspondence advising him to "consider getting

the committee meeting yesterday, constitute a violation of the School of Medicine's Technical Standards." [8]  (*Id.*).  The Suspension Letter did not identify any specific interactions that were "aggressive or inappropriate" or describe how they were "aggressive and inappropriate."  (*Id.*).

On December 4, 2018, Mr. Bhattacharya attempted to initiate a timely appeal of the suspension. (*Id.* ¶ 123).  On January 3, 2019, however, ASAC informed Mr. Bhattacharya that it would not complete the appeal process because UVA had issued a No Trespass Order against him for a four-year period.  (*Id.* ¶¶ 129-132, Ex. 61).  Mr. Bhattacharya sought to obtain readmission in July 2019 but was denied the opportunity to do so, again because of the No Trespass Order.  (*Id.* ¶¶ 132-37). UVA never disclosed the alleged basis for the No Trespass Order until July 18, 2019.[9]  (*Id.* ¶ 135). Even then, Defendant Ms. Fielding stated only that the No Trespass Order was issued "after concerns were raised about comments on a chat room that were perceived as threats."  (*Id.* ¶ 135, Ex. 63).  In response to a follow-up inquiry from Mr. Bhattacharya, UVA refused to identify who made the "comments," the alleged "chat room" on which the comments had been posted, the substance of the comments, and why they were "perceived as threats."[10]  (*Id.* ¶ 136, Ex. 64).

---

counseling" was his conduct at the AMWA Microaggression Seminar.  Similarly, the Suspension Letter identified no conduct other than Mr. Bhattacharya's questions and comments at the AMWA Microaggression Seminar and the November 28 Suspension Hearing.

[8] The recording of the November 28 Suspension Hearing does not support the insinuation in Defendants' MTD that ASAC could not make a record because of an alleged "interjection" by Mr. Bhattacharya.  Nothing that Mr. Bhattacharya said or did at that hearing precluded ASAC from making a record about any other "interactions and behaviors" upon which Mr. Bhattacharya's suspension was supposedly based.  At the November 28 Suspension Hearing and in the subsequent Suspension Letter, ASAC made no attempt to create a record of the reasons for Mr. Bhattacharya's suspension beyond his comments at the AMWA Microaggression Seminar, some unspecified interaction with an unidentified dean, and his efforts to defend himself in the Suspension Hearing against charges that ASAC could not or would not specify.

[9] By pointing out that Mr. Bhattacharya did not appeal the No Trespass Order within ten days, Defendants' MTD again tries to blame the victim.  ***How could Mr. Bhattacharya possibly appeal the No Trespass Order without knowing the basis for its issuance?***  To this day, UVA refuses to disclose this information.

[10] Defendants' MTD makes the Kafkaesque statement that Mr. Bhattacharya "does not deny the accuracy" of unspecified conduct that he allegedly "directed at members of the university community compromised safety and security and cause fear."  ***If UVA knows what Mr. Bhattacharya supposedly did or said in this regard, it isn't telling.*** Mr. Bhattacharya is unable to deny what he does not know.  Mr. Bhattacharya does deny, however, that he made threats against anyone or that his conduct or words compromised safety or served as a ***legitimate*** basis for fear.

7

In short, Mr. Bhattacharya's comments and questions during the AMWA Microaggression Seminar—"antagonistic" or not—resulted in his permanent exile to the UVA Med School equivalent of Siberia.

## III.   ARGUMENT

### A.   Defendants' MTD Should Be Denied Because Mr. Bhattacharya Alleges Sufficient Facts to State Plausible Constitutional and Conspiracy Claims.

Mr. Bhattacharya's 55-page, 164-paragraph Complaint (including 66 exhibits) contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).  Rule 12(b)(6) requires the Court "to accept all factual allegations in the complaint as true" and "draw all reasonable inferences in favor of the plaintiff,"[11] *not* UVA Med School.  In contravention of Rule 12(b)(6), Defendants' MTD attempts to ignore and rewrite critical allegations of the Amended Complaint.  Rather than cite documents referenced in or attached to the Complaint to refute its allegations, Defendants rely on innuendo—citing Mr. Bhattacharya's failure to address various issues that are irrelevant as grounds for dismissing claims that, on their face, contain all the essential elements of the causes of action asserted,[12] as set forth in the sections that follow.

### B.   UVA Med School's Retaliation Against Mr. Bhattacharya Included Suspending Him for Speech Protected By the First Amendment.

The First Amendment protects most expression from content-based government regulation unless the restriction in question can withstand strict scrutiny.  *Simon & Schuster, Inc. v, Members of the New York State Crime Victims Bd.*, 502 U.S. 105, 118 (1991).  In view of the presumption

---

[11] *Hardy v. Lewis Gale Med. Ctr., LLC*, 377 F. Supp. 3d 596, 604 (W.D. Va. 2019).

[12] For example, Defendants complain that Mr. Bhattacharya has alleged insufficient facts "to decipher what the internet statements actually were" that supposedly justified issuance of the No Trespass Order.  Mr. Bhattacharya has no idea what he supposedly said—on the Internet or elsewhere—that prompted UVA to banish him from the Grounds so that he could not appeal his suspension.  Coming on the heels of his suspension from UVA Med School, the No Trespass Order deprived Mr. Bhattacharya of his rights of due process and free speech alike.

4829-3382-7768.3

that all expression is protected by the First Amendment, UVA has the burden of showing that Mr. Bhattacharya's speech falls within a constitutionally ***unprotected*** class of expression. *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 251 (2002); *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 816-17 (2000). If the expression at issue falls on the protected side of the constitutional line—even by just a bit—it remains fully protected on the same terms and by the same constitutional standards as even the most clearly protected expression. *Free Speech Coalition*, 535 U.S. at 240, 251. "[S]tate colleges and universities are not enclaves immune from the sweep of the First Amendment,"[13] and students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines Indep. Comty. Sch. Dist.*, 393 U.S. 503, 506 (1969). The extent to which UVA can regulate student speech depends upon which of three types of speech it is.

