# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### Charlottesville Division

| | | |
|---|---|---|
| **KIERAN RAVI BHATTACHARYA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civ. Action No. 3:19-CV-00054-NKM-JCH** |
| | ) | |
| **JAMES B. MURRAY, JR., et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## REPLY MEMORANDUM IN SUPPORT OF DEFENDANTS' <u>RULE 12(B)(6) MOTION TO DISMISS FIRST AMENDED COMPLAINT</u>

## INTRODUCTION

This Court should dismiss Plaintiff's First Amended Complaint ("Complaint") because it fails to state a valid claim. Suspended from the University of Virginia School of Medicine ("School of Medicine" or "School") for professionalism violations, Plaintiff claims without basis that he was the target of a conspiracy to punish him for his views on microaggressions and that he was denied a constitutional right to defend himself. Plaintiff brings these far-fetched claims under the First and Fourteenth Amendment as well as state and federal conspiracy law.

Plaintiff's claims are unfounded. Along with the Complaint, Plaintiff has filed more than sixty exhibits including letters, emails, and meeting minutes that reflect the School's concerns about Plaintiff's inability to meet standards of professionalism due to a pattern of aggressive, combative, and disrespectful behavior. In addition, Plaintiff has filed two audio recordings of his interactions with faculty that validate these serious concerns. Together, the exhibits undermine all of Plaintiff's claims because the First Amendment permits universities—especially graduate-level healthcare programs—to enforce professionalism standards even when they burden otherwise protected speech. Likewise, the Fourteenth Amendment imposes minimal due process requirements on Schools under these circumstances.

Plaintiff raises several arguments in response, but none saves his claims. At bottom, Plaintiff asks this Court to substitute its judgment for the expert judgment of the School of Medicine about an intrinsically academic matter, which the Constitution does not permit. Because Plaintiff fails to state a valid claim and because certain defendants are entitled to qualified immunity, the Court should dismiss all claims as to all Defendants with prejudice.

<u>**REPLY ARGUMENT**</u>

**I.    PLAINTIFF FAILS TO STATE A FIRST AMENDMENT CLAIM.**

In his opposition, Plaintiff doubles down on his claim of viewpoint discrimination despite the many exhibits to the Complaint that prove otherwise. Based on the overwhelming evidence that Plaintiff's suspension was grounded in his aggressive and disrespectful behavior and entirely unrelated to Plaintiff's views on the theory of microaggression, this Court should dismiss this speculative and unwarranted First Amendment retaliation claim.[1]

**A.    The School's Actions Were Viewpoint-Neutral.**

In their opening memorandum, Defendants argue that Plaintiff has not stated a First Amendment claim because the Constitution permits universities to regulate student speech that violates established professionalism standards. In his opposition, Plaintiff does not deny that a medical school may regulate unprofessional student speech, so the Court should consider that point undisputed. Rather, Plaintiff argues that the School's reliance on professionalism standards was a pretext for viewpoint discrimination. Plaintiff's argument fails because the exhibits to the Complaint show that the professionalism concerns were valid and not pretextual.

For example, while Plaintiff points to Dr. Kern's professionalism concern card and her failure to disclose it to Plaintiff early on as evidence of viewpoint discrimination, (dkt. no. 115 at 21,) the card makes no reference to either the topic of microaggressions or Plaintiff's perspective on the topic, (*see* dkt. no. 33 Ex. 13). Instead, the card only mentions issues relating to professionalism, namely Plaintiff's inappropriate "level of frustration/anger" as well as his

---

[1] As Plaintiff does not challenge Defendants' argument that Plaintiff's social media statements were unprotected, the Court should view the argument as undisputed and dismiss the First Amendment claim as to those statements. As stated in Defendants' opening memorandum, Plaintiff simply has not alleged enough facts for this Court to infer that the social media statements were protected by the First Amendment. (*See* dkt. no. 113 at 17.)

"antagonistic" behavior toward faculty, which showed a lack of respect toward others. (*Id*.) Furthermore, the recording of the panel discussion bolsters Dr. Kern's basis for submitting the card on professionalism grounds. (*Id*. Ex. 2 (showing that Plainitiff was argumentative, rude and combative toward faculty).)

In addition, the exhibits reflecting the ASAC's decision to reprimand Plaintiff show no consideration of Plaintiff's particular viewpoints. The minutes from the November 14, 2018 ASAC meeting do not mention Plaintiff's views, nor do they mention the subject of microaggressions at all. (Dkt. no. 33 Ex. 35.) Likewise, the November 15 letter admonishing Plaintiff for his behavior takes no issue with Plaintiff's views. To the contrary, the letter *encourages* Plaintiff to *continue expressing his views* as long as he does so respectfully. (*Id*. Ex.36.)

