# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF VIRGINIA
### CHARLOTTESVILLE DIVISION

| | |
|---|---|
| KIERAN RAVI BHATTACHARYA,<br><br>*Plaintiff,*<br><br>v.<br><br>JAMES B. MURRAY, JR., *et al.*,<br><br>*Defendants.* | CASE NO. 3:19-cv-00054<br><br>MEMORANDUM OPINION<br><br>JUDGE NORMAN K. MOON |

Plaintiff Kieran Ravi Bhattacharya filed an amended four-count complaint against various individuals at the University of Virginia in relation to his suspension and dismissal from the University of Virginia School of Medicine.

Bhattacharya seeks injunctive relief and damages pursuant to 42 U.S.C. § 1983 for retaliation in violation of his First Amendment right of free speech (Count I) and for deprivation of his Fourteenth Amendment right of due process (Count II) from various individuals at the University of Virginia and its medical school.[1] Bhattacharya also seeks damages for conspiracy to interfere with civil rights in violation of 42 U.S.C. § 1985(3) (Count III) and conspiracy to injure

---

[1] The following defendants are sued in their official capacities only: Rector, Vice Rector, and Members of the Board of Visitors of the University of Virginia ("Board of Visitors Defendants"); Timothy Longo, Sr., Interim Chief of Police, and Melissa Fielding, Deputy Chief of Police of the University of Virginia ("UVA Defendants"); John J. Densmore, M.D., Ph.D., Associate Dean for Admissions and Student Affairs, and Jim B. Tucker, M.D., Chair of the Academic Standards and Achievement Committee of the University of Virginia School of Medicine ("UVA Medical School Defendants"). The following defendants are sued in both their official and individual capacities: Christine Peterson, M.D., Assistant Dean for Medical Education, Nora Kern, M.D., Assistant Professor of Urology, and Sara K. Rasmussen, M.D., Ph.D., Assistant Professor ("Individual Defendants").

him in his trade, business, and profession under Virginia Code § 18.2-499 (Count IV) from the Individual Defendants in their official and individual capacities.

Defendants[2] filed a motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). Dkt. 112. The Court will grant Defendants' motion to dismiss Counts II, III, and IV, but will deny Defendants' motion to dismiss Count I.

## I.     ALLEGED FACTUAL BACKGROUND

For the purposes of ruling on Defendants' motion to dismiss, the Court accepts as true the following allegations set forth in the amended complaint and attached exhibits.

### A. The October 25 Microaggression Panel Discussion

On October 25, 2018, Bhattacharya—then a second-year medical student at the University of Virginia School of Medicine ("UVA Medical School")—attended a panel discussion on "microaggressions." Dkt. 33 ¶ 3. During the event, UVA Professor Beverly Colwell Adams, Ph.D., gave a roughly seventeen-minute presentation about her research on microaggressions, and Bhattacharya asked Adams some questions. *Id.* The exchange began:

| | |
|---|---|
| Bhattacharya: | Hello. Thank you for your presentation. I had a few questions just to clarify your definition of microaggressions. Is it a requirement, to be a victim of microaggression, that you are a member of a marginalized group? |
| Adams: | Very good question. And no. And no— |
| Bhattacharya: | But in the definition, it just said you have to be a member of a marginalized group—in the definition you just provided in the last slide. So that's contradictory. |
| Adams: | What I had there is kind of the generalized definition. In fact, I extend it beyond that. As you see, I extend it to any marginalized group, and sometimes it's not a marginalized group. There are examples that you would think maybe not fit, such as body size, |

---

[2] Defendants are all represented by the Attorney General of Virginia and have filed a joint motion to dismiss.

|  | height, [or] weight. And if that is how you would like to see me expand it, yes, indeed, that's how I do. |
|---|---|
| Bhattacharya: | Yeah, follow-up question. Exactly how do you define marginalized and who is a marginalized group? Where does that go? I mean, it seems extremely nonspecific. |
| Adams: | And—that's intentional. That's intentional to make it more nonspecific . . . . |

Dkt. 33-2 (audio recording of panel discussion).

After the initial exchange, Bhattacharya challenged Adams's definition of microaggression. He argued against the notion that "the person who is receiving the microaggressions somehow knows the intention of the person who made it," and he expressed concern that "a microaggression is entirely dependent on how the person who's receiving it is reacting." *Id.* He continued his critique of Adams's work, saying, "The evidence that you provided—and you said you've studied this for years—which is just one anecdotal case—I mean do you have, did you study anything else about microaggressions that you know in the last few years?" *Id.* After Adams responded to Bhattacharya's third question, he asked an additional series of questions: "So, again, what is the basis for which you're going to tell someone that they've committed a microaggression? . . . Where are you getting this basis from? How are you studying this, and collecting evidence on this, and making presentations on it?" *Id.*; *see also* Dkt. 33 ¶ 56.

At that point, Assistant Professor Sara Rasmussen, a fellow panelist who helped organize the event, responded, "OK, I'll take that. And I think that we should make sure to open up the floor to lots of people for questions." Dkts. 33-2; 33 ¶ 4. Bhattacharya agreed, "Of course, yeah." Dkt. 33-2. Rasmussen then told a story about how her former peers and colleagues had subjected her to "harmless jokes" and microaggressions related to stereotypes about those who come from rural states, as she did. *Id.* She concluded:

> You have to learn to uncouple the intent of what you're saying and the impact it has on the audience. And you have to have a responsibility for the impact of your actions. And if you make a statement that someone considers insensitive, the first thing you can say is, "Oh my gosh, that was not my intent." But don't get frustrated with that person for bringing it to your attention.

*Id.*; *see also* Dkt. 33 ¶ 58. Bhattacharya responded to Rasmussen, saying:

> Bhattacharya:   I have to respond to that because I never talked about getting frustrated at a person for making a statement. I never condoned any statements that you are making like that. But what I am saying is that what you're providing is anecdotal evidence. That's what you provided. That's what she provided—
>
> Rasmussen:   No, I think she's provided a lot of citations in the literature. And I'm sorry—I was just reading your body language.

Dkt. 33-2; *see also* Dkt. 33 ¶¶ 59–60. Bhattacharya then began to speak over Rasmussen, who called on someone else to ask a question. Dkts. 33-2; 33 ¶ 60. Bhattacharya's dialogue with Adams and Rasmussen lasted approximately five minutes and fifteen seconds. Dkt. 33-2.

## B.  Kern's October 25 Professionalism Concern Card

Assistant Professor of Urology Nora Kern, who helped organize the panel and attended it, filed a Professionalism Concern Card ("Card") against Bhattacharya on the same day as the event. Dkt. 33-13; *see also* Dkt. 33 ¶ 66.[3] Kern's Card identified "Respect for Others" and "Respect for Differences" as areas of concern. Dkt. 33-13; *see also* Dkt. 33 ¶ 67. The comments section reads:

> For [an] AMWA session, we held a panel on micro aggression. Myself and 2 other faculty members were invited guests. This student asked a series of questions that were quite antagonistic toward the panel. He pressed on and stated one faculty member was being contradictory. His level of frustration/anger seemed to escalate until another faculty member defused the situation by calling on another student for questions. I am shocked that a med student would show so little respect toward faculty members. It worries me how he will do on wards.

---

[3] Professionalism Concern Cards are records of students' violations of UVA Medical School's professionalism standards. Dkt. 33 ¶ 44. *See* Dkt. 33-9 at 2.

4

Dkt. 33-13; *see also* Dkt. 33 ¶ 67. The Card noted that Kern had not discussed her concerns with Bhattacharya, but it also noted that she did not feel uncomfortable discussing her concerns with him. Dkt. 33-13; Dkt. 33 ¶ 69. Kern told Rasmussen and Peterson about the Card she filed, but Kern did not directly notify Bhattacharya. Dkt. 33 ¶ 69. Bhattacharya did not receive a copy of the Card until December 20, 2018, after his suspension. *Id.*

## C.  Peterson's October 25 Email and October 31 Meeting

Hours after the panel, Christine Peterson, Assistant Dean for Medical Education, sent Bhattacharya an email with the subject "The panel today." Dkt. 33-12. The email read:

> Kieran,
> I was at the noontime "Microaggressions" panel today and observed your discomfort with the speaker's perspective on the topic.
> Would you like to come share your thoughts with me? I think I can provide some perspective that will reassure you about what you are and are not responsible for in interactions that could be uncomfortable even when that's not intended. If you'd prefer to talk with your own college dean, that's fine too. I simply want to help you understand and be able to cope with unintended consequences of conversations.
> Dr. Peterson

*Id.*; *see also* Dkt. 33 ¶ 63. Kieran responded a couple of hours later:

> Dr. Peterson,
> Your observed discomfort of me from wherever you sat was not at all how I felt. I was quite happy that the panel gave me so much time to engage with them about the semantics regarding the comparison of microaggressions and barbs. I have no problems with anyone on the panel; I simply wanted to give them some basic challenges regarding the topic. And I understand that there is a wide range of acceptable interpretations on this. I would be happy to meet with you at your convenience to discuss this further.
> Sincerely,
> Kieran Bhattacharya

Dkt. 33-12; *see also* Dkt. 33 ¶ 65. That evening, Peterson replied: "I understand. I don't know you at all so I may have misinterpreted your challenges to the speaker." Dkt. 33-12; *see also* Dkt. 33 ¶ 65. The two agreed to meet on October 31. Dkt. 33-12; *see also* Dkt. 33 ¶ 65.

