**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**Charlottesville Division**

| | |
|---|---|
| **KIERAN RAVI BHATTACHARYA,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )   **Civil Action No. 3:19-CV-54-NKM-JCH** |
| | ) |
| | ) |
| **JAMES B. MURRAY, JR., et al.,** | ) |
| | ) |
| **Defendants.** | ) |
| | ) |

## DEFENDANT SARA K. RASMUSSEN, M.D., PH.D's MEMORANDUM IN SUPPORT OF HER MOTION TO DISMISS THE SECOND AMENDED COMPLAINT UNDER FEDERAL RULE 12(b)(6)

Defendant Sara K. Rasmussen, M.D., Ph.D., by counsel, files the following Memorandum in Support of her Motion to Dismiss the Second Amended Complaint filed by Plaintiff, Kieran Ravi Bhattacharya, for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure.  The Court should grant the Motion for the reasons discussed below.

## INTRODUCTION

The University of Virginia School of Medicine ("UVA") suspended Plaintiff on November 28, 2018, and later barred him from coming on grounds.  In his Second Amended Complaint, Plaintiff tries to connect those decisions to comments he made during a panel discussion on microaggressions a month earlier on October 25, 2018 (the "Panel").  He claims that the defendants retaliated against him for those comments in violation of 42 U.S.C. § 1983.  Among those defendants is Dr. Rasmussen—one of the panelists who oversaw the Panel event.  His claims against Dr. Rasmussen are meritless for several reasons.

First, he fails to show that Dr. Rasmussen violated his First Amendment rights *during* the Panel.  His factual allegations about Dr. Rasmussen concern a brief exchange between the two during that event.  Once the question and answer session began, Plaintiff held the floor and asked questions for over three minutes—to the exclusion of other students.  After three minutes of this, Dr. Rasmussen interjected and she said that she would answer Plaintiff's question (his fourth), but would then move on to another student.  Plaintiff agreed and yielded the floor to her.  But after she answered his question, Plaintiff attempted to hold the floor again.  Dr. Rasmussen briefly responded to him and then called on another student.

As an official overseeing a limited public forum, Dr. Rasmussen could impose reasonable limitations on Plaintiff's speech due to its duration, its repetitive nature, or to ensure that other students were able to exercise their own right to speak.[1]  The only caveat is that Dr. Rasmussen could not limit Plaintiff's speech based solely on its content.  Plaintiff fails to allege any *facts* to suggest that Dr. Rasmussen actions—i.e., answering his fourth question and calling on another student—were motivated by the content of Plaintiff's speech.  Instead, the facts show that her actions were reasonable under the circumstances.

Second, Plaintiff's own admissions—which he incorporates into the Second Amended Complaint—contradict his claim that Dr. Rasmussen violated his First Amendment rights.  Mere

---

[1] Defendants previously filed a joint Motion to Dismiss the First Amended Complaint.  (ECF 112, 113, and 116).  At the time, all Defendants were represented by the Attorney General of Virginia.  In the motion, Defendants argued that Plaintiff's speech during the Panel was not protected because it was "offensive" and "materially disrupted . . . the learning environment."  (ECF 113 at 23).  The Court rejected this argument, finding that Plaintiff's speech was protected by the First Amendment.  *Bhattacharya*, 515 F.Supp.3d at 455.  Dr. Rasmussen—through her new counsel and on her own behalf—advances a different argument.  She does not quarrel with the Court's holding that Plaintiff's speech at the Panel was protected by the First Amendment.  Instead, she argues that because that speech occurred in a limited public forum and that she, as an officer overseeing that forum, was entitled to impose reasonable, content-neutral, time, place, and manner restrictions on that speech.  The Court has yet to address this argument.

hours after the Panel event, Plaintiff sent an email to a UVA administrator in which he said that he was "***quite happy*** that the panel ***gave me so much time*** to engage with them" and added that he had "no problems with anyone on the panel."  (ECF 335 ¶ 84; ECF 335-12 at Pageid#: 4127–28) (emphasis added).  These admissions directly contradict Plaintiff's conclusory allegations that Dr. Rasmussen violated his First Amendment rights during the Panel, or that she retaliated against him.  Indeed, they are fatal to those allegations.

Finally, Plaintiff styles his § 1983 claim as a retaliation claim.[2]  Yet, he fails to allege any facts suggesting that Dr. Rasmussen retaliated against him *during* the Panel or *after* it ended. While he identifies several actions as "Retaliatory Conduct", all of that conduct occurred *after* the Panel ended, and Plaintiff does not offer any facts tying Dr. Rasmussen to that conduct.  Therefore, he fails to plead a necessary element of a retaliation claim: an adverse action that has a material (or chilling) effect on the exercise of his First Amendment rights.

### STATEMENT OF FACTS ALLEGED IN THE SECOND AMENDED COMPLAINT

**A.** **Plaintiff's matriculation, withdraw, and return to UVA (August 2016 through October 2018).**

Plaintiff matriculated in August 2016 and was slated to graduate as a member of the Class of 2020.  (ECF 335 ¶ 46).  He voluntarily withdrew from UVA in February 2017.  (*Id.* ¶ 52).  He re-enrolled on January 3, 2018, and was set to graduate with the Class of 2021.  (*Id.* ¶ 54).

**B.** **The Microaggression Panel (October 25, 2018).**

Plaintiff attended the Panel discussion on microaggressions on October 25, 2018.  (*Id.* ¶ 66).  The Panel was hosted by a student organization, the American Medical Women's Association

---

[2]  As with Dr. Rasmussen's new arguments concerning reasonable time, place, and manner restrictions in a limited public forum, the Court has yet to hear why Plaintiff fails to state a plausible retaliation claim against Dr. Rasmussen, specifically.  The Court should, therefore, consider that argument on this Motion to Dismiss.

("AMWA"), in a lecture hall on the UVA grounds.  (ECF 335 ¶ 3; *see also* ECF 1-2 at Pageid#: 81 (Exh. 9) (stating, in Plaintiff's writing, that the Panel discussion took place in the "lecture hall.")).  Dr. Rasmussen was one of three UVA professors on the Panel.  Beverly C. Adams (Ph.D.) and Nora Kern (M.D.) were the other two panelists.  (*Id*. ¶ 4).

Dr. Adams was the main presenter and spent the first few minutes of the Panel presenting her remarks.  (*Id*. ¶¶ 4, 67).  After Dr. Adams completed her remarks, Dr. Kern opened up the floor for questions from the audience.  (*Id*. ¶ 68).  Plaintiff took the microphone and asked Dr. Adams a question.  (*Id*. ¶¶ 68–69).[3]  After Dr. Adams responded, Plaintiff asked two more questions.  (*Id*. ¶ 69).  Dr. Adams responded to both.  (*Id*.).  Then Plaintiff attempted to ask a fourth question.  (*Id*. ¶ 69).  Plaintiff's colloquy with Dr. Adams lasted over three minutes, during which he prevented other students from asking questions of the panelists.  (ECF 335-2 at 28:45–32:01).  This Court described Plaintiff's questions and comments during this colloquy as "aggressive critiques." *Bhattacharya v. Murray*, 515 F.Supp.3d 436, 455 (W.D. Va. 2021).

Dr. Rasmussen interjected and offered to answer Plaintiff's fourth question saying, "OK. I'll take that and then I think we should make sure to open up the floor to lots of people for questions."  (*Id*. at 32:02).  Plaintiff responded, "Of course, yeah."  (*Id*. at 32:08–09).[4]  Dr. Rasmussen then answered Plaintiff's question.  (*Id*. at 32:02–33:38; ECF 335 ¶ 71).  As soon as Dr. Rasmussen had finished her statement, and before she could call on another student, Plaintiff responded: "I have to respond to that because I never talked about getting frustrated at a person

---

[3] Plaintiff includes a transcript of his questions in his Second Amended Complaint so we will not repeat them here.  Additionally, Exhibit 2 to the Amended Complaint (ECF 33-2) includes a recording of the entire Panel Discussion.

[4] Interestingly, Plaintiff omits this part of his exchange with Dr. Rasmussen from the face of the Second Amended Complaint, though it remains in the audio recording attached as Exhibit 2 thereto.

for making the statement.  I never would condone any statements that you are making like that. What I'm saying is that what you are providing is anecdotal evidence.  That's what you provided. That's what she provided."  (ECF 335-2 at 33:38–33:52; ECF 335 ¶ 72).  Dr. Rasmussen responded: "No, I think [Dr. Adams] provided a lot of citations in the literature" and in response to Plaintiff's comments about getting frustrated, said, "I'm sorry, I was just reading your body language."  (ECF 335-2 at 33:52–33:59; ECF 335 ¶ 73).  Dr. Rasmussen then turned to another student and said, "[w]ould you like to ask a question?"  (ECF 335 ¶ 73).

UVA received multiple complaints about Plaintiff's actions during the Panel, including a Professionalism Concern Card filed by Dr. Kern.  (*Id.* ¶ 74–78).[5]  However, none of those complaints came from or are linked to Dr. Rasmussen.

In the afternoon following the Panel, Dean Christine Petersen emailed Plaintiff the following:

> Kieran, I was at the noontime "Microaggressions" panel today and observed your discomfort with the speaker's perspective on the topic. Would you like to come share your thoughts with me? I think I can provide some perspective that will reassure you about what you are and are not responsible for in interactions that could be uncomfortable even when that's not intended. If you'd prefer to talk with your own college dean, that's fine too. I simply want to help you understand and be able to cope with unintended consequences of conversations.

(ECF 335 ¶ 82; ECF 335-12 at Pageid#: 4127).  Plaintiff responded to Dean Peterson's email that same afternoon:

> Your observed discomfort of me from wherever you sat was not at all how I felt. ***I was quite happy that the panel gave me so much time to engage with them about the semantics regarding the comparison of microaggressions and barbs. I have no problems with anyone on the panel***; I simply wanted to give them some basic challenges regarding the topic. And I understand that there is a wide range of

---

[5] "Professionalism Concern Cards are records of students' violations of UVA Medical School's professionalism standards."  *Bhattacharya*, 515 F.Supp.3d at 446, n.3.

acceptable interpretations on this. I would be happy to meet with you at your convenience to discuss this further.

(ECF 335 ¶ 84; ECF 335-12 at Pageid#: 4127–28) (emphasis added).

**C.**     **The factual allegations supporting Plaintiff's claims of retaliatory conduct (October 25, 2018 through January 2, 2019).[6]**

Plaintiff claims that he engaged in protected speech during the Panel and at other points thereafter. (ECF 335 ¶ 176). He alleges that Defendants—including Dr. Rasmussen by simply lumping her in with "Defendants"—took the following actions to retaliate against him for that speech ("Retaliatory Conduct"):

- Dr. Kern's Professionalism Concern Card;

- "disciplining [Plaintiff] for his Protected Free Speech";

- "requiring [Plaintiff] to undergo the November 14, 2018 and November 19, 2018 Forced Psychiatric Evaluations";

- "requiring [Plaintiff] to undergo counseling and obtain 'medical clearance' as a prerequisite for remaining enrolled at UVA Med School;

- "suspending [Plaintiff] from UVA Med School"; and

- "preventing [Plaintiff] from appealing his suspension or applying for readmission to UVA Med School by issuing and refusing to remove the No Trespass Order."

(ECF 335 ¶ 179). However, Plaintiff does not allege any facts tying Dr. Rasmussen to the conduct described above.

Plaintiff also points to several documents which, he contends, show the causal link between his protected speech and the alleged Retaliatory Conduct:

---

[6] This Court previously reviewed, in great detail, all of the events that occurred between the end of the Panel on October 25, 2018 and January 2, 2019, when UVA issued a no-trespass order against Plaintiff. *See Bhattacharya v. Murray, et al.*, 515 F.Supp.3d 436, 446–52 (W.D. Va. 2021). We will not repeat all of those facts here. Instead, we will focus on the specific alleged retaliatory conduct identified in the Second Amended Complaint.

- Dr. Kern's Professionalism Card;

- The minutes of the November 14, 2018 ASAC Meeting;

- The November 15, 2018 ASAC correspondence;

- The minutes of the November 28, 2018 ASAC disciplinary hearing;

- The November 29, 2018, Suspension Letter.

(ECF 335 ¶ 181; *see also* ECF 335-13, -15, -36, -49, and -53, respectively). Again, however, Plaintiff does not allege any facts suggesting that Dr. Rasmussen was involved in the discussion relating to, or drafting of, the documents identified above.

With three exceptions, the only specific allegations of fact about Dr. Rasmussen in the Second Amended Complaint concern her background and her conduct *during* the Panel on October 25, 2018. (ECF ¶¶ 4, 5, 7(a), 29–30, 32–33, 35, 67–68, 70–73, and 77). Those three exceptions include the following conclusory allegations:

- that there are "[i]nappropriate and unprofessional communications among Dean Densmore, Dean Peterson, Professor Kern, and Professor Rasmussen with one another, with others at UVA Med School, and with the University of Virginia Medical Center, and with third parties before and after the October 31, 2018 meeting between Mr. Bhattacharya and Dean Peterson, and before and after the November 14, 2018 and November 28, 2018 ASAC meetings in which Professor Kern participated and which Dean Peterson attended as a 'guest' even though she was not a member of the Committee"; and

- that there is other "evidence of retaliatory conduct" including "email and text message traffic to and from Professor Rasmussen, Professor Kern, Dean Peterson, the UVA Med School Defendants, and others within UVA Med School—some of which [Plaintiff] has in his possession, has seen, or knows about."

- that "Dean Peterson had been in contact with Professors Kern and Rasmussen and others about [Plaintiff's] questions and comments at the [Panel]."

(*Id*. ¶¶ 81, 81(b), 83).

However, Plaintiff does not allege which of these "inappropriate and unprofessional communications" or other "email[s] and text message[s]" involved Dr. Rasmussen; when Dr.

Rasmussen sent or received those communications; what she said (if anything); or how those communications connect Dr. Rasmussen to the alleged Retaliatory *Conduct*.   The Second Amended Complaint does not contain a single allegation of fact that specifically ties Dr. Rasmussen to any of the alleged Retaliatory Conduct described above.   Aside from the general reference to communications involving Dr. Rasmussen in Paragraphs 81, 81(b), and 83, the allegations about her in the Second Amended Complaint begin and end with her interaction with Plaintiff during the Panel on October 25, 2018.

## LEGAL STANDARD

"A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of a complaint to determine whether a plaintiff has properly stated a claim." *Bhattacharya v. Murray*, 515 F.Supp.3d 436, 452 (W.D. Va. 2021).   To state a claim, "a plaintiff must make a showing, rather than just a blanket assertion, of entitlement to relief and the showing must consist of enough facts to state a claim for relief that is plausible on its face." *Medeiros v. Wal-Mart, Inc.*, 434 F.Supp.3d 395, 415 (W.D. Va. 2020) (citations omitted).   "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).   "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*. (citing *Twombly*, 550 U.S. at 556).   "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id*. (citing *Twombly*, 550 U.S. at 557).

While the Court must accept as true all of the allegations in the complaint, that same tenant is "inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*. "Where the well-pleaded facts do not permit the court to infer more than a possibility of misconduct, the complaint has alleged—but it has not shown—the pleader is entitled to relief." *Id*. at 679 (citing Fed. R. Civ. Proc. 8(a)(2) (cleaned up)). "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Id*. at 678–79.

## ARGUMENT

Plaintiff's § 1983 claim against Dr. Rasmussen fails for at least three reasons. First, he fails to establish that Dr. Rasmussen's actions during the Panel violated his First Amendment rights. Second, his own statements—which are binding judicial admissions—contradict the claim that they did. Third, Plaintiff fails to allege a single fact suggesting that Dr. Rasmussen participated in—or was even aware of—any of the Retaliatory Conduct alleged in the Second Amended Complaint, whether during or after the Panel.

**A.**    **Dr. Rasmussen's actions during the Panel did not violate Plaintiff's First Amendment rights.**

"The college classroom with its surrounding environs is peculiarly the 'marketplace of ideas'" and the Supreme Court has repeatedly reaffirmed its "dedication to safeguarding academic freedom." *Healy v. James*, 408 U.S. 169, 180 (1972). Students are participants in this marketplace, and do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines Ind. Comm. School Dist.*, 393 U.S. 503, 506 (1969). Universities cannot, therefore, prevent the "dissemination of ideas . . . in the name alone of 'conventions of decency." *Papish v. Bd. of Curators of Univ. of Mo.*, 410 U.S. 667, 670 (1973). However, "the freedom of speech enjoyed by citizens" including students "is not absolute." *Turning Point USA*

9

*at Ark. St. Univ. v. Rhodes*, 973 F.3d 868, 875 (8th Cir. 2020) (citing *Ashcroft v. ACLU*, 535 U.S. 564, 573 (2002)).

"[T]he First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired." *Heffron v. Int'l Soc. for Krishna Consciousness, Inc.*, 452 U.S. 640, 647 (1981) (citations omitted). For example, otherwise protected speech may be "subject to reasonable time, place, and manner restrictions" as long as those restrictions are content-neutral. *Id.* (citations omitted); *see also Consol. Edison Co. v. Pub. Serv. Comm'n*, 447 U.S. 530, 536 (1980) (noting that such restrictions "may not be based upon either the content or the subject matter of speech."). Where the restrictions occur on government property, courts employ the so-called "forum analysis" to determine whether they are permissible. *See Goulart v. Meadows*, 345 F.3d 239, 248 (4th Cir. 2003) (citations omitted). This analysis recognizes three fora: (1) traditional public forum; (2) nonpublic forum; and (3) limited public forum. *Id.* at 248 (citations omitted).

The traditional public forum, as its name suggests, "is a place that 'by long tradition or by government fiat ha[s] been devoted to assembly or debate.'" *Id.* (quoting *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983)). By contrast, a nonpublic forum is one that is "not open by tradition or designation to the public for expressive activity." *Id.* (quoting *Perry*, 460 U.S. at 45). A limited public forum is one "which the government has opened for expressive activity to the public, or some segment of the public" through "purposeful public action" that is "intend[ed] to make the property generally available." *Id.* at 249 (citing and quoting *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 678 (1998)). As its name suggests, a limited public forum is "limited to use by certain groups or dedicated solely to the discussion of certain subjects." *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 470 (2009). The Government has varying

10

levels of authority to limit or restrict speech based on the nature of the forum, with the caveat that the restriction must always be content-neutral.  *See Goulart*, 345 F.3d at 248–50 (discussing the standards and restrictions applicable to each forum).

"University meeting facilities" which are "open for use for student groups" qualify as limited public fora. *Goulart*, 345 F.3d at 249 (citations omitted).  Numerous courts hold that a university lecture hall, when opened for discussion on a particular topic, is a limited public forum. *See Young America's Foundation v. Kaler*, 370 F. Supp. 3d 967, 983 (D. Minn. 2019) ("[T]he Supreme Court . . . [has] generally held that both university property (like lecture halls) and university programming (like student activity funds) are "limited public forums.") (subsequent history omitted)[7]; *Hickok v. Orange Cnty. Comm. College*, 472 F.Supp.2d 469, 474–75 (S.D.N.Y. 2006) (holding that a college created a limited public forum when it opened up its lecture hall for a speaker to come discuss and answer questions about the Iraq War as part of an ongoing lecture series); *Kushner v. Buhta*, No. 16-cv-2646, 2018 WL 1866033, at *10 (D. Minn. Apr. 18, 2018) (agreeing with the parties that by inviting a speaker to discuss a topic in a law school lecture hall, the school had created a limited public forum).

The Panel was hosted by a student organization and in a lecture hall on the UVA grounds. (ECF 335 ¶ 3; *see also* ECF 1-2 at Pageid#: 81 (Exh. 9) (stating, in Plaintiff's writing, that the Panel discussion took place in the "lecture hall.")).  UVA opened the lecture hall for a discussion about a specific topic: microaggressions.  Therefore, the Panel discussion took place in a limited

---

[7]  The Eight Circuit subsequently vacated and remanded the decision on mootness and standing grounds.  *Young America's Found. v. Kaler*, 14 F.4th 879 (8th Cir. 2021).  This had no effect on the underlying statements quoted above.

public forum, and the Court should assess Plaintiff's First Amendment claim under the limited public forum standard.

An official overseeing a limited public forum "is justified in limiting its meeting to discussion of specified agenda items and in imposing reasonable restrictions to preserve civility and decorum necessary to further the forum's purpose of conducting public business." *Steinburg v. Chesterfield City Planning Comm'n*, 527 F.3d 377, 385 (4th Cir. 2008).[8]  The official "may 'cut off speech which they reasonably perceive to be, or imminently to threaten, a disruption of the orderly and fair progress of the discussion, whether by virtue of its irrelevance, its duration, or its very tone and manner. . . ."  *Liggins v. Clarke Cnty. School Bd.*, No. 5:09CV00077, 2010 WL 3664054 at *7  (W.D. Va. Sept. 17, 2010) (quoting *Steinburg*, 527 F.3d at 385) (other citations omitted)).  Officials may limit speech that is too long, unduly repetitious, or that extends the discussion of irrelevant topics.  *Kindt v. Santa Monica Rent Control Bd.*, 67 F.3d 266, 270 (9th Cir. 1995) (citation omitted).  These time, place, and manner restrictions aim to ensure that all participants in a limited public forum have an opportunity to exercise their rights.  Indeed, if an official allows a speaker to "hijack the proceedings, or to filibuster them" this may well "impinge on the First Amendment rights of other would-be participants." *Eicenlaub v. Township of Indiana*, 385 F.3d 274, 281 (3d Cir. 2004).

"However, the power to restrict speech in a limited public forum 'is not without limits.'" *Judson v. Bd. of Supers. of Mathews Cnty., Va.*, 436 F.Supp.3d 852, 864–65 (E.D. Va. 2020) (quoting *Good News Club v. Milford Central School*, 533 U.S. 98, 106 (2001)).  The restriction

---

[8] For purposes of the Motion to Dismiss, we will assume that Plaintiff's comments during the Panel were sufficiently related to the "agenda items", i.e., microaggressions.  We will, instead, focus on the second issue of whether Dr. Rasmussen's actions during the Panel were in keeping with the "reasonable restrictions to preserve civility and decorum necessary to forum's purpose. . . ." *Steinburg*, 527 F.3d at 385.

"must not discriminate against speech on the basis of viewpoint" and "must be reasonable in light of the purpose served by the forum." *Judson*, 436 F.Supp.3d at 864–65 (quoting *Good News Club*, 533 U.S. at 106–07); *see also Pleasant Grove City*, 555 U.S. at 470 (stating that in a limited public forum "a government entity may impose restrictions on speech that are reasonable and viewpoint neutral.")

The "restriction(s)" at issue in Plaintiff's claims against Dr. Rasmussen, if they can be called restrictions at all, are not policies or rules. Rather, they are the following actions that she took during the Panel: (1) answering Plaintiff's fourth question to Dr. Adams after Plaintiff had held the floor for over three minutes; and (2) calling on another student afterward. Plaintiff must plead facts to support a plausible inference that Dr. Rasmussen took these actions because of the content of his speech. He fails to do so.

He simply offers the conclusory allegation that Dr. Rasmussen "subordinated [her] responsibilities to UVA Med School . . . to [her] personal ideologies and prejudices and [her] loyalty to AMWA." (ECF 335 ¶ 32). Neither this allegation, nor any of the other scant allegations about Dr. Rasmussen in the Second Amended Complaint, create a plausible inference that she attempted to silence Plaintiff's speech *because of its content*. Instead, the facts show that her actions fell within the reasonable time, place, and manner restrictions permitted in a limited public forum.

Dr. Rasmussen sat silent for over three minutes as Plaintiff made, what this Court previously described as, "aggressive critiques" of Dr. Adams' scholarship. *Bhattacharya*, 515 F.Supp.3d at 455. If Dr. Rasmussen was motivated by a desire to silence Plaintiff's speech because of its content, that content was on full display and she could have attempted to silence it. Yet, she

allowed Plaintiff to hold the floor for over three minutes and ask multiple, critical questions about the topic of microaggressions and Dr. Adams' scholarship on the topic.

When Dr. Rasmussen finally interjected, she did not criticize the content of Plaintiff's speech or refuse to engage with his critiques. Instead, she offered to answer his fourth question, but then open the floor to other students. Plaintiff acknowledged her intent by responding, "Of course, yeah." *Id.* at 445. The full text of her response to Plaintiff's fourth question is below:

> I am from West Virginia and on my father's side was sort of transplanted to West Virginia but my mother's side has been from West Virginia since the 1700s. And growing up, I was privileged enough to be able to go out of state to attend summer camps, and a rejoining refrain I heard all the time was oh you don't sound like you're from West Virginia. Or immediately lots of harmless jokes like oh but you are wearing shoes, oh but you are here at this math camp, oh but you're a girl, why are you bothering to get a …. These were all. You could argue it was said in good fun by people who don't know what they are saying. I grew up innocent to that and never pushed back on it but I tell you when I got to residency and I saw how people started thinking less of me because I was from a rural state. I began to understand the impact of these microaggressions. It doesn't matter. You have to learn to uncouple the intent of what you are saying and the impact it has on the audience. And you have to have a responsibility on the impact of your actions. And if you make a statement that someone considers insensitive, the first thing you can say is oh my gosh that it wasn't my intent. But don't get frustrated with that person for bringing it to your attention.

(ECF 335 ¶ 71).

While Dr. Rasmussen may have disagreed with Plaintiff's critiques about microaggressions, on their face, her comments cannot be reasonably viewed as suppressing his speech. On the contrary, Dr. Rasmussen was engaging in the very inquiry that Plaintiff wanted and that the First Amendment permits. If she had intended to suppress Plaintiff's speech due to its content, she could have simply ignored his question and moved directly to another student. Instead, she answered his question.

However, she made clear that she planned to call on another student after doing so. Plaintiff verbally consented to those terms and relinquished the floor. Nonetheless, when Dr. Rasmussen

finished speaking, Plaintiff retook the floor and again critiqued Dr. Adams' research.  (ECF 335 ¶¶ 72–73).  Dr. Rasmussen registered her disagreement with Plaintiff's assertions ("No, I think [Dr. Adams] provided a lot of citations and the literature") and explained that her comments about frustration were based on her "reading [of Plaintiff's] body language", and then called on another student.  She never cut off Plaintiff's microphone, told him to sit down or be quiet, refused to engage with his questions, criticized his views (though she may have disagreed with them), or attempt to have him removed from the lecture hall.  She simply answered his question and then— as she said she would—called on another student.

Answering a question and then moving on to another question was reasonable under the circumstances and fell well within the discretion of a person overseeing a limited public forum. *See Liggins*, 2010 WL 3664054 at \*7 (stating that an official overseeing a limited public forum "may cut off speech which they reasonably perceive to be, or imminently to threaten, a disruption of the orderly and fair progress of the discussion, whether by virtue of its irrelevance, its duration, or its very tone and manner. . . .") (citations and internal quotation marks omitted); *Kindt*, 67 F.3d at 270 (stating that such an official can limit or end speech that goes on too long, is unduly repetitive, or extends the discussion of irrelevant topics).   Indeed, the Fourth Circuit has sanctioned much more aggressive conduct to enforce reasonable time, place, and manner restrictions on speech in a public forum.

In *Steinburg*, the Fourth Circuit held that a chairman of a zoning commission did not violate the First Amendment when he cut off the plaintiff's comments during a board meeting and had the plaintiff forcibly removed from that meeting. *See Steinburg*, 527 F.3d 377.[9]  The commission had

---

[9] *Steinberg* has currency in this case because there was no evidence to show that the commission used a particular rule or policy to silence the plaintiff's speech.  The Fourth Circuit held that when

called the meeting to address a narrow procedural question. *Id*. at 380. The chair allowed one speaker to discuss the merits of a zoning issue that fell outside the scope of the meeting. *Id*. at 381. The plaintiff rose next and continued that discussion but also added a personal insult to one of the commission's members. *Id*. at 381–82. After the plaintiff and that member exchanged words, the chair interrupted and told the plaintiff to stop speaking. When the plaintiff refused, the chair had him removed from the meeting. *Id*. at 382–83. After finding that the commission meeting was a limited public forum, the Fourth Circuit concluded that the chairman acted "to cut off the irrelevant, off-topic discussion, to restore order, and to prevent the meeting from spiraling out of control, as was his right and duty as chair." *Id*. at 388.

Dr. Rasmussen's actions were equally permissible, though much less severe. As an official overseeing a public forum, she was empowered to employ content-neutral restrictions aimed at maintaining order, and was empowered to limit speech based on its duration or repetitiveness, among other things. *Liggins*, 2010 WL 3664054 at *7; *Kindt*, 67 F.3d at 270.[10] Plaintiff's attempt to retake the floor for additional comments or questions—after having agreed to allow Dr. Rasmussen to call on another student—threatened to prevent other attendees from exercising their First Amendment rights. Dr. Rasmussen's actions—responding to Plaintiff's fourth question and

---

the chairman cut off the plaintiff's speech, the chairman was simply acting to restore the "parliamentary order of the proceedings." *Id*. at 388.

There is no policy or rule at play in this case either. Dr. Rasmussen never invoked any rule or policy when she answered Plaintiff's fourth question and then moved on to another student. She simply exercised her discretion to "restore order, and to prevent the [Panel] from spiraling out of control, as was [her] right and duty as [a Panelist]." *Steinburg*, 527 F.3d at 388 (bracketed language added).

[10] Dr. Rasmussen would also have been justified in limiting Plaintiff's speech based on its tone. *Liggins*, 2010 WL 3664054 at *7. Complaints made by Panel attendees, and repeated in the Second Amended Complaint, variously described Plaintiff's tone during the questions and answer session as "aggressive", "combative", "condescending", "confrontational", disrespectful", and "unprofessional." (ECF 335 ¶¶ 75–78).

then calling on another student—were reasonable in light of the nature of the forum and the desire to allow questions from all of the attendees. Aside from his baseless conclusion that Dr. Rasmussen harbored a bias against his views, Plaintiff fails to offer any facts that lead to a plausible inference that her actions were motivated by animus towards the content of Plaintiff's speech.

In sum, Dr. Rasmussen's actions were well within the bounds of the First Amendment. Therefore, Plaintiff fails to state a plausible claim against her under § 1983 in Count I and the Court should dismiss that claim, as to Dr. Rasmussen, with prejudice.

**B.** **Plaintiff's claim against Dr. Rasmussen is barred by his own judicial admissions.**

Even if the Court harbors doubts about the constitutionality of Dr. Rasmussen's actions, there is another reason to dismiss Plaintiff's claims against her: Plaintiff cannot rise above his own judicial admissions. While Plaintiff claims that Dr. Rasmussen silenced his speech during the Panel due to its content, he said the exact opposite in an email that he sent mere hours after that event. What is more, he has included that email as both an allegation in, and an exhibit to, his Second Amended Complaint.

Dean Christine Peterson, who also attended the Panel, emailed Plaintiff a few hours after the Panel ended and said the following:

> Kieran, I was at the noontime "Microaggressions" panel today and observed your discomfort with the speaker's perspective on the topic. Would you like to come share your thoughts with me? I think I can provide some perspective that will reassure you about what you are and are not responsible for in interactions that could be uncomfortable even when that's not intended. If you'd prefer to talk with your own college dean, that's fine too. I simply want to help you understand and be able to cope with unintended consequences of conversations. Dr. Peterson

(ECF 335 ¶ 82; ECF 335-12 at Pageid#: 4127). Plaintiff gave the following response a few hours later:

> Your observed discomfort of me from wherever you sat was not at all how I felt. ***I was quite happy that the panel gave me so much time to engage with them*** about

the semantics regarding the comparison of microaggressions and barbs. ***I have no problems with anyone on the panel***; I simply wanted to give them some basic challenges regarding the topic. And I understand that there is a wide range of acceptable interpretations on this. I would be happy to meet with you at your convenience to discuss this further.

(ECF 335 ¶ 84; ECF 335-12 at Pageid#: 4127–28) (emphasis added).

Factual allegations in a complaint are generally considered binding judicial admissions by the party who makes them. *Amgen Inc. v. Conn. Retirement Plans and Trust Funds*, 568 U.S. 455, 470 n.6 (2013); *see also Wadi Food Indus. Co. S.A.E. v. Barclays Bank Del.*, 2019 WL 2169209, at *7 (E.D. Va. May 2, 2019) (noting that where the alleged admissions concern factual matters, as opposed to alternate legal theories, they are more likely to be deemed binding judicial admissions) (discussing *Svenge v. Mercedes-Benz Credit Corp.*, 329 F.Supp.2d 272 (D. Conn. 2004)); *Mt. Valley Pipeline, LLC v. 0.15 Acres of Land by Hale*, 827 Fed.Appx. 346 (Mem), 347 (4th Cir. Oct. 26, 2020) (citations omitted). Furthermore, where a plaintiff "adopt[s] the contents of [a] document" in his complaint, the Court "will credit the contents of the document over contradictory allegations in the Complaint." *Hegedus v. Nationstar Mortg. LLC*, No. 5:17cv53, 2018 WL 6515147, at *3 (W.D. Va. Dec. 11, 2018) (quoting *Goines v. Valley Cnty. Servs. Bd.*, 822 F.3d 159, 167 (4th Cir. 2016)) (internal quotation marks omitted).

Plaintiff has included an allegation concerning his October 25, 2018, email communications with Dean Peterson in every version of his complaint. (*See* ECF 1 ¶ 32; ECF 1-2 at Pageid#: 82 (Exh. 10); ECF 28 ¶¶ 63–65; ECF 28-12 at Pageid: 417; ECF 335 ¶¶ 82–84; ECF 335-12 at Pageid#: 4127–28).[11] He has also attached the email thread to each of his complaints as

_____

[11] The only exception is Plaintiff's original *pro se* Complaint. While he included the text of Dean Peterson's email in the body of the Complaint, he did not include the text of his response. Still, he attached an exhibit to that original complaint that contained both Dean Peterson's email and his response. (ECF 1-2 at Pageid#: 82 (Exh. 10)).

an exhibit.  Therefore, Plaintiff has adopted his October 25, 2018, email to Dean Peterson as part of the allegations in his Second Amended Complaint, and the statements in that email are binding judicial admissions.

Plaintiff's admissions the panelist gave him "so much time to engage with them" and that he had "no problems with anyone on the panel" directly contradict his much later conclusory allegations that Dr. Rasmussen "interrupted the dialogue between [him] and Professor Adams, launched into a diatribe about microaggressions . . . and raised her voice in anger at [him] before cutting him off altogether."  (ECF 335 ¶ 4).  Most importantly, they belie his allegation that Dr. Rasmussen "censor[ed]" Plaintiff or "deprive[d] [him] of his constitutional right of free speech." (*Id*. ¶¶ 4 and 35).  Reasonable minds could not differ that Plaintiff—by his own admission—was quite happy with the amount of time the panelists gave him to speak and that he had no problems with anyone on the Panel.

Mere hours after the event in which Plaintiff now claims Dr. Rasmussen restricted his fundamental right to free speech, Plaintiff expressed gratitude that she and the other panelists had given him *so much time to speak*.  These two assertions cannot coexist.  The Court should give weight to Plaintiff's own words—which are binding judicial admissions—over his later, conclusion-laden allegations against Dr. Rasmussen in the Second Amended Complaint. Therefore, Plaintiff cannot state a *prima facie* claim against Dr. Rasmussen under § 1983.

**C.**     **Plaintiff fails to plead a *prima facie* claim for retaliation against Dr. Rasmussen.**

Plaintiff styles his § 1983 claim in Count I as a retaliation claim and asserts it against all Defendants.  (ECF 335 ¶¶ 178–80) (including Dr. Rasmussen as one of the so-called "UVA Med School Individual Defendants").   A plaintiff claiming First Amendment retaliation must demonstrate that: "(1) he engaged in protected First Amendment activity, (2) the defendants took

some action that adversely affected his First Amendment rights, and (3) there was a causal relationship between his protected activity and the defendants' conduct." *Davison v. Rose*, 19 F.4th 626, 636 (4th Cir. 2021) (citations omitted, cleaned up).  Importantly, a plaintiff cannot simply make general allegations that a group of defendants violated his constitutional rights. Rather, he must "affirmatively show[ ] that the [defendant] acted personally in the deprivation of plaintiff's rights." *Roncales v. Cnty. of Henrico*, 451 F.Supp.3d 480, 500 (E.D. Va. 2020) (quoting *Wright v. Collins*, 766 F.2d 841, 850 (4th Cir. 1985)).

Our focus here is on the second element: an adverse action that affected the Plaintiff's First Amendment rights.  "Not every . . .  restriction . . . is sufficient to chill the exercise of First Amendment rights, nor is every restriction actionable, even if retaliatory." *The Balt. Sun Co. v. Ehrlich*, 437 F.3d 410, 416 (4th Cir. 2006) (citation omitted).  To be actionable, the conduct at issue must materially affect the exercise of the plaintiff's First Amendment rights. *Houston Cmty. College Sys. v. Wilson*, No. 20-804, --- S. Ct. ----, 2022 WL 867307, at *5 (U.S. Mar. 24, 2022) (distinguishing between material and immaterial adverse actions); *see also Ehrlich*, 437 F.3d at 416 (distinguishing between "actionable" and "*de minimis*" adverse actions).  "Some adverse actions may be easy to identify—an arrest, a prosecution, or a dismissal from governmental employment." *Wilson*, 2022 WL 867307 at *5 (citations omitted).  While "'[d]eprivations less harsh than dismissal' can sometimes qualify . . . no one would think that a mere frown from a supervisor constitutes a sufficiently adverse action to give rise to an actionable First Amendment claim." *Id*. at *5 (quoting *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 75 (1990)).  Lower courts have developed tests to "distinguish material from immaterial adverse actions." *Id*.  The Fourth Circuit asks whether "a similarly situated person of ordinary firmness reasonably would be chilled by the government conduct in light of the circumstances presented in the particular case." *Latson*

*v. Clarke*, 346 F.Supp.3d 831, 872 (W.D. Va. 2018) (quoting *Blankenship v. Manchin*, 471 F.3d 523, 530 (4th Cir. 2006)).

With these principles in mind, we turn to Plaintiff's retaliation claim against Dr. Rasmussen. That claim fails because Plaintiff fails to allege that Dr. Rasmussen engaged in a material adverse action—whether during or after the Panel.

First, Plaintiff fails to show how Dr. Rasmussen's actions *during* the Panel were material and had a chilling effect on his speech. *Wilson*, 2022 WL 867307 at *5 (distinguishing material adverse actions from immaterial ones); *Latson*, 346 F.Supp.3d at 872 (discussing the need to plead a chilling effect on one's speech). Plaintiff held the floor for over three minutes and asked multiple questions before Dr. Rasmussen interjected. When she did so, she told Plaintiff that she was going to answer his latest question, but would then move on to another student. Plaintiff verbally acknowledged this by saying, "Of course, yeah." (ECF 335-2 at 32:08–09). By doing so, Plaintiff acknowledged that his time to speak was over and relinquished the floor to Dr. Rasmussen to answer his question and call on another student. Thereafter, Plaintiff attempted to regain the floor and make additional points. Again, Dr. Rasmussen did not prevent him from doing so. She simply responded and then moved on to another student.

In fact, Dr. Rasmussen did not silence Plaintiff at all, but offered protected speech of her own. As in *Wilson*, "the only adverse action at issue [here] is itself a form of speech" by Dr. Rasmussen. *Wilson*, 2022 WL 867307 at *5 (bracketed language added, cleaned up). To be sure, Plaintiff takes issue with the content of Dr. Rasmussen's comments, describing them as a "diatribe" and an "angry outburst." (ECF 335 ¶¶ 4–5). But even if Plaintiff's descriptions of Dr. Rasmussen's actions during the Panel are accurate (and the audio recording reveals that they are not), the First Amendment does not create a "civility code." *Graham v. Mahmood*, No. 05 Civ.

21

10071, 2008 WL 1849167, at *10 (S.D.N.Y. Apr. 22, 2008).  It does quite the opposite.  *Hustler Magazine, Inc. v. Falwell,* 485 U.S. 46, 55  (1988) ("Indeed, if it is the speaker's opinion that gives offense, that  consequence is a reason  for according it constitutional protection.") (cleaned up, citations omitted).  The fact that Plaintiff did not like Dr. Rasmussen's responses does not show that they chilled his speech.  Indeed, he fails to allege any facts suggesting that they did.

Second, Plaintiff fails to allege any facts to support a plausible inference that Dr. Rasmussen participated in the Retaliatory Conduct alleged in the Second Amended Complaint—all of which occurred *after* the Panel.  (ECF 335 ¶ 179 (identifying that conduct); *see also supra* at 6–7).  For example, he does not allege that Dr. Rasmussen submitted a professionalism card or any other complaint about his comments at the Panel.  He does not claim that she was aware of—let alone participated in—the two meetings of the Academic Standards & Achievement Committee in November 2018 about Plaintiff.  He does not allege that she was aware of—let alone participated in—Plaintiff's meetings with Dr. Densmore, his visit to UVA's Counseling & Psychological Services (CAPs), or of his two hospitalizations in November 2018.  Nor does he allege that Dr. Rasmussen was aware of—let alone participated in—UVA's decision to suspend Plaintiff or to issue the no-trespass order.  In short, he alleges no facts to tie Dr. Rasmussen to the Retaliatory Conduct alleged in the Second Amended Complaint.

Instead, he points to alleged communications between multiple parties—including Dr. Rasmussen—and asks the Court to infer that these unspecified communications somehow relate to the Retaliatory Conduct.  He claims that Dr. Rasmussen engaged in "inappropriate and unprofessional communications" with Dean Densmore, Dean Peterson, and Professor Kern, and that she spoke with Dean Peterson, Professor Kern, and others "about [Plaintiff's] questions and comments" at the Panel.  (*Id*. ¶¶ 81(b), 83).  However, Plaintiff does not offer a single *fact* that

would allow the Court to infer that these communications constituted retaliation, or were related to the Retaliatory Conduct alleged in the Second Amended Complaint.

A plaintiff asserting retaliation must "allege how or why defendants retaliated against [him], and may not conclusorily assert that the conduct complained of occurred as part of defendants' general scheme of retaliation." *Talbert v. Hinkle*, 961 F.Supp.904, 913 (E.D. Va. 1997) (citation and internal quotation marks omitted, cleaned up); *see also Adams v. Rice*, 40 F.3d 72, 74–75 (4th Cir. 1994) (rejecting a retaliation claim that merely asserted that a defendant's actions were party of a "general scheme of retaliation" without alleging "how or why defendants retaliated against plaintiff."). Plaintiff's allegations concerning Dr. Rasmussen's alleged communications are of the "general scheme" variety.

He does not identify when Dr. Rasmussen sent or received those communications; the content of those communications (including any statements by Dr. Rasmussen); or how those comments related to the alleged Retaliatory Conduct. Instead, he simply groups Dr. Rasmussen with the other Defendants, claims that those parties communicated at some point, and asks the Court to infer some connection between those communications and the alleged Retaliatory Conduct. General allegations that fail to specify the nature of the alleged Retaliatory Conduct and who committed it cannot satisfy Plaintiff's pleading burden. *See Roncales*, 451 F.Supp.3d at 500 (stating that the plaintiff must "affirmatively show[ ] that the officer charged acted personally in the deprivation of plaintiff's rights.") (citation omitted). Yet, that is exactly what Plaintiff offers.

In sum, Plaintiff fails to offer any facts suggesting that Dr. Rasmussen participated in any of the Retaliatory Conduct alleged in the Second Amended Complaint. His oblique references to alleged communications between Dr. Rasmussen and other Defendants do not save his claims either, because he fails to explain how those communications constituted retaliation or related to

the alleged Retaliatory Conduct.  Plaintiff must allege how Dr. Rasmussen contributed to the

Retaliatory Conduct alleged in the Second Amended Complaint.  In this, his third attempt, Plaintiff

still fails to do so.

## **CONCLUSION**

Accordingly, and for the reasons discussed above, Dr. Sarah Rasmussen respectfully

requests that this Court grant her Motion to Dismiss and dismiss Plaintiff's claim against her under

42 U.S.C. § 1983 (Count I), with prejudice.


 Dated: April 6, 2022                                             Respectfully submitted,

                                                                 **SARAH K. RASMUSSEN, M.D., PH.D.**

                                                                 */s/ H. Robert Yates, III*
                                                                 H. Robert Yates, III (VSB No. 35617)
                                                                 C. Quinn Adams (VSB No. 90506)
                                                                 O'Hagan Meyer PLLC
                                                                 411 East Franklin Street, Suite 500
                                                                 Richmond, Virginia 23219
                                                                 (804) 403-7108 (phone)
                                                                 (804) 403-7110 (facsimile)
                                                                 raytes@ohaganmeyer.com
                                                                 cadams@ohaganmeyer.com

                                                                 *Attorneys for Sarah K. Rasmussen, M.D.,*
                                                                 *Ph.D.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 6th day of April 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will then send a notification of such filing (NEF) to counsel of record.

*/s/ H. Robert Yates, III* _____