UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

| | |
|---|---|
| KIERAN RAVI BHATTACHARYA,<br><br>*Plaintiff,*<br><br>v.<br><br>JAMES B. MURRAY, JR., *et al.*,<br><br>*Defendants.* | Case No. 3:19-cv-54<br><br>MEMORANDUM OPINION<br><br>Judge Norman K. Moon |

## I. Introduction

This matter comes before the Court on Defendants' motion for summary judgment, Dkt. 444. This case is a First Amendment retaliation claim brought by Plaintiff Kieran Ravi Bhattacharya against the Rector, Vice Rector, and Members of the University of Virginia Board of Visitors; Melissa Fielding, UVA's Former Deputy Chief of Police; Dr. Jim B. Tucker, the Chair of the Academic Standards and Achievements Committee at UVA School of Medicine; Dr. John Densmore, Associate Dean for Admissions and Student Affairs at the UVA School of Medicine; and Dr. Christine Peterson, former Assistant Dean for Medical Education at the UVA School of Medicine. Plaintiff sues Dr. Densmore and Dr. Peterson in their individual and official capacities; all other claims are against Defendants in their official capacities.

The Court will award summary judgment to all Defendants. There are three basic elements to a First Amendment retaliation claim: protected speech, an adverse action, and causation. That Plaintiff engaged in protected speech is uncontested. Although it is contested what specific adverse actions Defendants took, it is also uncontested that Defendants undertook *some* adverse action against Plaintiff. But there is no genuine dispute whether any adverse action

1

undertaken by Defendants was causally connected to Plaintiff's protected speech. Simply put, discovery has failed to produce a single piece of evidence indicating that Defendants retaliated against Plaintiff because of his protected speech.

## II. Facts

The pleadings on this motion paint two competing narratives about the circumstances that led to Plaintiff Kieran Ravi Bhattacharya's dismissal from the University of Virginia School of Medicine.[1] Bhattacharya contends that Defendants—various administrators at the University of Virginia—retaliated against him for his speech at a faculty panel on microaggressions held in October 2018. Defendants contend that the School of Medicine dismissed Bhattacharya because of his threatening behavior and history of dangerous mental health episodes.

Bhattacharya began medical school at the University of Virginia School of Medicine in fall 2016. In January 2017, he voluntarily presented to the UVA Health System's emergency department, complaining of mental health symptoms. (DX8, 9; Dkt. 466 at 12).[2] He was subsequently hospitalized for about two weeks with symptoms "consistent with a manic episode of psychosis." (DX9; *see also* DX 8; Dkt. 466 at 12). He was discharged with a diagnosis of "[b]ipolar disorder, current manic episode, with psychosis." (DX8). Around the same time, Bhattacharya's roommates contacted Defendant Dr. John D. Densmore about Bhattacharya's alarming behavior, and Dr. Densmore spoke directly to Bhattacharya about his difficulties. (DX10 at 37:25–38:13). Bhattacharya then took a voluntary leave of absence from the School of Medicine beginning on February 7, 2017. (DX11). He returned to classes for the spring semester

---

[1] The facts described are either uncontested or viewed in the light most favorable to Plaintiff, as the non-movant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)

[2] For the citations in this opinion, the Court has adopted the parties' titles for their exhibits, which are docketed at Dkt. 460 (Defendants' exhibits) and Dkt. 464 (Plaintiff's exhibits).

of 2018. (DX14).

On the evening of September 1, 2018, Bhattacharya contacted the Dean-on-Call, Dr. Christine Peterson, explaining that he had been experiencing mental health symptoms for a few days, had been unable to sleep or study, and sought to delay a summative exam. (DX15, 16 at ¶ 5). Dr. Peterson granted the request and passed along information about Bhattacharya's situation to other faculty members, including Dr. Densmore. (DX15, 17).

Then, on October 25, 2018, the faculty panel on microaggressions at the heart of this case occurred. The panel was hosted by the School of Medicine's student chapter of the American Medical Women's Association and was titled "Microaggressions: Why Are 'They' So Sensitive." Three faculty members spoke at the event: Dr. Beverly Adams from UVA's Department of Psychology, and Dr. Nora Kern and Dr. Sara Rasmussen from the School of Medicine. During the question-and-answer portion of the panel, Bhattacharya asked Dr. Adams several questions challenging her ideas about microaggressions. The exchange proceeded:

> Bhattacharya: Hello. Thank you for your presentation. I had a few questions just to clarify your definition of microaggressions. Is it a requirement, to be a victim of microaggression, that you are a member of a marginalized group?
>
> Adams: Very good question. And no. And no—
>
> Bhattacharya: But in the definition, it just said you have to be a member of a marginalized group—in the definition you just provided in the last slide. So that's contradictory.
>
> Adams: What I had there is kind of the generalized definition. In fact, I extend it beyond that. As you see, I extend it to any marginalized group, and sometimes it's not a marginalized group. There are examples that you would think maybe not fit, such as body size, height, [or] weight. And if that is how you would like to see me expand it, yes, indeed, that's how I do.
>
> Bhattacharya: Yeah, follow-up question. Exactly how do you define marginalized and who is a marginalized group? Where does that go? I mean, it

>           seems extremely nonspecific.
>
> Adams:    And—that's intentional. That's intentional to make it more nonspecific . . . .

(DX18 at 28:44, *et seq.* (audio recording of Q&A section of panel)).

After the initial exchange, Bhattacharya challenged Adams's definition of microaggressions. (*Id.*). He argued against the idea that "the person who is receiving the microaggressions somehow knows the intention of the person who made it," and he expressed that "a microaggression is entirely dependent on how the person who's receiving it is reacting." (*Id.*). He continued his critique of Adams's work, saying: "The evidence that you provided—and you said you've studied this for years—which is just one anecdotal case—I mean do you have, did you study anything else about microaggressions that you know in the last few years?" (*Id.*). After Adams responded to Bhattacharya's third question, he asked an additional series of questions: "So, again, what is the basis for which you're going to tell someone that they've committed a microaggression? . . . Where are you getting this basis from? How are you studying this, and collecting evidence on this, and making presentations on it?" (*Id.*).

At that point, Dr. Rasmussen responded, "OK, I'll take that. And I think that we should make sure to open up the floor to lots of people for questions." (*Id.*). Bhattacharya agreed, "Of course, yeah." (*Id.*). Rasmussen then told a story about how her former peers and colleagues had subjected her to "harmless jokes" and microaggressions related to stereotypes about those who come from rural states, as she did. (*Id.*). She concluded:

> You have to learn to uncouple the intent of what you're saying and the impact it has on the audience. And you have to have a responsibility for the impact of your actions. And if you make a statement that someone considers insensitive, the first thing you can say is, "Oh my gosh, that was not my intent." But don't get frustrated with that person for bringing it to your attention.

(*Id.*). Bhattacharya responded to Rasmussen, saying:

4

> Bhattacharya: I have to respond to that because I never talked about getting frustrated at a person for making a statement. I never condoned any statements that you are making like that. But what I am saying is that what you're providing is anecdotal evidence. That's what you provided. That's what she provided—
>
> Rasmussen: No, I think she's provided a lot of citations in the literature. And I'm sorry—I was just reading your body language.

(*Id.*). Bhattacharya then began to speak over Rasmussen, who called on someone else to ask a question. (*Id.*). Bhattacharya's dialogue with Adams and Rasmussen lasted approximately five minutes and fifteen seconds. (*Id.*).

Later that afternoon, Dr. Kern emailed Dr. Peterson to ask if she knew the "extremely unprofessional" student from the panel and suggested that his behavior "should be brought up at ASAC" (the School of Medicine's Academic Standards and Achievement Committee) because she would "definitely have concerns on having someone like that in rotations." (DX21). Dr. Peterson responded by suggesting that Dr. Kern submit a "concern card" if she thought she needed to. (*Id.*). A "concern card" is a tool used by the School of Medicine to monitor the professional behavior of students; a concern card may prompt review by ASAC but contains no punitive effect itself. (DX5 at 6). Dr. Kern submitted a concern card later that evening. (DX20-A). A few days later, on November 1, 2018, after receiving the concern card, Dr. Densmore submitted the card to ASAC for review. (DX22).

ASAC considered the card at a meeting on November 14, 2018. (DX23). The committee unanimously voted to send Bhattacharya a letter "reminding him of the importance in medicine to show respect to all." (*Id.*). Dr. Jim Tucker then sent such a letter to Bhattacharya on behalf of ASAC on November 15, 2018. (DX24).

Also on November 14, 2018, Dr. Densmore (who did not attend the ASAC meeting)

called a meeting with Bhattacharya to discuss his failing grade on a summative exam in hematology. (DX25, 26; Dkt. 466 at 17). Bhattacharya's behavior during the meeting caused Dr. Densmore to become concerned about his mental health, so Dr. Densmore asked Bhattacharya to either consult with his private psychiatrist or go to UVA Student Health's Counsel and Psychological Services (CAPS) for evaluation. (PX22; DX27). After the meeting, Dr. Densmore walked with Bhattacharya to CAPS, where a clinician evaluated him. (PX22; DX27). Due to his behavior during the evaluation, CAPS petitioned for an emergency custody order, which was granted, and University Police escorted Bhattacharya to the UVA Medical Center for further treatment. (DX29, 30). He was hospitalized there until his discharge on November 16, 2018. (Dkt. 466 at 20; PX27).

Just a few days later, on November 18, 2018, Charlottesville police officers responded to a reported domestic incident at Bhattacharya's home involving Bhattacharya and his mother. (DX32). The next day, his mother filed a Petition for Involuntary Admission for Treatment in the General District Court for the City of Charlottesville, in which she alleged that Bhattacharya was "[getting] inches from [her] face" while "screeming [sic] and pounding [his] fists toward [her]" and "exhibiting paranoid behavior saying that UVA medical school was 'out to get him.'" (DX33). A magistrate judge issued the Emergency Custody Order the same day, November 19. (DX93).

Also on November 19, Bhattacharya's ex-girlfriend, who was also a medical student at UVA, contacted Dr. Peterson to seek help obtaining a protective order against Bhattacharya. (DX34-C). The Juvenile and Domestic Relations District Court for the City of Charlottesville later awarded Plaintiff's ex-girlfriend a preliminary protective order on November 26, 2018. (DX 34-D).

6

That same day, November 19, Bhattacharya entered the Dean of Medicine's office to meet with Dr. Densmore. (DX35; Dkt. 466 at 21–22). Bhattacharya asked Dr. Densmore during that meeting, "Do you think you have power over me?" and stated "You better watch yourself." (DX35; DX10). Concerned, Dr. Densmore contacted a colleague who contacted the police. (DX46). Officers from the Charlottesville Police Department intercepted Bhattacharya as he was leaving the building. (DX36). The police took him into custody and transported him to the emergency department at UVA Medical Center. (*Id.*). The Charlottesville General District Court later issued a temporary detention order for Bhattacharya, who was transported to Poplar Springs Hospital in Petersburg, VA. (DX38, 39).

On November 21, while Bhattacharya was still held at Poplar Springs, the Petersburg General District Court ordered that he continue to be involuntarily committed. (DX40). He was released from Poplar Springs on November 26. (DX41).

Upon learning of Bhattacharya's discharge from Poplar Springs Hospital on November 26, 2018, Dr. Densmore emailed Bhattacharya to inform him that he would need to be evaluated by CAPS before returning to class because the medical school's attendance policy requires that students receive a medical evaluation if they miss two or more consecutive days due to illness. Bhattacharya refused to comply. (DX42, 44). On November 27, 2018, Dr. Randolph Canterbury, Senior Associate Dean for Education and Professor of Psychiatry and Internal Medicine, reiterated the requirement to Plaintiff, instructing him not to attend class but to instead make an appointment with CAPS to begin the clearance process. (DX47).

ASAC held a meeting on November 28, 2018 to discuss Bhattacharya's enrollment status and invited Bhattacharya to attend. (DX51, 52). In the prior weeks, administrators at the medical school had discussed various avenues to suspend Bhattacharya from the medical school,

determining that he could not be suspended on academic or Title IX grounds. (PX33). At the November 28 meeting, Bhattacharya repeatedly attempted to bring up the microaggression panel, but Dr. Tucker told him that "we addressed that last month," and that "the reason we're having this meeting tonight is that there's concern about your interactions and behaviors most recently." (DX52). Dr. Bart Nathan similarly explained: "We are having this discussion because we are concerned about your professionalism and professional behavior in medical school." (DX52).

After Bhattacharya left the meeting, the ASAC committee decided that Bhattacharya had failed to meet the school's requirements for continued enrollment, and therefore voted unanimously to suspend him from the medical school. (DX54). Neither Dr. Peterson nor Dr. Densmore participated in the vote because they were not voting members of ASAC. (*Id.*).

The following day, November 29, 2018, Dr. Tucker sent Plaintiff a letter from ASAC explaining that he was suspended from the School of Medicine for one year. (DX56). The letter communicating the suspension explained that ASAC had voted to suspend Plaintiff due to his "aggressive and inappropriate interactions in multiple situations, including in public settings, during a speaker's lecture, with [his] Dean, and during the committee meeting yesterday" and concluded that Plaintiff's conduct on the whole "constitute[s] a violation of the School of Medicine's technical standards." (*Id.*).

Approximately a month later, in late December 2018, Medical School faculty members learned from concerned students and individuals outside the UVA community that Bhattacharya was posting information relating to his suspension online, including the photograph of the ASAC members that he took at the beginning of the November 28, 2018, ASAC meeting. (DX57, 58). Faculty members learned that Bhattacharya had posted about his suspension on the message board 4Chan, which had provoked messages from other users encouraging violence against the

8

school. (DX57, 58-B, 59, 60).

On about December 30, 2018, Captain Melissa Fielding of the University Police Department conferred with UVA's "Threat Assessment Team" to discuss concerns regarding Bhattacharya's behavior. (DX1 at 28:6-30:21). The Threat Assessment Team discussed the protective order that his ex-girlfriend had obtained, his involuntary commitments, his threats against faculty members at the School of Medicine, and his pattern of retaliatory behavior. (*Id.* at 148:21-149:1). Captain Fielding ultimately decided to issue a no trespass order (NTO) against Bhattacharya; she issued a verbal NTO against Bhattacharya that same day, December 30. (*Id.* at 28:2-5). She followed with a mailed physical copy a few days later. (DX63). The NTO stated that Bhattacharya could not enter the University's grounds or facilities for four years except as a patient of the medical center and notified him of the process by which he could appeal the order. (*Id.*).

On January 3, Dr. Densmore emailed Plaintiff to explain that the School of Medicine would "not be able to proceed with an appeal of [his] suspension" because of the NTO. (DX64).

Several months later, on July 12, after Bhattacharya petitioned for readmission to the School of Medicine, Dr. Densmore told him by email that "[The School of Medicine] cannot address your request for readmission while a no trespass order is in effect. Should you have questions about that order, you will need to contact [the University Police Department] directly." (DX68). Bhattacharya then appealed the NTO on July 21, 2019. (DX72). UVA considered and denied his appeal of the NTO as untimely because it was filed outside of the appeal period. (DX73).

Bhattacharya filed a *pro se* complaint (Dkt. 1) in September 2019, and, after retaining counsel, filed a First Amended Complaint (Dkt. 33) in February 2020. The First Amended

9

Complaint alleged four causes of action. (Dkt. 33). In a March 2021 order, this Court dismissed all claims stated in the First Amendment Complaint except for a First Amendment Retaliation claim under 42 U.S.C. § 1983. (Dkt. 129). This Court subsequently granted Bhattacharya leave to file a Second Amended Complaint (Dkt. 324), which restated the First Amendment Retaliation claim. (Dkt. 335). This Court's subsequent order on Defendants' motion to dismiss portions of the Second Amended Complaint dismissed certain Defendants from the case but kept intact the core First Amendment Retaliation claim against various UVA administrators. (Dkt. 487).

### III. Legal Standard

#### A. Summary Judgment

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if a reasonable jury could return a verdict for the nonmoving party," and "[a] fact is material if it might affect the outcome of the suit under the governing law." *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018). The nonmoving party must "show that there is a genuine dispute of material fact . . . by offering sufficient proof in the form of admissible evidence." *Id*. (quoting *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016)). The district court must "view the evidence in the light most favorable to the nonmoving party" and "refrain from weighing the evidence or making credibility determinations." *Id*. "Although the court must draw all justifiable inferences in favor of the nonmoving party, the nonmoving party must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence." *Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013).

The moving party bears the burden of establishing that summary judgment is

warranted. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). If the moving party meets this burden, then the nonmoving party must set forth specific, admissible facts to demonstrate a genuine issue of fact for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The non-movant may not rest on allegations in the pleadings; rather, it must present sufficient evidence such that reasonable jurors could find by a preponderance of the evidence for the non-movant. *Celotex Corp.*, 477 U.S. at 322–24; *Sylvia Dev. Corp. v. Calvert Cnty, Md.*, 48 F.3d 810, 818 (4th Cir. 1995).

B.  First Amendment Retaliation

The First Amendment protects not only the affirmative right to speak, but also the "right to be free from retaliation by a public official for the exercise of that right." *Adams v. Trs. Of the Univ. of N.C.-Wilmington*, 640 F.3d 550, 560 (4th Cir. 2011) (quoting *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 685 (4th Cir. 2000)). To prove his First Amendment retaliation claim at trial, Bhattacharya must prove that (1) he "engaged in protected First Amendment activity," (2) "the defendants took some action that adversely affected [his] First Amendment rights," and (3) "there was a causal relationship between [his] protected activity and the defendants' conduct." *Buxton v. Kurtinitis*, 862 F.3d 423, 427 (4th Cir. 2017). There is no dispute in this case whether Bhattacharya engaged in protected speech; there are only disputes about what adverse action or actions Defendants undertook against Bhattacharya and whether there was a causal relationship between Bhattacharya's protected speech and some adverse action.

To prove that Defendants took an action that adversely affected Bhattacharya's First Amendment rights at trial, Bhattacharya must demonstrate that Defendants engaged in some conduct that "would likely deter 'a person of ordinary firmness' from the exercise of First Amendment rights." *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474,

500 (4th Cir. 2005). This test "focuses on the status of the speaker, the status of the retaliator, the relationship between the speaker and the retaliator, and the nature of the retaliatory acts." 202 F.3d at 686.

To prove causation at trial, Bhattacharya must show that Defendants desired to retaliate against him for his speech and that this desire was the but-for cause of their actions. *Nieves v. Bartlett*, 587 U.S. ___; 139 S. Ct. 1715, 1722 (2019); *see also Hartman v. Moore*, 547 U.S. 250, 257 (2006).

### IV.  Discussion

There are three overarching questions before the Court at this stage. First is whether there is a genuine dispute that Defendants took an adverse action that affected Plaintiff's First Amendment rights. Second is whether there is a genuine dispute that there was a causal connection between Plaintiff's protected speech and some adverse action by Defendants. Third is whether the Defendants sued in their individual capacities for money damages are entitled to qualified immunity.

#### A.  Adverse Action

Plaintiff alleges that Defendants took ten adverse actions against him. (Dkt. 466 at 46–52). They are as follows:

(1) The October 25, 2018 Professionalism Concern Card

(2) The November 14, 2018 Psychiatric Evaluation

(3) The November 14, 2018 ASAC Vote to Reprimand

(4) The November 15, 2018 ASAC Letter of Reprimand

(5) The November 19, 2018 Psychiatric Evaluation

(6) The November 27, 2018 CAPS Evaluation Requirement

(7) The November 28, 2018 ASAC Suspension Hearing

(8) The November 29, 2018 ASAC Suspension Letter

(9) The "Refusal to Allow Appeal"

(10) The No Trespass Order, Denial of Appeal, and Refusal to Dissolve

Some of these are just different ways of splitting the same alleged adverse action—it is unclear whether there is a distinction between, for instance, the meeting to consider whether to suspend Bhattacharya and the actual decision to suspend him. The same is true for the NTO and the follow-up to the NTO. Regardless, Defendants concede that suspending Bhattacharya from the medical school and the NTO would chill the speech of an ordinary person. (Dkt. 445 at 26). They only argue that there was no causal connection between those adverse actions and Bhattacharya's speech at the microaggression panel. (*Id.*). In addition, this Court has already held that the Professionalism Concern Card was not an adverse action as a matter of law. (Dkt. 487 at 11). Thus, the Court will determine here whether there is a genuine dispute that the other alleged adverse actions are in fact cognizable as adverse actions as a matter of law.

### 1. The Psychiatric Evaluations and Holds

The Court holds that the November 14, 2018 psychiatric evaluation was an adverse action because being forced into psychiatric care as a result of one's protected speech "would likely deter 'a person of ordinary fitness' from the exercise of First Amendment rights." *Constantine*, 411 F.3d at 500.

The Court does not credit Defendants' argument that the psychiatric evaluations were not adverse actions as a matter of law because they were "treatment." (*See* Dkt. 445 at 31). Being forced into a psychiatric evaluation on account of one's protected speech would chill an ordinary person's speech regardless of whether some benefit might come of it.

Defendants argue that Dean Densmore did not "force" Bhattacharya to receive psychiatric treatment, but rather suggested that he do so and then walked with him to CAPS. (*Id.* at 31–32). But that is a disputed fact—Bhattacharya has put some evidence into the record indicating that the trip to CAPS was non-optional. *See* PX29 ("John Densmore (SOM) met with [Bhattacharya] on Wednesday 11/14 regarding an exam he failed and his behavior during micro aggression panel. John had him walk to CAPS."); DX28 ("Dr. Densmore walked [Bhattacharya] in today because there has been concern expressed about a number of recent events[.]").

The November 19 psychiatric evaluation was also an adverse action in the sense that a psychiatric evaluation and hold would deter a person of ordinary fitness from the exercise of his First Amendment rights, but it is unclear from the evidence in the record whether any action undertaken by the Defendants in this case led to the November 19 psychiatric hold. Two events that led to Bhattacharya's evaluation and hold occurred within about half an hour of one another on November 19. First, his mother procured the emergency protective order; that occurrence is obviously not reasonably attributable to Defendants. Second, Bhattacharya presented at Dr. Densmore's office and Dr. Densmore contacted a colleague who called the police after Bhattacharya threatened him. There is no evidence in the record that Dr. Densmore discussed the contents of Bhattacharya's protected speech at the microaggression panel with Bhattacharya at the November 19 meeting. After the police engaged Bhattacharya following his meeting with Dr. Densmore, a local magistrate issued a Temporary Detention Order, after which Bhattacharya was transferred to Poplar Springs Hospital in Petersburg.

There are disputed facts about the extent to which Dr. Densmore's actions on November 19 led to Bhattacharya's psychiatric hold—i.e., whether or not the hold would have happened regardless of whether Densmore contacted a colleague who called the police—so the Court will

not grant summary judgment on the adverse action prong for the November 19 evaluation and hold.

2. *The November 14 ASAC Vote to Reprimand and the November 15 ASAC Letter of Reprimand*

The Court holds that the November 14 ASAC vote and the November 15 letter were not adverse actions as a matter of law because they carried no concrete consequences nor did they threaten concrete consequences. The Fourth Circuit has held that "where a public official's alleged retaliation is in the nature of speech, in the absence of a threat, coercion, or intimidation intimating that punishment, sanction, or adverse regulatory action will imminently follow, such speech does not adversely affect a citizen's First Amendment rights." *Suarez*, 202 F.3d at 687; *see also Scheffler v. Molin*, 743 F.3d 619, 622 (8th Cir. 2019) (To deter the exercise of speech, a defendant's actions generally must have some kind of "concrete consequences.").

Here, there is no genuine dispute whether the November 14 vote and the November 15 letter imposed concrete consequences on Bhattacharya—they did not. The letter reminded Bhattacharya of the school's professional standards; it neither imposed nor threatened any consequences. (DX24). It suggested that the Bhattacharya seek counseling (*see id.*), but even he acknowledges that this was not a "necessary requirement." (DX2 at 126:8-14). And the mere fact that the vote and letter preceded ASAC's later concrete actions—namely, suspending Bhattacharya on November 28—does not render the vote and letter themselves adverse actions.

3. *The November 27 CAPS Evaluation Requirement*

The Court holds that the School of Medicine neutrally applying its attendance policy by requiring Bhattacharya to receive medical clearance pursuant to the school's time and attendance policy after missing more than two days of class was not an adverse action as a matter of law. The Court finds instructive the Tenth Circuit's opinion in *Couch v. Board of Trustees of*

15

*Memorial Hospital of Carbon County*, 587 F.3d 1223, 1240 (10th Cir. 2009), which held that requiring a hospital employee to submit to a psychiatric evaluation before returning to work would not support a First Amendment retaliation claim where the employee had a documented history of difficulties with other hospital staff because the "minimally invasive" "one-time consultation" had an "understandable context." The case here bears significant similarity to *Couch*, with the difference that the psychiatric evaluation in that case was imposed *ad hoc*, where here the required health evaluation was pursuant to a neutral policy—which makes Bhattacharya's argument that the health evaluation was an adverse action even weaker than the plaintiff's argument in that case.

Bhattacharya cites no case law supporting the proposition that the application of a generally applicable policy can constitute an adverse action, nor has he put any evidence into the record that the time and attendance policy was not neutrally applied.

### 4. Conclusion

In sum, there are genuine disputes with respect to four alleged adverse actions—the November 14 and 19 psychiatric evaluations and holds, the suspension, and the no trespass order. The jury would have a sufficient evidentiary basis to find that those actions would chill the speech of a person of ordinary fitness.

### B. Causal Connection

Although there are disputes of material fact with respect to some alleged adverse actions, there is no genuine dispute of that Defendants undertook any adverse action because of Plaintiff's protected speech. Even viewing the evidence in the light most favorable to Plaintiff, and drawing every reasonable inference in his favor, the Court cannot identify any evidence in the record that could reasonably support a jury verdict in his favor on the causation prong of his

First Amendment Claim. This applies to both the set of alleged adverse actions that the Court has held are actionable and those that the Court has held are not actionable.

First, the Court notes that it is not a Constitutional violation for government officials to take protective or preventative action based on the manner or context in which an individual speaks, especially where the speech is aggressive or threatening. *See Davison v. Rose*, 19 F.4th 626, 637 (4th Cir. 2021) ("Davison has not sufficiently provided evidence to prove that the no-trespass ban was issued because of his protected speech, as opposed to his threats and antagonistic behavior."); *Wood v. Arnold*, 321 F. Supp. 3d 565, 581 (D. Md. 2018), *aff'd*, 915 F.3d 308 (4th Cir. 2019) ("[T]he record is clear that Defendants issued the No Trespass Order in response to perceived threats of a disruption on school grounds, not in retaliation against Mr. Wood's protected speech."). Thus, Bhattacharya must provide evidence that goes to the content of his speech, not just its tone or demeanor.

Bhattacharya has put forward no direct evidence that Defendants considered the content of his speech in undertaking any of the adverse actions in question. At oral argument on this motion, when this Court repeatedly asked Plaintiff's counsel which pieces of evidence in the record indicate that Defendants considered the content—rather than just the tone or demeanor—of Bhattacharya's speech, Plaintiff's counsel put forward a handful of pieces of evidence that plainly do not indicate that Defendants considered the content of Bhattacharya's speech. First, Plaintiff's counsel put forward the professionalism concern card, but the professionalism concern card says nothing about the content of Bhattacharya's speech—only that he was "antagonistic"—and that Dr. Kern was "worrie[d]" about how Bhattacharya would "do on wards." (DX 20–A). Second, Plaintiff's counsel put forward other medical students' complaints about Bhattacharya's behavior at the microaggression panel, but there is no evidence that Defendants relied on or in

any way incorporated those complaints into their decision making, and, needless to say, those other students are not defendants in this case. Third, Plaintiff's counsel put forward a set of exchanges between ASAC members considering whether Bhattacharya should be suspended, and, if so, how. The record indicates that Defendants considered multiple options for grounds on which to suspend Bhattacharya—including academic and Title IX grounds—before suspending him for failing to sustain the medical school's "technical standards". *See* PX33 (emails between School of Medicine administrators stating that "I don't believe we can defend an interim suspension on Standards or Title IX grounds," and that "KB has not yet had enough academic failures to remove him from the program academically[.]"). But the fact that Defendants considered multiple options for how to suspend Plaintiff is of no consequence when there is no evidence that any of the options were predicated on Plaintiff's protected speech.

Apparently recognizing the absence of any direct evidence that Defendants considered the content of his speech in undertaking an adverse action, Bhattacharya attempts to rely in the alternative on a "pretext" theory—that all of Defendants' stated reasons for suspending him were just pretext for retaliating against his protected speech. (Dkt. 466 at 44–45). He offers the cases *Jiminez v. Mary Washington Coll.*, 57 F.3d 369 (4th Cir. 1995) and *Warren v. Halstead Indus., Inc.*, 802 F.2d 746 (4th Cir. 1986) for the proposition that "[s]ufficient evidence that proffered justifications for discrimination are pretextual creates a genuine issue of material fact and will preclude summary judgment." (Dkt. 466 at 44). But neither of those cases stands for the proposition that he can advance to trial on a First Amendment retaliation claim without any evidence in the record that Defendants retaliated against him because of his protected speech. *Jiminez* was a Title VII race and national origin discrimination case arising from a professor's denial of tenure. The Fourth Circuit reversed the district court's judgment following a bench

18

trial; the district court rendered judgment in favor of the Plaintiff, and the Fourth Circuit reversed on fact-specific grounds. *Warren* was a § 1981 and Title VII retaliation case in which the Fourth Circuit similarly reversed the district court after a bench trial for fact-specific reasons. Neither case has any bearing on the legal issues presented here.

The bottom line is that Plaintiff has put into the record neither direct evidence of a causal connection between his protected speech and any adverse action nor any evidence that Defendants' stated reasons for undertaking those adverse actions were pretextual. Having been afforded the benefit of substantial discovery, Bhattacharya still has nothing more than speculation to support his claim—he has not unearthed even a scintilla of evidence that would demonstrate that Defendants took any adverse action against him because of his protected speech. Without more, the Court must grant Defendants' summary judgment motion.

### C.  Qualified Immunity

Although the causation issue settles the case, the Court holds that Dr. Densmore and Dr. Peterson are entitled to qualified immunity for the claims against them in their individual capacities for money damages.

Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In determining whether a right is "clearly established," the Supreme Court and the Fourth Circuit both "have admonished that 'courts must not define clearly established law at a high level of generality.'" *Doe ex rel. Watson v. Russell Cnty. Sch. Bd.*, 292 F. Supp. 3d 690, 713 (W.D. Va. 2018) (quoting *E.W. v. Dolgos*, 884 F.3d 172, 185 (4th Cir. 2018)). "The dispositive question is 'whether the violative nature of

19

*particular* conduct is clearly established.'" *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (per curiam) (emphasis in original) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)).

Bhattacharya argues that the Court should consider the claim at the high level of generality—a "right to be free from viewpoint discrimination in public institutions," a "right to be free from First Amendment retaliation," and a "right to record government officials performing their duties." (Dkt. 466 at 54). But those highly generalized rights do not cut to the "violative nature of [the] particular conduct" here. *Mullenix*, 577 U.S. at 12.

Simply put, there is no clearly established First Amendment retaliation claim for taking action against a student who, in the same time period that he is repeatedly involuntarily committed to mental health institutions for threatening others, makes protected speech in an aggressive and unprofessional manner, especially where there is no evidence whatsoever that the content of his speech, rather than his tone or demeanor, was the cause of the adverse action. It does not matter which of the alleged adverse actions the Court considers here; there is no glimmer of a clearly established claim.

## V. Conclusion

In an order that will accompany this memorandum opinion, the Court will grant Defendants' summary judgment motion, Dkt. 444, in full.

The Clerk of Court is directed to send this opinion to all counsel of record.

Entered this 19th day of August 2022.

NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE