**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────

**No. 22-1999**

───────────

KIERAN RAVI BHATTACHARYA,

Plaintiff - Appellant,

v.

JAMES B. MURRAY, JR., in his official capacity as Rector of the Board of Visitors of the University of Virginia; WHITTINGTON W. CLEMENT, in his official capacity as Vice Rector of the Board of Visitors of the University of Virginia; ROBERT M. BLUE; MARK T. BOWLES; L. D. BRITT, M.D. , M.P.H.; FRANK M. CONNER, III; ELIZABETH M. CRANWELL; THOMAS A. DEPASQUALE; BARBARA J. FRIED; JOHN A. GRIFFIN; LOUIS S. HADDAD; ROBERT D. HARDIE; MAURICE A. JONES; BABUR B. LATEEF, M.D.; ANGELA HUCLES MANGANO; C. EVANS POSTON, JR.; JAMES V. REYES, in his official capacity as Member of the Board of Visitors of the University of Virginia; PETER C. BRUNJES, in his official capacity as Member of the Board of Visitors of the University of Virginia; MELISSA FIELDING, in her official capacity as Deputy Chief of Police of the University of Virginia; JOHN J. DENSMORE, M.D., Ph.D., in his official capacity as Associate Dean for Admissions and Student Affairs of the University of Virginia School of Medicine; JIM B. TUCKER, M.D., in his official capacity as Chair of the Academic Standards and Achievement Committee of the University of Virginia School of Medicine; CHRISTINE PETERSON, M.D., Assistant Dean for Medical Education of the University of Virginia School of Medicine; EVELYN R. FLEMING; CARLOS M. BROWN; LEWIS FRANKLIN (L. F.) PAYNE, JR.,

Defendants - Appellees.

───────────

**No. 22-2064**

───────────

KIERAN RAVI BHATTACHARYA,

                Plaintiff - Appellant,

     v.

JAMES B. MURRAY, JR., in his official capacity as Rector of the Board of Visitors of the University of Virginia; WHITTINGTON WHITESIDE CLEMENT, in his official capacity as Vice Rector of the Board of Visitors of the University of Virginia; ROBERT M. BLUE; MARK T. BOWLES; L. D. BRITT, M.D. , M.P.H.; FRANK M. CONNER, III; ELIZABETH M. CRANWELL; THOMAS A. DEPASQUALE; BARBARA J. FRIED; JOHN A. GRIFFIN; LOUIS S. HADDAD; ROBERT D. HARDIE; MAURICE A. JONES; BABUR B. LATEEF, M.D.; ANGELA HUCLES MANGANO; C. EVANS POSTON, JR.; JAMES V. REYES, in his official capacity as Member of the Board of Visitors of the University of Virginia; PETER C. BRUNJES, in his official capacity as Member of the Board of Visitors of the University of Virginia; MELISSA FIELDING, in her official capacity as Deputy Chief of Police of the University of Virginia; JOHN J. DENSMORE, M.D., Ph.D., in his official capacity as Associate Dean for Admissions and Student Affairs of the University of Virginia School of Medicine; JIM B. TUCKER, M.D., in his official capacity as Chair of the Academic Standards and Achievement Committee of the University of Virginia School of Medicine; CHRISTINE PETERSON, M.D., Assistant Dean for Medical Education of the University of Virginia School of Medicine; EVELYN R. FLEMING; CARLOS M. BROWN; LEWIS FRANKLIN (L. F.) PAYNE, JR.

                Defendants - Appellees.

--------------

Appeal from the United States District Court for the Western District of Virginia, at Charlottesville.  Norman K. Moon, Senior District Judge.  (3:19-cv-00054-NKM-JCH)

--------------

Argued:  October 24, 2023                Decided:  February 26, 2024

--------------

Before THACKER and QUATTLEBAUM, Circuit Judges, and KEENAN, Senior Circuit Judge.

--------------

Affirmed by published opinion.  Judge Thacker wrote the opinion, in which Judge Keenan concurred.  Judge Quattlebaum wrote a separate opinion concurring in part and dissenting in part.

———————————

**ARGUED:**  Michael J. Lockerby, FOLEY & LARDNER LLP, Washington, D.C., for Appellant.  Frederick William Eberstadt, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Appellees.  **ON BRIEF:**  Jason S. Miyares, Attorney General, Charles H. Slemp, III, Chief Deputy Attorney General, Andrew N. Ferguson, Solicitor General, Erika L. Maley, Principal Deputy Solicitor General, Kevin M. Gallagher, Deputy Solicitor General, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Appellees.

THACKER, Circuit Judge:

Kieran Bhattacharya ("Appellant") is a former medical student at the University of Virginia School of Medicine ("UVA"). He claims that numerous UVA officials (collectively, "Appellees")[1] reprimanded, suspended, and then expelled him in violation of the First Amendment because of the views he expressed during a faculty panel -- in other words, because of his protected speech. Appellees assert they took these actions against Appellant *not* because of his speech, but as a result of Appellant's confrontational, threatening, behavior.

The district court sided with Appellees, holding at summary judgment that Appellant could point to no evidence that Appellees punished Appellant due to his speech.

We agree. Appellant has failed to present evidence sufficient to create a triable issue as to whether his speech caused the actions UVA took against him. A medical school's administrators have the authority to set the minimum standards of professionalism for conferral of a medical doctorate. Even more, they have the authority and obligation to ensure the safety of the school's faculty and staff. Appellees appropriately exercised that authority with due regard for the Constitution.

We affirm.

---

[1] The Appellees include James B. Murray, Jr., Whittington Whiteside Clement, Robert M. Blue, Mark T. Bowles, Dr. L.D. Britt, Frank M. Conner, III, Elizabeth M. Cranwell, Thomas A. DePasquale, Barbara J. Fried, John A. Griffin, Louis S. Haddad, Robert D. Hardie, Maurice A. Jones, Dr. Babur B. Lateef, Angela Hucles Mangano, C. Evans Poston, Jr., James V. Reyes, Peter C. Brunjes, Melissa Fielding, Dr. John J. Densmore, Dr. Jim B. Tucker, Dr. Christine Peterson, Evelyn R. Fleming, Carlos M. Brown, and Lewis Franklin (L.F.) Payne Jr.

I.

A.

Appellant began medical school at UVA in the fall of 2016.  By January 2017, Appellant checked himself into UVA Health System's emergency department with mental health symptoms.  He reported that he was "feeling out of it in the head."  J.A. at 2050.[2] While Appellant was in the hospital, his roommates contacted Appellee Dr. John Densmore, the Dean of Student Affairs, about Appellant's problems.  Dean Densmore visited Appellant in the hospital.  Following a two week hospitalization, during which Appellant had symptoms "consistent with a manic episode of psychosis," *id.* at 1313, Appellant was discharged and was diagnosed with "[b]ipolar disorder, current manic episode, with psychosis," *id.*  Appellant took a voluntary leave from UVA starting on February 7, 2017.  He returned to class in Spring 2018.

In September 2018, Appellant reported to Dr. Christine Peterson, a faculty member who was the dean on call at the time,[3] that a mental health episode was preventing him from sleeping or studying.  He requested that he be able to delay taking an exam, and his request was granted.  Dean Peterson informed other faculty members, including Dean Densmore, about Appellant's call.

---

[2] Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

[3] The dean on call is a UVA faculty member available to help with student crisis management and incident response.

5

B.

On October 25, 2018, the student chapter of the American Medical Women's Association hosted a faculty panel called "Microaggressions: Why Are 'They' So Sensitive?" Appellant attended that panel, and he claims to have been punished by UVA for certain statements he made, and questions he asked, on the topic of microaggressions.[4]

During the panel, several faculty members offered their views and research on microaggressions, and another faculty member moderated. At the end, the moderator opened the floor for questions from the audience. Appellant was the first student to address the panel. He had the following interaction:

> [Appellant]:        Hello. Thank you for your presentation. I had a few questions just to clarify your definition of microaggressions. Is it a requirement, to be a victim of microaggression, that you are a member of a marginalized group?
>
> [Dr. Beverly] Adams[, a faculty panelist]: Very good question. And no. And no—
>
> [Appellant]:        But in the definition, it just said you have to be a member of a marginalized group—in the definition you just provided in the last slide. So that's contradictory.
>
> [Dr.] Adams:        What I had there is kind of the generalized definition. In fact, I extend it beyond that. As you see, I extend it to any marginalized group, and sometimes it's not a marginalized group. There are examples that you would think

---

[4] "A statement, action, or incident regarded as an instance of indirect, subtle, or unintentional discrimination or prejudice against members of a marginalized group such as a racial minority." *Microaggression*, Oxford English Dictionary (July 2023), https://perma.cc/H9PW-9E9M.

> maybe not fit, such as body size, height, [or] weight. And if that is how you would like to see me expand it, yes, indeed, that's how I do.

> [Appellant]:   Yeah, follow-up question. Exactly how do you define marginalized and who is a marginalized group? Where does that go? I mean, it seems extremely nonspecific.

> [Dr.] Adams:   And—that's intentional. That's intentional to make it more nonspecific . . . .

J.A. 1314–16.

After this exchange, Appellant continued to critique Dr. Adams' theory and impugn her research as anecdotal. Appellant asked a series of follow-up questions until UVA faculty panelist Dr. Sara Rasmussen intervened. Dr. Rasmussen discussed her own understanding of microaggressions, offered an anecdote, and attempted to open the floor to other students for questions. But Appellant took the microphone again to contest Dr. Rasmussen's statements, and the two briefly argued until Dr. Rasmussen called on another student to ask a question.

One of the faculty panelists, Dr. Nora Kern, later emailed Dean Peterson about Appellant's interaction with the panel. Drs. Kern and Peterson were the only members of the UVA faculty present during the microaggressions panel. Dr. Kern initiated the email exchange by asking if Dean Peterson knew who the "extremely unprofessional" student during the panel discussion was, and she suggested his behavior should be discussed by the School of Medicine's Academic Standards and Achievement Committee ("ASAC"). J.A. 1316. Dr. Kern expressed concern about how Appellant's professionalism would affect his rotations. Dean Peterson told Dr. Kern that, if she wished, she could submit a

"Concern Card," a tool used by UVA to monitor students' professional behavior, which "may prompt review by ASAC but contains no punitive effect." *Id.*  Thereafter, Dr. Kern submitted a Professionalism Concern Card to memorialize her concerns with Appellant's colloquy.

On November 1, Dean Densmore, who was Appellant's dean, submitted the Concern Card to the ASAC for review.  The ASAC considered the Concern Card in a November 14 meeting and voted unanimously to send Appellant a letter the following day (the "ASAC Letter").[5]  The letter was sent by Dr. Jim B. Tucker, a member of the ASAC. It read in its entirety as follows:

> The [ASAC] has received notice of a concern about your behavior at a recent AMWA panel. It was thought to be unnecessarily antagonistic and disrespectful. Certainly, people may have different opinions on various issues, but they need to express them in appropriate ways.
>
> It is always important in medicine to show mutual respect to all: colleagues, other staff, and patients and their families. We would suggest that you consider getting counseling in order to work on your skills of being able to express yourself appropriately.

J.A. 765.

### C.

On November 14, the same day the ASAC met and voted to send the ASAC Letter to Appellant, Dean Densmore met with Appellant in person to discuss his failing grade in his hematology course.  Appellant's behavior during this meeting gave Dean Densmore

---

[5] Dean Densmore was not at the ASAC meeting and did not vote on whether to send the letter.

cause for concern, so Dean Densmore asked Appellant either to consult with his private psychiatrist or seek evaluation at UVA Student Health's Counsel and Psychological Services ("CAPS"). After the meeting, Appellant and Dean Densmore walked together to CAPS. A clinician evaluated Appellant, and, based on Appellant's behavior during the evaluation, petitioned for an emergency custody order. University police then escorted Appellant to the UVA Medical Center where he was hospitalized until November 16, 2018.

Two days after Appellant's discharge from emergency custody, police officers responded to a domestic incident at Appellant's apartment between Appellant and his mother. The next day, November 19, Appellant's mother filed a petition to have Appellant involuntarily committed. She alleged Appellant "got inches from [her] face screaming and pounding fists toward me so that I felt I was in imminent harm." J.A. 1317. A magistrate issued an emergency custody order for Appellant that day based upon "probable cause" that Appellant "ha[d] a mental illness and [wa]s in need of hospitalization or treatment, and . . . a substantial likelihood that, as a result of mental illness, [Appellant would] . . . cause serious physical harm to self or others, as evidenced by recent behavior." J.A. 986.

The same day this second emergency custody order was issued, Appellant's ex-girlfriend, also a medical student at UVA, sought Dean Peterson's help obtaining a protective order against Appellant. Dean Peterson helped Appellant's ex-girlfriend obtain the protective order by writing a letter in support of the ex-girlfriend's petition.[6]

---

[6] On November 26, 2018, a municipal court in Charlottesville awarded Appellant's ex-girlfriend a protective order based upon a preliminary finding that she was "in immediate and present danger of family abuse or there [wa]s sufficient evidence to (Continued)

Also on November 19, Appellant met again with Dean Densmore.  And once again, Appellant's behavior caused Dean Densmore concern.  As a result, University Police were contacted.  The police intercepted Appellant as he was leaving the building.  Because an emergency custody order had been entered in response to Appellant's mother's petition, Appellant was taken into custody and transported to the emergency department at UVA Medical Center.  Based upon clinicians' diagnosis of Appellant, a municipal court issued a temporary detention order for Appellant to be transported to Poplar Springs Hospital in Petersburg, Virginia.

Upon Appellant's release from the hospital on November 26, 2018, Dean Densmore emailed Appellant to tell him he would need to be cleared by CAPS before returning to class because the UVA medical school attendance policy required students to be medically evaluated if they missed two or more consecutive days due to illness.

### D.

On November 28, 2018, the ASAC held a meeting with Appellant to discuss his enrollment status.  At the beginning of the meeting, Appellant photographed the ASAC members collectively.  Appellant made an audio recording of the meeting on his cell phone, and the meeting was videoed on the body camera of a police officer who attended the meeting.

The district court described the meeting as follows:

---

establish probable cause that family abuse ha[d] recently occurred so as to justify an *ex parte* proceeding."  J.A. 2703.

> ASAC held a meeting on November 28, 2018 to discuss [Appellant]'s enrollment status and invited [Appellant] to attend. In the prior weeks, administrators at the medical school had discussed various avenues to suspend [Appellant] from the medical school, determining that he could not be suspended on academic or Title IX grounds. At the November 28 meeting, [Appellant] repeatedly attempted to bring up the microaggression panel, but [was] told that "[had been] addressed last month," and that "the reason we're having this meeting tonight is that there's concern about your interactions and behaviors most recently." Dr. Bart Nathan similarly explained: "We are having this discussion because we are concerned about your professionalism and professional behavior in medical school."

J.A. 1318–19 (citations omitted). At the end of the meeting, while still recording, Appellant asked the ASAC members each of their names individually.

After the meeting, the ASAC decided that Appellant failed to meet the school's requirements for continued enrollment and voted unanimously to suspend him. The next day, November 29, 2018, the ASAC sent Appellant a letter informing him he was suspended for one year. In relevant part, the letter stated as follows:

> [ASAC] has determined that your aggressive and inappropriate interactions in multiple situations, including in public settings, during a speaker's lecture, with your Dean, and during the committee meeting yesterday, constitute a violation of the School of Medicine's Technical Standards that are found at: [link].
> Those Standards, in relevant part and as related to professionalism, state that each student is responsible for: Demonstrating self-awareness and self-analysis of one's emotional state and reactions; Modulating affect under adverse and stressful conditions and fatigue; Establishing effective working relationships with faculty, other professionals and students in a variety of environments; and Communicating in a non-judgmental way with persons whose beliefs and understandings differ from one's own.

11

J.A. 871.  The letter further stated that Appellant could appeal the suspension, which he did, though the suspension process was put on hold and eventually derailed by the events that followed.

E.

In December 2018, UVA became aware that Appellant was posting about his suspension online.  This included the photographs he took of the ASAC members, which Appellant posted to the message board 4chan[7] with the caption, "These are the f[***]gots ruining my life."  J.A. 1181.  The message prompted posts from other users encouraging acts of violence against the ASAC members.

On December 30, 2018, UVA police met with UVA's Threat Assessment Team to address Appellant's behavior.  They discussed the protective order Appellant's ex-girlfriend obtained against Appellant; his multiple involuntary commitments; his threats against faculty members at UVA; and his "pattern of retaliatory behavior."  J.A. 1320.  The police decided to issue a no trespass order ("NTO") against Appellant which was delivered to Appellant orally on a telephone call.  The police followed up and mailed a written version of the NTO to Appellant's parents' house on January 2, 2019.  The written NTO prohibited Appellant from entering UVA grounds for four years except as a patient of the medical center and explained the process for appealing the order.  The deadline for

---

[7] 4chan is "a simple image-based bulletin board where anyone can post comments and share images. There are boards dedicated to a variety of topics, from Japanese animation and culture to videogames, music, and photography. Users do not need to register an account before participating in the community." 4chan, https:/perma.cc/XN5N-XTF7 (last visited Dec. 21, 2023).

appealing the NTO was five days from the date of service.  Appellant did not appeal the NTO until July 21, 2019.  UVA considered and denied Appellant's appeal of the NTO as untimely because it was filed more than six months after the order was issued.

F.

On September 16, 2019, Appellant filed a pro se Complaint against Appellees alleging two claims, a First Amendment claim and a Fifth Amendment procedural due process claim.  He retained counsel and filed an Amended Complaint in February 2020, alleging four claims: (1) a First Amendment retaliation claim; (2) a Fourteenth Amendment due process claim; (3) a claim for conspiracy to interfere with civil rights in violation of 42 U.S.C. § 1985; and (4) a common law conspiracy claim.  Appellees moved to dismiss the First Amended Complaint, and on March 31, 2021, the district court dismissed all claims except Appellant's First Amendment retaliation claim.  Appellant then sought leave to file a Second Amended Complaint with additional facts regarding his First Amendment claim, a new conspiracy claim, and additional defendants, including his ex-girlfriend.  On March 16, 2022, the district court denied Appellant's request to amend his complaint to add a civil conspiracy claim and to add his ex-girlfriend as a defendant.  Appellant accordingly filed a Second Amended Complaint, alleging only First Amendment retaliation.

Appellees moved for summary judgment.  They argued Appellant could not show that Appellees took adverse action against him because of his protected speech and that Appellees Densmore and Peterson were shielded by qualified immunity.  The district court granted the motion.  The court held Appellant had failed to show that several of the actions of which he complained, including the Concern Card, the ASAC Letter, and the

13

requirement of CAPS clearance, were adverse actions under the First Amendment. The court also held that Appellant had failed to present evidence of a causal connection between his speech and any of Appellees' actions.

The evidence indicated Appellees took action against Appellant for each of the following reasons:

- Multiple involuntary hospitalizations for psychiatric treatment
- Threats against his mother, which resulted in an emergency custody order
- Intimidating behavior toward his girlfriend, which resulted in an emergency protective order
- Confrontational conduct directed at his dean
- Abrasive, interruptive exchanges with faculty, including at the faculty panel and in the ASAC meeting
- Disclosing the identities and likenesses of UVA administrators with an accompanying slur in an online forum

Appellant timely appealed.

## II.

We review a district court's grant of summary judgment de novo. *Guthrie v. PHH Mortg. Corp.*, 79 F.4th 328, 342 (4th Cir. 2023) (citing *Sedar v. Reston Town Ctr. Prop., LLC*, 988 F.3d 756, 761 (4th Cir. 2021)). Summary judgment is appropriate only when there are "no genuine disputes as to any material fact." *Id.* A dispute is "genuine" if the evidence presented would allow a reasonable factfinder to find for the nonmovant. *Id.* A fact is "material" if it may influence the outcome of the suit under governing law. *Jones v. Chandrasuwan*, 820 F.3d 685, 691 (4th Cir. 2016).

A court cannot substitute its judgment for that of the factfinder and award summary judgment based on its prediction of the result at trial. *Guthrie*, 79 F.4th at 342. But a court *must* award summary judgment when "the evidence could not permit a reasonable jury to

return a favorable verdict" for the nonmoving party. *Id.* In making that determination, a court must view all facts, and reasonable inferences taken therefrom, in the light most favorable to the nonmoving party -- here, Appellant. *Davison v. Rose*, 19 F.4th 626, 633 (4th Cir. 2021), *cert. denied*, 143 S. Ct. 106 (2022).

Ordinarily, when a district court denies leave to amend, we review the district court's denial for abuse of discretion. *Mowery v. Nat'l Geospatial-Intel. Agency*, 42 F.4th 428, 442 (4th Cir. 2022), *cert. denied*, 143 S. Ct. 783 (2023); *United States ex rel. Nicholson v. MedCom Carolinas, Inc.*, 42 F.4th 185, 197 (4th Cir. 2022). But when a district court denies leave to amend based upon the futility of the proposed amendment, as the court did here, that denial amounts to a dismissal of the proposed claims as legally insufficient, and we review the court's judgment de novo. *See Cannon v. Peck*, 36 F.4th 547, 575 (4th Cir. 2022). Similarly, when, as here, a district court dismisses a count for failure to state a claim, we review the dismissal de novo, taking as true all plausible, well pled allegations in the complaint. *United States ex rel. Taylor v. Boyko*, 39 F.4th 177, 189 (4th Cir. 2022) (citing Fed. R. Civ. P. 12(b)(6); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

III.

Appellant raises three issues on appeal. First, he argues the district court resolved genuine disputes of fact in favor of Appellees at summary judgment, discrediting evidence that he was punished for protected speech. Second, he argues the district court erroneously denied him leave to add a conspiracy claim on the basis that his proposed amendment was futile. And third, he argues the district court erred in dismissing his due process claim

because his dismissal from UVA was disciplinary, not academic, and he argues he received inadequate process for a disciplinary dismissal.

A.

Summary Judgment: First Amendment Claim

The district court determined that Appellant presented no evidence at summary judgment from which a reasonable factfinder could decide he was retaliated against because of his protected speech.  The court observed, "[Appellant] still has nothing more than speculation to support his claim -- he has not unearthed even a scintilla of evidence that would demonstrate that Defendants took any adverse action against him because of his protected speech."  J.A. 1330.  Instead, the court held, UVA took action because of Appellant's conduct, which included his being "repeatedly involuntarily committed to mental health institutions for threatening others."  *Id.* at 1331.  As a result, the district court awarded summary judgment against Appellant.  We agree with the district court's assessment.

A review of the record in this case yields but one conclusion: Appellant was suspended, and later banned, from UVA because of his confrontational and threatening behavior, not his speech.

1.

First Amendment Framework

The First Amendment's Free Speech Clause provides, "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I.  The parties do not dispute that, as a general matter, the First Amendment constrains UVA's actions, as UVA is an

16

arm of the Commonwealth of Virginia. *See, e.g.*, *Porter v. Bd. of Trustees of N.C. State Univ.*, 72 F.4th 573, 582 (4th Cir. 2023); *Cuccinelli v. Rector, Visitors of Univ. of Va.*, 722 S.E.2d 626, 630 (Va. 2012).

Here, Appellant has sued Appellees under a theory of First Amendment retaliation. The First Amendment's Free Speech Clause guarantees both "the affirmative right to speak" and the concomitant "right to be free from retaliation by a public official for the exercise of that right." *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 499 (4th Cir. 2005) (quoting *Suarez Corp. Indus. V. McGraw*, 202 F.3d 676, 685 (4th Cir. 2000)). "A plaintiff claiming First Amendment retaliation must demonstrate that: '(1) [he] engaged in protected First Amendment activity, (2) the defendants took some action that adversely affected [his] First Amendment rights, and (3) there was a causal relationship between [his] protected activity and the defendants' conduct.'" *Davison v. Rose*, 19 F.4th 626, 636 (4th Cir. 2021) (alteration in original) (quoting *Constantine*, 411 F.3d at 499), *cert. denied*, 143 S. Ct. 106 (2022).

The district court rested its summary judgment order upon adverse action and causation, granting Appellant the benefit of the doubt regarding his "protected speech" -- i.e., the views and criticisms he offered regarding microaggressions during the microaggressions panel. Appellant contends the district court erred as to both the adverse action and causation elements, first by discounting several of his asserted adverse actions and then by determining that Appellant could not point to "any evidence in the record that could reasonably support a jury verdict in his favor on the causation prong." J.A. 1327.

Like the district court, we assume without holding that Appellant engaged in protected speech at the microaggressions panel.

2.

Adverse Actions and Causation

The district court held that Appellant "put forward no direct evidence that [the Appellees] considered the content of his speech in undertaking any of the adverse actions in question." J.A. 1328. The court held this was true for *all* actions taken against Appellant, including those the court deemed "adverse actions" and those it did not.

The district court placed particular emphasis on the fact that any references to the microaggressions panel that cropped up in later actions -- the Concern Card, the ASAC Letter, Appellant's suspension, Appellant's psychiatric evaluations, and the NTO -- referred to the tone and demeanor of Appellant's speech during the panel, *not* the content. And the district court held, citing this court, "[I]t is not a Constitutional violation for government officials to take protective or preventative action based on the manner or context in which an individual speaks, especially where the speech is aggressive or threatening." J.A. 1328 (citing *Davison*, 19 F.4th at 637; *Wood v. Arnold*, 321 F. Supp. 3d 565, 581 (D. Md. 2018), *aff'd*, 915 F.3d 308 (4th Cir. 2019)).

But Appellant contends he did present evidence that UVA took adverse actions against him because of the contested speech. To make that case, Appellant must explain how the district court erred in linking the actions taken against him to his *conduct*, as opposed to his *speech*. *See Raub v. Campbell*, 785 F.3d 876, 885 (4th Cir. 2015) ("[I]t is not enough that the protected expression played a role or was a motivating factor in the

18

retaliation; claimant must show that '*but for*' the protected expression the [state actor] would not have taken the alleged retaliatory action.") (alterations in original) (quoting *Huang v. Bd. of Governors of Univ. of N.C.*, 902 F.2d 1134, 1140 (4th Cir. 1990)). He must demonstrate that the court ignored material evidence that would allow a factfinder to determine UVA punished him for his speech, or that the court sided with UVA when material facts pointed both ways, creating a genuine issue for a factfinder to resolve. *Guthrie v. PHH Mortg. Corp.*, 79 F.4th 328, 342 (4th Cir. 2023) (noting a court may not "base a grant of summary judgment merely on the belief 'that the movant will prevail if the action is tried on the merits'") (quoting *Sedar v. Reston Town Ctr. Prop., LLC*, 988 F.3d 756, 761 (4th Cir. 2021)).

Contrary to Appellant's assertion, the record is replete with evidence that Appellees took the actions they did against Appellant based upon his conduct, which rendered him unfit, in their view, for the professional practice of medicine. On the other hand, the evidence they took these steps because of the content of his speech is slim to none, and no reasonable factfinder could agree with Appellant's theory of the case.

a.

Professionalism Concern Card and the ASAC Letter

The first actions Appellant contends were adverse actions taken because of his speech at the microaggressions panel were the Professionalism Concern Card submitted by Dr. Kern and the ASAC Letter following up on the Concern Card. The district court determined that neither action was an "adverse action" for First Amendment purposes and

19

that, regardless, Appellant could not show that UVA took either of these actions because of Appellant's protected speech.

i.

The district court determined that the Concern Card and the ASAC Letter were not adverse actions.  An adverse action for First Amendment purposes is one that "may tend to chill individuals' exercise of constitutional rights."  *Constantine*, 411 F.3d at 500 (quoting *ACLU of Md., Inc. v. Wicomico County*, 999 F.2d 780, 785 (4th Cir. 1993)).  A plaintiff asserting adverse action must show more than "*de minimis* inconvenience."  *Id.* (citing *ACLU of Md.*, 999 F.2d at 786 n.6).  An action chills speech if it "would likely deter 'a person of ordinary firmness' from the exercise of Fourth Amendment rights."  *Id.* (citations omitted).  Whether an action chills speech is an "objective" analysis we conduct "in light of the circumstances presented in [a] particular case."  *The Baltimore Sun Co. v. Ehrlich*, 437 F.3d 410, 416 (4th Cir. 2006).

As to the Concern Card, the district court held it was not an adverse action because it had no punitive effect on its own, independent of the ASAC's review, and because Appellant was not even aware of the Concern Card until after he had been banned from UVA.  The district court held the Concern Card was "a referral for another party to consider discipline that [Appellant] did not know about."  *Bhattacharya v. Murray*, No. 3:19-cv-00054 (W.D. Va. July 21, 2022), ECF No. 487, at 11–12.  And the district court held that the ASAC Letter did not impose or threaten consequences of sufficient severity to qualify as an adverse action.

20

We agree that the Concern Card was not an adverse action.  The Concern Card was a routine documentation that had no punitive effect on its own.  We have held that even more severe actions than the Concern Card were insufficient for First Amendment purposes.  *See Suarez Corp. Indus.*, 202 F.3d at 686 ("[C]ourts have declined to find that an employer's actions have adversely affected an employee's exercise of his First Amendment rights where the employer's alleged retaliatory acts were criticisms, false accusations, or verbal reprimands.") (citations omitted).

We also agree that the ASAC Letter was not an adverse action.  "[W]here a public official's alleged retaliation is in the nature of speech, in the absence of threat, coercion, or intimidation intimating that punishment, sanction, or adverse regulatory action will immediately follow, such speech does not adversely affect a citizen's First Amendment rights, even if defamatory."  *Suarez Corp. Indus.*, 202 F.3d at 687.  We do not regard the ASAC Letter as threatening, coercing, or intimidating Appellant, or as holding punishment over him.  The ASAC Letter merely observed that Appellant was unnecessarily antagonistic, reminded him that people may have different opinions as long as they express them appropriately, and encouraged him to develop the skills of showing mutual respect to his colleagues.  Thus, the ASAC Letter was not an action which would chill the speech of a person of ordinary firmness and did not violate Appellant's First Amendment rights.[8]

---

[8] The same is true of the November 14 vote to reprimand Appellant, which was the basis for the November 15 ASAC Letter.  *See Suarez Corp. Indus.*, 202 F.3d at 686 ("[C]ourts have declined to find that an employer's actions have adversely affected an employee's exercise of his First Amendment rights where the employer's alleged (Continued)

ii.

The district court also determined that Appellant could not make the causal link as to the Concern Card because it said "nothing about the content of [Appellant's] speech— only that he was 'antagonistic'—and that Dr. Kern was worried about how [he] would do on wards." J.A. 1328 (internal alterations and quotation marks omitted).

For context, Concern Cards are forms for faculty to document observed professionalism issues with a UVA medical student. *See* J.A. 641 ("Praise/Concern Cards and written narratives are assessment tools used to describe behaviors in areas of altruism; honesty and integrity; caring, compassion and communication; respect for others; respect for differences; responsibility and accountability; excellence and scholarship; leadership and knowledge and other skills related to professionalism."); *id.* ("Any breach of professionalism resulting in a recorded observation, e.g., Professionalism Concern Card . . . must be addressed with the student by his/her college dean and documentation of the discussion must be recorded."); *see also Bhattacharya v. Murray*, No. 3:19-cv-00054 (W.D. Va. July 21, 2022), ECF No. 487, at 11 ("[T]he professionalism concern card had no punitive effect in itself; it was simply a referral to a committee to consider further punitive action . . . .").

But in any case, as the district court properly noted, Dr. Kern's Concern Card did not target the content of Appellant's expression, only the manner of his delivery. *See* J.A.

---

retaliatory acts were criticisms, false accusations, or verbal reprimands.") (citations omitted).

753 ("I am shocked that a med student would show so little respect toward faculty members. It worries me how he will do on wards.").  Indeed, Dr. Kern's emails with Dean Peterson make quite clear that the concern was not with Appellant's expressed views but, instead, with his tone and demeanor:

> I more was curious where this anger/frustration was coming from; he was talking so fast, I wasn't even sure what he was saying exactly or asking. But if he handles himself in that kind of manner on the wards, that is not acceptable *behavior*.

J.A. 756 (emphasis supplied).  It was these thoughts that found their way into the Concern Card, which manifestly deals with Appellant's unprofessional behavior, not the content of his speech.

The same is true of the ASAC Letter.  This letter grew out of the Concern Card because Dean Densmore asked the ASAC to consider the Concern Card as evidence of Appellant's "extreme professionalism lapse."  J.A. 759.  The ASAC did consider that lapse which culminated in the ASAC Letter being sent to Appellant:

> The [ASAC] has received notice of a concern about your *behavior* at a recent AMWA panel. It was thought to be unnecessarily antagonistic and disrespectful. **Certainly, people may have different opinions on various issues, but they need to express them in appropriate ways.**
>
> It is always important in medicine to show mutual respect to all: colleagues, other staff, and patients and their families. We would suggest that you consider getting counseling in order to work on your skills of being able to express yourself appropriately.

J.A. 765 (emphases supplied).  Plainly this letter dealt with Appellant's "behavior," not with the content of his speech, the validity of which the ASAC expressly granted: "Certainly, people may have different opinions on various issues, but they need to express

them in appropriate ways." *Id.*; *see also Davison*, 19 F.4th at 637 (affirming summary judgment when a no trespass order was instituted not because "of a causal relationship [with] his protected speech" but because of "threats and antagonistic behavior").

Accordingly, we agree with the district court that neither the ASAC Letter, nor the Concern Card that prompted it, were adverse actions *caused* by Appellant's speech.

b.

Psychiatric Evaluations

As discussed above, Appellant had two psychiatric evaluations, one on November 14, 2018, and another on November 19, 2018. The district court found no material evidence indicating Appellant was subjected to these evaluations because of his protected speech. Appellant contends this was error. He argues that his views led to the evaluations because Dr. Kern's description of Appellant's "antagonis[m] toward the panel" "found its way into . . . the November 14, 2018 [evaluation] . . . [and] the November 19 [evaluation]." Opening Br. at 42–43. This contention is belied by the record.

i.

November 14 Psychiatric Evaluation

The November 14 evaluation took place after Appellant met with Dean Densmore to discuss Appellant's failing grade in hematology. The district court determined that Appellant's "behavior during the meeting caused Dean Densmore to become concerned about [Appellant's] mental health," so Dean Densmore asked Appellant either to "consult with his private psychiatrist or go to [CAPS] for evaluation." J.A. 1317. The clinicians at CAPS evaluated Appellant, and based upon his behavior, they "petitioned for an

emergency custody order, which was granted, and University Police escorted [Appellant] to the UVA Medical Center," where he was admitted and held until November 16, 2018. *Id.*

The record indicates that when Dean Densmore insisted that Appellant seek evaluation on November 14, it was out of concern for "[Appellant's] health" and his "behavior," not his speech. S.J.A. 40. More specifically, according to the CAPS notes at intake, Dean Densmore had taken Appellant to CAPS for the following reasons: "[Appellant] failed 2 of his last 3 exams; [he] attended a panel regarding microaggressions and many concerns were raised by the panelists and others in attendance that [Appellant] was confrontational; his girlfriend recently broke up with him because of his behavior, describing him as paranoid (she was adamant that there were no safety concerns);"[9] "he has not been sleeping; and he is smoking an increased amount of marijuana." J.A. 2620. Dean Densmore gave Appellant the choice whether to consult with a private psychiatrist or walk with him to CAPS, and Appellant walked to CAPS with Densmore. *Id.*

The clinicians at CAPS who evaluated Appellant agreed with Dean Densmore's insistence that Appellant seek treatment, so much so that they concluded he might be "experiencing a manic episode" with "delusions and paranoia," that he did not seem "connected to reality or able to function currently in daily activities," and that he was "at

---

[9] The November 14 evaluation took place *before* Appellant's ex-girlfriend expressed her safety concerns which led to the order of protection.

risk of decompensating." J.A. 2621–22. And the CAPS clinicians recommended that Appellant be committed

> [d]ue to [his] refusal to comply with treatment recommendation or allow for his treating provider to be notified, risk that his symptoms are worsening and could further decompensate, evidence of potential delusions or paranoia, and concern that he is not connected to reality or able to function currently in daily activities based on symptoms.

*Id.* at 2622. Appellant was thus referred to the emergency department at UVA Medical Center for inpatient psychiatric hospitalization where he was diagnosed with "Bipolar I disorder, manic, with psychotic features, with cannabis use disorder." *Id.* at 665.

Given all of this, no reasonable factfinder would conclude that Dean Densmore asked Appellant to seek treatment on November 14, 2018, because of his views on microaggressions, as opposed to his manic episode and escalating string of worrying behavior.

ii.

November 19 Psychiatric Evaluation

The November 19 evaluation occurred after Appellant returned to meet with Dean Densmore again following his November 16 discharge from hospitalization. Appellant's behavior again caused Dean Densmore concern, so he contacted a colleague who, in turn, contacted police. The police intercepted Appellant as he was leaving the building. At that time, there was already an emergency custody order for Appellant based on his mother's petition filed the same day, November 19. As a result, police took Appellant into custody, and transported him to the emergency department at UVA Medical Center. And the

26

municipal court issued a temporary detention order for Appellant.  He was released on November 26, 2018.

Again, the record makes clear that Appellant was treated and eventually hospitalized not because of protected speech, but because his *behavior* gave Dean Densmore and the physicians who treated Appellant cause for concern.  Dean Densmore testified in his deposition that during the meeting Appellant paced back and forth in front of Dean Densmore's desk, spoke to him in an accusatory manner, demanded to see his medical license, and told him he needed to watch himself.  Once Appellant had been taken by police to the emergency department at UVA Medical Center, clinicians again agreed with Dean Densmore regarding Appellant's behavior.  The treating physician stated:

> I recall him and -- and recall my observations to be such that he was, indeed, anxious, had a labile mood and affect, was angry that he was in the emergency department. His speech was rapid and pressured. He did appear to be agitated and was acting aggressive and hyperactive. We were concerned about him potentially becoming combative due to his anger and aggression. We thought his thought content to be paranoid at times. We did not find his thought content to have any delusional components to that. We did think his -- his cognition and -- and memory were normal at the time insofar that he was not, at the time, having any sort of clear evidence of memory loss. He was acting impulsive with inappropriate judgment and did not necessarily endorse homicidal and suicidal ideation.

J.A. 796.  The notes from Appellant's admission to the emergency department reflect that involuntary commitment was recommended due to Appellant's "presentation of mania

symptoms, poor judgment, lack of insight into situation, irritability, and inability to care for self." S.J.A. 108.

Thus, while there is strong evidence, both from Dean Densmore and from the practitioners who treated Appellant on November 19, that Appellant's condition was such that he needed psychiatric treatment, there is no evidence that he was compelled to seek such treatment because of the views he expressed during the microaggressions panel.

Significantly, November 19 was the same day that Appellant's mother sought an order to have him involuntarily committed, in part because he "got inches from [her] face screaming and pounding fists toward [her] so that [she] felt . . . in imminent harm." J.A. 785–790. And it was also the same day Appellant's ex-girlfriend, also a medical student at UVA, sought Dean Peterson's help obtaining a protective order against Appellant.

Accordingly, no reasonable factfinder would conclude that Appellant was compelled to undergo psychiatric evaluation on because of his speech, as opposed to his behavior and mental condition.

c.

Clearance Requirement After Hospitalization

Next, Appellant contends that when Appellees required him to undergo a psychiatric evaluation before returning to campus after his second involuntary committal, they were retaliating against him for the views he expressed during the microaggressions panel. The district court rejected this proposition, noting that (1) "the required health evaluation was pursuant to a neutral policy," J.A. at 1327, which applied to anyone returning from a health-related absence for two days or more; and (2) the requirement was "minimally invasive"

28

and understandable within the context given Appellant's history, *id.* (citing *Couch v. Bd. of Trustees of Mem'l Hosp.*, 587 F.3d 1223, 1240 (10th Cir. 2009)).

Appellant notes that both Dr. R.J. Canterbury, a UVA faculty member not named in this case, and Dean Densmore emailed him to tell him he was required to meet with CAPS before returning to campus. While Dr. Canterbury and Dean Densmore purported to require as much pursuant to the UVA policy, there is no evidence whatsoever that they did so in order to retaliate against Appellant for his views on microaggressions. Indeed, the emails Appellant points to wherein Dr. Canterbury and Dean Densmore advise him of the UVA policy say nothing about Appellant's speech. Rather, the only evidence is from Dr. Canterbury's internal email to others, including Dean Densmore, in which Dr. Canterbury noted that *Appellant* claimed he was being retaliated against for First Amendment expression.

Thus, Appellant has provided no evidence that he was required to get medical clearance before returning to class because of his views expressed during the microaggressions panel, as opposed to his having been hospitalized with mania, psychosis, etc.[10]

---

[10] As with the Professionalism Concern Card and the ASAC Letter, the district court determined that requiring Appellant to be medically cleared before returning to campus was not an "adverse action" for First Amendment purposes. We do not address whether medical clearance was or was not an "adverse action" for First Amendment purposes, confining our analysis to whether Appellant's speech during the microaggressions panel *caused* this requirement. It did not.

d.

### The ASAC Suspension

Next, Appellant contends the district court erred in holding there was not a triable question whether he was suspended because of his protected speech during the microaggressions panel.  On appeal, Appellant theorizes that the ASAC voted to hold a meeting regarding Appellant's conduct -- and ultimately suspend him -- at the request of Drs. Canterbury and Peterson, who, Appellant contends, had it out for him because of his expressed views on microaggressions.  *See* Opening Br. at 39 (asserting the ASAC "apparently relied on what individuals like Canterbury [and] Peterson were telling them they should do").  We turn back to the record to determine whether any material evidence supports Appellant's position.  Again, it does not.

As to Dr. Canterbury, who is not a named defendant in this case, Appellant apparently believes Dr. Canterbury was motivated to retaliate against Appellant because he disagreed with what Appellant said during the microaggressions panel.  Appellant attempts to make this connection by pointing to communications Dr. Canterbury received from students who were complaining about Appellant's conduct during the panel.  Specifically, these students submitted reports via "Listening Post," an online portal for UVA students to submit reports about mistreatment or unprofessional conduct.  The students took issue with Appellant's tone and behavior, which they called "extremely disrespectful, unprofessional and condescending," J.A. 1067, and "very disrespectful to the panelists in his tone and manner of questioning," *id.* at 1085.  On their face, these posts do not address Appellant's views, but even if they did, they were merely forwarded to Dr.

Canterbury, prompting general observations on his part. *See id.* at 1066 ("Has he been the subject of an ASAC discussion?"); *id.* at 1084 ("I have heard about this in general from students and will follow up."). The district court held these student complaints could not have caused adverse actions against Appellant, because there is no evidence Appellees relied upon these complaints in their decision making, and the other students are not defendants.

Appellant submits on appeal that the student complaints caused adverse action against him because Dr. Canterbury "hauled him in" before the ASAC based on the complaints. *See* Opening Br. 43–44 ("Canterbury, Peterson, Reed, and others all acted upon and relied upon such student complaints. Reed even directed a student to submit a complaint to the 'Listening Post[.]'"). In fact, at oral argument, when Appellant's counsel was asked repeatedly to point to any record evidence that Appellant's views caused adverse action, counsel could point only to these student complaints, arguing that Dr. Canterbury "adopted" them. Oral Argument at 4:30, *Bhattacharya v. Murray*, No. 22-1999(L), 22-2065 (4th Cir. Oct. 24, 2023), https://www.ca4.uscourts.gov/oral-argument/listen-to-oral-arguments (hereinafter "Oral Argument").

However, there is simply no evidence that Dr. Canterbury orchestrated retaliation against Appellant because he agreed with students who took issue with Appellant's views at the faculty panel. Dr. Canterbury did not even attend the panel. And Appellant admits that "[Dr.] Canterbury never listened to what [Appellant] actually said on October 25, 2015," a fact that gravely undermines the argument that Dr. Canterbury struck out against Appellant because of his views. Opening Br. at 10. At best, Appellant has cited a single

email where, in response to a description primarily of Appellant's *behavior* at the microaggressions panel, Dr. Canterbury asked if Appellant "[h]as been the subject of an ASAC discussion[.]"  J.A. 1066–67.  In another email, responding to a student portal post objecting to Appellant's "very disrespectful . . . tone and manner of questioning," Dr. Canterbury said, "I have heard about this in general from students and will follow up."  *Id.* at 1084.

Most tenuous of all, Appellant attempts to link Dr. Canterbury to alleged adverse actions through a Twitter (now known as X) post in which Dr. Canterbury complained about the lack of professionalism demonstrated by United States Senator Mitch McConnell during Justice Brett Kavanaugh's confirmation hearings.  Curiously, this tweet was one of the only places in the record Appellant's counsel could point to during oral argument in attempt to support the assertion that Dr. Canterbury violated Appellant's First Amendment rights.  Oral Argument at 2:50, 4:10.  But, critically, the tweet does not even mention Appellant.[11]

Appellant also cites an email from Dr. Canterbury to Dr. Jim Tucker ostensibly to indicate retaliation against Appellant in violation of the First Amendment.  The email indicates nothing of the sort.  In entirety, it states:

> Can you call an emergency meeting of the ASAC to discuss a
> student, Kieran Bhattacharya, who has been hospitalized for

---

[11] The dissent notes that Dr. Canterbury emailed a colleague about Appellant's "unprofessional behavior" during 2016 post-election town halls.  *Post* at 47–48.  And Appellant submits that Dean Peterson brought up Appellant's views about the 2016 election during a meeting.  *Id.* at 47.  But there is no evidence that this behavior, or anything having to do with the 2016 election, contributed to UVA's decisions related to Appellant.

> psychotic mania twice in the past two weeks and was released
> yesterday. He is still manic and has been intimidating John
> Densmore-to the point that John had to have him taken from
> his office by police a week ago. John has all the details. I have
> used my emergency authority to tell him that he cannot return
> to the learning environment until he has been cleared by CAPS
> but that authority has time limits, of course. He is insisting on
> returning to class today-which is what I have forbidden. He's
> still quite manic and likely psychotic.

J.A. 828. All Dr. Canterbury said in this email was what Appellees have said all along --

they took action against Appellant because of his *conduct*, not his speech.

Appellant also argues that Dean Peterson initiated the ASAC meeting or compelled

its members to vote to suspend him. But yet again, Appellant has provided no evidence to

support his assertion. Dean Peterson's emails with Dr. Kern following the

microaggressions panel clearly reflect that they were not at all concerned with the *content*

of Appellant's colloquy with the panel, but, rather, with his delivery. *See* J.A. 757

(initiating chain with email referencing "the student who asked the first questions and was

extremely unprofessional"; "that kind of behavior should be brought up at ASAC"); *id.* at

756 ("[H]e was talking so fast, I wasn't even sure what he was saying exactly or asking.

But if he handles himself in that kind of manner on the wards, that is not acceptable

behavior.").

Appellant cites other evidence in the record ostensibly to demonstrate that Dean

Peterson retaliated against him for his views during the microaggressions panel. However,

the record supports the opposite conclusion. It was not about his *views*. It was about his

*delivery*. For example, during her deposition, Dean Peterson consistently testified her

intention to communicate to Appellant "that he needs to learn the skills how to bring up . . .

even opposing ideas, in many different settings, without being rude and disrespectful to the -- to the speaker whose ideas he is challenging." J.A. 1042.

All told, contrary to Appellant's arguments, the substance of the ASAC meeting to discuss Appellant's enrollment status, which led to his suspension, was not about his speech during the microaggressions panel. Despite Appellant's repeated efforts to raise that speech during the ASAC meeting, Dr. Tucker, the administrator who led the meeting, repeatedly noted the meeting was about Appellant's *behavior*. The minutes from the ASAC meeting reflect that the committee was "convened to discuss concerning *behavior* exhibited by" Appellant. S.J.A. 80 (emphasis supplied). Following the meeting, the committee resolved that Appellant failed the school's technical standards, "especially the Emotional, Attitudinal and Behavioral Skills." *Id.* And the declarations of the voting ASAC members confirm Appellant's views were not considered. J.A. 939, 944, 949, 955, 962, 968, 973.

Finally, the suspension letter that the ASAC sent Appellant the day after the ASAC meeting cited as grounds for his suspension "aggressive and inappropriate interactions in multiple situations, including in public settings, during a speaker's lecture, with [Dean Densmore], and during the committee meeting [on November 28]"; this conduct "constituted a violation of the School of Medicine's technical standards." J.A. 1319.

At bottom, the evidence points overwhelmingly to Appellant's *conduct*, not his expression as the basis for his suspension.

USCA4 Appeal: 22-1809      Doc: 73      Filed: 02/26/2024      Pg: 35 of 57

e.

Document 561   Filed 02/26/24   Page 35 of 57

No Trespass Order

As with the suspension, the district court determined that Appellant had failed to identify a triable issue as to whether Appellees procured a No Trespass Order from the university police department to retaliate against him for views he expressed during the panel discussion which occurred two months earlier.  Appellant contends that the link between that speech and the NTO is "[Dr.] Canterbury," who, Appellant contends, was biased against Appellant because of his views, and who also insisted "upon the NTO and the UVA Police . . . issuing it based on the alleged online threats made by [Appellant]." Opening Br. at 13.

The evidence is emphatically contrary to Appellant's theory.  The university police possessed sole authority to issue the No Trespass Order, and they issued it for several well founded reasons.  First, Appellant's girlfriend had taken out a protective order against him for fear of her own safety, citing texts in which he said, "i dont love you and sincerely hope that you kill yourself in the near future," J.A. 2692, and because he had surreptitiously moved a shovel into his bedroom.[12]  Second, Appellant had told Dean Densmore to "watch himself," which the dean perceived as a threat.  And third, Appellant had posted photos of

---

[12] The officer who issued the No Trespass Order testified she issued it primarily to protect Appellant's girlfriend, a student at the medical school.  As discussed further below, Appellant disputes the credibility of his ex-girlfriend, arguing that she conspired with UVA administrators to have Appellant expelled because she was bitter that he broke up with her. That matters little for purposes of the First Amendment claim; the point is that UVA Police issued the NTO against Appellant for reasons unrelated to protected speech.

the ASAC members to 4chan, claiming they were punishing him for his views of microaggressions -- "These are the f[***]ots ruining my life," *id.* 1181 -- and the post provoked several threatening responses, *see* S.J.A. 31 ("We really need someone like you to snap and take these white traitors out."); *id.* at 32 ("OP, march in there with a gun and shoot the biggest f[***]ts in the room. make sure to shoot dead every single bastard that is out to ruin your life and save others from going through the same.").

In attempt to support his position, Appellant points to the NTO itself, arguing Dr. Canterbury was instrumental in procuring it. But the NTO does not so much as mention Dr. Canterbury. However, a related incident report does mention Appellant's post to "an alt-right web site/ chat room." J.A. 1177. Appellant posits that this reference must mean Dr. Canterbury was operating behind the scenes because in a separate email, Dr. Canterbury mentioned to a faculty member that Appellant had wandered into an Alt-Right chatroom (which he had). That is no connection at all.

Appellant further notes Dr. Canterbury emailed UVA medical students about "disturbing online posts" "that Canterbury attributed to [Appellant]." Opening Br. at 13. None of this provides support for Appellant's theory that Dr. Canterbury was retaliating against Appellant for the views he expressed on microaggressions. First of all, Dr. Canterbury was correct. The online posts are disturbing. Second, the university police were well within their authority to issue the NTO based on Appellant's disturbing posts and the threats that ensued as a result.

The record indicates conclusively that police issued the NTO to protect UVA's students and faculty based upon multiple reports of Appellant's threatening conduct toward

his mother and girlfriend; after multiple psychiatric evaluations precipitating involuntary hospitalizations; and after Appellant posted on 4chan a photo of faculty members with the caption, "These are the f[***]ots ruining my life," which post prompted a thread of responses, some antisemitic, many racist, and some explicitly violent.

"The right to communicate is not limitless." *Lovern v. Edwards*, 190 F.3d 648, 656 (4th Cir. 1999). In *Lovern*, we held, "School officials have the authority to control students and school personnel on school property, and also have the authority and responsibility for assuring that parents and third parties conduct themselves appropriately while on school property." *Id.* at 655 (citing *Carey v. Brown*, 447 U.S. 455, 470–71(1980); *Goss v. Lopez*, 419 U.S. 565, 582–83 (1975)). This concept applies equally to public universities like UVA. Where, as here, administrators take steps to protect their faculty and students based upon a pattern of conduct unrelated to protected speech, we see no First Amendment violation. *See Davison*, 19 F.4th at 637 ("Davison has not sufficiently provided evidence to prove that the no-trespass ban was issued because of his protected speech, as opposed to his threats and antagonistic behavior.").

While the First Amendment surely empowers Appellant to offer his views in appropriate ways, it is not unfettered. The evidence here overwhelmingly points to the conclusion that UVA administrators, through reasoned judgment, determined that Appellant should be disqualified from maintaining his status as a UVA medical student due to his pattern of confrontational and threatening behavior. The district court rightly held that no reasonable jury could find otherwise.

We agree and affirm.[13]

## B.

### Denial of Leave to Amend: Conspiracy Claims

The district court denied Appellant leave to amend his complaint to add a claim of civil conspiracy because the proposed amendment would have been futile for two reasons. First, though Appellant sought to add his ex-girlfriend to the lawsuit, a medical student at UVA, he had no plausible claim that she shared with UVA administrators an "illegal objective," nor that she committed any tortious conduct that would sustain a claim against her. And second, the district court held Appellant could not bring a conspiracy claim against UVA administrators because, pursuant to Virginia's intracorporate conspiracy doctrine, school officials cannot conspire with each other.

Appellant contends on appeal that these holdings were erroneous. He contends that his ex-girlfriend and Appellees collaborated, and that he adequately alleged that individual administrators had an independent personal stake in retaliating against him such as would undermine the intracorporate conspiracy doctrine. We agree with the district court.

### 1.

First, the court correctly rejected Appellant's proposed amendment to add his ex-girlfriend as a defendant. Conspiracy claims under both federal and Virginia common law require Appellant to allege joint action in furtherance of some wrongful scheme. *The*

---

[13] Because Appellant has failed to create a genuine issue that any constitutional violation occurred, we do not reach the question of qualified immunity.

*Country Vintner, Inc. v. Louis Latour, Inc.*, 634 S.E.2d 745, 751 (Va. 2006) ("A common law conspiracy consists of two or more persons combined to accomplish, by some concerted action, some criminal or unlawful purpose or some lawful purpose by a criminal or unlawful means."); *Hinkle v. City of Clarksburg*, 81 F.3d 416, 421 (4th Cir. 1996) ("To establish a civil conspiracy under § 1983, Appellants must present evidence that the Appellees acted jointly in concert and that some overt act was done in furtherance of the conspiracy which resulted in Appellants' deprivation of a constitutional right.").  And Virginia courts have long required of conspiracy allegations "that there was a common understanding and a common design." *Ratcliffe v. Walker*, 85 S.E. 575, 579 (Va. 1915).

But, here, Appellant failed to allege "that [his girlfriend] did anything wrongful or tortious, as is required to state a claim for civil conspiracy." J.A. at 373–74 (citing *Dunlap v. Cottman Transmission Sys., LLC*, 754 S.E.2d 313, 317 (Va. 2015)); *see also Almy v. Grisham*, 639 S.E.2d 182 (Va. 2007) ("[A] common law claim of civil conspiracy generally requires proof that the underlying tort was committed."); *Blevins v. Mills*, 106 Va. Cir. 297 (2020) ("Where there is no actionable claim for the underlying alleged wrong, there can be no action for civil conspiracy based on that wrong.").

In any event, since we hold Appellees did not violate the First Amendment, even if Appellant's ex-girlfriend had committed some tort to that end, the conspiracy count would still fail inasmuch as there was no underlying deprivation of rights to sustain the conspiracy. *See Dunlap*, 754 S.E.2d at 317 ("[C]onspiracy allegations do not set forth an independent cause of action; instead, such allegations are sustainable only after an underlying tort claim has been established.").

2.

Appellant also sought to add a claim that several UVA faculty members had conspired to have him kicked out of UVA for exercising his First Amendment rights.  The district court rejected Appellant's proposed amendment.  Under the intracorporate conspiracy doctrine, "an agreement between or among agents of the same legal entity, when the agents act in their official capacities, is not an unlawful conspiracy."  *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1867 (2017); *Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 352 (4th Cir. 2013) ("The intracorporate conspiracy doctrine recognizes that a corporation cannot conspire with its agents because the agents' acts are the corporation's own.").  There is an exception to this rule when an "officer has an independent personal stake in achieving the corporation's illegal objective."  *Greenville Pub. Co. v. Daily Reflector, Inc.*, 496 F.2d 391, 399 (4th Cir. 1974); *see also ePlus Tech., Inc. v. Aboud*, 313 F.3d 166, 179 (4th Cir. 2002) (holding the exception "applies only where a co-conspirator possesses a personal stake independent of his relationship to the corporation"). [14]

Appellant attempts to skirt the intracorporate conspiracy doctrine by invoking the exception for an independent personal stake on the part of Dean Peterson.  Appellant argues that Dean Peterson acted outside the scope of her official duties in signing a letter to support Appellant's girlfriend's application for an emergency protective order against Appellant.  As the district court noted, however, Appellant "failed to allege in his proposed [complaint]

---

[14] Virginia has not yet recognized the independent personal stake exception.  Because we hold Appellant has not carried his burden to show an independent personal stake, we assume without deciding that Virginia might apply such an exception.

that [Dr.] Peterson's letter was outside of [her] duties, or make any allegation regarding the letter at all." J.A. 374. Regardless of Appellant's failure to make this allegation in his proposed complaint, the evidence shows Dean Peterson acted well within the scope of her duties in helping a UVA medical student obtain a protective order against Appellant. As the dean on call, Dean Peterson had a responsibility to handle crisis management. This court and the Supreme Court of Virginia have observed that administrators "have obligations . . . to protect their students." *Abbott v. Pastides*, 900 F.3d 160, 173 (4th Cir. 2018); *Burns v. Gagnon*, 727 S.E.2d 634, 643 (Va. 2012). Dean Peterson performed that obligation within the scope of her duties.

Additionally, we find neither error nor abuse of discretion in the district court's refusal to reopen this issue pursuant to 28 U.S.C. § 636(b)(1) to consider evidence uncovered during discovery. Appellant asserts that, when the district court was considering the magistrate judge's recommendation to deny leave to amend, the district court should have considered the letter Dean Peterson wrote on Appellant's ex-girlfriend's behalf to help obtain a restraining order. This letter, Appellant contends, was produced during discovery but before the district court ruled on the motion for leave to amend.

We reject this contention. If anything, the evidence only contradicted Appellant's theory of a conspiracy to violate his constitutional rights and of an independent personal stake on the part of Dean Peterson. The evidence indicated no causal link between Appellant's protected speech and Appellees' actions. Rather, it proved Appellees sanctioned Appellant due to his unprofessional *conduct*, not his speech. And the evidence indicated Dean Peterson carried out her duties as dean on call to protect a UVA student.

41

The district court was accordingly correct in rejecting Appellant's proposed amendment to add a conspiracy claim.

C.

Dismissal: Due Process Claim

Finally, we turn to the third and final issue in this appeal, the district court's dismissal of Appellant's due process claim. Appellant alleged that his due process rights were violated because he was subject to a disciplinary removal from UVA, and a disciplinary removal requires more process than he received. The district court disagreed, holding Appellant was subject to discipline for failing to meet the essential academic criterion of "professionalism." Given this, the court held Appellant received adequate process.

The Fourteenth Amendment's Due Process Clause provides, "[N]or shall any State deprive any person of life, liberty, or property, without due process of law . . . ." U.S. Const. amend. XIV § 1. To succeed on his due process claim, Appellant must prove (1) a cognizable "liberty" or "property" interest; (2) the deprivation of that interest by "some form of state action"; and (3) that the procedures employed were constitutionally inadequate. *Iota Xi Chapter of Sigma Chi Fraternity v. Patterson*, 566 F.3d 138, 145 (4th Cir. 2009) (quoting *Stone v. Univ. of Md. Med. Sys. Corp.*, 855 F.2d 167, 172 (4th Cir. 1988)). While it is arguable whether Appellant has a property interest in continued enrollment at UVA, the Supreme Court as well as this court have assumed without deciding that such a property interest exists. *See Regents of the Univ. of Mich. v. Ewing*, 474 U.S. 214, 223 (1985); *Tigrett v. Rector & Visitors of the Univ. of Va.*, 290 F.3d 620, 627 (4th

42

Cir. 2002). Therefore, we will assume without deciding that Appellant had such an interest. Even so, Appellant was afforded adequate process.

Appellant argues the district court erred in determining his suspension and eventual ban from UVA were academic, as opposed to disciplinary. And because Appellant received only four hours' notice of the ASAC hearing resulting in his suspension, and because that hearing lasted only 28 minutes, he argues that he did not receive adequate process. Appellant argues the same was true of the No Trespass Order banning him from campus because he had no notice of it and no explanation of it until after the appeal deadline.

The Due Process Clause does not require a "formal hearing" or "stringent procedural protections" for academic dismissals as opposed to disciplinary action. *Henson v. Honor Comm. of Univ. of Va.*, 719 F.2d 69, 74 (4th Cir. 1983). We agree with the district court that Appellant's dismissal was not disciplinary, but academic, because the professionalism concerns that the ASAC raised dealt with core competencies of UVA's curriculum for medical students. This court and the Supreme Court have held that expulsions of medical students for lack of the professional competence required to practice medicine are academic dismissals. *See Bd. of Curators of Univ. of Mo. v. Horowitz*, 435 U.S. 78, 90 (1978) (holding student's dismissal was academic in nature when school determined she lacked "necessary clinical ability to perform adequately as a medical doctor and was making insufficient progress toward that goal"); *Halpern v. Wake Forest Univ. Health Scis.*, 669 F.3d 454, 462 (4th Cir. 2012) (noting that "[i]n the context of due-process challenges, the Supreme Court has held that a court should defer to a school's professional

judgment regarding a student's academic or professional qualifications'") (citing *Horowitz*, 435 U.S. at 92; *Ewing*, 474 U.S. at 225). And the Supreme Court has emphasized, "When judges are asked to review the substance of a genuinely academic decision, . . . they may not override it unless it is such a substantial departure from accepted academic norms as to demonstrate the person or committee responsible did not actually exercise professional judgment." *Ewing*, 474 U.S. at 225.

The dissent questions whether UVA's decision to suspend Appellant was "really an academic decision," or "perhaps [a decision] couched . . . as a matter of professionalism" to avoid the complexities of addressing Appellant's "obvious signs of mental illness . . . head-on." *Post* at 56. But UVA acted well within its authority in treating Appellant's behavior as a matter of professionalism, even if that behavior flowed from mental health issues.

In *Halpern*, we approved a medical school's dismissal of a student whose behavioral issues prevented him from interacting professionally with patients and staff. 669 F.3d at 462–64. We emphasized that "we accord great respect to [the medical school's] professional judgments on these issues." *Id.* at 463. We equated the deference owed to the medical school as to a student's professionalism and qualifications with the deference owed "'to evaluate academic performance.'" *Id.* (quoting *Davis v. Univ. of N.C.*, 263 F.3d 95, 101–02 (4th Cir. 2001)). We observed that the medical school maintained "professionalism []as an essential requirement." *Id.*; *see also id.* ("[T]he Medical School identified professionalism as a fundamental goal of its educational program, and it required that students demonstrate professional behavior and attitudes prior to graduating."). Thus,

the student's dismissal was appropriate in view of his "treatment of staff both before and after his medical leave," "his behavior towards faculty," and "instances of unprofessional conduct reflected in his clinical evaluations." *Id.* at 463–64. "Although, in isolation, these may not have warranted [the student's] evaluators giving him failing grades in professionalism, the school reasonably considered them as part of an ongoing pattern of unprofessional behavior." *Id.* at 464. And all of this behavior flowed from a plaintiff who concededly had mental health disabilities. *Id.* at 462 ("His ADHD and anxiety disorder constitute disabilities giving rise to protection.").

Here, like the medical school in *Halpern*, UVA had academic criteria of professionalism specifically designed to ensure medical students could work effectively as doctors. *See* J.A. 640 ("Professional attitudes and behaviors are components of the 12 Competencies Required of the Contemporary Physician that enable the independent performance of the responsibilities of a physician and therefore are a requirement for the successful award of the degree of Doctor of Medicine."). It is thus clear that Appellant's suspension, and effective expulsion, for failure to meet the requirements of professionalism was an academic dismissal. *See Halpern*, 669 F.3d at 463–64 (taking this view in the disability accommodation context). And as in *Halpern*, we "accord great respect" to the UVA's professional judgments in that regard, even if Appellant's behavior stemmed from underlying mental health concerns. *Id.* at 463.

Given the academic nature of Appellant's discipline, and affording appropriate deference to the judgment of UVA administrators, the process Appellant received was sufficient. Appellant had a hearing in which he was allowed to air his grievances at length,

and during which Appellees repeatedly explained to Appellant they were considering taking action against him because of his behavior.  To the extent Appellant complains the grounds for discipline were not more thoroughly described during the hearing, or that the hearing was too short, the reasons for both those issues are clear from the recording Appellant himself took of the meeting: namely, that Appellant seized the floor at the outset of the hearing and held it as long as he pleased.

As to the NTO, Appellant was afforded appropriate process given the dangers to students and faculty perceived by university police.  We have observed that students posing "'a continuing danger to persons or property or an ongoing threat of disrupting the academic process may be immediately removed from school' without a pre-deprivation hearing." *See Davison*, 19 F.4th at 642 (quoting *Goss v. Lopez*, 419 U.S. 565, 582 (1975)).  As in *Davison*, Appellant had notice by phone and in writing of the NTO, and he had the opportunity to contest the NTO by appeal.  *Id.*  Given the risk of his disrupting academic life at UVA, Appellant was afforded adequate process through the issuance of the NTO.

Therefore, we hold the district court properly dismissed Appellant's due process claim.

## IV.

For all the above reasons, the district court's award of summary judgment to Appellees, denial of leave to amend, and dismissal of Appellant's due process claim are

*AFFIRMED.*

QUATTLEBAUM, Circuit Judge, concurring in part and dissenting in part:

Courts rightly defer to the academic judgments of schools. And for good reason. We are hardly equipped to micro-manage academic decisions outside our area of expertise. But that general principle should not immunize actions cloaked in academic garb that are really something else. Kieran Bhattacharya—a former University of Virginia Medical School student—claims UVA used concerns about professionalism as a pretext to retaliate against him for protected speech. And in my view, genuine disputes of material fact exist as to whether he is right. So, I respectfully dissent in part.[1]

## I.

UVA's chapter of the American Medical Women's Association sponsored a panel discussion about microaggressions. During the event, a panel expressed their views on microaggressions, generally describing unintentional or unconscious insults and statements reflecting prejudice or stereotypes against a marginalized group. After the speakers concluded their remarks, they invited questions and comments. Bhattacharya was the first to speak. He asked four to five questions back-to-back. He also commented on the panelists' answers. His questions and comments reflected disagreement with the speakers. He described one answer as "contradictory" to a slide used in the presentation. He labeled one answer "extremely non-specific." And he remarked that only a single "anecdotal case"

---

[1] I take no issue with the district court's order granting summary judgment as to UVA's decisions after the vote to suspend Bhattacharya and as to his due process claim. I likewise see no reversible error in denying Bhattacharya's motion to amend.

47

supported one presenter's position. Even so, Bhattacharya did not violate any written or stated guidelines about the question and comment session. Nor did he yell or make personal attacks.

After the panel discussion, Dr. Nora Kern, who was a presenter at the panel and a UVA medical school faculty member, emailed Dr. Christine Peterson, Assistant Dean of Medical Education. After discussing Bhattacharya's comments and behavior with Dr. Peterson, who also attended the panel discussion, Dr. Kern filled out a Professionalism Concern Card ("PCC") and submitted it to Bhattacharya's dean, Dr. John Densmore. Dr. Kern described Bhattacharya's questions as "quite antagonistic." J.A. 459. She added that he "pressed on and stated one faculty member was being contradictory" and that "[h]is level of frustration/anger seemed to escalate." J.A. 459. Dr. Kern concluded, "I am shocked that a med student would show so little respect toward faculty members." J.A. 459.

Dr. Densmore passed the PCC on to the Academic Standards and Achievement Committee. But neither he nor Dr. Kern told Bhattacharya anything about the PCC.

After hearing from Dr. Kern, Dr. Peterson also emailed Bhattacharya. In that email, she said that she "observed [his] discomfort with the speaker's perspective on the topic" of microaggressions. J.A. 165. In offering to meet with Bhattacharya, Dr. Peterson further stated, "I think I can provide some perspective that will reassure you about what you are and are not responsible for in interactions that could be uncomfortable even when that's not intended." J.A. 165. Then, at their meeting, Bhattacharya claims that Dr. Peterson brought up his prior comments about the 2016 election. And, after a colleague emailed concerns raised by students about Bhattacharya's criticism of the presenters at the

microaggressions panel, Dr. R.J. Canterbury, Senior Associate Dean for Education at the medical school, responded that Bhattacharya "exhibited unprofessional behavior twice in the [2016] post-election town halls." J.A. 1066. He added, "Now this." J.A. 1066.

Just after the microaggressions panel discussion, Dr. Densmore also emailed Bhattacharya "to check in and see how [he was] doing." J.A. 168. They met a few days later, but, like Dr. Peterson, Dr. Densmore did not tell Bhattacharya that a PCC had been issued as a result of his questions and comments at the microaggressions discussion or that he had sent the PCC to the Academic Standards and Achievement Committee.

Within a couple of weeks of Bhattacharya's meetings with Dr. Peterson and Dr. Densmore, the Academic Standards and Achievement Committee met to, among other things, consider Bhattacharya's PCC. No one told Bhattacharya about the meeting or gave him an opportunity to be heard. Even so, the Committee voted to issue a letter of reprimand. The letter stated, "The Academic Standards and Achievement Committee has received notice of a concern about your behavior at a recent . . . panel. It was thought to be unnecessarily antagonistic and disrespectful. Certainly, people may have different opinions on various issues, but they need to express them in appropriate ways." J.A. 465. The letter continued, "We would suggest that you consider getting counseling in order to work on your skills of being able to express yourself appropriately." J.A. 465.

After the letter of reprimand, Bhattacharya's mental health situation seemed to deteriorate. His conduct became more erratic and aggressive. In fact, as the majority notes, both UVA and Bhattacharya's mother sought and obtained orders from local magistrate judges requiring that Bhattacharya be taken into custody and hospitalized for emergency

treatment. What's more, his ex-girlfriend obtained a protective order based on comments he had made to her. And after he was released from the hospital, Bhattacharya was aggressive in his interactions with Dr. Densmore.

The Academic Standards and Achievement Committee held another meeting, this time to decide whether Bhattacharya should be suspended from school. While he received no notice of the Committee's earlier meeting, he got a little this time. The day of the meeting, the medical school's registrar emailed Bhattacharya advising him that the Committee would meet that same day "to discuss [his] current enrollment status." J.A. 481. The email informed Bhattacharya, "You are invited to attend to share your insights with the committee." J.A. 481.

Despite the late and vague notice, Bhattacharya attended the meeting. During it, his behavior was erratic. He was combative, even walking around the meeting room, questioning the school officials and recording the events on his phone.

The Committee voted to suspend Bhattacharya. The next day, it sent Bhattacharya a letter stating, "The Academic Standards and Achievement Committee has determined that your aggressive and inappropriate interactions in multiple situations, including in public settings, during a speaker's lecture, with your Dean, and during the committee meeting yesterday, constitute a violation of the School of Medicine's [professionalism standards]." J.A. 871. The letter advised Bhattacharya that the Committee "voted to suspend [him] from school, effective immediately." J.A. 871.

II.

Bhattacharya claims that, in retaliation for his comments at the microaggressions panel, UVA violated his First Amendment rights by issuing the letter of reprimand and then by suspending him. A plaintiff seeking to recover for First Amendment retaliation must allege that (1) he engaged in protected First Amendment activity, (2) the defendants took some action that adversely affected his First Amendment rights, and (3) there was a causal relationship between the protected activity and the defendants' conduct. *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 499 (4th Cir. 2005). I will first consider Bhattacharya's claim as to the letter of reprimand before turning to his suspension.

A.

The district court held that Bhattacharya's speech at the panel discussion was protected First Amendment activity. But it held that the Committee's vote and resulting letter of reprimand were not adverse actions—the second element of a First Amendment retaliation claim—because they simply reminded Bhattacharya of the school's professional standards without threatening or imposing any "concrete consequences." J.A. 1326. In support of this conclusion, the court relied on our decision in *Suarez Corporation Industries v. McGraw*, 202 F.3d 676 (4th Cir. 2000). And it is true that in that decision, we held that a response by government officials that did not threaten, impose punishment or sanctions, or intimidate did not adversely affect First Amendment rights for purposes of a First Amendment retaliation claim. *Id.* at 690. But neither *Suarez* nor subsequent decisions

of the Supreme Court or our Court require an express threat in order to satisfy the adverse action requirement. Indeed, after *Suarez*, we explained that "a plaintiff suffers adverse action if the defendant's allegedly retaliatory conduct would likely deter 'a person of ordinary firmness' from the exercise of First Amendment rights." *Constantine*, 411 F.3d at 500. In my view, there is, at a minimum, a genuine dispute of material fact as to whether a student of ordinary firmness would be chilled from exercising his free speech rights if immediately after doing so, he received a letter of reprimand from a faculty academic standards committee calling his behavior "unnecessarily antagonistic and disrespectful," admonishing him to express his views "in appropriate ways" and suggesting he get counseling. J.A. 465.

As to the third element—causation—the district court held that Bhattacharya had "not unearthed even a scintilla of evidence that would demonstrate that Defendants took any adverse action against him because of his protected speech." J.A. 1330. I disagree. There is no question that UVA reprimanded Bhattacharya because of what happened at the microaggressions panel. The only question is whether there is a causal connection between the content of his comments, the First Amendment activity, and UVA's response, the adverse action.[2] *Constantine*, 411 F.3d at 501.

UVA argues it reprimanded Bhattacharya based on the way he conducted himself. And no doubt, the letter of reprimand describes Bhattacharya's "behavior" as

---

[2] Generally, such a plaintiff must show that, "but for" his protected speech, he would not have suffered the adverse action. *See Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019).

"unnecessarily antagonistic and disrespectful." J.A. 465. But the way a school labels its discipline cannot be dispositive. Otherwise, professionalism criticisms become fail-safe tools to tamp down debate. No, a jury would reasonably look beyond labels to the actual conduct of the parties when assessing an adverse action.

The most relevant evidence comes from the audio recording of the microaggressions panel. Keep in mind that Bhattacharya's behavior that led to the involuntary custody orders and restraining order had not yet occurred. So, supposedly, the only behavior at issue to his letter of reprimand is his conduct at the microaggressions panel. There, after being invited to participate in open discussion, he expressed critical views on microaggressions and the panel's recommendations about them. He also questioned some of the panelists' methodology. True, Bhattacharya's questions and comments reflect passion and even some frustration. But is that—especially during a Q & A session about a controversial topic on a university campus—enough to issue a letter of reprimand calling his behavior "unnecessarily antagonistic and disrespectful," admonishing him to express his views "in appropriate ways" and suggesting he get counseling? To me, there is enough evidence in this record that a jury could conclude no. *See Porter v. Bd. of Trustees of N. Carolina State Univ.,* 72 F.4th 573, 595 (4th Cir. 2023) (Richardson, J., dissenting) ("dispute and disagreement are integral, not antithetical, to a university's mission"). A jury could reasonably conclude that that UVA disguised its contempt for the content of Bhattacharya's speech by critiquing his professionalism.

Bhattacharya may not be able to convince a jury that he is right. But that is not our standard. "Summary judgment cannot be granted merely because the court believes that

the movant will prevail if the action is tried on the merits." *Jacobs v. N.C. Admin. Off. of the Cts.*, 780 F.3d 562, 568 (4th Cir. 2015) (quoting 10A Charles Alan Wright et al., Federal Practice and Procedure § 2728 (3d ed. 1998)). The court may grant summary judgment only if it concludes that the evidence could not permit a reasonable jury to return a favorable verdict for the nonmoving party. "Therefore, courts must view the evidence in the light most favorable to the nonmoving party and refrain from weighing the evidence or making credibility determinations." *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018) (cleaned up). A court improperly weighs the evidence if it fails to credit evidence that contradicts its factual conclusions or fails to draw reasonable inferences in the light most favorable to the nonmoving party. *Id.* at 659–60. Construing the evidence in the light most favorable to Bhattacharya, as we must, there is a genuine dispute of material fact as to whether the letter of reprimand was an adverse action triggered by the content of Bhattacharya's speech. In my view, a reasonable jury could conclude that UVA used its guidelines on professionalism to quiet dissenting views. I would let the jury decide.

## B.

Bhattacharya also alleges UVA suspended him in retaliation for his comments about microaggressions at the panel discussion. The district court, noting the defendants' concession on this point, held that the suspension was an adverse action. But it reiterated that the record contained no evidence that Bhattacharya was suspended because of the content of his speech.

Considering causation, the letter of suspension identified Bhattacharya's conduct "during a speaker's lecture" as one of the examples of the "aggressive and inappropriate interactions" that led to his suspension. J.A. 871. So, once again, the causation question is whether UVA's response to Bhattacharya's questions and comments at the microaggressions panel incident relates to what he said—content—or how he said it—conduct. And, as already explained, there is a genuine dispute of material fact on that point if we construe the evidence in the light most favorable to Bhattacharya.

But in fairness, despite those concerns, I might go along with my colleagues in the majority on the suspension were it not for what seems so odd—and sad—about this case. Bhattacharya suffered from mental illness even before the microaggressions panel. And by the time of his suspension, the record indicates that—due to his mental illness— Bhattacharya seemed to pose a potential threat to himself or others. At a minimum, by the time of the suspension, he appeared to be in no position to continue as a medical school student. Had UVA suspended Bhattacharya or taken other action based on his conduct that led to the protective custody orders or protective orders, it would be hard to question such decisions. The majority relies heavily on those decisions, and at oral argument, counsel for UVA argued that this escalating and troubling conduct was the reason for the school's decisions. The problem in referring to this conduct, however, is that the school didn't rely on it in suspending Bhattacharya. In fact, the letter of suspension mentions only Bhattacharya's conduct at the panel discussion, in public settings, during meetings with Dr. Densmore and before the Committee. *See generally E.E.O.C. v. Sears Roebuck & Co.*, 243 F.3d 846, 852-53 (4th Cir. 2001) ("the fact that Sears has offered different justifications

at different times for its failure to hire Santana is, in and of itself, probative of pretext"); *Lashley v. Spartanburg Methodist Coll.*, 66 F.4th 168, 177 (4th Cir. 2023) ( "A straight and consistent line of explanation is more persuasive than one which wanders here, there, and yonder.")

Why radio silence on Bhattacharya's obvious signs of mental illness? Professionalism in medical schools and in the medical profession is, of course, important. But is that really the issue here? It seems like UVA's concerns were, or at least should have been, about Bhattacharya's mental health and his potential danger to himself or others. But rather than identifying the real issues, UVA relied on professionalism. I realize that addressing the real issues head-on might have been complicated. Doing so might have implicated state or federal disability and discrimination laws. But if the real problems were mental health—and all signals point that way—shouldn't the school have addressed Bhattacharya's situation accordingly? Instead, perhaps coincidentally or perhaps conveniently, it couched Bhattacharya's suspension as a matter of professionalism, which might require us to defer to UVA's academic decisions. *See Halpern v. Wake Forest Univ. Health Sciences*, 669 F. 3d 454, 462–63 (4th Cir. 2012).

Is this really an academic decision? "[W]e must take care 'not to allow academic decisions to disguise truly discriminatory requirements.'" *Id.* at 463 (quoting *Zulke v. Regents of the Univ. of Cal.*, 166 F.3d 1041, 1048 (9th Cir. 1999)). I worry that UVA and its officials are trying to cloak the resolution of a situation involving serious issues of mental health as a purely academic decision, perhaps to gain the advantage of the deferential standard by which we review academic decisions.

III.

Applying the well-settled summary judgment standard, there are genuine disputes of material fact as to Bhattacharya's First Amendment claims regarding UVA's letter of reprimand and suspension decision. As a result, I would vacate the district court's order granting summary judgment on those issues and remand the case for a jury trial.