The first type of student speech—which UVA has considerable discretion to regulate—is speech that, while perhaps not obscene, is nevertheless vulgar, lewd, indecent, or plainly offensive. *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 683-85 (1986); *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 272 n. 4 (1988). Mr. Bhattacharya's questions and comments at the AMWA Microaggression Seminar and at the Suspension Hearing were clearly not within this first category. UVA's characterization of Mr. Bhattacharya's speech as "offensive" (Dkt. #113) (p. 16 of 31) does not square with the facts alleged in the Complaint, including the recording of the AMWA Microaggression Seminar filed with the Court. (FAC, Ex. 9). Unlike the speaker in *Fraser*, Mr. Bhattacharya did not engage in speech that was sexually explicit and did not advocate drug use. UVA's characterization of Mr. Bhattacharya's speech as "antagonistic"—a direct quote

---

[13] *Papish v. Bd. of Curators of Univ. of Mo.*, 410 U.S. 667, 670 (1973) (quotation marks and citation omitted); *see also Gay Lib v. Univ. of Mo.*, 558 F.2d 848, 857 (8th Cir. 1977) ("[T]he First Amendment must flourish as much in the academic setting as anywhere else . . . . To invoke censorship in an academic environment is hardly the recognition of a healthy democratic society.").

9

from Professor Kern's PCC—does not change the nature of his speech to "offensive public discourse."  To allow such an end-run around First Amendment protections flies in the face of established law and would permit state universities to censor speech with which they disagree by the simple expedient of characterizing it as "antagonistic" and therefore offensive.

The second type of student speech, speech that is "school-sponsored," can be regulated if the regulation is "reasonably related to legitimate pedagogical concerns." *Hazelwood*, 484 U.S. at 273.  The speech at issue in this case does not fall within this second category either.  "[E]xpressive activities that students, parents, and members of the public might reasonably perceive to bear the imprimatur of the school" is school-sponsored speech." *Id*. at 271.  Examples of this type of speech include school-sponsored publications, such as a school newspaper, or theatrical productions where the school would be lending its "name and resources to the dissemination of student expression" *Id*. at 272.  Here, the event in question was sponsored by the AMWA and was not a "school event."  Even if the seminar had been "school-sponsored," Mr. Bhattacharya's questions and comments were clearly personal and did not carry the imprimatur of the school.

The third type of student speech—speech that is neither vulgar, lewd, indecent or plainly offensive under *Fraser* nor school-sponsored under *Hazelwood*—is subject to the rule of *Tinker*, which prohibits regulation of student speech unless it would materially and substantially disrupt classwork and discipline in the school.  *See Tinker*, 393 U.S. at 513.  The First Amendment right of free speech "includes not only the affirmative right to speak, but also the right to be free from retaliation by a public official for the exercise of that right." *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 685 (4th Cir. 2000).  Retaliation "place[s] informal restraints on speech 'allow[ing] the government "to produce a result which it could not command directly.  Such interference with constitutional rights is impermissible." *Id*. (quoting *Perry v. Sindermann*, 408 U.S. 593, 597

10

(1972) (citations omitted)).  To establish a First Amendment retaliatory discharge claim pursuant to 42 U.S.C. § 1983, Mr. Bhattacharya must prove three elements (1) "that the expressions which are alleged to have provoked the retaliatory action relate to matters of public concern," (2) "that the alleged retaliatory action deprived him of some valuable benefit" (*id.* at 1140); and (3) that there was a causal relationship between the protected expression and the retaliatory action.  *Huang v. Bd. of Governors of Univ. of N.C.*, 902 F.2d 1134, 1140 (4th Cir. 1990); *Wagner v. Wheeler*, 13 F.3d 86, 90 (4th Cir. 1993); *see also Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977); *Givhan v. W. Line Consol. Sch. Dist.*, 439 U.S. 410, 416–17 (1979).  The speech at issue in this case—questioning the controversial theory of microaggression—was not vulgar, lewd, indecent, plainly offensive, or school-sponsored.[14]  Accordingly, Mr. Bhattacharya's speech could be prohibited only if it caused a substantial and material disruption of UVA Med School's operation under the doctrine of *Tinker*.  Clearly, it did not.[15]

Mr. Bhattacharya's questions and comments during the AMWA Microaggression Seminar occurred during a period expressly reserved for this purpose.  They followed logically from the presentation that he had just heard and did not disrupt the program in any way.  Mr. Bhattacharya did not cause a substantial and material disruption of the school's operation or adversely affect school discipline.  His only transgression during the October 25, 2018 political reeducation camp was not to take at face value the indoctrination being served up by Professors Rasmussen and Kern and the advocacy group to which they belong, the AMWA.

---

[14] Mere disagreement with a philosophy or viewpoint does not allow UVA to suppress that viewpoint.  *Healy v. James*, 408 U.S. 169, 187 (1972).

[15] The cases cited in support of Defendants' MTD are inapposite to the facts of this case.  For example, in *Wood v. Moss*, 572 U.S. 744 (2014), the issue was the ability of the Secret service to engage in crowd control to protect the President—a far cry from an educational institution suppressing differing opinions.  In *Sword v. Fox*, 446 F.2d 1091, 1093 (4th Cir. 1971), the issue was whether a college could deny students the right to demonstrate and protest through a "sit-in" within a combination classroom and administration building while permitting demonstrations without any restriction in other areas of campus.  Here, UVA Med School invited students to ask questions but then retaliated against Mr. Bhattacharya for the views that he expressed in response to that invitation.

Mr. Bhattacharya's interactions with school officials following the panel discussion also did not cause a substantial and material disruption.  The stated grounds for Mr. Bhattacharya's suspension did not specify which interactions with his dean were supposedly "inappropriate."  The facts alleged in the Complaint—which Rule 12(b)(6) requires be accepted as true—do not support a finding of disruptive behavior.  Mr. Bhattacharya was invited to speak with Dean Peterson and did so without any issues being reported or raised regarding that interaction.  (FAC ¶¶ 32, 34, 43, Ex. 10).  Mr. Bhattacharya did disagree with the demand by Dean Densmore that he undergo a mandatory psychological evaluation before he could return to class.  Mr. Bhattacharya expressed his disagreement in the form of a private email (*id.* ¶ 88, Ex. 36) that did not disrupt the operation of UVA Med School in any way.  These and other factual allegations of the Complaint (including exhibits) demonstrate that Mr. Bhattacharya's interactions with UVA Med School were not disruptive and were appropriate within their context.  For example, ASAC characterized Mr. Bhattacharya as "defensive" during the November 28 Suspension Hearing.  Yet he had been invited for the express purpose of defending his "enrollment status" at UVA Med School.

Mr. Bhattacharya's questions and comments during the Suspension Hearing did not substantially and materially disrupt UVA Med School's operation.  Indeed, the Suspension Hearing was specifically convened to give Mr. Bhattacharya (on three hours' notice) an opportunity to present his case to the body that would be determining whether he would remain enrolled at UVA Med School.  The characterization of the Suspension Hearing upon which Defendants' MTD is based is contrary to the factual allegations of the Complaint.  In the audio recording of the Suspension Hearing (FAC, Ex. 48), Mr. Bhattacharya asked why the Suspension Hearing had been convened and the basis on which his fate would be determined, attempted to defend himself, and complained about the lack of transparency and due process.  The Complaint

12

and audio recording provide no support for Defendants' characterizations that Mr. Bhattacharya "mocked" or "implicitly threatened" anyone or "played dumb."

The first element of the *Huang* test is satisfied because Mr. Bhattacharya's expression of his views at the AMWA Microaggression Seminar addressed a matter of public concern, a determination that "rests on whether the public or the community is likely to be concerned with or interested in the particular expression, or whether it is more properly viewed as a private matter." *Saleh v. Upadhyay*, 11 F. App'x 241, 255 (4th Cir. 2001) (internal quotations and citation omitted). The second element of the *Huang* test is also satisfied because his discharge deprived him of valuable benefits—including the exercise of his constitutional right to free speech and the ability to complete his medical studies and pursue a career in medicine.  The third element of the *Huang* test—"a causal relation between the expression of public concern and the retaliatory action" (902 F.2d at 1140)—is also satisfied**.**  We know this because the University has so stated in writing. The Suspension Letter (FAC, Exs. 51, 51.B) specifically cites Mr. Bhattacharya's "interactions" at the AMWA Microaggression Seminar (in other words, his expression of his views).  ASAC's November 15, 2018 letter—which states that Mr. Bhattacharya was "unnecessarily antagonistic and disrespectful" (*id.*, Exs. 35, 35.B)—is not the only communication from UVA Med School confirming that the content of Mr. Bhattacharya's speech was the real issue.  Other examples include the October 25, 2018 email from Individual Co-Conspirator Dean Peterson and the PCC lodged that same day by Individual Co-Conspirator Professor Kern.   (*Id.*, Exs. 10, 13). Defendants' insistence that there was no "causal relation between the expression of public concern and the retaliatory action" (*Huang*, 902 F.2d at 1140) is contrary to the allegations of and exhibits to the Complaint—including documents originating with UVA itself.

4829-3382-7768.3

**C.** **The Complaint Plausibly Alleges the Essential Elements of a Claim for Violation of Mr. Bhattacharya's Fourteenth Amendment Due Process Rights.**

To establish a due process violation, Mr. Bhattacharya must show "(1) a cognizable liberty or property interest; (2) the deprivation of that interest by some form of state action; and (3) that the procedures employed were constitutionally inadequate." *Iota XI Chapter of Sigma Chi Fraternity v. Patterson*, 566 F.3d 138, 145 (4th Cir. 2009). The factual allegations of the Complaint establish each of these three elements.

The Constitution, the source of Mr. Bhattacharya's liberty interest in free speech, does not create protected property interests. *Doe v. Rector & Visitors of George Mason Univ.*, 132 F. Supp. 3d 712, 721 (E.D. Va. 2015) (quoting *Equity in Athletics, Inc. v. Dep't of Educ.*, 639 F.3d 91, 109 (4th Cir. 2011)). A protected property interest must have some other source, such as state law or rules entitling citizens to certain benefits. *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972). It can include public school attendance (*Goss v. Lopez*, 419 U.S. 565, 573–74 (1975)) and—under the doctrine established by the Supreme Court in *Sindermann*—continued enrollment in a state university. *Doe v. Alger*, 228 F. Supp. 3d 713, 725-29 (W.D. Va. 2016); *Zhao v. Virginia Polytechnic Inst. and State Univ.*, Case No. 7:18cv00189, 2018 WL 5018487, at *7 (W.D. Va. Oct. 16, 2018). Here, UVA Med School admits only a certain number of students each year. Mr. Bhattacharya paid tuition to reserve his space and accordingly has a property interest in continuing his medical education at UVA Med School. *See, e.g., Bd. of Curators of Univ. of Missouri v. Horowitz*, 435 U.S. 78, 84 (1978); *Davis v. Mann*, 882 F.2d 967, 971 (5th Cir. 1989).

A liberty interest is implicated "[w]here a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him." *Wisconsin v. Constantineau*, 400 U.S. 433, 437 (1971). "[E]xpulsion from a public university on charges of misconduct implicates a protected liberty interest under the Fourteenth Amendment." *Doe*, 132 F. Supp. 3d at

724 (citing *Goss*, 419 U.S. at 573-74).  Under these precedents, UVA Med School has clearly deprived Mr. Bhattacharya of interests protected by the Fourteenth Amendment.

The adequacy of the procedures followed by UVA Med School at the November 28 Suspension Hearing depends upon (1) "the private interest . . . affected," (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards," and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).  Here, all three factors weigh decidedly in Mr. Bhattacharya's favor.

The first *Mathews* factor—the private interest affected, *i.e.*, continued enrollment at UVA Med School—is "significant," "extends beyond [the student's] immediate standing at [the present institution] and could interfere with later opportunities for higher education and employment." *Flaim v. Med. Coll. of Ohio* 418 F.3d 629, 638 (6th Cir. 2005) (citing *Goss*, 419 U.S. at 573-74). The other two *Mathews* factors—the risk of an erroneous result created by the use of the flawed procedures and the burden that correcting the procedures would place on UVA Med School—also weigh in favor of Mr. Bhattacharya for three reasons.

First, the November 28 Suspension Hearing—which lasted all of 28 minutes, following little or no notice of its purpose and the nature and basis of the "charges" against Mr. Bhattacharya—deprived him of "[t]he fundamental requirement of due process," *i.e.*, "the opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews*, 424 U.S. at 333 (internal quotation marks omitted).  Like the "Sentence first–verdict afterward" trial convened by the Queen of Hearts in *Alice's Adventures in Wonderland*, the November 28 Suspension Hearing was a "mere sham." *Lightsey v. King*, 567 F. Supp. 645, 649-650 (E.D.N.Y. 1983).  UVA

15

Med School "simply brushed aside" its own policies and procedures.  *Escobar v. State Univ. of New York/Coll. at Old Westbury*, 427 F. Supp. 850, 858 (E.D.N.Y. 1977).  Mr. Bhattacharya was alerted to the November 28 Suspension Hearing the very day that it was convened and was not notified as to its purpose or subject matter of the meeting, finally learning less than three hours beforehand that it had something to do with his statements at the AMWA Microaggression Seminar.  He could not prepare for the discussion or present evidence in his defense.  As is evident from the recording, ASAC simply opened the floor to Mr. Bhattacharya without establishing the grounds for the disciplinary hearing or the basis on which ASAC would deciding his "enrollment status."   The only reason the November 28 Suspension Hearing lasted as long as it did (approximately 28 minutes) is that Mr. Bhattacharya persisted in seeking information about the basis for the claims against him so that he could defend himself.  Rather than providing specific information or evidence, one ASAC member repeatedly asked why ***Mr. Bhattacharya*** thought he was there.   The November 28 Suspension Hearing was perfunctory, and its outcome was preordained.

The second deficiency in ASAC's procedure was its failure to provide a statement of reasons for its decision sufficient to provide "a basis for objection before the next decisionmaker or in a subsequent . . . review."  *Wilkinson v. Austin*, 545 U.S. 209, 226 (2005); *see also Incumaa v. Stirling*, 791 F.3d 517, 535 (4th Cir. 2015).

Third, UVA Med School did not even follow its own internal procedures set forth in its Policy on Academic and Professional Advancement (FAC, Ex. 14) (the "Policy").[16]

---

[16] The Policy requires any breach of professionalism resulting in a PCC to be addressed with the student by the college dean, and documentation of the discussion must be recorded.  Professionalism issues are presented to ASAC for review only when there are "three or more" written PCCs unless there are severe professional violations (for example, commission of a felony or threat to a patient).  When suspension is being considered, ASAC must notify the student in writing before the meeting as to the major concerns to be addressed.  In this case, there were only two PCCs—one for an alleged absence, the other for statements that were supposedly "unnecessarily antagonistic and disrespectful."  Neither was violent or otherwise within any exception to the general rule of requiring three PCCs

16

After the fact, the University now seeks to characterize its disciplinary determination to suspend or expel Mr. Bhattacharya as an "academic removal" in which his due process rights were minimal.  Before suspension or expulsion for disciplinary reasons, the student is entitled to due process—including a formal hearing at which the student may call witnesses, present evidence, and otherwise fully rebut the accusations against him.  "Expulsion for misconduct triggers a panoply of safeguards designed to ensure the fairness of factfinding by the university." *Abbariao v. Hamline Univ. Sch. of Law*, 258 N.W.2d 108, 112 (Minn. 1977) (citing *Dixon v. Alabama State Bd. of Educ.*, 294 F.2d 150 (5th Cir. 1961)).

Other courts have rejected similar efforts by educators to justify violations of the Fourteenth Amendment by the simple expedient of characterizing an "expulsion for misconduct" as an "academic removal."  For example, in *Byrnes v. Johnson Cnty. Cmty. Coll.*, No. CIV.A. 10-2690-EFM, 2011 WL 166715 at *2 (D. Kan. Jan. 19, 2011), the court rejected a college's attempt to categorize as an "academic" decision its dismissal of four students from a nursing program for unprofessional behavior on Facebook.  The decision of UVA Med School to suspend Mr. Bhattacharya and ultimately prevent him from continuing his medical education is nothing "[l]ike the decision of an individual professor as to the proper grade for a student in his course." *Bd. of Curators of Univ. of Missouri v. Horowitz,* 435 U.S. 78, 90 (1978).  Determining that Mr. Bhattacharya's statements were "unnecessarily antagonistic and disrespectful" does ***not*** "require[] an expert evaluation of cumulative information" and ***is***—unlike a grading decision—"readily adapted to the procedural tools of judicial or administrative decisionmaking." *Id.*

---

before consideration by the Committee.  The dean failed to discuss the two PCCs with Mr. Bhattacharya and record the discussion in his file.  In advance of the November 28 Suspension Hearing, the Committee provided no written notice of its concerns.  At the November 28 Suspension Hearing Meeting, ASAC did not identify any specific "professionalism" concerns—instead referring to vague, unsupported assertions.  ASAC also deprived Mr. Bhattacharya of his right to appeal or reapply—citing a No Trespass Order issued by UVA.

Allowing the exception for "academic decisions" to swallow the rule of due process will inevitably result in the suspension and expulsion of students whose views differ from those of the faculty and administration.  For example, in *Barnes v. Zaccari*, 669 F.3d 1295 (11th Cir. 2012), Valdosta State University in Georgia summarily expelled—without pre-removal process—a student environmental activist whose blogging and leafleting was annoying to the university president.  The Eleventh Circuit found the removal to be a violation of the student's due process rights, notwithstanding the university's insistence that the removal was justified by safety concerns over speech indicating that the student might be violent.  *Id.* at 1307.

Here, ASAC raised no concerns about Mr. Bhattacharya's academic record.  By all accounts (including the facts alleged in the Complaint) Mr. Bhattacharya was performing well academically.  The decision to suspend Mr. Bhattacharya was based on his views and how he expressed them.  It had nothing to do with "academic" considerations.  UVA is not entitled to any deference under the pretext that its decision was "academic."

### D.      The Individual Co-Conspirators Are Not Entitled to Qualified Immunity In View of "Clearly Established" Free Speech and Due Process Precedent.

The Individual Co-Conspirators are not entitled to a qualified immunity defense because it is "clearly established" that state universities cannot deny students their rights of free speech and due process and that viewpoint discrimination is strictly prohibited.  For the qualified immunity defense to be inapplicable, "a court need not have 'previously found the specific conduct at issue to have violated an individual's rights.'"  *Feminist Majority Found. v. Hurley*, 911 F.3d 674, 704 (4th Cir 2018) (citation omitted).  "'Indeed, a right may be clearly established if a previously identified general constitutional rule obviously applies to the disputed conduct.'  Even under novel factual circumstances, a government official 'can still be on notice that [his] conduct violates established law . . . so long as the law provided fair warning that [his] conduct was

18

unconstitutional.'" *Id.* (citation omitted).  The previously cited cases decided under the First and Fourteenth Amendments provided the Individual Co-Conspirators with "fair warning" that they could not engage in viewpoint discrimination or otherwise deprive students at UVA Med School of their rights to free speech and due process.

The cases cited by the Individual Co-Conspirators in support of their qualified immunity defense are all readily distinguishable.  It is certainly true that, in the case of *Hunt v. Board of Regents of Univ. of New Mexico*, 792 Fed.App'x. 595, 598 (10th Cir. 2019), the Tenth Circuit upheld the University of New Mexico's determination that a medical student had engaged in speech that was "unprofessional."  To understand why *Hunt* has no bearing on this case, the Court need only read what the student actually said, as quoted on page 598.  Notably, the Tenth Circuit recognized that to make the qualified immunity determination, courts can look to "'whether a general constitutional rule already identified in the decisional law applies with obvious clarity to the specific conduct at issue.'"  *Hunt*, 792 Fed. App'x. at 601 (citation omitted).  In this regard, the precedent that provided the Individual Co-Conspirators with "fair warning" that they could not engage in viewpoint discrimination includes the Eighth Circuit opinion cited in Defendants' MTD. *See Keefe v. Adams*, 840 F.3d 523, 530 (8th Cir. 2016) ("a university may violate the First Amendment if it invokes a curriculum-based code of ethics as a pretext to punish a student's religious views and speech.")

And upon closer examination, the "Supreme Court and Fourth Circuit case law" cited in support of the Individual Co-Conspirators' qualified immunity defense does not help their cause. In *Papish v. Bd. of Curators of Univ. of Missouri*, 410 U.S. 667, 671 (1973), the Supreme Court held that lower court had to be reversed because "the First Amendment leaves no room for the operation of a dual standard in the academic community with respect to the content of speech, and

19

because the state University's action here cannot be justified as a ***nondiscriminatory*** application

of reasonable rules governing conduct." (emphasis added). In *Sword v. Fox*, 446 F.2d 1091, 1096

(4th Cir. 1971), the Fourth Circuit held that a college may adopt and enforce reasonable,

***nondiscriminatory*** rules governing demonstrations on campus." (emphasis added).

        As with the defendants in *Ward v. Members of the Bd. of Control of E. Michigan University*,

700 F.Supp.2d 803, 807 (E.D. Mich 2010), the Individual Co-Conspirators' "true motivations for

dismissing [Mr. Bhattacharya] Ward are issues of intent for which [dismissal or] summary

judgment is particularly inappropriate on the grounds of qualified immunity." *Id. at* 816-17

(citations omitted). If the Individual Co-Conspirators had "fair warning" of any case, it was

certainly this Court's decision in *Goodreau v. Rector & Visitors of Univ. of Virginia*, 116

F.Supp.2d 694, 701 (W.D.Va. 2000) (denying a motion to dismiss based on the qualified immunity

defense because the plaintiff's claims for revocation of his degree on various grounds—including

due process—reflected clearly established due process rights).

### E.    The Complaint Plausibly Alleges Sufficient Facts to Establish a Conspiracy in Violation of Both 42 U.S.C. § 1985(3) and Virginia Code § 18.2-499 .

#### 1.    The Complaint alleges that the Individual Co-Conspirators conspired among themselves and with others—including various third parties.

        Contrary to the assertion of Defendants' MTD, the Complaint is replete with allegations

establishing that Dean Peterson, Professor Kern, and Professor Rasmussen conspired with each

other, the UVA Med School Defendants, and third parties[17] for the unlawful purposes set forth in

---

[17] *See, e.g.*, FAC ¶¶ 25 ("Dean Peterson also acted in combination and conspiracy with ***third parties*** to subvert and corrupt the activities of the Academic Standards and Achievement Committee and abuse its processes for improper purposes."); 62.b ("inappropriate and unprofessional communications among Professor Kern, Professor Rasmussen, and Dean Peterson with one another and ***third parties*** before and after the October 31, 2018 meeting between Mr. Bhattacharya and Dean Peterson, and before and after the November 14, 2018 and November 28, 2018 ASAC meetings in which Professor Kern participated and which Dean Peterson attended as a 'guest' even though she was not a member of the Committee"); 160 ("These ***third parties*** with whom the Individual Co-Conspirators conspired in violation of Virginia Code § 18.2-499 include"—in addition to the UVA Med School Defendants and Dean Thomas—

20

the Complaint.[18]  The conduct in furtherance of the conspiracy is further described in a series of paragraphs beginning with ¶ 61, the first sentence of which states: "Beginning shortly after the October 25, 2018 Microaggression Panel Discussion—and continuing through the November 14, 2018 and November 28, 2018 ASAC meetings that resulted in official communications from UVA Med School censuring and later suspending Mr. Bhattacharya—the Individual Co-Conspirators collaborated with one another, with the UVA Med School Defendants, and with other UVA Med School faculty members and students who shared their personal ideology."  Other conduct in furtherance of the conspiracy includes: (1) Dean Peterson's interrogation of Mr. Bhattacharya to ascertain his political views on a variety of topics (including sexual assault, affirmative action, and the President of the United States) that had no *legitimate* connection to his "enrollment status" at UVA Med School; (2) Professor Kern's submission the other Individual Co-Conspirators' concealment of the existence of the PCC that she had shared with them and other UVA Med School Defendants; (3) the requirement—instigated by Dean Peterson—that Mr. Bhattacharya undergo psychiatric evaluation before he could return to class after Thanksgiving break; and (4) the improper influence over ASAC exerted by Professor Kern (who was a member of ASAC) and Dean Peterson (who attended ASAC meetings as a "guest").  (FAC ¶¶ 66, 69, 73, 79, 84, 96).[19]

___

"*other individuals who disagreed with Mr. Bhattacharya's questions and comments at the AMWA Microaggression Panel Discussion*.") (emphasis added).

[18] These include "depriv[ing] Mr. Bhattacharya of his right to free speech protected by the First Amendment and his right to due process protected by the Fourteenth Amendment," "depriv[ing] Mr. Bhattacharya of his constitutional rights of free speech and due process," "subvert[ing] and corrupt[ing] the activities of the Academic Standards and Achievement Committee and abus[ing] its processes for improper purposes," "punish[ing] Mr. Bhattacharya for his questions and comments during the AMWA Microaggression Panel Discussion and … deter[ring] others from questioning or challenging the ideology of the Individual Co-Conspirators," "caus[ing] injury to Mr. Bhattacharya in his chosen profession," and "depriving Mr. Bhattacharya of the ability to complete his medical school studies and enter the medical profession."  (*Id.* ¶¶ 2, 25, 61,160).

[19] The alleged conduct in furtherance of the conspiracy also includes—in addition to the deprivation of Mr. Bhattacharya's free speech and due process rights by UVA Med School itself, culminating in his suspension and issuance of the No Trespass Order—(1) "emails from Dean Peterson to Mr. Bhattacharya that resulted in an October 31, 2018 meeting between her and Mr. Bhattacharya" (*id.* ¶ 62.a); (2) "inappropriate and unprofessional communications among Professor Kern, Professor Rasmussen, and Dean Peterson with one another and third parties before and after the October 31, 2018 meeting between Mr. Bhattacharya and Dean Peterson, and before and after the

The evidence in support of the conspiracy includes—in addition to various emails and letters cited in and attached as exhibits to the Complaint, such as the October 25, 2018 email from Dean Peterson to Mr. Bhattacharya that she orchestrated with Professor Kern, who submitted her PCC that same day—"email and text message traffic to and from Professor Rasmussen, Professor Kern, Dean Peterson, the UVA Med School Defendants, and others within UVA Med School to which Mr. Bhattacharya does not have access" (*id.* ¶ 62) and email and text message traffic among the Individual Co-Conspirators and with third parties to which Mr. Bhattacharya *does* have access but has not quoted, cited, or attached for various reasons—including the privacy of certain individuals who are not parties to this litigation. With respect to such documents that Mr. Bhattacharya does *not* have, the Complaint reminds the Individual Co-Conspirators of their obligation to preserve such evidence.[20] Contrary to the suggestion of Defendants' MTD, Mr. Bhattacharya is not required to already have all the documents in Defendants' Possession to survive a Rule 12(b)(6) motion.

2. **The intra-enterprise conspiracy doctrine does not bar Counts III and IV against Dean Peterson, Professor Kern, and Professor Rasmussen.**

Not only did Dean Peterson, Professor Kern, and Professor Rasmussen conspire with one another and with third parties, "each had an independent personal stake in the foregoing conspiracy" (FAC ¶ 26), as follows:

---

November 14, 2018 and November 28, 2018 ASAC meetings in which Professor Kern participated and which Dean Peterson attended as a 'guest' even though she was not a member of the Committee" (*id.* ¶ 62.b); (3) "the surreptitious submission by Professor Kern of a 'Professionalism Concern Card' to Mr. Bhattacharya's UVA Med School student file and the wrongful concealment of that submission by Professor Kern, Dean Peterson, and other UVA Med School Defendants—including Dean Densmore—who had a duty to disclose it to Mr. Bhattacharya" (*id.* ¶ 62.c); and "orchestrating the November 14, 2018 and November 28, 2018 ASAC meetings described herein and the discipline against Mr. Bhattacharya that resulted from these meetings." (*Id.* ¶ 62.d).

[20] *See* FAC ¶ 62 ("The Individual Co-Conspirators, the UVA Med School Defendants, and UVA Med School had a duty to preserve and hopefully have preserved such evidence. To the extent that the Individual Co-Conspirators, the UVA Med School Defendants, and UVA Med School destroyed rather than preserved such evidence, Mr. Bhattacharya is entitled to adverse inferences with respect to the conspiracy.").

22

> Although the Individual Co-Conspirators are employees of UVA Med School, they had an independent personal stake in the conspiracy that went beyond—and was actually contrary to—their duties and responsibilities as members of the faculty and administration of UVA Med School. The Individual Co-Conspirators' independent personal stake included their allegiance to the AMWA chapter for which the AMWA Microaggression Panel Discussion was the first scheduled event, and their ideology.

(FAC ¶ 161). On its face, an alleged conspiracy with third parties is not an "intra-enterprise conspiracy." In any event, the "independent personal stake" that each of the Individual Co-Conspirators had in the alleged conspiracy makes Mr. Bhattacharya's claims subject to a well-recognized exception to the intra-enterprise conspiracy doctrine of *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752 (1984) [21]—as this Court held in a case decided under Virginia Code § 18.2-499, *Warner v. Buck Creek Nursery, Inc.*, 149 F. Supp. 2d 246, 267 (W.D. Va. 2001).

### 3.   Count III plausibly alleges the essential elements of Mr. Bhattacharya's claim for violation of 42 U.S.C. § 1985(3).

The elements of a 42 U.S.C. § 1985(3) claim are: (1) a conspiracy of two or more persons, (2) who are motivated by a specific class-based, invidiously discriminatory animus, (3) to deprive the plaintiff of the equal enjoyment of rights secured by the law to all, (4) resulting in injury to the plaintiff (5) as a consequence of an overt act committed by the defendants in connection with the conspiracy. *See Buschi v. Kirven*, 775 F.2d 1240, 1258 (4th Cir. 1985) (citing *United Bhd. of Carpenters & Joiners, Local 610, AFL-CIO v. Scott*, 463 U.S. 825, 828-29 (1983)). Defendants' MTD challenges the Complaint's sufficiency as to the first and second elements only.

---

[21] *See, e.g., Bell v. Fur Breeders Agric. Coop.*, 348 F.3d 1224, 1233 (10th Cir. 2003); *St. Joseph's Hosp. v. Hosp. Corp. of Am.*, 795 F.2d 948, 956 (11th Cir. 1986); *N. Carolina Bd. of Dental Examiners v. F.T.C.*, 717 F.3d 359, 371-72 (4th Cir. 2013); *Wesley v. Howard Univ.*, 3 F. Supp. 2d 1, 4 (D.D.C. 1998); *Williams v. 5300 Columbia Pike Corp.*, 891 F. Supp. 1169, 1174 (E.D. Va. 1995); *Patel v. Scot. Mem'l Hosp.*, 1995 U.S. Dist. LEXIS 5258, at *8-12 (M.D.N.C. 1995), *aff'd*, 91 F.3d 132 (4th Cir. 1996); *Poindexter v. Am. Bd. of Surgery*, 911 F. Supp. 1510, 1518-19 (N.D. Ga. 1994), *aff'd mem.*, 56 F.3d 1391 (11th Cir. 1995); *Matter of Massachusetts Bd. of Registration in Optometry*, 110 F.T.C. 549, 580-82 (1988); *cf. Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 214-15 (D.C. Cir. 1986); *Weiss v. York Hosp.*, 745 F.2d 786, 813-17 (3d Cir. 1984); *Sky Angel U.S., L.L.C. v. Nat'l Cable Satellite Corp.*, 947 F. Supp. 2d 88, 101 (D.D.C. 2013).

23

With respect to the first element, the Complaint's allegations of the existence of a conspiracy are legally sufficient, as previously discussed.  With respect to the second element, Mr. Bhattacharya is in fact a member of a "protected class," but the Complaint does not allege that the Dean Peterson, Professor Kern, and Professor Rasmussen discriminated against Mr. Bhattacharya **because** he is of Indian descent.  Such an allegation is not necessary, however, to state a claim for violation of 42 U.S.C. § 1985(3).  The Supreme Court's decision in *Carpenters* expressly left open the possibility that 42 U.S.C. § 1985(3) could be "construed to reach conspiracies aimed at any class or organization on account of its ***political views or activities***."  463 U.S. at 837 (emphasis added).  The actual holding of *Carpenters* is limited to the Court's finding that 42 U.S.C. § 1985(3) does not prohibit "conspiracies motivated by bias towards others on account of their ***economic views***."  *Id.* (emphasis added).  In *Carpenters*, the Court expressly declined to decide "whether § 1985(3) must be construed to reach only cases involving racial bias."  *Id.* at 826.  Characterizing this as a "close question" (*id.* at 835), the Supreme Court cited legislative history supporting the proposition that 42 U.S.C. § 1985(3) should "be construed to reach conspiracies aimed at any class or organization on account of its ***political views or activities***."  *Id.* at 837 (emphasis added).  The legislative history "to support the view that § 1985(3) has a broader reach" (*Carpenters*, 463 U.S. at 836) includes floor statements by the Senate bill manager[22] and the House author of the original bill, before its amendment.[23]  Citing *Carpenters*, the Fourth Circuit has since observed that "it is a close question whether § 1985(3) was intended to reach any class-based animus other than animus

---

[22] *See Carpenters*, 463 U.S. at 836 (if a conspiracy were formed against a man "because he was a Democrat, if you please, or because he was a Catholic, or because he was a Methodist, or because he was a Vermonter, ... then this section could reach it.") (citing Cong. Globe, 42d Cong., 1st Sess., 567).

[23] *See Carpenters*, 463 U.S. at 844-845 (Blackmun, Brennan, Marshall, O'Connor, dissenting) ("to confine the authority of this law to the prevention of deprivations which shall attack the equality of rights of American citizens; that any violation of the right, the animus and effect of which is to strike down the citizen, to the end that he may not enjoy equality of rights as contrasted with his and other citizens' rights shall be within the scope of the remedies of this section.") (citing Cong. Globe, 42d Cong., 1st Sess., 478 (Apr. 5., 1871).

against Negroes and those who championed their cause, most notably Republicans." *Buschi*, 775 F.2d at 1257.[24]   What the Supreme Court and the Fourth Circuit, among other courts, have characterized as a "close question" is simply not grounds for dismissal as a matter of law.

### 4.  Count IV plausibly alleges the essential elements of a claim that the Individual Co-Conspirators violated Virginia Code § 18.2-499.

Virginia Code § 18.2-499 makes it unlawful for two or more persons to "combine, associate, agree, mutually undertake or concert together for the purpose of . . . willfully and maliciously injuring another in his reputation, trade, business or profession by any means whatever."   The cases cited by Defendants in support of dismissal involved alleged injury to *employment* interests[25]—not injury to a "profession" (such as the practice of medicine).[26]

## IV.   CONCLUSION

Defendants' MTD attempts to stand Rule 12(b)(6) on its head.   If the UVA Med School Defendants and the Individual Co-Conspirators have any facts to rebut the allegations of the Complaint, they should come forward with them.   Their attempt to instead rewrite the allegations of the Complaint or rebut them with innuendo is improper.   Mr. Bhattacharya therefore respectfully requests that Defendants' MTD be denied.

---

[24] *See also Volunteer Medical Clinic, Inc. v. Operation Rescue*, 948 F.2d 218, 223-224 (6th Cir. 1991) ("[t]he Supreme Court has explicitly left open whether §1985(3) reaches conduct other than that motivated by racial animus") (citing *Carpenters*, 463 U.S. at 835).   Rather, *Carpenters* stands simply for the narrow proposition that 42 U.S.C. § 1985(3) "does not reach conspiracies motivated by bias based on economic views." *Conklin v. Lovely,* 834 F.2d 543, 549 (6th Cir. 1987) (citing *Carpenters*, 463 U.S. at 837).

[25] *See Mansfield v. Anesthesia Assocs.*, No. 1:07cv941, 2008 U.S. Dist. LEXIS 34732, at * 8 (E.D. Va. 2008); *Inman v. Klockner-Pentaplast of Am. Inc.*, 467 F. Supp. 2d 642, 654 (W.D. Va. 2006); *Warner*, 149 F. Supp. 2d at 267.

[26] *See, e.g., Rohrbaugh v. Kreidler*, 71 Va. Cir. 298, 303, 2006 Va. Cir. LEXIS 245, *11 (Arlington County 2006) allegations that defendants intentionally conspired to harm Mr. Rohrbaugh by imputing to him "an unfitness to perform his job . . . a lack of integrity in the discharge of his job, and prejudiced [him] in his profession. . . ." actionable under Virginia Code §18.2-499).

Date:  April 7, 2020                     Respectfully submitted,


                                         KIERAN RAVI BHATTACHARYA

                                         By:  _____*s/ Michael J. Lockerby*_____
                                                          Counsel

                                             Michael J. Lockerby (VSB No. 24003)
                                             Jack G. Haake (VSB No. 87590)
                                             FOLEY & LARDNER LLP
                                             Washington Harbour
                                             3000 K Street, N.W., Suite 600
                                             Washington, D.C. 20007-5109
                                             Telephone: (202) 672-5300
                                             Facsimile: (202) 672-5399
                                             Email: mlockerby@foley.com
                                             Email: jhaake@foley.com


                                         *Counsel for Plaintiff, Kieran Ravi Bhattacharya*

26

4829-3382-7768.3

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on this 7th day of April, 2020, I electronically filed the foregoing MR.

BHATTACHARYA'S OPPOSITION DEFENDANTS' RULE 12(b)(6) MOTION TO DISMISS

with the Clerk of the Court using the CM/ECF system, and will deliver the foregoing via email to

the following counsel of record:

> Madeline M. Gibson, Esq.
> Assistant Attorney General
> Office of the Attorney General
> Commonwealth of Virginia
> 202 North Ninth Street
> Richmond, Virginia 23219


> *s/ Michael J. Lockerby*
> Michael J. Lockerby (VSB No. 24003)
> Jack G. Haake (VSB No. 87590)
> FOLEY & LARDNER LLP
> Washington Harbour
> 3000 K Street, N.W., Suite 600
> Washington, D.C. 20007-5109
> Telephone: (202) 672-5300
> Facsimile: (202) 672-5399
>
> *Counsel for Plaintiff, Kieran Ravi Bhattacharya*

27

4829-3382-7768.3