Plaintiff's suspension was not based on viewpoint discrimination, either. The recording of the November 28 ASAC meeting contains *no discussion* of Plaintiff's views. (Dkt. no. 33 Ex. 48.) Throughout the recording, committee members focus *only* on Plaintiff's *behavior*, citing instances of threatening, defensive, and aggressive behavior with Plaintiff's college dean and at the ASAC meeting itself. (*Id*.) Corroborating the committee's professionalism concerns, the recording of the meeting reveals Plaintiff to be highly emotional, unnecessarily argumentative, insulting toward faculty, and unwilling to seriously address the committee's concerns. (*Id*.) Neither the meeting minutes nor the suspension letter reflect any consideration of Plaintiff's viewpoints either. (*Id*. Exs. 49, 53.)[2] Contrary to Plaintiff's assertion, there is no basis to read the

---

[2] While the Complaint alludes to improper and viewpoint-discriminatory acts by the faculty, the allusions are vague, conclusory, or both, and, in any event, cannot overcome the exhibits. *Doe v. Alger*, 175 F. Supp. 3d 646, 656 (W.D. Va. 2016) (when in conflict, exhibits trump "bare allegations" in complaint) (citation omitted).

ASAC's description of "aggressive an inappropriate interactions" as code for disagreement with Plaintiff's views. (See dkt. no. 115 at 13.)

In short, Plaintiff's viewpoint discrimination claim rests entirely on legal conclusions and unwarranted inferences that cannot on their own state a valid First Amendment claim. The exhibits to the Complaint establish that Plaintiff suffered adverse consequences because his behavior was incompatible with the School's standards of professionalism.

**B.      Plaintiff's Speech Was Not Protected By The First Amendment.**

In his opposition, Plaintiff argues that his speech was protected because it did not literally disrupt the School's administration in violation of *Tinker v. Des Moines Indep. Comty. Sch. Dist.*, 393 U.S. 503, 513 (1969) and did not contain sexual innuendo in violation of *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 683-85 (1986). (Dkt. no. 115 at 9, 11-12.) Plaintiff is wrong and reads these cases too narrowly.

A core principle behind these and other seminal cases on student speech is that the First Amendment permits schools to enforce their "basic educational mission" even when that means censoring otherwise protected speech. *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 266 (1988) (quoting *Fraser*, 478 U.S. at 685); *see Fraser*, 478 U.S. at 686 (stating that schools need not "surrender control" to students) (quoting *Tinker*, 393 U.S. at 526 (Black, J. dissenting)). As the Sixth Circuit stated in *Ward v. Polite*, 667 F.3d 727, 734 (6th Cir. 2012), "[w]hen a university lays out a program's curriculum or class's requirements for all to see, it is the rare day when a student can exercise a First Amendment veto over them." *See Keeton v. Anderson-Wiley*,

664 F.3d 865, 875-76 (11th Cir. 2011) (permitting regulation of speech that "interfere[s] with [a University's] control over its curriculum")

In the instant case, professionalism is an essential part of the School of Medicine's "basic educational mission," so the First Amendment permits the School to enforce its professionalism standards. *See, e.g., Keefe v. Adams*, 840 F.3d 523, 532 (8th Cir. 2016), *cert. denied*, 2017 U.S. LEXIS 2226 (U.S. Apr. 3, 2017) (holding that a nursing student's dismissal for unprofessional behavior did not offend the First Amendment); *Keeton*, 664 F.3d at 876 (upholding speech restriction because "[the university] has a legitimate pedagogical concern in teaching its students to comply with the ACA Code of Ethics"). In light of Plaintiff's disrespectful, antagonistic, and argumentative behavior on multiple occasions that was clearly incompatible with the School's professionalism standards, the School was authorized under the First Amendment to reprimand and ultimately suspend Plaintiff. (*See, e.g.*, dkt. no. 33, Exs. 2, 48.) To hold otherwise would give license to medical students like Plaintiff to defy professionalism standards under the banner of the First Amendment without consequence.[3]

### C.  Drs. Kern, Rasmussen, And Peterson Are Entitled To Qualified Immunity.[4]

_____

[3] *See Keefe*, 840 F.3d at 533 ("Courts should be particularly cautious before interfering with the degree requirements in the health care field when the conferral of a degree places the school's imprimatur upon the student as qualified to pursue his chosen profession.") (citation omitted).

[4] In his opposition, Plaintiff claims that defense counsel's reference to Drs. Kern, Rasmussen, and Peterson as "female faculty defendants" insinuates that Plaintiff has singled these Defendants out for suit in their individual capacity because they are female. (Dkt. no. 115 at 1, 2.) That claim is unfounded. As Plaintiff points out, there are other female co-defendants who have not been sued in their individual capacity and there is also no basis in the Complaint to

Plaintiff attempts to argue that Drs. Kern, Rasmussen, and Peterson are not entitled to qualified immunity because they engaged in deliberate viewpoint discrimination, which is clearly unconstitutional. Citing *Ward v. Members of the Bd. of Control of E. Mich. Univ.*, 700 F. Supp. 2d 803, 807 (E.D. Mich. 2010), Plaintiff argues that it is inappropriate to grant qualified immunity when Plaintiff has alleged that the School's reliance on its professionalism standards was a pretext for viewpoint discrimination. (Dkt. no. 115 at 27.) But the facts of *Ward* are inapposite to the facts alleged here. In *Ward*, the Eastern District of Michigan denied a qualified immunity claim where the plaintiff claimed that she was expelled from a graduate counseling program because the administration disagreed with her views on homosexuality. *Ward*, 700 F. Supp. at 807-809.   There was no question in *Ward* that the plaintiff's homophobic views triggered the administration's concerns and the plaintiff alleged facts calling into question whether her conduct actually violated the program's professional code at all. *Id*. at 815-17.

Here, by contrast, Plaintiff asserts no facts showing that Plaintiff was disciplined because of his views. One after another, the exhibits show that Plaintiff was actually disciplined for content- and viewpoint-neutral reasons related to his unprofessional manner of expression. Thus, to the extent that Drs. Rasmussen, Peterson, and Kern took any adverse action against Plaintiff, the action was motivated by professionalism concerns and unrelated to Plaintiff's viewpoint, which the Constitution does not clearly prohibit.

---

make such a claim. Defense counsel used this phrase as a shorthand merely for ease of reference, just as Plaintiff has done by using the phrase "individual co-conspirators." (*See* dkt. nos. 33, 115.) Defense counsel could not simply refer to these Defendants as "faculty defendants" because there are other faculty defendants who are not sued in their individual capacity.

## II.     PLAINTIFF FAILS TO STATE A FOURTEENTH AMENDMENT CLAIM.

Plaintiff's opposition cannot save his Fourteenth Amendment claim either. With little analysis, Plaintiff asserts that his suspension was for ordinary misconduct because it was "based on his views and how he expressed them" rather than the School's professionalism standards. (Dkt. no. 115 at 18.) Again, the viewpoint discrimination claim is unsupported by the facts. In addition, courts have repeatedly held that how students expresses themselves in the healthcare context can be grounds for an academic-based dismissal without notice or a hearing. Moreover, due process considerations were never even triggered here because Plaintiff has not stated a protected liberty or property interest.[5]

### A.     Plaintiff Has Not Stated A Protected Property Interest.

To withstand a Rule 12(b)(6) motion, a procedural due process claim must first assert a protected liberty or property interest within the meaning of the Fourteenth Amendment. *Siu v. Johnson*, 748 F.2d 238, 242 (4th Cir. 1984). To state a protected property interest in continued university enrollment, Plaintiff must identify "a legitimate claim of entitlement" that is rooted in "an independent source such as state law." *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972). As the Complaint contains no such assertions, Plaintiff has not stated a protected property interest and his opposition cannot save his claim.

---

[5] Plaintiff's opposition does not address Defendants' argument that the No Trespass Warning did not violate due process. Thus, this Court should consider that point undisputed. To the extent that Plaintiff claims he was denied due process because of the No Trespass Warning, the Court should dismiss the claim because Plaintiff lacks a protected interest and, in any event, received an opportunity to appeal. *See Price v. Mount Wachusett Cmty. Coll.*, No. 11-10922, 2012 WL 3596859, at *5 (D. Mass. Feb. 17, 2012) (holding that "the college complied with due process requirements by issuing a no-trespass notice and subsequently providing plaintiff opportunities to address its propriety and scope").

In his opposition, Plaintiff argues that he gained a property interest in continued enrollment by paying tuition but cites no case in which a court has so held. (Dkt. no. 115 at 21.) Plaintiff cites only cases where the court assumed that a property right existed in order to reach the issue of whether the process was constitutional or where the plaintiff identified school policies and practices that could form the basis of a property right.[6]

As Defendants argue in their opening memorandum, university enrollment alone does not give rise to a property interest under the Fourteenth Amendment. *Alger*, 175 F. Supp. 3d at 657 (Dillon, J.) (holding that a college student has no intrinsic property right in continued enrollment); *Doe v. Rector & Visitors of George Mason Univ*., 132 F. Supp. 3d 712, 720-21 (E.D. Va. 2015) (noting that "[n]either the Supreme Court nor the Fourth Circuit has held that such a proper interest exists in connection with higher education"). As payment of tuition is a mere precondition for enrollment and not a law or policy that can give rise to a protected property interest, Plaintiff's claim fails.

### B.    Plaintiff Has Not Stated A Protected Liberty Interest.

Plaintiff's liberty interest argument is likewise meritless. Plaintiff argues that he had a protected liberty interest in his reputation, which the School deprived him of by suspending him. To support his argument, Plaintiff cites two cases that this Court has declined to follow in the context of a university dismissal. Plaintiff first cites *Wisconsin v. Constantineau*, 400 U.S. 433, 437 (1971), in which the Supreme Court recognized that "a person's good name, reputation, honor, or integrity" could form a liberty interest in the context of a procedural due process claim.

---

[6] *See Bd. of Curators v. Univ. of Mo. v. Horowitz*, 435 U.S. 78, 84 (1978) (assuming a protected property interest); *Zhao v. Virginia Polytechnic Inst. & State Univ.*, No. 7:18cv189, 2018 U.S. Dist. LEXIS, at *18-*19 (W.D. Va. Oct. 16, 2018) (Urbanski, CJ.) (same); *Davis v. Mann*, 882 F.2d 967, 973 (5th Cir. 1989) (same). *Cf. Alger*, 175 F. Supp. 3d at 657-58 (Dillon, J.) (holding that a college student stated a property interest by citing specific school policies).

Subsequently, the Supreme Court held that "injury to reputation by itself" is not sufficient to state a protected liberty interest. *Siegert v. Gilley*, 500 U.S. 226, 234 (1991). "Instead, a plaintiff must demonstrate that his reputational injury was accompanied by a state action that distinctly altered or extinguished his legal status." *Shirvinksi v. United States Coast Guard*, 673 F.3d 308, 315 (4th Cir. 2012) (citation internal quotation marks omitted). Plaintiff also cites *Doe v. Rector & Visitors of George Mason Univ.* (*"GMU"*), in which a district court in the Eastern District of Virginia held that a student who was expelled from a university had a liberty interest in his reputation because the expulsion would affect the student's employment and education prospects in the future.[7] 132 F. Supp. at 723-24.

One year after *GMU* was decided, this Court came to the opposite conclusion. In *Doe v. Alger*, 175 F. Supp. 3d 646, 660, n. 8 (W.D. Va. 2016), Judge Dillon rejected the *GMU* court's holding, stating that there is no current precedent to support "borrow[ing] from public employment cases to find a liberty interest in cases of suspension or expulsion from public colleges and universities." Moreover, Judge Dillon held that "there is no statutory right to be a public college or university student," so a student cannot establish the requisite change in legal status in order to satisfy the test for a reputational liberty interest. *Id*; *see Armstrong v. James Madison Univ.*, No. 5:16-cv-53, 2017 U.S. Dist. LEXIS 25014, at *31-*32 (W.D. Va. Feb. 23, 2017) (Report and Recommendation of Hoppe, MJ.), adopted by *Armstrong v. James Madison Univ.*, 2017 U.S. Dist. LEXIS 84191, at *8 (W.D. Va. June 1, 2017) (Urbanski, CJ.) (applying *Alger* to deny a reputational liberty interest in enrollment). Here, Plaintiff does not (and cannot) allege a statutory right to enrollment so cannot state a reputational liberty interest claim.

---

[7] Ultimately, the *GMU* court dismissed the due process claim on qualified immunity grounds because "a state college or university officer might reasonably conclude that the public employment cases do not control in the college or university setting." *Id*. at 726.

### C.      Defendants Satisfied The Requirements Of Due Process.

In the case of an academic-based dismissal like Plaintiff's, a due process claim cannot withstand at 12(b)(6) motion to dismiss unless the allegations show that the dismissal was "arbitrary and capricious" and "did not involve the exercise of professional judgment." *Betts v. Rector & Visitors of the Univ. of Va.*, No. 97-1850, 1999 U.S. App. LEXIS 23105 (4th Cir. Sept. 22, 1999) (internal quotation marks omitted). In his opposition, Plaintiff argues that his suspension was an ordinary misconduct decision for which he was owed "the opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976). Ignoring virtually all of the case law cited in Defendants' memorandum as well as the exhibits to his own Complaint, Plaintiff states that the School's decision "does not 'require[ ] an expert evaluation of cumulative information' and is—unlike a grading decision—'readily adapted to the procedural tools of judicial or administrative decision making.'" (Dkt. no. 115 at 17 (quoting *Bd. of Curators of Univ. of Mo. v. Horowitz*, 435 U.S. 78, 90 (1978)).)

Plaintiff's argument is wrong and is contradicted by courts in this and other federal circuits, which have unanimously held that in the context of a procedural due process challenge, student dismissals based on a lack of professional qualifications are entrusted to the discretion of academic institutions.[8] Fundamentally, the School's decision to suspend Plaintiff was based on a

---

[8] *See, e.g.*, *Horowitz*, 435 U.S. at 90 (holding that medical school's dismissal of resident based on lack of "necessary clinical ability" required minimal process); *Halpern v. Wake Forest Univ. Health Sciences*, 669 F.3d 454, 463 (4th Cir. 2012) ("In the context of due-process challenges . . . a court should defer to a school's professional judgment regarding a student's academic or professional qualifications"); *Al-Dabagh v. Case W. Reserve Univ.*, 777 F.3d 355, 358–59 (6th Cir. 2015) (deferring to decision to dismiss medical student for lack of professionalism); *Fenje v. Feld*, 398 F.3d 620, 625 (7th Cir. 2005) (deferring to decision to dismiss medical resident for lack of candor because it was an "academic judgment"); *Ku v. Tennessee*, 322 F.3d 431 (6th Cir. 2003) (deferring to decision to place medical student on mandatory leave of absence due to "inability to interact with others in a basic professional manner"); *Shaboon v. Duncan*, 252 F.3d 722, 731 (5th Cir. 2001) (deferring to decision to

determination that Plaintiff lacked the requisite professional qualifications to remain in the medical program. To make that determination, eleven physicians and one medical studentsevaluated Plaintiff's attitudes and behaviors against the School of Medicine's standards of professionalism, which all medical students are required to meet in order to graduate. (Dkt. no. 33, Exs. 9, 49.) Considerations included Plaintiff's competency to perform on wards, (*id*. Ex. 13,) which is when medical students tend to actual patients under the close supervision of licensed physicians, as well as Plaintiff's competency to interact successfully with patients, (*id*. Ex. 48). Contrary to Plaintiff's argument, the School's decision was directly analogous to a grading decision because evaluating a student's qualifications for patient care requires expert knowledge in the medical field. *See, e.g.*, *Halpern v. Wake Forest Univ. Health Sciences*, 669 F.3d 454, 460, 462-63 (4th Cir. 2012) (holding that medical school's decision to dismiss student for rudeness to staff required the exercise of professional judgment that courts should not second guess). This was precisely the type of medicine-specific decision that courts should not question absent a showing of arbitrary and capricious judgment.).[9]

---

dismiss medical resident based on "intransigence" and "refusal to acknowledge and deal with her problem"); *see also Noffsinger v. Va. Commonwealth Univ.*, No. 3:12cv236, 2012 U.S. Dist. LEXIS 97857, at * 7 (E.D. Va. Jul. 13, 2012), *aff'd*, 2013 U.S. App. LEXIS 6579 (4th Cir. Va., Apr. 2, 2013) (dismissal from graduate physical therapy program for lack of professionalism and clinical qualifications required minimal process) *Herron v. Va. Commonwealth Univ.*, 366 F. Supp. 2d 355 (E.D. Va. 2004), *aff'd on other grounds,* 116 Fed. App'x. 467 (4th Cir. 2004) (dismissal of nursing student for "combativeness" and inability to accept criticism as well as failure to perform clinical tasks required minimal constitutional process).

[9] In addition, the facts here are distinguishable from the lone case that Plaintiff cites in an attempt to rebut Defendants' supporting case law. (*See* Opp. Br. at 17.) In *Byrnes v. Johnson Cty. Cmty. Coll.*, No. 10-2690, 2011 U.S. Dist. LEXIS 5105, at *9 (D. Kan. Jan. 19, 2011), the District of Kansas held that a nursing program's dismissal of several students for unprofessional Facebook activity was not academic because the decision was based on an *ad hoc* "sense of propriety" rather than established curricular standards of professionalism. Thus, the college owed the nursing students the full panoply of due process rights set forth under *Mathews*. Unlike the facts in *Byrnes*, however, exhibits to Plaintiff's Complaint show that Plaintiff was suspended because of his failure to satisfy legitimate standards of professionalism that are a core part of the

### D.     The School's Internal Policies And Procedures Are Irrelevant.

In his opposition, Plaintiff argues that the School's alleged failure to adhere to its internal policy and procedure deprived Plaintiff of due process. (Dkt. no. 115 at 16.) Plaintiff is wrong. In *Riccio v. County of Fairfax*, 907 F.2d 1459, 1469 (4th Cir. 1990), the Fourth Circuit held that a state's own rules governing the deprivation of a protectable interest do not necessarily reflect the level of constitutional process due. *Id*. (holding that if state law grants more procedural rights than the Constitution requires, a state's failure to abide by that law is not a federal due process issue); *see Wall v. Stevens*, No. 7:16-cv-373, 2018 U.S. Dist. LEXIS 14375, at *9 (W.D. Va. Jan. 30, 2018) (Kiser, SJ.) (holding that  prison officials' failure to  follow their own polices or procedures did not state a due process clam) (citing *Riccio*, 907 F.2d at 1469). If they did, courts would be forced "to defer to states on the ultimate issue of whether there has been a violation of the Constitution. Such a result would be untenable[.]" *Riccio*, 907 F.2d at 1469.

Because a state's procedural rules cannot trump or change what the Constitution requires, it is immaterial whether the School of Medicine followed the letter of its policy and procedure in suspending Plaintiff. Under *Riccio*, the relevant inquiry is only whether the School provided the *constitutional* process that was due. On the face of the Complaint and the attached exhibits, it is plain that the School discharged its constitutional duty by carefully exercising its subjective judgment in assessing Plaintiff's pattern of behavior against standards of professionalism.

### E.     Drs. Rasmussen, Peterson, And Kern Are Entitled To Qualified Immunity.

In their opening memorandum, Defendants argue that Drs. Rasmussen, Peterson, and Kern are entitled to qualified immunity because a reasonable university administrator acting

---

School's medical program. Thus, this Court should not find *Byrnes* persuasive and should instead look to the case law that Defendants cite herein and in their opening memorandum.

under circumstances similar to those here would not know a) that Plaintiff had a protected liberty or property interest in enrollment, or b) that Plaintiff was entitled to additional process.

In his opposition, Plaintiff cites no case where a university administrator acting under circumstances similar to the instant case violated due process.  Instead, Plaintiff cites *Goodreau v. Rector & Visitors of the Univ. of Va.*, 116 F.Supp.2d 694, 701 (W.D.Va. 2000), which is distinguishable from the facts here. In *Goodreau*, this Court denied qualified immunity based on facts alleging that the University of Virginia revoked the plaintiff's undergraduate degree without offering a notice or hearing after learning that the plaintiff had embezzled school funds while he was a student. The allegations in *Goodreau* established a clear case of non-academic "[m]isconduct subject to disciplinary action[,]" which "can be distinguished from failure to attain the required standard in a program of study." *Horowitz*, 435 U.S. at 88; *see Cobb v. Rectors & Visitors of Univ. of Virginia*, 84 F.Supp.2d 740, 750 (W.D.Va. 2000) (Moon, J.) (holding that cheating is a disciplinary matter requiring notice and an opportunity to be heard). The facts of *Goodreau* do not apply to the facts of this case, which involve the violation of professional standards that lie at the heart of the School of Medicine's curriculum.

**III.    PLAINTIFF FAILS TO STATE A CLAIM UNDER 42 U.S.C. § 1985(3) OR VIRGINIA CODE §§ 18.2-499 AND -500.**

Plaintiff also cannot save his state and federal conspiracy claims. Plaintiff has not alleged an actual agreement between the parties so he has not stated a plausible conspiracy. Plaintiff also cannot overcome the intracorporate conspiracy bar because Defendants' actions were in line with their job responsibilities. Plaintiff cannot state a claim for a business conspiracy because he has no profession or business to speak of. And finally, the class-based animus required to state a § 1985(3) claim does not include animus against those who doubt the theory of microaggression.

### A.        Plaintiff Has Not Alleged A Conspiracy.

In their opening memorandum, Defendants argue that the Complaint fails to state a claim against Drs. Kern, Rasmussen, or Peterson under either 42 U.S.C. § 1985(3) (civil rights conspiracy) or § 18.2-499 of the Virginia Code (business conspiracy) because Plaintiff does not allege a plausible conspiracy. To survive a Rule 12(b)(6) motion to dismiss, Plaintiff must allege a combination of two or more persons to cause harm to his business or profession under § 18.2-499, *Warner v. Buck Creek Nursery, Inc.*, 149 F. 246, 266 (W.D. Va. 2001), or to deprive him of equal protection of the law under § 1985(3), *Buschi v. Kirven*, 775 F.2d 1240, 1258 (4th Cir. 1985). In his opposition, Plaintiff argues that the Complaint is replete with evidence of conspiracy but points only to conclusory and vague language that is insufficient to state a claim.

The Fourth Circuit has held that "where a conspiracy is alleged, the plaintiff must plead facts amounting to more than parallel conduct and a bare assertion of conspiracy. The factual allegations must plausibly suggest agreement, rather than being merely consistent with agreement." *A Soc'y Without a Name, for People without a Home, Millennium Future-Present v. Virginia*, 655 F.3d 342, 346 (4th Cir. 2011) (citation, internal quotation marks, an punctuation omitted). In *ASWAN*, the plaintiff alleged a § 1985(3) conspiracy to remove the homeless from downtown Richmond, alleging that the defendants "entered into a conspiracy" and that "they had a meeting of the minds that they would act in concert" to remove the homeless from the public eye. *Id.* at 347. Granting the defendants' Rule 12(b)(6) motion, the Fourth Circuit held that the claim was "unsupported by concrete facts" such as "the specific communications amongst the conspirators" demonstrating an actual meeting of the minds. *Id.*

Like the allegations in *ASWAN*, Plaintiff's conspiracy allegations are almost entirely conclusory. For example, Plaintiff states that "the Individual Co-Conspirators collaborated with

one another" but provides *no* details about their collaboration. (Dkt. no. 33 ¶ 61.) Plaintiff also alleges that Drs. Kern, Peterson, and Rasmussen engaged in "email and text message traffic" and "inappropriate and unprofessional communications" but offers *no* details about the specific contents of their communications. (*Id*. ¶ 62.) Similarly, Plaintiff states that Dr. Peterson "abus[ed] [ASAC's] disciplinary powers for personal reasons" but offers *no* specifics about the nature of the abuse. (*Id*. ¶¶ 61.) As in *ASWAN*, these allegations lack the requisite specificity to state a plausible conspiracy between these faculty Defendants. *Cf. Sines v. Kessler*, 324 F. Supp. 3d 765, 785-94 (W.D. Va. 2018) (Moon, SJ.) (holding that plaintiffs satisfied the conspiracy element of a § 1985(3) claim by describing co-defendants' statements about coordinating activity, weapons, and transportation, as well as their mutual intention to commit violence).

At best, Plaintiff alleges parallel conduct or conduct that might be consistent with a conspiracy. For example, Plaintiff alleges that Drs. Kern, Rasmussen, and Peterson each attended the October 24 panel discussion and responded to Plaintiff's comments in independent ways. Dr. Rasmussen was a panelist who engaged with Plaintiff during the discussion, (dkt. no. 33 ¶¶ 54, 58); Dr. Kern was a panelist issued a professionalism concern card after the discussion, (*id*. ¶¶ 54, 66); and Dr. Peterson, who is one of the School deans, arranged a meeting with Plaintiff to help him understand a social issue in medicine that appeared to trouble him, (*id*. ¶¶ 62, 73). Plaintiff also alleges that Drs. Kern and Peterson attended the November 14 ASAC meeting, (*id*. ¶¶ 63, 79, 84,) and that Dr. Kern and eleven of her peers voted to send Plaintiff a written admonition about respectful communication, (*id*. ¶ 88). Dr. Peterson also attended the November 28 ASAC meeting that resulted in Plaintiff's suspension, but had no control over the outcome of either meeting because she is not one of the twelve voting members of the ASAC. (*Id*. ¶ 114.)

These allegations not only fail to show any agreement, but also fail to show that any of these Defendants had a hand in Plaintiff's suspension.

In short, and drawing all reasonable factual inferences in Plaintiff's favor, the Complaint fails to establish anything more than "a sheer possibility" of a conspiracy or any resulting harm.

### B.     The Intracorporate Conspiracy Doctrine Bars Both Claims.

In their opening memorandum Defendants argued that the intracorporate conspiracy doctrine bars the conspiracy claims because Drs. Kern, Rasmussen, and Peterson are all employees of the University of Virginia and were acting within the scope of their employment. In his opposition, Plaintiff argues that the doctrine does not apply because he alleges a conspiracy "with third parties" and that Drs. Kern, Peterson, and Rasmussen "had an independent personal stake in the conspiracy." (Dkt. no. 115 at 22-23.) These assertions are conclusory and fail to overcome this defense.

For one, the Complaint never identifies anything about the alleged "third parties" or how they were involved in the alleged conspiracy against Plaintiff. Second, the Complaint contains no facts to plausibly suggest that Drs. Kern, Peterson, or Rasmussen were driven to act by their loyalty to the AMWA or to their personal ideologies. (*See generally* dkt. no. 33.) On the face of the Complaint, participating in a School panel discussion, observing and noting acts of unprofessionalism, and participating in administrative committee functions are all well-within the role of a faculty member. *See Langadinos v. Appalachian Sch. of Law*, No. 1:05cv39, 2005 U.S. Dist. LEXIS 20958, at *36-*37 (W.D. Va. Sept. 25, 2005) (Jones, J.) (holding that the intracorporate conspiracy doctrine barred a § 1985 claim despite allegations of discriminatory motives because the defendants' alleged activity was still within their scope of employment).

### C.      Plaintiff Has Not Alleged Harm To His Profession Under § 18.2-499.

In their opening memorandum, Defendants argue that Plaintiff has not stated a business conspiracy claim under § 18.2-499 and -500 for the additional reason that Plaintiff has not alleged harm to a business or profession. In his opposition, Plaintiff merely restates that he has suffered injury to his medical profession and cites *Rohrbaugh v. Kreidler*, 71 Va. Cir. 298 (Arlington Cty. Cir. Ct. 2006), which is distinguishable from this case. (Dkt. no. 115 at 25.) In *Rohrbaugh*, the circuit court upheld a business conspiracy claim in part because the plaintiff alleged harm to his profession when he was fired from his job as an engineer. *Id*. at 303. By contrast, Plaintiff has no professional credentials in the medical field because he has not yet completed his medical education.  Plaintiff cannot suffer injury to a profession that he has never even had. *See Warner v. Buck Creek Nursery, Inc.*, 149 F. Supp. 2d 246, 267 (W.D. Va. 2001) (Moon, SJ.) (holding that the plaintiff could not state a clam for a business conspiracy based on harm to his "ability in the future to start his own business").

### D.      Plaintiff Has Not Alleged A Discriminatory Animus Under 42 U.S.C. § 1985(3).

In their opening memorandum, Defendants argue that Plaintiff has not satisfied the second element of a § 1985(3) claim, which is "a specific class-based, invidiously discriminatory animus." *Buschi v. Kirven*, 775 F.2d 1240, 1258 (4th Cir. 1985). In his opposition, Plaintiff argues that § 1985(3) extends to conspiracies aimed at political views, including Plaintiff's views on the theory of microaggression. (Dkt. no. 115 at 31.) In support of his argument, Plaintiff cites *United Bhd. of Carpenters & Joiners, Local 610 v. Scott*, 463 U.S. 825 (1983) and *Buschi v. Kirven*, but neither case recognizes political views as a protected class under § 1985.

In *Carpenters*, the Supreme Court emphasized that § 1985 was enacted "to combat the prevalent animus against Negroes and their supporters." 463 U.S. at 836. In determining that the

statute does not extend to discrimination against economic views, the Court stated that it was "a close question" whether the statute extended to "political views" such as being a Democrat or a Catholic. *Id*. at 837. In *Buschi*, the Fourth Circuit reiterated that the scope of § 1985 was a close question, 775 F.2d at 1257, but held that the statute did not extend to the class of "whistleblowers," *id*. at 1258. In its reasoning, the Fourth Circuit stated that whistleblowers do not possess "characteristics comparable to those characterizing classes such as race, national origin, and sex." *Id*. In addition, whistleblowers are not in "unprotected circumstances similar to those of the victims of Klan violence" because they can "seek protection from a discharge in retaliation for his exercise of his rights of free speech." *Id*. at 1257-58. (citation omitted).

So too here. The views at issue here relate to Plaintiff's skepticism about microaggression theory. This is not at all similar to immutable traits like race, national origin, or sex, which § 1985 protects. And, like the whistleblower plaintiff in *Buschi*, Plaintiff is not in "unprotected circumstances" like a vulnerable class would be because he has a remedy under the First Amendment. In short, Plaintiff has not alleged the type of vulnerable, marginalized class that § 1985 was intended to protect and thus cannot satisfy the second element of this claim. To hold otherwise would be inconsistent with the history and purpose of that statute.

## **CONCLUSION**

Defendants respectfully ask this Court to dismiss the Complaint in its entirety and with prejudice under Federal Rule 12(b)(6).

Respectfully submitted,

/s/ Madeline M. Gibson

MARK R. HERRING
Attorney General of Virginia

SAMUEL T. TOWELL
Deputy Attorney General

MARSHALL H. ROSS
Senior Assistant Attorney General

Madeline M. Gibson (VSB No. 87561)
Assistant Attorney General
Office of the Virginia Attorney General
202 North 9th Street
Richmond, Virginia 23219
Telephone:  (804) 692-0551
Facsimile:   (804) 371-2087
Email: mgibson@oag.state.va.us

Counsel for Defendants

## CERTIFICATE OF SERVICE

I hereby certify that on this 14th day of April, 2020, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, and that the CM/ECF system will deliver a notice of electronic filing to all counsel of record.

_/s/ Madeline M. Gibson_____
Madeline M. Gibson (VSB No. 87561)
Assistant Attorney General
Office of the Virginia Attorney General
202 North 9th Street
Richmond, Virginia 23219
Telephone:  (804) 692-0551
Facsimile:   (804) 371-2087
Email: mgibson@oag.state.va.us

_Counsel for Defendants_