During Bhattacharya and Peterson's one-hour meeting, Peterson "barely mentioned" Bhattacharya's questions and comments at the panel discussion. Dkt. 33 ¶ 73. Instead, Peterson attempted to determine Bhattacharya's "views on various social and political issues—including sexual assault, affirmative action, and the election of President Trump." *Id.*

### D.  The November 1 Meeting with Densmore

On October 26, the day after the panel discussion, Densmore—Associate Dean for Admissions and Student Affairs, and Bhattacharya's assigned academic dean—emailed Bhattacharya. *Id.* ¶ 71. Densmore's email read:

> Hi Kieran,
> I just wanted to check in and see how you were doing. I hope the semester is going well. I'd like to meet next week if you have some time.
> JJD

*Id.*; *see also* Dkt. 33-14. Bhattacharya agreed to meet with Densmore on November 1. Dkt. 33 ¶ 72. During their ten-minute meeting, Densmore did not inform Bhattacharya about Kern's Card, nor did he mention Bhattacharya's questions and comments at the panel discussion. *Id.* ¶¶ 74–75. When Bhattacharya mentioned his meeting with Peterson, Densmore informed Bhattacharya that he was aware of that meeting. At no point during the meeting did Densmore convey any concerns related to his meeting with Peterson or to Bhattacharya's behavior during the panel. *Id.*

### E.  The November 14 Academic Standards and Achievement Committee ("ASAC") Meeting and Tucker's November 15 Letter

At an ASAC meeting on November 14, the committee considered Kern's Card against Bhattacharya. *Id.* ¶ 77. UVA Medical School's Policy on Academic and Professional Advancement vests the ASAC with the power to act on behalf of the School of Medicine's faculty with respect to "patterns of unprofessional behavior and egregious violations of professionalism." Dkt. 33-9 at 2. The policy includes the following provision:

6

> If a student receives three or more written observations of concern . . . , or is cited for a single egregious breach of professionalism, notice will be sent to ASAC for review. A student identified as having a pattern of unprofessional behavior may be directed to further counseling and/or to supportive remediation and/or placed on *academic warning* or *academic probation* . . . , or if the professional violations are severe, a student may be dismissed from school even if they have passing grades in all courses. . . . . Egregious behaviors, such as but limited to assault on or threat to a patient, patient's family member, student, GME trainee or faculty member, conduct that may constitute a felony, etc., regardless of whether criminal prosecutions are initiated or pursued, will be referred immediately to ASAC, irrespective of whether previous observations of concern exist, with the recommendation for dismissal from school.

*Id.* at 3 (emphasis in original).

Kern, a voting ASAC member, attended and voted at the meeting. Dkt. 33 ¶ 79. She was the only voting member at the meeting who witnessed the events at the microaggression panel. *Id.* ¶ 95. Peterson also attended the meeting as a guest. *Id.* ¶ 84. The meeting minutes memorialized the text of the Card that Kern submitted. Dkts. 33-35; 33 ¶¶ 86–87. Under "Professionalism Issues," the meeting minutes state: "The committee voted unanimously to send Kieran Bhattacharya (Densmore) a letter reminding him of the importance in medicine to show respect to all: colleagues, other staff, and patients and their families." Dkt. 33 ¶¶ 77, 88; *see also* Dkt. 33-15. At the time, Bhattacharya remained unaware that Kern had issued a Card against him. Dkt. 33 ¶ 90.

The ASAC's letter, in its entirety, dated and emailed to Bhattacharya on November 15, reads as follows:

> Dear Mr. Bhattacharya:
>       The Academic Standards and Achievement Committee has received notice of a concern about your behavior at a recent AMWA panel. It was thought to be unnecessarily antagonistic and disrespectful. Certainly, people may have different opinions on various issues, but they need to express them in appropriate ways.
>       It is always important in medicine to show mutual respect to all: colleagues, other staff, and patients and their families. We would suggest that you consider getting counseling in order to work on your skills of being able to express yourself appropriately.

7

Sincerely,
Jim B. Tucker, M.D.
Chair, Academic Standards and Achievement Committee

*Id.* ¶ 91; Dkt. 33-36.

### F.  The November 28 ASAC Suspension Hearing

Eleven days later, on the afternoon of November 26, Densmore sent Bhattacharya an email stating, "We were notified by the Dean of Students Office that you were heading back to Charlottesville. You will need to be seen by CAPS [Counseling and Psychological Services] before you can return to classes." *Id.* ¶ 96–97; *see also* Dkt. 33-37.

On the morning of November 27, Bhattacharya responded in an email questioning UVA Medical School's ability to "mandate psychiatric evaluations" before allowing him to continue his education. Dkt. 33 ¶ 98; Dkt. 33-37.

The same day, R. J. Canterbury, Senior Associate Dean for Education at UVA Medical School, emailed Bhattacharya telling him that he was not permitted to return to class until he had "been evaluated by CAPS at the Student Health Service." Dkt. 33 ¶ 99; Dkt. 33-40.

On the afternoon of November 28, UVA Medical School Registrar Katherine Yates emailed Bhattacharya notifying him that "The Academic Standards and Achievement Committee will be meeting today to discuss your current enrollment status. You are invited to attend to share your insights with the committee." Dkt. 33 ¶ 101; Dkt. 33-42. Within ten minutes, Bhattacharya responded:

> []Who exactly will be present? Do you normally just give students 3 hours to prepare after indirectly threatening to kick them from medical school? Why exactly is my enrollment status up for discussion?

Dkt. 33 ¶ 102; Dkt. 33-43. Bhattacharya asked whether he could have legal representation at the meeting, but he did not have time to obtain legal advice or counsel before the meeting. Dkt. 33

¶¶ 102, 108. Yates responded to Bhattacharya's email with hyperlinks to the ASAC's policies. *Id.* ¶ 103; Dkt. 33-44. Section III.D of the ASAC Operating Procedures requires the Committee to notify a student "in writing as to what the major concerns of the Committee are likely to be during the coming meeting." Dkt. 33 ¶ 104; Dkt. 33-45 at 4. Bhattacharya did not obtain "any written statement of the allegations against him" before the hearing. Dkt. 33 ¶¶ 105, 107.

Bhattacharya attended the hearing that evening. Dkt. 33 ¶ 110. He photographed the attendees, Dkt. 33-47, and recorded audio of the hearing, Dkt. 33-48. Dkt. 33 ¶ 110. Tucker and Kern both attended the hearing. *Id.* ¶ 112; Dkt. 33-49.

Bhattacharya first asked Tucker to explain why the ASAC was meeting to discuss his enrollment status. Tucker referred to the November 15 letter, which "was talking about some interactions [Bhattacharya] had at a forum on microaggression." Dkt. 33-48. Bhattacharya repeatedly denied receiving the letter.[4] *Id.*

Tucker explained that the ASAC was "concerned with the interactions [Bhattacharya] had since [the microaggression panel discussion]." *Id.* Tucker repeated, "What we're concerned about is some of the behaviors you've shown since then. . . . There's concern about your interactions and behaviors most recently." *Id.* When Bhattacharya pressed Tucker to identify what interactions were concerning and who found them concerning, Tucker mentioned "interactions" with Densmore as well as "students" and "other administrators." *Id.* Tucker elaborated that he "suspect[ed] [Bhattacharya's behavior in those interactions] was similar to what [Bhattacharya was] showing" at the hearing. *Id.*

---

[4] Bhattacharya admits that he had in fact received the letter. *See* Dkts. 33 ¶ 91; 33-36.

Tucker then noted that "Dr. Canterbury recommended that [Bhattacharya] go to CAPS before returning to class and [Bhattacharya had] been resisting that." *Id.* Bhattacharya objected to Tucker's use of the word "recommend," saying it was "a very key mistake." *Id.* He read the subject line of Canterbury's email: "required process to attend class." *Id.* Bhattacharya also told the ASAC that "it's not about whether or not [he wanted] to go to CAPS, it's about being told to go to CAPS. It's about being required to receive a . . . psychiatric evaluation to attend school, a public university." *Id.*

After several minutes, another voting ASAC member, Dr. Bart Nathan, said that the ASAC was holding the hearing because of concerns "about [Bhattacharya's] professionalism and [his] professional behavior in medical school." *Id.* Nathan mentioned "[Bhattacharya's] behavior at a panel meeting and other subsequent behaviors, including the behavior [Bhattacharya was] exhibiting right" then. *Id.* Nathan described Bhattacharya as "extremely defensive" and noted that Bhattacharya's "recording" of the hearing "[was] unusual behavior" not "typical" of "a medical student." *Id.* Nathan said that the ASAC was "requiring [Bhattacharya] to change" his "aggressive, threatening behavior." *Id.* Bhattacharya retorted that Nathan was "just projecting." *Id.* Nathan replied, "Any patient that walked into the room with [Bhattacharya] would be scared." *Id.* Nathan characterized that as "the professionalism issue that [the ASAC was] having." *Id.* Bhattacharya insisted that "[he had] been near patients as part of the training here, and [he had] never received any complaints from any patients about that." *Id.*

Toward the end of the hearing, Tucker told Bhattacharya that "[t]he concern [was] how [Bhattacharya had] been coming across to people in the last few weeks." *Id.* Bhattacharya said that "[he] just wish[ed] [the ASAC members] would provide a specific example of what exactly [he

had] said and done." Another doctor stated that the "entire episode . . . [was] a very good example of inappropriate behavior and aggressive behavior." *Id.*

Under the heading "Professionalism Issues," the minutes of the hearing state that "[t]he committee convened to discuss concerning behaviors exhibited by Kieran Bhattacharya (Densmore) over the past weeks after members of the Technical Standards Committee determined that the concerns were best addressed by the ASAC." Dkt. 33 ¶ 115; Dkt. 33-49. After noting that Bhattacharya attended and participated in the hearing when "given the opportunity to address concerns about his behavior," the minutes note that "[t]he Committee reviewed the list of technical standards that are acknowledged annually by the students[,] especially the Emotional, Attitudinal and Behavioral Skills." Dkt. 33 ¶ 115; Dkt. 33-49. The minutes then state:

> Because the student's behavior demonstrated his inability to meet several of those standards, Dr. Nathan made a motion to suspend Kieran Bhattacharya (Densmore) from the School of Medicine, effective immediately, with the option to petition to return in August of 2019. . . . The committee voted unanimously to accept the motion. Nora Kern did not vote on the matter, as personal business required her to leave before the vote was executed.

Dkt. 33 ¶ 115; Dkt. 33-49.

## G.  The November 29 Suspension Letter

The day after the hearing, Tucker sent Bhattacharya an email with a letter attached. The letter, in relevant part, reads:

> The Academic Standards and Achievement Committee ("ASAC") convened on November 28, 2018 to review concerns that your recent behavior in various settings demonstrated a failure to comply with the School of Medicine's Technical Standards. . . . The ASAC decided that the nature of the concerns necessitated the calling of an emergency meeting. . . .
>
> The Academic Standards and Achievement Committee has determined that your aggressive and inappropriate interactions in multiple situations, including in public settings, during a speaker's lecture, with your Dean, and during the committee meeting yesterday, constitute a violation of the School of Medicine's Technical Standards that are found at: https://med.virginia.edu/student-affairs/policies/technical-standards/

Those Standards, in relevant part and as related to professionalism, state that each student is responsible for: Demonstrating self-awareness and self-analysis of one's emotional state and reactions; Modulating affect under adverse and stressful conditions and fatigue; Establishing effective working relationships with faculty, other professionals and students in a variety of environments; and Communicating in a non-judgmental way with persons whose beliefs and understandings differ from one's own.

The committee has voted to suspend you from school, effective immediately. You may apply for readmission to return to class no earlier than August, 2019. . . . The committee would only approve your return if you are able to provide evidence that further violations of the Technical Standards are unlikely to occur. . . .

Dkts. 33 ¶ 116–17; 33-53 at 2–3. The suspension letter also states that Bhattacharya could file an appeal of his suspension within 14 days and explains the appeal procedures. Dkts. 33 ¶ 122; 33-53 at 4.

Five days later, on December 4, Bhattacharya emailed Densmore to initiate an appeal of the ASAC's decision to suspend him. Dkts. 33 ¶ 123; 33-54. Densmore replied later that day and acknowledged that the appeal process had started. Dkts. 33 ¶ 123; 33-55. In the meantime, Bhattacharya sent information about these events to SecureDrop, a website through which individuals can anonymously transmit documents to dozens of news organizations. Dkt. 33 ¶ 124. In addition, because he was no longer actively enrolled in medical school, the National Board of Medical Examiners canceled Bhattacharya's registration for the United States Medical Licensing Exam Step 1 ("USMLE Step 1"). *Id.* ¶ 126; Dkt. 33-57.

### H.  The January 2019 No Trespass Order

On December 30, Deputy Chief of Police of the University of Virginia Melissa Fielding called Bhattacharya to inform him that the UVA Police Department would be issuing a No Trespass Order ("NTO") against him. Dkt. 33 ¶ 127. When Bhattacharya inquired into the basis for the NTO, Fielding did not provide any additional information. *Id.* On January 2, 2019, Fielding sent Bhattacharya a letter with the NTO attached. *Id.* ¶ 128; Dkt. 33-58. The NTO stated that, for

four years from its effective date of January 3, Bhattacharya was "not to come on **any** property or facility on the Grounds of the University of Virginia **except** as a patient at the University of Virginia Medical Center." Dkt. 33 ¶ 28; Dkt. 33-58 at 3 (emphasis in original). The NTO also stated that it "must be appealed in writing to the Associate Vice President for Safety and Security within five (5) calendar days" after service; failure to deliver or postmark an appeal within that timeframe would constitute "waive[r of] the opportunity to appeal." Dkt. 33-58 at 4.

The next day, Densmore informed Bhattacharya that UVA Medical School would "not be able to proceed with an appeal of [his] suspension" because of the NTO. Dkt. 33 ¶ 129; Dkt. 33-59. Bhattacharya spoke with Fielding by phone on January 15. Despite his request that UVA rescind the NTO, Fielding refused to do so, and she told Bhattacharya that he could not appeal at that time. Dkt. 33 ¶ 130.

After six months, in early July 2019, Bhattacharya emailed Densmore regarding readmission to UVA Medical School. Densmore informed Bhattacharya that the school "cannot address [his] request for readmission while a no trespass order is in effect." *Id.* ¶ 132; Dkt. 33-61. In response, Bhattacharya called and emailed Fielding asking for "specific reasons" why the NTO was issued, for the NTO to be "dissolve[d] . . . immediately," or "both." Dkts. 33 ¶ 134; 33-62. Fielding responded that the UVA Police Department had issued the NTO "after concerns were raised about comments on a chat room that were perceived as threats." Dkts. 33 ¶ 135; 33-63. She said that those "comments raised safety concerns for the community" and that "[t]he NTO was not a result of [Bhattacharya's] suspension." *Id.* Fielding also noted that Bhattacharya "did not appeal the NTO as specified in the appeal process instructions." *Id.* Bhattacharya responded with a list of questions asking for further details. Dkt. 33 ¶ 136.

A week after his exchange with Fielding, Bhattacharya appealed the NTO in writing to the Associate Vice President for Safety and Security. *Id.* ¶ 137; Dkt. 33-65. In the appeal letter, Bhattacharya wrote:

> It is not clear to me what Deputy Chief Melissa Fielding was referring to by the term "chat room." I have posted on publicly available internet forums which include but are not limited to the following: StudentDoctorNetwork, CollegeConfidential, Reddit, 4chan, and others. The term "internet forum" itself is ambiguous and difficult for one to distinguish from "social media." This includes but is not limited to the following: Facebook, Twitter, Google hangou[]ts, Skype, and others.
>     Furthermore, Deputy Chief Melissa Fielding mentions that concerns were raised about comments on a chat room that were perceived as threats. . . . It is [] unclear as to what, if any, perceived threats were a direct result of any actions that I have taken or statements that I have made. I do not want anyone to feel threatened.

Dkt. 33-65.

On August 7, UVA upheld the NTO because Bhattacharya had "engag[ed] in conduct that threatened the well-being of members of the community through various social media platforms," Dkt. 33 ¶ 137; Dkt. 33-66, and because "[t]he conduct [Bhattacharya] directed at members of the university community compromised safety and security and caused fear." *Id.*; Dkt. 33 ¶ 137.

## II.    LEGAL STANDARD

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of a complaint to determine whether a plaintiff has properly stated a claim. The complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007), with all allegations in the complaint taken as true and all reasonable inferences drawn in the plaintiff's favor. *King v. Rubenstein*, 825 F.3d 206, 212 (4th Cir. 2016). A motion to dismiss "does not, however, resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Id*. at 214.

Although the complaint "does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his entitle[ment] to relief requires more than labels and conclusions,

and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555; *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). A court need not "accept the legal conclusions drawn from the facts" or "accept as true unwarranted inferences, unreasonable conclusions, or arguments." *Simmons v. United Mortg. & Loan Inv., LLC*, 634 F.3d 754, 768 (4th Cir. 2011) (internal quotations omitted). And the court cannot "unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 556 U.S. at 678–79. This is not to say Rule 12(b)(6) requires "heightened fact pleading of specifics"; instead, the plaintiff must plead "only enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. Still, "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal*, 556 U.S. at 679.

## III.    ANALYSIS

### A.  Count I: First Amendment Retaliation

The First Amendment protects not only the affirmative right to speak, but also the "right to be free from retaliation by a public official for the exercise of that right." *Adams v. Trs. of the Univ. of N.C.-Wilmington*, 640 F.3d 550, 560 (4th Cir. 2011) (quoting *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 685 (4th Cir. 2000)). Under § 1983, a student at a public university may state a plausible claim for First Amendment retaliation if he alleges that (1) he "engaged in protected First Amendment activity," (2) "the defendants took some action that adversely affected [his] First Amendment rights," and (3) "there was a causal relationship between [his] protected activity and the defendants' conduct." *Buxton v. Kurtinitis*, 862 F.3d 423, 427 (4th Cir. 2017) (citing *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 499 (4th Cir. 2005) (citing *Suarez*, 202 F.3d at 686)).

15

Defendants argue that Bhattacharya's claim fails because his speech was not protected. They submit that Bhattacharya was dismissed not because of his speech but because he violated the school's professional standards. They also argue that the Individual Defendants—Peterson, Kern, and Rasmussen—to the extent that they are sued in their individual capacities, are entitled to qualified immunity. Dkt. 113 at 20–25; Dkt. 116 at 3–7.

But, as discussed below, the Court disagrees with Defendants' arguments and concludes that Bhattacharya states a plausible claim for First Amendment retaliation.

## 1. Protected Speech

The first prong of the First Amendment retaliation test asks whether the plaintiff "engaged in protected First Amendment activity." *Buxton*, 862 F.3d at 427. Students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969); *see also Papish v. Bd. of Curators of Univ. of Missouri*, 410 U.S. 667, 670 (1973) (per curiam) (emphasizing that "'state colleges and universities are not enclaves immune from the sweep of the First Amendment'") (quoting *Healy v. James*, 408 U.S. 169, 180 (1972)). But the Supreme Court has recognized two major categories of speech that public schools, including public universities, may regulate.

First, schools may regulate "conduct by the student, in class or out of it, which for any reason—whether it stems from time, place, or type of behavior—materially disrupts classwork or involves substantial disorder or invasion of the rights of others." *Tinker*, 393 U.S. at 513; *see also Papish*, 410 U.S. at 669–70 (recognizing "a state university's undoubted prerogative to enforce reasonable rules governing student conduct" and "legitimate authority to enforce reasonable regulations as to the time, place, and manner of speech and its dissemination").

Second, schools "need not tolerate student speech that is inconsistent with its 'basic educational mission,' even though the government could not censor similar speech outside the school." *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 266 (1988) (quoting *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 685 (1986)). For example, school officials can punish students for "vulgar and lewd" speech at school because it "undermine[s] the school's basic educational mission" and "is wholly inconsistent with the 'fundamental values' of public school education." *Fraser*, 478 U.S. at 685–86. School officials also may "exercis[e] editorial control over the style and content of student speech in school-sponsored expressive activities so long as their actions are reasonably related to legitimate pedagogical concerns." *Kuhlmeier*, 484 U.S. at 273. Expressive activities are school-sponsored when the school "lend[s] its name and resources to the dissemination of student expression" such that "students, parents, and members of the public might reasonably perceive [that student's expression] to bear the imprimatur of the school." *Id.* at 271–73.

Finally, the First Amendment does not protect "true threats" within or beyond the schoolhouse gates. *United States v. Bly*, 510 F.3d 453, 458–59 (4th Cir. 2007); *see Virginia v. Black*, 538 U.S. 343, 359 (2003).

Still, where speech occurs off campus, school officials may regulate that speech only if it has a "sufficient nexus with the school." *Kowalski v. Berkeley Cnty. Schools*, 652 F.3d 565, 577 (4th Cir. 2011). In *Kowalski*, the Fourth Circuit found that a school did not violate the First Amendment when it suspended a student who created a webpage ridiculing a fellow student. The court rejected the student's argument that the webpage was not school-related, noting that the student "designed the website for 'students' . . . ; she sent it to students inviting them to join; . . .

those who joined were mostly students[;] . . . and [t]he victim understood the attack as school-related, filing her complaint with school authorities." *Id.* at 576.

Bhattacharya claims that Defendants retaliated against him for his questions and comments during the Microaggression Panel Discussion, his attempt to defend himself at his ASAC hearing, and his attempt to seek press coverage of his suspension. Dkt. 33 ¶ 140. He also alleges that Defendants informed him that the NTO was issued "for engaging in conduct that threatened the well-being of members of the community through various social media platforms." *Id.* ¶ 137; Dkt. 33-66. The Court examines each of these expressive activities in turn to determine which, if any, were protected by the First Amendment.

### i.   Comments and Questions at the Microaggression Panel Discussion

Bhattacharya's speech at the panel discussion—questioning and critiquing the theory of microaggression—does not clearly fall into any category of speech that UVA Medical School can regulate or prohibit. His comments and questions did not "materially disrupt[] classwork or involve[] substantial disorder or invasion of the rights of others." *Tinker*, 393 U.S. at 513. Defendants argue that because "the purpose of the panel discussion was to teach students about a social issue in medicine, it was not the time or place for Plaintiff to dispute the validity of the subject matter, argue with faculty, or disparage a professor's substantial research in the field." Dkt. 113 at 23. To support this contention, Defendants assert that "speech reflecting non-compliance with [a professional conduct] [c]ode that is related to academic activities materially disrupts the [p]rogram's legitimate pedagogical concerns." *Keefe v. Adams*, 840 F.3d 523, 531 (8th Cir. 2016).

In *Keefe*, the Eighth Circuit upheld, at the summary judgment stage, a school's decision to dismiss Keefe, a nursing student, for Facebook posts that were offensive and threatening to other

students. *Id.* at 532. The court found that Keefe's "posts were directed at classmates, involved their conduct in the Nursing Program, and included a physical threat related to their medical studies—'I'm going to . . . give someone a hemopneumothorax.[5]'" *Id.* Considering that fellow students reported these posts and their resulting fears to instructors, Keefe's "disrespectful and threatening statements toward his colleagues had a direct impact on the students' educational experience. They also had the potential to impact patient care" because students who cannot communicate and collaborate in a clinical setting may cause "poor outcomes for the patients." *Id.* The court concluded that the First Amendment did not prevent the school from dismissing Keefe because he "had crossed the professional boundaries line, but . . . he had no understanding of what he did or why it was wrong, and he evidenced no remorse for his actions." *Id.* at 532–33.

Here, Bhattacharya's comments and questions were directed at the professors participating in the panel during a time designated for asking questions. His statements were academic in nature. Bhattacharya challenged one professor's definitions of "microaggression" and "marginalized group" as "contradictory" and "extremely nonspecific." Dkt. 33-2. He also asked several questions about the "evidence" underlying that professor's claims, critiquing it—and the professor's research over "years"—as "anecdotal." *Id.* These comments and questions might be forward or pointed, but—as alleged—they did not materially disrupt the discussion or substantially invade the professor's, or anyone else's, rights. Certainly, Bhattacharya's line of questioning concerned Rasmussen enough that she mentioned the need to "make sure to open up the floor to lots of people for questions" and ultimately called on another student to ask a question. *Id.* But Bhattacharya's allegations do not show that his statements had a "direct impact on [other] students' educational

---

[5]  In *Keefe*, the plaintiff testified that a hemopneumothorax is "a 'trauma' where the lung is punctured and air and blood flood the lung cavity." *Id.* at 527.

19

experience" or "had the potential to impact patient care." *Keefe*, 840 F.3d at 531. Indeed, Bhattacharya's comments are a far cry from the comments at issue in *Keefe*.

Nor were Bhattacharya's comments and questions at the panel "vulgar," "lewd," "indecent," or "plainly offensive." *See Fraser*, 478 U.S. at 685–86. Defendants argue that Bhattacharya's comments meet these criteria because they were "insulting, disrespectful, and uncivil" to the faculty. Dkt. 113 at 23. In *Fraser*, the Supreme Court upheld the school district's decision to suspend a high school student who gave a speech at a school assembly in which he described a student he was nominating for student elective office "in terms of an elaborate, graphic, and explicit sexual metaphor." 478 U.S. at 678. But Bhattacharya's comments were not offensive or indecent in this manner. Indeed, the comments did not involve ad-hominem attacks or curse words. At worst, they were aggressive critiques.

Accordingly, the Court concludes that the amended complaint alleges sufficient facts to find that Bhattacharya's questions and comments at the microaggression panel were protected speech. His expressions were not made at inappropriate times or places, nor were his comments disruptive or offensive.

### ii.   Speech at the ASAC Suspension Hearing

Similarly, Bhattacharya's comments at his suspension hearing were not materially disruptive or offensive. The panel convened to give Bhattacharya a chance to explain to faculty members on the ASAC why he should be able to remain enrolled at UVA Medical School. He inquired why the hearing had been convened and complained about the lack of due process and transparency. Dkt. 33-48. Indeed, Bhattacharya fixated on whether or not he had received the November 15 letter from the ASAC, and he contested—at length—Tucker's statement that Canterbury had "recommended" that Bhattacharya go to CAPS in order to attend class. *Id.* In

addition, several ASAC members told Bhattacharya that his behavior was "extremely defensive," "aggressive," "threatening," and "inappropriate," and that his insistence on recording the meeting was "unusual." *Id.* But the Fourth Circuit has held that "the First Amendment protects bizarre behavior," and "bizarre does not equal disruptive." *Tobey v. Jones*, 706 F.3d 379, 388 (4th Cir. 2013). Furthermore, the audio recording did not contain "true threats," *Black*, 538 U.S. at 359, nor did the ASAC members say that the *content* of Bhattacharya's speech was threatening or might scare patients. Even if Bhattacharya's comments were contentious, rude, and defensive, they did not materially disrupt the hearing or substantially invade the ASAC members' rights. *Tinker*, 393 U.S. at 513. Nor did they "undermine the school's basic educational mission." *See Fraser*, 478 U.S. at 685–86.

Accordingly, the Court concludes that the amended complaint alleges sufficient facts to find that Bhattacharya's expressions at the ASAC suspension hearing were protected speech. His expressions were not made at inappropriate times or places, nor were his comments disruptive or offensive.

### iii.   Online Speech

Defendants argue that Bhattacharya has not alleged enough facts about the social media statements that drove UVA's decision to issue an NTO against him. Dkt. 113 at 24. Defendants also argue that Bhattacharya's statements that triggered the NTO were not protected speech because they were "true threats" related to the school. *Id.* But Bhattacharya alleges that Defendants have not disclosed any social media statements to him, even after he repeatedly requested them. Dkts. 33 ¶ 136–37; 33-65. In his appeal, Bhattacharya provided UVA with a list of social media platforms and other online forums he had been active on at the time the NTO was issued. *See id.* Without the statements, the Court cannot determine whether they are "true threats" related to the

school. But Bhattacharya's amended complaint makes clear that the statements in question are those that UVA used as the basis for issuing the NTO against him. Of course, once UVA discloses the statements underlying the issuance of the NTO, UVA may again then that the statements are "true threats" that receive no First Amendment protection. *Black*, 538 U.S. at 359. At this stage, however, the Court concludes that Bhattacharya has sufficiently alleged that his statements were protected speech.

### 2.  Adverse Action

The second prong of the First Amendment retaliation test asks whether "the defendants took some action that adversely affected [the student's] First Amendment rights." *Buxton*, 862 F.3d at 427. "[A] plaintiff suffers adverse action if the defendant's allegedly retaliatory conduct would likely deter a person of ordinary firmness from the exercise of First Amendment rights." *Martin v. Duffy*, 858 F.3d 239, 249 (4th Cir. 2017), *cert. denied*, 138 S. Ct. 738 (2018). Indeed, because "conduct that tends to chill the exercise of constitutional rights might not itself deprive such rights, . . . a plaintiff need not actually be deprived of [his] First Amendment rights in order to establish . . . retaliation." *Constantine*, 411 F.3d at 500.

Bhattacharya sufficiently alleges that Defendants retaliated against him. Indeed, they issued a Professionalism Concern Card against him, suspended him from UVA Medical School, required him to undergo counseling and obtain "medical clearance" as a prerequisite for remaining enrolled, and prevented him from appealing his suspension or applying for readmission by issuing and refusing to remove the NTO. *Id.* ¶ 142. Because a student would be reluctant to express his views if he knew that his school would reprimand, suspend, or ban him from campus for doing so, the Court concludes that Bhattacharya has adequately alleged adverse action.

### 3.    Causal Connection

The third prong of the First Amendment retaliation test asks whether "there was a causal relationship between [the student's] protected activity and the defendants' conduct." *Buxton*, 862 F.3d at 427. To allege a causal connection between the protected speech and the adverse action, a plaintiff must show (1) the defendants' awareness of the plaintiff's protected speech and (2) "some degree of temporal proximity" between that awareness and the adverse action. *Constantine*, 411 F.3d at 501.

Bhattacharya alleges that Defendants were aware of his comments and questions at the microaggression panel discussion and suspension hearing. *Id.* ¶ 144. Certainly, the faculty members present at the microaggression panel discussion and those present at the suspension hearing were aware of his speech. In addition, he points to Kern's Card, which stated that Bhattacharya "asked a series of questions that were quite antagonistic toward the panel" and "stated one faculty member was being contradictory." Dkts. 33 ¶ 67; 33-13. He also points to the November 15 letter from the ASAC, which states that his "behavior" at the panel was "thought to be unnecessarily antagonistic and disrespectful." Dkts. 33 ¶ 91; 33-35. The November 29 suspension letter, too, states that his "aggressive and inappropriate interactions in multiple situations, including in public settings, during a speaker's lecture, with your Dean, and during the committee meeting yesterday, constitute a violation of the School of Medicine's Technical Standards." Dkts. 33 ¶ 116–17; 33-51. Finally, Bhattacharya also alleges that UVA Defendants were aware of some unidentified comments on "various social media platforms," which UVA informed him were the basis of the NTO banning him from campus. Dkts. 33 ¶ 137; 33-66. These

23

allegations are sufficient to show that Defendants were aware of Bhattacharya's speech at the panel discussion, suspension hearing, and on social media.[6]

In terms of temporal proximity, Bhattacharya's comments and questions at the microaggression panel discussion occurred on October 25, 2018, Dkt. 33 ¶ 3, and his suspension hearing occurred on November 28, *id.* ¶ 110. UVA Medical School suspended him on November 29, *id.* ¶ 116—just over a month after the panel discussion and one day after the suspension hearing. UVA issued the NTO against him on January 2, 2019, *id.* ¶ 128—just over two months after the panel discussion and one month after his suspension hearing. The Court is satisfied that the time that elapsed between Bhattacharya's protected speech and his suspension and ban from the UVA Grounds is sufficient to raise a plausible inference of a causal connection. *Constantine*, 411 F.3d at 501 (finding a causal connection where "[a]t most, four months elapsed from the time [plaintiff] complained about [a professor's] exam and the grade appeals process to the time of the defendants' alleged retaliatory conduct"). At this stage, no more is needed.

### i.      But-For Causation

Defendants contest causation and argue that they suspended Bhattacharya for behavior that violated UVA Medical School's professional code of conduct, and not for the content of his speech or his viewpoint. *See, e.g.*, Dkt. 116 at 3–5. Defendants rely on the same exhibits that Bhattacharya does. They point to Kern's Card, which stated that Bhattacharya's "level of frustration/anger seemed to escalate" and expressed "shock" that Bhattacharya showed "so little respect toward faculty members." Dkts. 33 ¶ 67; 33-13. They also note that the November 15 letter from the ASAC emphasized that "people may have different opinions on various issues, but they need to

---

[6] However, Bhattacharya does not allege any facts from which the Court can draw the inference that Defendants were aware of his attempts to gain publicity about his situation by submitting documents to SecureDrop.

express them in appropriate ways," and that "[i]t is always very important in medicine to show mutual respect to all." Dkts. 33 ¶ 91; 33-35. In addition, the physicians at the suspension hearing told Bhattacharya that his behavior *since* the panel discussion was the primary focus on their meeting, and that they felt patients in the room during the suspension hearing would be "scared" of him. Dkt. 33-48. Finally, Defendants point to the same language as Bhattacharya does in the November 29 suspension letter to underscore that the letter cited specific UVA Medical School Technical Standards that Bhattacharya violated, including "[d]emonstrating self-awareness and self-analysis of one's emotional state and reactions, . . . [e]stablishing effective working relationships with faculty, other professionals and students in a variety of environments; and [c]ommunicating in a non-judgmental way with persons whose beliefs and understandings differ from one's own." Dkts. 33 ¶ 116–17; 33-51.

But to survive a motion to dismiss, Bhattacharya does not need to establish that but for his protected speech he would not have been suspended from UVA Medical School or banned from the UVA Grounds. Of course, Bhattacharya must clear a higher hurdle to *prevail* on a First Amendment retaliation claim. "It is not enough to show that an official acted with a retaliatory motive and that the plaintiff was injured—the motive must *cause* the injury. Specifically, it must be a 'but-for' cause, meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive." *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019) (quoting *Hartman v. Moore*, 547 U.S. 250, 260 (2006)). In *Mount Healthy City School Board of Education v. Doyle*, for example, the Supreme Court held that even if a teacher's "protected conduct played a part, substantial or otherwise, in [the] decision not to rehire," he was not entitled to reinstatement "if the same decision would have been reached" absent his protected speech. 429 U.S. 274, 285 (1977).

Although the Fourth Circuit has yet to address this question, several courts have found that schools may enforce academic professionalism requirements in programs that train licensed medical professionals without violating the First Amendment. *Keefe*, 840 F.3d at 532–33; *Ward v. Polite*, 667 F.3d 727, 734 (6th Cir. 2012); *Keeton v. Anderson-Wiley*, 664 F.3d 865 (11th Cir. 2011). "Given the strong state interest in regulating health professions, teaching and enforcing viewpoint-neutral professional codes of ethics are a legitimate part of a professional school's curriculum that do not, at least on their face, run afoul of the First Amendment." *Keefe*, 840 F.3d at 530. Still, a university may violate the First Amendment if it uses a professional code of conduct or ethics as a pretext to punish the content of a student's speech. *Ward*, 667 F.3d at 785 (denying university's motion for summary judgment because student produced sufficient evidence to show that university's decision to dismiss counseling student from training program on basis that student's request for a referral to avoid counseling gay and lesbian clients violated professional code of ethics may have been "deployed as a pretext for punishing" student's speech). *See also Papish*, 410 U.S. at 671 (ordering a student's reinstatement where the facts "show[ed] clearly that petitioner was expelled because of the disapproved content of the newspaper rather than the time, place, or manner of its distribution").

Bhattacharya's amended complaint and attached exhibits provide some evidence regarding Defendants' justifications for their actions. Yet Bhattacharya adequately alleges that Defendants used the professionalism standards as a pretext for engaging in content-based or viewpoint discrimination, thereby calling that justification into question. *See* Dkt. 33 ¶¶ 144–45. Bhattacharya also adequately alleges that UVA's issuance of the NTO was pretextual. *Id.* ¶ 137.

The record is not developed sufficiently at this stage to determine whether Bhattacharya's First Amendment retaliation claim fails as a matter of law. Moreover, such fact-intensive

arguments about causation are better evaluated on summary judgment. "Based on [Bhattacharya's amended] complaint, it is unclear whether [Defendants'] behavior was reasonably motivated by [his] 'disruptive' conduct or unreasonably motivated by his protected [speech]." *Tobey*, 706 F.3d at 389 (finding, at the motion to dismiss stage, that plaintiff who was arrested when he "removed his sweatpants and t-shirt to reveal the text of the Fourth Amendment on his chest" at airport screening checkpoint had stated a valid First Amendment retaliation claim).

### 4.      Qualified Immunity for Individual Defendants

"Qualified immunity shields an officer from suit when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted." *Taylor v. Riojas*, 141 S. Ct. 52, 53 (2020) (per curiam) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam)) (internal quotation marks omitted). "Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992) (citing *Anderson v. Creighton*, 483 U.S. 635, 639–40 (1987)). To determine whether a complaint should survive a motion to dismiss on grounds of qualified immunity, the Court asks (1) "whether a constitutional violation occurred" and (2) "whether the right violated was clearly established." *Tobey v. Jones*, 706 F.3d at 385 (4th Cir. 2011). But the Court need not address the questions in that order. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). A right is clearly established if it is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)) (internal quotation marks and alteration omitted).

Based on Bhattacharya's allegations, the Court cannot conclude that the Individual Defendants are entitled to qualified immunity on the First Amendment retaliation claim.

A defendant is entitled to raise a qualified immunity defense at the motion to dismiss stage of litigation, and later on a motion for summary judgment. *Tobey*, 706 F.3d at 393–94. In *Tobey*, the Fourth Circuit affirmed the denial of qualified immunity on a motion to dismiss. The court concluded that "[t]he question whether Mr. Tobey's conduct was so 'bizarre' and 'disruptive' that Appellant's reaction was reasonable" in "jump[ing] straight to arrest" Tobey could not "be decided at the 12(b)(6) stage." *Id.* at 393. Here, the ultimate question whether Individual Defendants in fact violated Bhattacharya's First Amendment rights by retaliating against him because of his protected speech—and accordingly, whether the First Amendment right violated was clearly established— requires a more developed record. Indeed, "[o]rdinarily, the question of qualified immunity should be decided at the summary judgment stage." *Willingham v. Crooke*, 412 F.3d 553, 558 (4th Cir. 2005). Thus, while the Court reviews this issue based on the allegations in the complaint now, "[i]t may be that discovery will reveal there is no genuine issue of material fact," and Peterson, Kern, and Rasmussen "can move for summary judgment" on qualified immunity grounds. *See Tobey*, 706 F.3d at 393.

At this stage of the litigation, the Court finds that Peterson, Kern, and Rasmussen are not entitled to qualified immunity on the First Amendment retaliation claim.

Accordingly, the Court will deny Defendants' motion to dismiss Count I of the amended complaint.

## B. Count II: Constitutional Due Process

The Due Process Clause of the Fourteenth Amendment provides that "no state shall deprive any person of life, liberty, or property, without due process of law." U.S. Const. Amend. XIV § 1. To state a procedural due process claim, Bhattacharya must allege: "(1) a cognizable 'liberty' or 'property' interest; (2) the deprivation of that interest by 'some form of state action'; and (3) that

the procedures employed were constitutionally inadequate." *Iota Xi Chapter of Sigma Chi Fraternity v. Patterson*, 566 F.3d 138, 145 (4th Cir. 2009) (quoting *Stone v. Univ. of Md. Med. Sys. Corp.*, 855 F.2d 167, 172 (4th Cir. 1988)).

Bhattacharya argues that he had a "liberty interest in [his] Protected Free Speech" and a "liberty and property interest in continuing his medical studies at UVA Med School and pursuing the practice of medicine." Dkt. 33 ¶¶ 148–49. He claims that Defendants deprived him of these interests without proper notice and the opportunity to be heard. *Id.* ¶ 152. Specifically, when UVA Medical School suspended him, it failed to accord with all of its internal policies and procedures, including the ASAC Operating Procedures. *Id.* ¶ 151.

### 1.    Liberty Interest in Protected Free Speech

Defendants' purported deprivation of Bhattacharya's free speech interest is not cognizable as a procedural due process claim.

The Supreme Court's decision in *Board of Regents of State Colleges v. Roth* addressed this issue directly. 408 U.S. 564 (1972). In *Roth*, a university professor claimed that his removal could have been based in part on the exercise of his First Amendment right to freedom of speech. *Id.* The Court remarked that "[w]hen a State would directly impinge upon interests in free speech or free press, this Court has on occasion held that opportunity for a fair adversary hearing must precede the action, whether or not the speech or press interest is clearly protected under substantive First Amendment standards." *Id.* at 575 n.14. However, the Court went on to note that actions requiring such procedural safeguards were those in which the core interest at stake was "itself a free speech interest," such as "before an injunction is used against the holding of rallies and public meetings" or "before a State makes a large-scale seizure of a person's allegedly obscene books, magazines, and so forth." *Id.* (internal citations omitted). The Supreme Court reasoned that the deprivation of

the plaintiff's free speech rights was not "directly impinged . . . in any way comparable to a seizure of books or an injunction against meetings." *Id.* It concluded that "[w]hatever may be a teacher's rights of free speech, the interest in holding a teaching job at a state university, simpliciter, is not itself a free speech interest." *Id.*

In this case, Bhattacharya has faced no direct deprivation of his free speech rights comparable to the examples the Supreme Court highlighted. Indeed, Bhattacharya does not allege that Defendants prohibited him from expressing his views at all. Whatever may be Bhattacharya's free speech rights as a medical student, his interest in continuing his medical studies and pursuing a career in the medical profession "is not itself a free speech interest" cognizable under procedural due process. *Id.*

## 2.   Liberty and Property Interest in Continued Enrollment and Practice of Medicine

Bhattacharya claims a purported liberty and property interest in continuing his studies at UVA Medical School and pursuing the practice of medicine. Assuming such interests are cognizable,[7] this procedural due process claim also would fail.

---

[7] The Court doubts that Bhattacharya has sufficiently pled either a property or a liberty interest in continued enrollment. "A protected property interest cannot be created by the Fourteenth Amendment itself, but rather must be created or defined by an independent source." *Equity In Athletics, Inc. v. Dep't of Educ.*, 639 F.3d 91, 109 (4th Cir. 2011) (citing *Roth*, 408 U.S. at 577). For example, in *Goss v. Lopez*, 419 U.S. 565, 573–74 (1975), the Supreme Court held that a student had a property interest in continued public school enrollment because the student located a state statute creating an entitlement to a free education to all residents between 5 and 21 years old. Here, Bhattacharya's amended complaint "fails to cite or to identify any statute or other source of a legitimate claim of entitlement to [Bhattacharya's] continued enrollment at [UVA Medical School]." *Doe v. Rector & Visitors of George Mason Univ.*, 132 F. Supp. 3d 712, 720 (E.D. Va. 2015). Furthermore, "[n]either the Supreme Court nor the Fourth Circuit has held that such a property interest exists in connection with higher education, either categorically or specifically with regard to Virginia law." *Id.* at 720–21. But the Supreme Court and Fourth Circuit have assumed without deciding that students have a protected property right to continued enrollment, as the Court does here. *See Tigrett v. Rector & Visitors of the Univ. of Va.*, 290 F.3d 620, 627 (4th Cir. 2002).

When determining what procedural safeguards are required under the Due Process Clause, courts distinguish between academic and disciplinary dismissals. A disciplinary dismissal is one in response to charges of misconduct; in such circumstances, a hearing at which a student can present his side of a factual issue could "provide a meaningful hedge against erroneous action." *Goss v. Lopez*, 419 U.S. 565, 583 (1978) (classifying as disciplinary students' suspension for participating in demonstrations that had disrupted classes, attacking a police officer, and damaging school property). In contrast, an academic dismissal is one related to performance in studies; an academic "judgment is by its nature more subjective and evaluative than the typical factual questions presented in the average disciplinary decision" and requires "expert evaluation of cumulative information." *Bd. of Curators of Univ. of Mo. v. Horowitz*, 435 U.S. 78, 90 (1978) (classifying as academic a student's dismissal because she lacked "the necessary clinical ability to perform adequately as a medical doctor and was making insufficient progress toward that goal"). A public university must give a student notice and an opportunity to be heard when taking disciplinary action. *Goss*, 419 U.S. at 581. But the Due Process Clause does not require such "stringent procedural protection[s]" for academic dismissals. *Henson v. Honor Comm. of Univ. of*

---

Bhattacharya also argued that he has alleged a liberty interest in his reputation. A plaintiff has a right to due process "[w]here a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him," *Wisconsin v. Constantineau*, 400 U.S. 433, 437 (1971), as long as a "tangible interest such as employment"—or perhaps suspension from a public school—is involved. *Paul v. Davis*, 434 U.S. 693, 701 (1976). In *Goss*, the Supreme Court found that public school students suspended for misconduct allegations had been deprived of a reputational liberty interest. 419 U.S. at 575. To state a claim for procedural due process violations based on a reputational interest in the context of suspension from a public university, a student must allege (1) a stigmatizing statement (2) made public by the public university, (3) in conjunction with his suspension from the university, and (4) that the charge triggering his suspension was false. *Doe*, 132 F. Supp. 3d at 723–24 (citing *Sciolino v. City of Newport News*, 480 F.3d 642, 646 (4th Cir. 2007)). Here, Bhattacharya's amended complaint has not alleged any of these elements. His allegations do not raise the inference that he was suspended for misconduct, nor that UVA Medical School made public a stigmatizing statement about him. If anything, Bhattacharya alleges that *he* sought to make information about his suspension public. *See* Dkt. 33 ¶ 124.

*Va.*, 719 F.2d 69, 75 (4th Cir. 1983); *see also Horowitz*, 435 U.S. at 86 (1978). Indeed, no formal hearing at all is required for an academic dismissal. *Id.* at 90.

Bhattacharya's due process claim faces an uphill climb because the allegations in the amended complaint demonstrate that the decision to suspend Bhattacharya from the medical school was an academic judgment, not a disciplinary one. The ASAC members who suspended Bhattacharya from the medical program were evaluating whether Bhattacharya met the professionalism standards set by the institution.[8] Dkt. 33-49 at 2. Professionalism is a core competency of the degree program at UVA Medical School, evaluated by faculty along with any other competency required to obtain a medical degree. *See* Dkt. 33-9 at 2. And evaluating professionalism is a subjective inquiry best suited for the judgment of medical educators, not the Court. *See Halpern v. Wake Forest Univ. Health Sciences*, 669 F.3d 454, 462 (4th Cir. 2012) ("[T]he Supreme Court has held that a court should defer to a school's professional judgment regarding a student's academic or professional qualifications."). *See also Al-Dabagh v. Case Western Reserve Univ.*, 777 F.3d 355, 359–60 (6th Cir. 2015) (holding that a medical student's dismissal for failing to meet the school's professionalism standards was an academic judgment that deserved deference under procedural due process analysis); *Nofsinger v. Va. Commonwealth Univ.*, 3:12-cv-236, 2012 WL 2878608, at *7 (E.D. Va. July 13, 2012), *aff'd* 523 F. App'x 204 (4th Cir. 2013) (holding on a motion to dismiss that plaintiff who was a graduate student in physical

---

[8] This section focuses, of course, on the process that plaintiff was afforded. The analysis is different from that for a First Amendment retaliation claim. A university is not required under the Constitution to provide a hearing for academic dismissals, but that does not mean that university officials who retaliate against students for their speech under the guise of dismissing them for academic reasons do not violate the Constitution. *See Booker v. S.C. Dep't of Corrs.*, 855 F.3d 533, 542 (4th Cir. 2017) ("That a prison is not required under the Constitution to provide access to a grievance process does not mean that prison officials who retaliate against inmates for filing grievances do not violate the Constitution.").

therapy was "well aware that professionalism was a criterion used to evaluate her in her Clinical, and was also on notice that professionalism was at the very core of the Department's philosophy—and thus necessary for her success in the program," making dismissal based in part on professionalism an academic judgment).

Accordingly, Bhattacharya was given more process than the Constitution required. Indeed, although the Constitution does not require a hearing before rendering an academic judgment, *Horowitz*, 435 U.S. at 90, Bhattacharya received one.[9] Further, the Constitution, not university policies and procedures, determines the process that is required. *See Mathews v. Eldridge*, 424 U.S. 319, 334–35 (1976). Thus, Bhattacharya's allegations that ASAC failed to abide by its own policies and procedures cannot support a claim that he did not receive constitutional due process.

Finally, nothing in Bhattacharya's amended complaint suggests that he was denied due process with respect to the NTO. Bhattacharya does not claim to have a property or liberty interest in being present on the UVA Grounds. In any event, he was given the right to appeal the NTO, which he did in July 2019. Dkt. 33-65. His appeal was subsequently denied. Dkt. 33-66.

For these reasons, Bhattacharya's procedural due process claim under Count II will be dismissed.

### C. Count III: § 1985(3) Civil Rights Conspiracy

Bhattacharya must plausibly allege the following elements to state a Section 1985(3) claim:

> (1) a conspiracy of two or more persons, (2) who are motivated by a specific class-based, invidiously discriminatory animus to (3) deprive the plaintiff of the equal enjoyment of rights secured by the law to all, (4) and which results in injury to the plaintiff as (5) a consequence of an overt act committed by the defendants in connection with the conspiracy.

---

[9] Bhattacharya also had notice of the professional standards he was expected to abide by, as well as notice of the consequences of failing to meet them, Dkt. 33-9 at 2–3.

*A Soc'y Without A Name v. Virginia*, 655 F.3d 342, 346 (4th Cir. 2011) (citing *Simmons v. Poe*, 47 F.3d 1370, 1376 (4th Cir. 1995)). "To meet the requirement of a class-based discriminatory animus, under this section the class must possess the 'discrete, insular and immutable characteristics comparable to those characterizing classes such as race, national origin and sex.'" *Buschi v. Kirven*, 775 F.2d 1240, 1257 (4th Cir. 1985) (citation omitted).

Bhattacharya argues that the class-based animus requirement should be read to encompass those who are discriminated against based on their political views. He points to the Supreme Court's decision in *United Brotherhood of Carpenters v. Scott*, 463 U.S. 825, 836 (1983), as evidence that § 1985(3) has not been interpreted to exclude conspiracies motivated by bias against groups who hold particular political views. Dkt. 115 at 30–32. Indeed, Bhattacharya argues that the Supreme Court expressly left this question open when it said, "[I]t is a close question whether § 1985(3) was intended to reach any class-based animus other than animus against Negroes and those who championed their cause, most notably Republicans." *Scott*, 463 U.S. at 836.

What Bhattacharya leaves out of his quotation, however, is what the Court went on to state in the following sentences: "the predominant purpose of § 1985(3) was to combat the prevalent animus against Negroes and their supporters."[10] Moreover, the Supreme Court has expressed reservation in expanding the scope of § 1985(3) beyond race discrimination. *See Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 269 (1993).

---

[10] The Fourth Circuit provides additional detail of § 1985(3)'s history: "[The] failure or inability on the part of local southern governments to control the Klan was particularly troubling to Republican Congressmen. During this period, Republicans were leading supporters of the emancipation of blacks, and as a result frequently joined the blacks as common victims of Klan intimidation and violence." *Harrison v. KVAT Food Mgmt., Inc.*, 766 F.2d 155, 157 (4th Cir. 1985).

To the extent the Supreme Court left the issue Bhattacharya presents open, the Fourth Circuit has foreclosed his argument. *Harrison v. KVAT Food Mgmt., Inc.*, 766 F.2d 155, 157 (4th Cir. 1985); *see also Farber v. City of Paterson*, 440 F.3d 131, 139, 143 (3rd Cir. 2006) (noting a circuit split over the question and siding with the Fourth, Seventh, and Eighth Circuits in holding that § 1985(3) "does not provide a cause of action for individuals allegedly injured by conspiracies motivated by discriminatory animus directed toward their political affiliation").

In *Harrison v. KVAT Food Mgmt., Inc.*, the Fourth Circuit specifically held that the Supreme Court's reasoning in *Scott* could not be extended to include claims citing discriminatory animus against a class formed around purely political views. 766 F.2d at 157. In coming to this conclusion, the Court addressed how the legislative history of § 1985, also known as the "Ku Klux Klan Act," made clear that the statute was intended to provide relief for those who suffered at the hands of Klan violence. *Id.* at 160–61. It also explained that the Supreme Court's opinion in *Scott* "exhibits a noticeable lack of enthusiasm for expanding the coverage of § 1985(3) to any classes other than those expressly provided by the Court." *Id.* at 161. The Court's later decision in *Bray* not to extend the scope of invidious class-based animus in § 1985(3) to include discrimination based on opposition to abortion only serves to emphasize this point. 506 U.S. at 269; *see also Buschi*, 775 F.2d at 1258 ("It is obvious that, whether we take the majority or the dissenting view in *Scott*, the class protected can extend no further than to those classes of persons who are, so far as the enforcement of their rights is concerned, 'in unprotected circumstances similar to those of the victims of Klan violence.'") (quoting *Scott*, 463 U.S. at 851 (Blackmun, J., dissenting)).

Bhattacharya has expressly acknowledged that the bias against him was not motivated by any discriminatory animus toward his race or national origin. Dkt. 115 at 31. Rather, his contention is that the alleged conspiracy was motivated by animus based on "ideological views." Dkt. 33 at

52. But this is not the type of class-based discriminatory animus that is cognizable under § 1985(3) in this Circuit. *See Harrison*, 766 F.2d at 157. The class Bhattacharya cites is not one in "unprotected circumstances" remotely similar to those who were victims of Klan violence, nor does he cite political views in support of such victims that might subject him to such violence. *See Buschi*, 775 F.2d at 1258.

Finally, Bhattacharya's conspiracy claim also fails because Peterson, Kern, and Rasmussen are protected by the intracorporate conspiracy doctrine, which the Fourth Circuit has applied in the civil rights context. *Id.* at 1251–52. The intracorporate conspiracy doctrine protects individual defendants who are employees of a corporation and were acting in their capacities as employees in connection with the alleged conspiracy. *Id.* at 1252. "Simply joining corporate officers as defendants in their individual capacities is not enough to make them persons separate from the corporation in legal contemplation. The plaintiff must also allege that they acted other than in the normal course of their corporate duties." *Id.* (internal quotation marks and citation omitted). Only if corporate employees have "an independent personal stake in achieving the corporation's illegal objective," *Greenville Publishing Co. v. Daily Reflector, Inc.*, 496 F.2d 391, 399 (4th Cir. 1974), or if corporate employees' acts in furtherance of a conspiracy were "unauthorized," *Buschi*, 775 F.2d at 1253 (internal quotation marks and citation omitted).

Here,  Bhattacharya's amended complaint and attached exhibits allege that Peterson, Kern, and Rasmussen were UVA Medical School faculty members. Dkt. 33 at 1. None of his allegations support a reasonable inference that Peterson, Kern, or Rasmussen conspired with anyone outside UVA, or that they were not acting in their capacities as UVA Medical School faculty members in participating in the decision to suspend Bhattacharya. To the contrary, Rasmussen's discussion with Bhattacharya at the microaggression panel discussion, Peterson's meeting with Bhattacharya,

Kern's Card, and Kern's attendance at the ASAC's meetings all occurred at UVA Medical School and in relation to the Individual Defendants' responsibilities as faculty members. Moreover, Bhattacharya's conclusory allegations, Dkt. 33 ¶¶ 161–62, lack factual support and do not support an inference that the Individual Defendants' acts were unauthorized or that they had an independent personal stake in Bhattacharya's suspension. Thus, the Court concludes that the Individual Defendants are protected by the intracorporate conspiracy doctrine.

For these reasons, Bhattacharya's § 1985(3) claim will be dismissed.

### D.  Count IV: Va. Code § 18-499–500 Conspiracy to Injure in Trade, Business, or Profession

Bhattacharya alleges that Defendants Peterson, Kern, and Rasmussen are liable to him for violating Virginia Code § 18.2-499. The statute states in relevant part, "Any two or more persons who combine, associate, agree, mutually undertake or concert together for the purpose of (i) willfully and maliciously injuring another in his reputation, trade, business or profession by any means whatever . . . shall be jointly and severally guilty of a Class 1 misdemeanor." Va. Code. § 18.2-499.[11] "To ultimately prevail under the Virginia conspiracy statute, a plaintiff must prove by clear and convincing evidence the following elements: (1) concerted action; (2) legal malice; and (3) causally related injury." *Schlegel v. Bank of Am., N.A.*, 505 F. Supp. 2d 321, 325 (W.D. Va. 2007).

A claim under these statutes "focuses upon conduct directed at property, that is, one's business, and applies only to conspiracies resulting in business-related damages." *Buschi*, 775 F.2d at 1259 (internal quotation marks omitted); *see Shirvinski v. U.S. Coast Guard*, 673 F.3d 308, 321 (4th Cir. 2012) (stating it is "well-settled" that the Va. Code § 18-499 does not apply to "personal

---

[11] Section 18.2-500 creates a private cause of action for parties injured under this statute, permitting them to recover treble damages.

or employment interests") (citing *Andrews v. Ring*, 585 S.E.2d 780, 784 (Va. 2003)). The statute does not cover a claim that only relates to "employment and possible injury to their employment reputation" because the claim does not include any "business-related injury." *Buschi*, 775 F.2d at 1259.

Bhattacharya alleges that the purported co-conspirators conspired to deprive him "of the ability to complete his medical school studies and enter the medical profession." Dkt. 33 at 53. He does not raise anything more than a harm to his interest in pursuing employment.[12] He does not allege to have any existing stake or interest in a business, let alone one that was the target of a conspiracy. Rather, he claims injury to a future interest in employment, which does not raise a right to relief under the statute. *See Shirvinski*, 673 F.3d at 321 (denying claim under Va. Code § 18-499 where plaintiff suffered harm to only his "personal employment prospects"); *Marcantonio v. Dudzinski*, 155 F. Supp. 3d 619, 636 (W.D. Va. 2015) (holding that harm to a future business or employment interest is not cognizable under Va. Code. § 18-499).

Finally, for the same reasons noted above, Bhattacharya's conspiracy claim also must fail because Peterson, Kern, and Rasmussen's actions fall under the intracorporate conspiracy doctrine. *See Buschi*, 775 F.2d at 1251–53.

Accordingly, because Bhattacharya's alleged harm falls outside the scope of the statute and the Individual Defendants are protected by intracorporate immunity, the Court will dismiss the conspiracy claim under Virginia Code § 18.2-499.

---

[12] Bhattacharya argues that his pursuit of the practice of medicine is an interest in a *profession*, not *employment*. The Court sees no cognizable difference between the two for purposes of the Virginia statute, and moreover, Bhattacharya has provided no argument delineating the difference.

## IV.    CONCLUSION

For the foregoing reasons, the Court will grant in part and deny in part Defendants' motion to dismiss. The Court will grant the motion to dismiss Counts II, III, and IV with prejudice. The Court will deny the motion to dismiss Count I.

An appropriate Order will issue.

The Clerk of Court is directed to send this Memorandum Opinion to all counsel of record.

ENTERED this ___31st___ day of March, 2021.

NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE